1                IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3   ANTHONY DEFRANCO,                :
             Plaintiff              :
4                                   :
       v.                           :        C.A. No. 04-230 Erie
5                                   :
WILLIAM WOLFE, et al.,              :
6            Defendants             :

7

8

9

10          Hearing in the above-captioned matter held

11      on Friday, December 17, 2005, commencing at

12      at 10:50 a.m., before the Honorable Susan Paradise

13      Baxter, at the United States Courthouse, Courtroom B,

14      617 State Street, Erie, PA 16501.

15

16

17

18  For William Wolfe, et al.:

19      Christian D. Bareford, Esquire
        Office of the Attorney General
20
For the Defendant:
21
        Anthony DeFranco (Pro se)
22

23

24
            Reported by Janis L. Ferguson, RPR
25

1                          I N D E X

2

3    TESTIMONY OF CARLA J. WEBB

4         Direct examination by Mr. Bareford  . . . . . .  6
          Cross-examination by Mr. DeFranco . . . . . . . 15
5

6    TESTIMONY OF SUE ANN REBELE

7         Direct examination by Mr Bareford   . . . . . . 50
          Cross-examination by Mr. DeFranco   . . . . . . 61
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1            THE COURT:  My apologies for our tardy return.
 2    All right.  We just finished up with Dr. Lindemuth.  And do
 3    you have any other witnesses?
 4            MR. DeFRANCO:  Is there an Officer Campbell?
 5            THE COURT:  Officer Campbell here?
 6            MR. BAREFORD:  No, ma'am.  We were unaware that he
 7    was actually asking for Officer Campbell.  We did not
 8    require him --
 9            THE COURT:  So you didn't bring him.
10            MR. BAREFORD:  Correct.
11            THE COURT:  Did you ask that he be here?
12            MR. DeFRANCO:  I did.
13            THE COURT:  You did ask.
14            MR. DeFRANCO:  I asked for Dr. Lindemuth and
15    Officer Campbell, but --
16            MR. BAREFORD:  Ma'am, I can't speak to that.  I
17    don't know exactly what the context of that was.  I can tell
18    you that had I known he had a desire to do it, I would
19    have --
20            THE COURT:  You would have done that.  Okay.
21    Well, there's some mixup there.  And how about one of the
22    other folks here?
23            MR. DeFRANCO:  I have no other witnesses.
24            THE COURT:  Okay.  Could you give me what we call
25    a proffer.  What sort of testimony did you plan to elicit
```

1  from Officer Campbell?

2          MR. DeFRANCO:  Officer Campbell was present during

3  the October 22nd, 2004 hearing before --

4          THE COURT:  Me, okay.

5          MR. DeFRANCO:  -- before you.  He was the officer

6  in the strip-and-search room.  He witnessed Miss Rebele, who

7  is in the courtroom, leave the conference room prior to Mr.

8  Barr and I.  And I had a visitor actually waiting for me --

9  my mother -- after the hearing.  And in her affidavit, she

10  specifically stated that she was present when Mr. Barr

11  made -- did not make a threat.  It was merely whatever

12  their -- he said.

13          THE COURT:  I read that.

14          MR. DeFRANCO:  And I -- Officer Campbell did see

15  her leave prior, and --

16          THE COURT:  You were going to have him --

17          MR. DeFRANCO:  Right.  Verify that.

18          THE COURT:  So he -- did he witness the statement

19  of Mr. Barr to you?

20          MR. DeFRANCO:  No, ma'am.  He witnessed --

21  immediately after the hearing, I had a visitor waiting, so I

22  didn't report back to my housing unit, as Miss Rebele said

23  in her affidavit.  She claimed I said, thank you, Mr.

24  Barr --

25          THE COURT:  You know, I read that, and I'm not

4

1    clear as to why that's important.  Can you explain to me why

2    that's important.

3            MR. DeFRANCO:  Because it's an affidavit, and it's

4    notarized.  I did not go back to my housing unit.

5            THE COURT:  So your point is that she's not

6    credible --

7            MR. DeFRANCO:  Exactly.

8            THE COURT:  -- because she made that statement.

9    It's not that that has something to do with the factual --

10           MR. DeFRANCO:  That part of it.

11           THE COURT:  Okay.

12           MR. DeFRANCO:  And the other part is she left the

13   room before Mr. Barr and I, and she couldn't have heard the

14   conversation.

15           THE COURT:  Okay.  Oh, I see.  She says in here

16   that she --

17           MR. DeFRANCO:  She was there, and she heard this

18   and that and --

19           THE COURT:  Okay.  Are you going to do any

20   testimony yourself, sir?

21           MR. DeFRANCO:  It would be -- I could make it real

22   brief.  I know the Court -- I know the Court is in a hurry.

23   I could probably --

24           THE COURT:  Well, I was actually in a hurry

25   before.  I mean, we have time to get this done.  I want to

1  get it done.  I'm not going to rush you through.  I was in a

2  hurry to get the court reporter off, because she needed to

3  be elsewhere at 1:00.

4               Do you want to be called by the defense,

5  or --

6          MR. DeFRANCO:  If they wish to, I wouldn't oppose

7  it.  I have nothing to hide.

8          THE COURT:  Do you want to testify first?  On your

9  own?

10          MR. DeFRANCO:  No.

11          THE COURT:  No, okay.  All right.  So then we will

12  turn it over to Mr. Bareford.

13          MR. BAREFORD:  Yes, ma'am.  Thank you.

14               At this time the Defendants would like to

15  call Miss Carla Webb to the stand, please.

16

17          C A R L A   J E A N   W E B B, first having

18               been duly sworn, testified as follows:

19

20          THE COURT:  Please be seated.  State your full

21  name and spell your last name for the record.

22          THE WITNESS:  Carla Jean Webb, W-E-B-B.

23

24                       DIRECT EXAMINATION

25  BY MR. BAREFORD:

1      Q.    Miss Webb, where do you work?

2      A.    Albion State Correctional Institute.

3      Q.    And how long have you worked at Albion?

4      A.    Approximately five and a half years.

5      Q.    What do you do at Albion now?

6      A.    I'm a corrections counselor.

7      Q.    Are you the corrections counselor for

8  Mr. DeFranco?

9      A.    Yes.

10     Q.    How long have you been his corrections counselor?

11     A.    Since August of 2002.

12     Q.    Could you just describe for the Judge what kind of

13 contact you had with Mr. DeFranco as part of the routine

14 performance of your duties as counselor.

15     A.    Okay.  My office is in the middle of a pod, so I

16 have daily contact with Mr. DeFranco, along with another 127

17 inmates.  I see him pretty much day to day.  If it's not

18 just to say hello, sometimes he comes in the office.  But

19 it's regular contact on a daily basis.

20     Q.    What does Mr. DeFranco do during the day?

21     A.    He is employed in the law library, so he works

22 during the day.  He often is out in the day room associating

23 with other inmates.  I believe during the summertime he goes

24 to the yard.

25     Q.    Does Mr. DeFranco appear to get along well with

1   the other inmates in the pod?

2        A.    Yes.

3        Q.    And you know that how?

4        A.    Just by visual interaction.  By watching, by

5   hearing, by talking with him.

6        Q.    Does Mr. DeFranco perform any additional duties,

7   for lack of a better way to describe it, within the --

8   within the prison?

9        A.    I know that he helps other inmates with legal

10  paperwork and so on and so forth, helping them do their

11  court process, along with his duties as a law clerk in the

12  library.

13       Q.    Does he perform any duties as a peer leader for

14  any groups?

15       A.    Yes, he is.  He is a peer leader for my

16  citizenship group.

17       Q.    And how long has he been that peer leader?

18       A.    He has been my peer leader since he came on the

19  block in August.

20       Q.    So he was a peer leader before --

21       A.    Yes, he was trained --

22       Q.    -- he came to the pod?

23       A.    -- he was trained as a peer leader on another

24  unit.

25       Q.    What is that peer leader of a citizen group?  What

1    does that do?

2         A.    The program was designed to help other inmates

3    learn how to adjust back into society.  It teaches them

4    moral reasoning, right versus wrong, victim empathy, and so

5    on and so forth.  It's just a -- it's supposed to be a

6    nine-session program to reintegrate yourself into society,

7    and learning the ways to abide by society rules.

8         Q.    Have you had the opportunity to observe him as the

9    peer leader of this group?

10        A.    Yes, I have.

11        Q.    And how does he conduct himself as a peer leader?

12        A.    Very appropriately.

13        Q.    Do you feel it's necessary to observe him every

14   time that he conducts the group as a peer leader?

15        A.    No.  Not at all.  I go in for one out of the nine

16   sessions, and that's the victim empathy session.  And

17   otherwise he is running the group by himself.

18        Q.    Do you have any problem with him doing that?

19        A.    No.

20        Q.    Are you aware of an issue in his life -- and I'll

21   put a frame of reference.  It would have been probably the

22   first half of 2003 -- that had to do with the custody of his

23   daughter?

24        A.    Yes, I am.

25        Q.    If you could just describe for the Judge exactly

1    what you recall from that period of time.

2            THE COURT:  What date was that?  I'm sorry.

3        Q.  And if I mis -- I don't want to mischaracterize

4    the time frame.  I defined the question as the first half of

5    2003.  If I'm off a little bit, you know, by all means, feel

6    free to adjust the dates on that.

7        A.  I believe you're roughly around the same time.  I

8    know that he was dealing with an issue where his daughter

9    did not want to come and see him at Albion, or her mother

10   would not allow her to come to Albion and allow her to visit

11   with his family.  And he was having a real difficult time

12   understanding why this was going on.

13           And he had known that I had previously worked at

14   Children's Services, so he was asking a lot of questions

15   about the legalities and, you know, can Children's Services

16   get involved and so forth.  And we would spend a lot of time

17   talking -- talking about that.

18       Q.  Describe what kind of policy you had with

19   respect -- or that you have with respect to the inmates and

20   their ability to have access to you.

21       A.  On my unit, I -- I personally have an open-door

22   policy.  There is no set guideline as to what counselors

23   need to do at Albion.  So my policy is, if my door is open,

24   they are free to come in at any point in time.  If I'm busy,

25   I can tell them that I'm busy.  And they know, of course, if

1    my door is closed, they need to knock or -- I also have a

2    sign-up sheet at the officer's desk that they can sign up.

3    So if I'm in group or I'm not there, then I know that

4    somebody needs to see me.  And then there is also the

5    request list that they can use to send to me that tells me

6    that they want me -- they want to see me.

7        Q.   During this period of time that we were just

8    discussing about the issue with the custody of his daughter,

9    did Mr. DeFranco come in and have frequent contact with you,

10   occasional contact with you, or rare contact with you?

11       A.   I would say frequent.  We would talk at least on a

12   weekly basis, if not more, regarding that situation.  And

13   other things too, not just regarding his daughter.  We would

14   just talk about some day-to-day things.  But --

15       Q.   What -- I'm sorry.

16       A.   Oh, no, go ahead.

17       Q.   Would you characterize this as a -- to the extent

18   that you can, just given your observation of him and what

19   you can recall, was that a stressful period of time for

20   Mr. DeFranco?

21       A.   I believe it was, yes.

22       Q.   Do you have access to his inmate file, as his

23   counselor?

24       A.   Yes, I do.

25       Q.   Are you familiar with the materials that are

1    contained within his inmate file?

2        A.    Yes, I am.

3        Q.    Are reports of his misconducts maintained within

4    his inmate file?

5        A.    Yes, they are.

6        Q.    Are you familiar with what a report of misconduct

7    looks like, and especially when it's completed?

8        A.    Yes.

9        Q.    Did you review the reports of misconduct that were

10   maintained in his file?

11       A.    Yes.

12       Q.    Was there a portion of his misconduct report --

13   let me back up.  Are you familiar with a misconduct report

14   as it related to an incident in which he was charged with

15   threatening a staff member?

16       A.    Yes.

17       Q.    Did you review that misconduct report?

18       A.    Yes, I have.

19       Q.    Is there a portion on that misconduct report that

20   the inmate himself, Mr. DeFranco, completed himself?

21       A.    Yes, there is.

22       Q.    Would that portion have to do with identification

23   of witnesses that he would like to have called during his

24   misconduct hearing?

25       A.    Yes, it would.

1    Q.    And did you review that portion that he completed?

2    A.    Yes, I did.

3    Q.    Do you recall if he gave any kind of explanation

4    as to why he identified -- there's three officers; Sergeant

5    Shape, Officer Irwin, or Officer Frey, as potential

6    witnesses to this misconduct during the hearing?

7    A.    I believe that he called them to testify on his

8    behalf to show that what he had done with the officer who

9    wrote the misconduct was joking around, and that he had

10   joked around with him like that on numerous occasions

11   before.  So that's what he had called them for.

12   Q.    Did Mr. DeFranco ever come and ask you about Z

13   code status?

14   A.    Yes, he did.

15   Q.    Can you describe for the Judge the kind of

16   communications that he would make with you with respect to a

17   Z code status.

18   A.    When he had first come on the unit, we had

19   discussed why he was moved down to D unit from J unit.  And

20   he had mentioned that he had a Z code and that he lost his Z

21   code.  And what were the chances of him obtaining that Z

22   code again.  We had talked about it at length.  I told him

23   it would come up at an annual review or six months after the

24   staffing.  He kind of let it go at that.

25          As the time came around for his annual review, he

1    told me that -- it was a constant, you need to talk to

2    Dr. Lindemuth; Dr. Lindemuth says I need a Z code; I need my

3    Z code; you know I need my Z code; my cellmates are telling

4    me this kind of thing, on a regular basis.

5        Q.   Was that persistent?  How would you -- let me

6    rephrase the question.  How would you characterize his

7    communications with you when he would come in and discuss Z

8    code?

9        A.   (No response.)

10       Q.   And more precisely -- actually, let me rephrase

11   the question altogether.  Disregard it.  When he would come

12   and ask you about Z code status, how often would he come in

13   and ask you about that?

14       A.    It started off maybe once a month or so, and it

15   became more frequent.  I can't give an exact number.  But

16   every -- every time that him and I would come into contact

17   inside my office, he would ask about his Z code status and

18   if I'm going to be staffed and will you recommend me if I --

19   if I get up for staffing, do I have your vote kind of thing.

20          MR. BAREFORD:  Your Honor, if I could just have

21   one minute.

22          THE COURT:  Certainly.

23          (Pause.)

24   BY MR. BAREFORD:

25       Q.   Have you had opportunity to see Mr. DeFranco

```
 1  demonstrate any violence towards fellow inmates?

 2      A.   I personally have not, no.

 3           MR. BAREFORD:  Ma'am, that's all I have.  Thank

 4  you.

 5

 6                    CROSS-EXAMINATION

 7  BY MR. DeFRANCO:

 8

 9      Q.   Good morning -- good afternoon.

10           THE COURT:  Hold on one second.

11      Q.   Good afternoon, Miss Webb.  I have a couple

12  questions for you regarding your testimony.

13           You have never seen me become violent or me become

14  violent with you, correct?

15      A.   Correct.

16      Q.   Have former cellmates came to you requesting to be

17  moved or told you things about me I exhibited that would,

18  like, cause you to worry?

19      A.   I'm not sure what you mean by "worry".

20      Q.   Have my cellmates, any of them, came to you

21  regarding my behavior that bothered them in the cell?

22      A.   Yes.

23      Q.   Okay.  And how many times, Miss Webb, do you think

24  that happened?

25      A.   Several.
```

1      Q.    Several?  At least several?

2      A.    Um-hum.

3      Q.    Okay.  And --

4      A.    Not all of them.  Just -- just two.

5      Q.    Just two?

6      A.    Um-hum.

7      Q.    And what did you do as a result of those

8   complaints?

9      A.    Eventually, they were -- they were moved.

10      Q.    They were moved?

11      A.    Um-hum.

12      Q.    Okay.  Let me draw your attention to an Inmate

13   Miley.

14           THE COURT:  Can we ask her what they complained

15   of?  Do you mind?

16           MR. DeFRANCO:  Oh, absolutely, Your Honor.

17           THE COURT:  I don't want to mess with your

18   cross-examination, but I would like to know what their

19   complaints were about.

20           THE WITNESS:  Two of his cellmates were

21   complaining that he at times was overbearing, acting

22   paranoid, would do things inside the cell that would cause

23   them concern, and would -- he would want them to do things

24   for him.  Just very demanding.  This is my cell, this is how

25   things are going to work.  And just always constant fear

16

1    of -- he would talk a lot about fear of retaliation, fear of

2    things that are going on, fear of everything else, and the

3    institution is doing this and the institution is doing that.

4            And I think that these two cellmates in

5    particular, who were very young, it was a difficult time for

6    them, and after a while -- one lasted much longer than the

7    other.  But after a while, it just became too much for them.

8            THE COURT:  All right, thank you.  Go ahead, sir.

9    BY MR. DeFRANCO:

10    Q.   And I went through -- according to -- and I'm

11    going to take Mr. Barr's word for it.  I don't know why, but

12    I will.  That I went through 10 cellmates during that time.

13    Would you think that's a long time -- a lot of cellmates to

14    go through?

15    A.   I don't -- I can't honestly say if I know that

16    that's how many you went through, but --

17    Q.   If it was, if that was accurate.  Is that a lot of

18    cellmates to go through?

19    A.   In comparison to?  I mean --

20    Q.   The normal -- a normal inmate.

21            THE COURT:  There is one for you.

22    A.   I was going to say, that is a difficult question

23    to answer, depending on units or housing situations or

24    behaviors.  You know, it's not just you.  It's the other

25    person also.  You know --

1        Q.    I understand.

2        A.    -- there are people that can maintain in two cells

3    together, and there are people that cannot.

4        Q.    Can you tell this Court specifically an incident

5    regarding an Inmate Miley, M-I-L-E-Y, and exactly what he

6    was doing not to go in the cell with me.

7        A.    He was trying to work out on the block for longer

8    periods of time, offering to do --

9        Q.    I'm talking about the day that -- an incident when

10   he was actually moved.  What was he doing?

11       A.    Telling the officers that you were threatening

12   him.

13       Q.    He was telling --

14       A.    And that if he would not deliver commissary to

15   another inmate for you, that you were going to do something

16   to him.  So he felt fearful that if he didn't do what you

17   were asking him to do, because he had been doing it for so

18   long, that he was going to get hurt.

19       Q.    That's what he said?  I wasn't aware of that.

20   But -- that's news.  But -- was he crying?

21       A.    No.  Not to me, he was not crying.

22       Q.    You didn't hear about him crying tears?

23       A.    No, I did not.

24       Q.    Okay.

25       A.    I had talked to Miley at length about that whole

1    situation.  But history shows with Inmate Miley, too, he has

2    done this with four or five other cellmates since then.  So

3    it could be a behavior pattern.  I'm not sure if it was just

4    you or -- so he has had more cellmates than you.  So I'm not

5    sure if that's a pattern of something he does when he gets

6    tired of being with people, that he comes up with stories.

7         Q.    That's fair enough.  And let me ask you this:

8    There was testimony given by Dr. Lindemuth today regarding Z

9    code.  Can you tell me about that process.  And the Court.

10             THE COURT:  What specifically?

11             MR. DeFRANCO:  Specifically how it works.

12        A.    An inmate can go to a counselor or a psychiatrist

13   or a medical doctor or a nurse.  Someone up in healthcare

14   can initiate what is called a Z code staffing, where they

15   feel that an inmate should be housed in a single cell.  What

16   happens at that point is the counselor arranges for the

17   packet to come out, they sit down with an inmate and the

18   unit manager, and they do what is called a formal staffing.

19             At that staffing, the counselor makes a vote, the

20   unit manager makes a vote.  The packet is then forwarded to

21   the psychologist, the classification program manager, the

22   major, both deputies, and the superintendent of the facility

23   has the final vote on all packets.

24        Q.    Can you tell me how you voted this time in my

25   staffing.

1    A.    Are you referring to the one in March?

2    Q.    Yes.  That is my only staffing --

3    A.    Well, you have to -- I voted that you should have

4  a single cell.

5    Q.    Can you tell me who else voted that I should have

6  a single cell.  You don't have to look at them.  You have to

7  look over here.

8    A.    Myself, Mr. Reilly.

9    Q.    Who is Mr. Reilly?

10    A.    He is the chief psychologist at SCI-Albion.

11    Q.    He voted favorably for me?

12    A.    Yes, he did.

13    Q.    Anybody else, do you know of, that voted favorably

14  for me?

15    A.    No.

16    Q.    You did?

17    A.    Yes.

18    Q.    And Mr. Reilly did?

19    A.    Correct.

20    Q.    And Mr. Reilly don't see me very often.

21    A.    I don't know Mr. Reilly schedule, so I don't know

22  if he sees you often or not.

23    Q.    Well, you apparently know mine.

24    A.    I live with you every day.

25    Q.    Right.  So he doesn't see me regularly, correct?

1        A.    I can't answer that.  I don't know if you go to

2  Mr. Riley's office once a week, once a day, once an hour.  I

3  don't -- I don't have his schedule --

4        Q.    Let me ask you a question, then.  When -- when did

5  you know you were going to be called as a witness in this

6  case?

7        A.    Last Friday.

8        Q.    Last Friday?  And in that time, you have known

9  since Friday, a week ago today, that you were going to be a

10  witness.

11        A.    Correct.

12        Q.    Do you read any of my legal mail?

13        A.    Did I read any of your legal mail?

14        Q.    Legal stuff.  Talk to me about the legal thing --

15  legal case?  This case.

16             THE COURT:  Which?  Did she read your legal mail

17  or talk to you about it?

18             MR. DeFRANCO:  Yeah, read -- both.  I want to know

19  if this witness knew that there was going to be a hearing on

20  this past Friday.  I just learned that she was -- Wednesday,

21  I believe, morning, she told me that she was going to be an

22  actual witness in this case.

23             THE COURT:  Did you read his legal mail since

24  Friday?

25             MR. DeFRANCO:  Yes.  I mean, before I knew she was

1    a witness.

2        A.    You showed me on -- I believe, it was Monday --

3    maybe Monday or Tuesday.  I'm not sure.  But you showed me

4    on Monday that -- I believe it was maybe the original Court

5    Order -- or original -- I don't even know what actually it

6    would be called.  But you showed me the paperwork that you

7    filed with the courts about your Z code.  You had about four

8    or five papers, and you were telling me about certain

9    testimony from -- from people here.

10        Q.    And you didn't tell me that you were going to be a

11    witness?  You didn't let me know that?

12        A.    I heard there was a court hearing on Friday and

13    that I was going to be here.  Whether I was going to be

14    called, I hadn't talked to anybody.  I was informed by my

15    unit manager that there was going to be a hearing here this

16    Friday.

17            MR. DeFRANCO:  Go ahead, Your Honor.

18            THE COURT:  No, that's all right.  Go ahead.

19        Q.    Are you -- last Friday -- and I have been very

20    leary of the unit, as you know.  And since all this

21    happened, in my cell, I overheard in my cell -- how close is

22    my cell to the officers' desk, would you say, approximately?

23        A.    I --

24        Q.    I'm the closest cell to --

25        A.    Maybe from here to where you're sitting.  Maybe a

1    little bit farther.

2        Q.    While I was in my rack, I heard laughter -- I'm

3    not -- I'm not -- I don't believe you were there.  I'm not

4    saying that.  I just wonder if you have any information.

5    There was -- it was between 2:00 and 2:30.  Guards were

6    laughing and saying someone is going to lose -- and I can't

7    swear it was my name.  But they were laughing -- this was on

8    Friday.

9            THE COURT:  You have to ask a question.

10           MR. DeFRANCO:  Okay.

11       Q.    Are you aware of anybody thinking that it was

12   funny that I would be losing the Z code?

13       A.    I'm not aware of any officers discussing your Z

14   code.

15       Q.    Okay.  I'm going to show you some -- do you know

16   John Rogers?  Do you remember that inmate?

17       A.    Um-hum.

18       Q.    Do you remember what happened to him?

19       A.    I believe he was moved off the unit and maybe

20   paroled.  I'm not sure if he was paroled right from our unit

21   or if he moved to a different unit and then paroled.  I'm

22   not sure -- I can't --

23       Q.    Do you know if he was my cellmate?

24       A.    Yes, he was.

25       Q.    He was?  What did he do when he was my cellmate?

1          A.    What do you mean, what did he do?

2          Q.    Did he do anything?

3          A.    He was at block-out, he went to groups, he went to

4    classes.  I mean, is that what you're asking me?

5          Q.    John Rogers -- I'm going to read this to you --

6          A.    Okay.

7                THE COURT:  What are you reading from?

8                MR. DeFRANCO:  This is an official report by John

9    Rogers -- by captains; Captain Jones and Captain Abu

10   (phonetic), who is now a Major.  And although there is a

11   typo.  It is supposed to be 2003.  It says 2003.  They

12   corrected it.

13               THE COURT:  All right.

14         Q.    He was my cellmate.  DA-57 was my cell, Miss Webb,

15   before I was moved there --

16         A.    It was 37 or --

17         Q.    57.

18         A.    Okay, 57.

19         Q.    Okay.  And it says -- this is to him.  This is

20   John Rogers.

21         A.    This is John Rogers speaking?

22         Q.    This is John Rogers' other report.  It is not a

23   misconduct.  It's an other report.

24               THE COURT:  Who wrote the report?

25               MR. DeFRANCO:  It was typed, and it was signed by

 1  Captain Abu and Captain Jones.

 2             THE COURT:  Okay.

 3  BY MR. DeFRANCO:

 4     Q.  It says, "You spoke to myself and Captain Jones

 5  and requested and was granted administrative custody.  You

 6  stated you were having anxiety attacks and were afraid for

 7  your safety from inmates in general population.  You did not

 8  provide the names of any inmates who had caused you to feel

 9  threatened."  And then it goes on, "I have requested

10  replacing AC status for protective custody," signed John

11  Rogers.  Were you aware of that?

12     A.  Now that you're reading it, yes.

13             MR. DeFRANCO:  Then I got an affidavit, Your

14  Honor.  It was submitted with my objections.  These are all

15  part of the record.  John Rogers made that affidavit before

16  he maxed out.  He didn't come back to the block.  But he

17  finally came out of protective custody.

18             THE COURT:  You have his affidavit?

19             MR. DeFRANCO:  Yes.  It's right here.  You have it

20  too.  It's in the objections, attached to my objections.

21             THE COURT:  All right.

22  BY MR. DeFRANCO:

23     Q.  Reads, "I, John Rogers, was forced to cell up with

24  Inmate Anthony DeFranco in 2003."  And let me stop there.

25  Have I ever signed a cell agreement with anybody?  To your

1   knowledge.

2       A.    To my knowledge, no.  But cell agreements don't go

3   through me.

4       Q.    "We were only cellmates for a short period of

5   time, because I took protective custody and was moved away.

6   DeFranco was a high-strung, who was set in his ways.  He was

7   also unstable, in my opinion.  For example, on a few

8   occasions, I would walk near him.  He would jump up and grab

9   at me until he realized it was me.  He also made," as you

10  said, "numerous cell rules.  For example, I had to keep the

11  cell clean."  Then it has some stuff scratched out.  I don't

12  know what it said.  It's scratched out.

13          "I felt that I could not snitch on him because

14  maybe him and others look at me as a snitch.  DeFranco would

15  set traps up to see if any guards or anybody would come into

16  his cell while he was out.  He would put baby powder on the

17  floor.  He constantly believed that people were out to get

18  him and wanted to protect himself as much as he could."

19          He said, "I also remember waking in the middle of

20  the night to find DeFranco standing near my bunk, just

21  staring at me.  When I asked him in the morning what he was

22  doing, he did not recall doing this.  I did report this to

23  unit counselor, and she thought he may have been

24  sleepwalking."

25          And, "I am making this statement now because I am

1    leaving prison and won't see DeFranco again.  This is made

2    pursuant to -- subject to penalty of perjury.  John Rogers."

3    Signed September 9th, '04.

4            Was he one of the inmates that complained?

5        A.    He had mentioned that he had some concerns with

6    you sprinkling baby powder on the floor and with the rules

7    and the demands that you placed upon him inside the cell,

8    yes.

9        Q.    Cosimo LaBerto (phonetic), did he ever complain

10   about me?

11       A.    C-O-S-I-M-O.  Did he ever complain about --

12       Q.    Yes.

13       A.    To me, no.

14       Q.    I have an affidavit by Mr. LaBerto.  This one is

15   also signed in September.  Basically saying the same thing.

16   He wanted --

17           MR. BAREFORD:  Your Honor, he has already asked

18   whether or not she has seen this or whether or not -- more

19   precisely, he asked whether ot not --

20           THE COURT:  This one -- sustained.  She hasn't

21   seen this one, so you can't get it in on her.

22   BY MR. DeFRANCO:

23       Q.    How about Daniel Francis?  Has he ever complained

24   to you about me?

25       A.    Complained?

1    Q.    Complained.

2    A.    (No response.)

3    Q.    Did he ever say anything?

4    A.    He said that he didn't like living with you,

5  because you were too -- you're nervy, you're paranoid,

6  you're high-strung, and you put too many rules on people

7  inside your house.  You think it's yours.

8    Q.    Do you think there's a problem with that?

9    A.    When you're sharing something with somebody else,

10  yes, those cells belong to the Department of Corrections, to

11  the State.  They don't belong to you.

12    Q.    Do you see there's a problem with an individual

13  who acts like that?

14    A.    No.  I believe that probably 80 percent of the

15  population at Albion feels exactly the same way that you do.

16  That they have a right to their time, their cell, their

17  this, their that.

18        So, I mean, if you're asking a general question on

19  the whole, most of the guys on my unit say things like that;

20  well, this is my cell, my hut.

21    Q.    If I had a request slip here signed by you that

22  you said you believed I needed a Z code, would that be

23  untrue?

24    A.    I'd like to see it.

25    Q.    I'm asking the question first.  Would you answer

1      the question.

2          A.    Do I believe it would be true?  If a psychiatrist

3      and a psychologist makes a recommendation that an inmate

4      needs a Z code for mental health reasons, because I am not a

5      mental health expert, I tend to go with them.

6          Q.    You tend to go with them?

7          A.    Um-hum.

8          Q.    The vote goes -- you make your own independent

9      vote, correct?

10         A.    Correct.

11         Q.    Did you make your own independent vote based on me

12     in March of 2004?

13         A.    I made an independent vote, but I based it off the

14     recommendation of the psychiatrist and the chief

15     psychologist.

16         Q.    And that's the way you are supposed to make your

17     vote?

18         A.    What --

19              THE COURT:  Hold on.  Hold on.  You're asking her

20     how she is supposed to make her vote.  All right.  Go ahead.

21     You can answer.

22         A.    I got lost there for a minute.  Do you want to

23     repeat that, please.

24         Q.    On these votings, are they supposed to be

25     independent votes?

1     A.    That would be an independent vote, yes.    But

2    because I'm not an expert on your mental health or deal with

3    your mental health on a daily basis, I would speak to the

4    professionals and the experts, which would be Dr. Lindemuth

5    and Mr. Reilly, who was the chief psychologist.

6         Q.    And they believed I needed a Z code?

7         A.    Yes.

8              MR. BAREFORD:    Well, that sort of -- you know,

9    lack of first-hand knowledge.    What she can testify to is

10   they both recommended that he have Z code.    That doesn't

11   necessarily mean the exact same thing.

12             THE COURT:    Overruled.    I'll allow that.    That's

13   all right.

14        Q.    The answer was?

15        A.    They did.

16        Q.    They did.    Let me ask you a question.    I'm sorry,

17   I'm calling you by your maiden name.    I gave you a subpoena

18   yesterday.

19        A.    Correct.

20        Q.    Correct.    And it was -- I read -- counsel's -- he

21   objected to it, because for some reason it was supposed to

22   be in the records department.    Is my inmate file kept in the

23   records department, or is it kept in your office?

24             MR. BAREFORD:    Ma'am, actually, this isn't -- I

25   don't know if this necessarily -- first of all, I don't know

1    how aware the Court is of what he is making reference to.

2             THE COURT:  I have no idea.

3             MR. BAREFORD:  This was -- Mr. DeFranco, as he

4    just explained, handed a subpoena to --

5             THE COURT:  For his records?

6             MR. BAREFORD:  Yes, ma'am.  Yesterday.

7             THE COURT:  Yesterday.

8             MR. BAREFORD:  And I received a copy of that

9    yesterday, and I responded with a written objection to his

10   attempt to gain access to his inmate file by handing a

11   subpoena as a party directly to a witness who is not the

12   records custodian for the institution.

13                That's what -- that's what this is, and

14   that's from -- from what I could tell, that's about what

15   he's going to ask her --

16            MR. DeFRANCO:  Your Honor, that's not what I'm

17   saying.  And I wish he would not try to read my mind.

18            THE COURT:  Well, he's telling me what he did too.

19            MR. DeFRANCO:  Okay.  But I wanted her to bring

20   the file with her.  I didn't want access to it.

21            THE COURT:  You wanted her to bring the file with

22   her.  See, his point is he objected to it because she's not

23   the records keeper of that record.

24            MR. DeFRANCO:  But it's in her office.  She keeps

25   it.  It's sitting right in her office.  She has physical

1  control over it.

2          THE COURT:  Who are the Defendants in this case?

3          MR. BAREFORD:  The Defendants?  She is not a named

4  Defendant in this case.  It's William Wolfe, Steve Reilly,

5  Dennis Brunner, Jackson, and a couple of John Does.

6          THE COURT:  I'm trying to decide if that should

7  have been a discovery request.  Is a third party subpoena

8  requested, or is it --

9          MR. BAREFORD:  It wasn't even a third -- it was a

10 request for production of documents on a third party.

11         THE COURT:  On a third party.

12         MR. BAREFORD:  Yes, ma'am.  Served by

13 Mr. DeFranco --

14         THE COURT:  So it was on her as the third party,

15 when --

16         MR. BAREFORD:  Yes, ma'am.

17         THE COURT:  -- officers of the DOC are Defendants.

18         MR. BAREFORD:  Yes, ma'am.

19         THE COURT:  Does he have access to his file?

20         THE WITNESS:  I believe that --

21         THE COURT:  I ask this of Mr. Barr at every

22 hearing.  I can't remember.  Does he have access to his

23 file?

24         THE WITNESS:  I believe he does have access to it

25 if he would go through the proper channels to receive that,

1  yes.  I do not have permission to grant that.  That would be

2  something that the superintendent and the records department

3  would have to release that to him.  That is something that I

4  cannot do.

5         THE COURT:  Okay.  So your attorney -- or the

6  attorney for the Department of Corrections told you not to

7  bring that file with you today, because you objected to it;

8  is that correct?

9         THE WITNESS:  That is correct.

10         THE COURT:  Would you have brought it had he not

11  objected to it?

12         THE WITNESS:  No.  I would not have.  I had no

13  intent.  What I meant -- regarding this case, I had no

14  intentions of bringing that file.

15         THE COURT:  Why is that?

16         THE WITNESS:  There would be nothing that I would

17  need in it.

18         THE COURT:  Oh, I see.  It's not because you

19  weren't allowed to take it.

20         THE WITNESS:  Correct.

21         THE COURT:  Well, this should have been decided

22  before we came here, but --

23         MR. BAREFORD:  I have a copy of the subpoena as

24  well, ma'am.  I should have volunteered this minutes ago.  A

25  copy of the subpoena as well as a copy of my written

1    objection.

2              THE COURT:  Have you filed that?

3              MR. BAREFORD:  No, ma'am.  Just because I got it

4    late yesterday afternoon, so I responded in writing --

5              THE COURT:  The timing was the problem.

6              MR. DeFRANCO:  The timing was the problem.  This

7    is not his fault either.  I got it on Wednesday.

8              THE COURT:  Well, I can't -- I can't resolve that

9    issue if the file is not here, so let's move on to another

10   topic.

11             MR. DeFRANCO:  Okay.  And I just wanted to bring

12   that up, because inside the file there was -- I believe

13   there was evidence that supports my Z code in this case.

14   However, it's not before you, so --

15             THE COURT:  Well, you can ask her if she recalls

16   something in your file, but -- you can ask her if she

17   recalls something in your file.  If she doesn't, we'll move

18   on.  If she does, she can testify to it.  First-hand

19   knowledge, she can testify to it.

20   BY MR. DeFRANCO:

21        Q.   Do you recall the staffings I had, Miss Webb --

22   because you said the Z code -- this big Z code thing,

23   everybody has been looking at it, and you had to look at it,

24   and apparently you have been deposed by counsel or Mr. Barr

25   regarding this case.  Did you look at my prior Z code votes?

1      A.    No, I did not.

2      Q.    You never got -- never had a chance to see them?

3   You never seen why I was denied a Z code?

4      A.    There was no need, based off -- I believe --

5   and -- I believe that the reason that you were denied a Z

6   code at that time was because of your anxiety disorder not

7   being serious enough to preclude you to have a single cell

8   on your own.  Something along those lines.  That's why it

9   was taken from you.

10     Q.    Okay.  So if -- if that's true -- and which that

11  is my recollection, so I'm in agreement with you.  If that

12  was my only problem mentally, and the people who are making

13  the votes to take it, would it be an informed vote?  In

14  other words, if a person looking at my packet only thought I

15  suffered from anxiety, I didn't have -- I wasn't borderline

16  mixed-personality disorder --

17     A.    I have never -- I have never seen a diagnosis of

18  you of borderline mixed-personality disorder in your file.

19     Q.    Okay.  Well, I can show you one today.

20     A.    Well, that's fine.

21     Q.    Obviously --

22     A.    I'm just saying, you're asking me, and that is not

23  something --

24     Q.    But I'm --

25     A.    I --

1          (Proceedings interrupted by the court reporter.)

2      Q.    My question is, if that was not in my file --

3  apparently it's not.  So this Z code committee did not make

4  an informed decision regarding it.  They only believe I

5  suffered from --

6          THE COURT:  Is that -- that's not a question.

7      A.    Your entire --

8          THE COURT:  Hold on.  Hold on.

9          THE WITNESS:  Oh, I'm sorry.

10          THE COURT:  Hold on.  That's not a question.

11  You're making argument again.  Ask her a question.

12          MR. DeFRANCO:  Okay.

13          THE COURT:  She can't -- go ahead.

14  BY MR. DeFRANCO:

15      Q.    If the Z code committee only had a partial file of

16  my history of what is wrong with me and didn't have the

17  complete -- my complete mental makeup, and they were voting

18  on it, would it be a qualified vote?

19          MR. BAREFORD:  Ma'am -- and that's -- I'm going to

20  object for two reasons.  First of all, it assumes facts not

21  in evidence.  It also calls for the witness to make the

22  ultimate determination as to the question of law that's

23  before this Court.

24          THE COURT:  Sustained.  You can't ask a witness --

25          MR. DeFRANCO:  I understand -- I understand.

1            THE COURT:  You can make that argument.

2   BY MR. DeFRANCO:

3        Q.   Are you very happy with me?  You can speak

4   honestly.

5        A.   What do you mean by "happy"?

6        Q.   You're not -- are you happy with me or displeased

7   with me over all of this?

8        A.   I'm not -- well, that's irrelevant to anything.

9   You -- you are a part of my job.  So I don't get happy or

10  unhappy with people.  This is my job.

11       Q.   Well, let me ask you this:  Is anything adverse

12  going to happen to me because of this?

13       A.   Why would you think that?  Has anything adverse

14  happened yet?

15       Q.   Well, we haven't been before this Court yet, and

16  we haven't got back to SCI-Albion yet.

17       A.   This has been ongoing for years.  This is part of

18  the issue --

19       Q.   This has been going on since, I believe, August.

20       A.   Of 2002.

21       Q.   No.  2004.

22       A.   2002.

23       Q.   I just filed it.  I don't know what lawsuit we're

24  talking about.  I only filed one ever, and this is it.  But

25  let me just --

1          MR. DeFRANCO:  May I stand up, Your Honor?  I have

2   a chart.  I know it's not what you're used to seeing, but I

3   only have access to --

4          THE COURT:  It's all right.

5          MR. DeFRANCO:  -- the limited stuff that

6   inmates --

7          THE COURT:  Well done.  The court deputy will hold

8   it up.

9          (Discussion held off the record.)

10         MR. DeFRANCO:  And just for the record, Your

11  Honor, Miss Webb is a good counselor.

12         THE COURT:  All right.  That will be your

13  testimony.

14         MR. DeFRANCO:  Okay.  I want you to look at

15  something, if you would.  This is Mr. Barr's declaration.

16         MR. BAREFORD:  Ma'am, actually, before you get

17  into this -- I don't want to interrupt the flow.  Do you

18  mind if I just look at that?

19         THE CLERK:  Oh, I'm sorry.

20         (Discussion held off the record.)

21         MR. DeFRANCO:  It's a flow chart.

22         THE COURT:  Be careful, though.  This is not her

23  declaration, so she has to have personal knowledge about

24  everything you are going to ask her.

25         MR. DeFRANCO:  I know.  I'm going to give her

1    Mr. Barr's declaration.

2            THE COURT:  I know that.  But she can't make

3    opinions about that.  You have to ask her things of her

4    personal knowledge.  I'm going to make an opinion about his

5    declaration.  I decide his credibility.

6    BY MR. DeFRANCO:

7        Q.   Have you read Mr. Barr's declaration?

8        A.   Is that what you handed me on Monday?

9        Q.   Yes.

10       A.   I skimmed through it, yes.  Did I thoroughly read

11   it?  No.

12       Q.   I have it here.  And what it says is -- and it

13   tells exactly what you said about how the Z codes --

14           MR. BAREFORD:  Your Honor -- and I apologize to

15   Mr. DeFranco for interrupting.  But just for purposes of the

16   line of questioning --

17           THE COURT:  You want a proffer?

18           MR. BAREFORD:  Yes.  Or at least a foundation as

19   far as to how her ability to be able to even answer

20   questions without -- I mean, if he's going to --

21           THE COURT:  I understand.

22           MR. BAREFORD:  Yes, Your Honor.

23           THE COURT:  We want to know where you're going

24   with this line of questioning before --

25           MR. DeFRANCO:  I want to know --

1          THE COURT:  -- just so we don't get in trouble

2     beforehand.

3          MR. DeFRANCO:  All right.  I want to know what

4     significant progress constitutes -- according to Mr. Barr,

5     Your Honor.  And we'll go with what he said -- that I was

6     Z-coded March 26th, '02 until 6/24/02, which is

7     approximately three months.

8          THE COURT:  Okay.

9          MR. DeFRANCO:  In between that time, I was placed

10    in RHU for 45 days.  I came out of RHU to a new housing

11    unit, and Mr. -- according to Mr. Barr's declaration,

12    inmates are classified annually.  Only when they show

13    significant progress, quote/unquote --

14         THE COURT:  I understand.  And what are you going

15    to --

16         MR. DeFRANCO:  -- will a Z code be removed.

17         I wanted to know if 44 days out of the hole

18    for threatening of a staff constitutes significant progress.

19    In the counselor's view.

20         MR. BAREFORD:  May I be heard, Your Honor?

21         THE COURT:  Yes.

22         MR. BAREFORD:  She is not the one who made that

23    determination.  Mr. Barr was the one that made that

24    determination.  And so basically what he's asking her to do

25    is to speculate what Mr. Barr meant by, you know, weighing

1  the factors of this -- whatever the Z code committee was, or

2  the decision-maker on not --

3          THE COURT:  First you have to ask her if she was

4  the one who made the decision as to what your status would

5  be when you came out of RHU.  And if she was, then you can

6  continue.  If not, the objection will be sustained.

7          MR. DeFRANCO:  Well, I know she was not.

8          THE COURT:  Well, she was on the committee later,

9  so she may have been part of the committee, so you can ask

10  her.

11 BY MR. DeFRANCO:

12     Q.    You were on a committee at one time for my

13 staffing, correct?

14     A.    Correct.  But there -- it's not a -- it's not a

15 committee.  It's a staffing team.  It's a unit team.  So the

16 word "committee" -- I think that's where I'm getting

17 confused.  There is no actual --

18     Q.    That was what -- Dr. Lindemuth kept using the word

19 "committee".

20     A.    Okay.  Well, it's the staffing process.

21     Q.    Right.

22     A.    I am a unit team member voting, yes.

23     Q.    Okay.  Can you understand by looking at that

24 flowchart --

25          THE COURT:  No.

1          MR. DeFRANCO:  No?

2          THE COURT:  No.  Did she make the determination of

3  significant progress in June of 2002.

4  BY MR. DeFRANCO:

5      Q.   Did you make the decision of significant progress

6  in June of 2002?

7      A.   No.  I was not part of that --

8          THE COURT:  Objection sustained.  You can't pull

9  that.  You will have to ask Mr. Barr those questions, if

10  he's the one.

11  BY MR. DeFRANCO:

12      Q.   On direct examination, you testified that I run a

13  citizenship group, correct?

14      A.   Correct.

15      Q.   And you said that I do a good job, and that you

16  observe me.

17      A.   Correct.

18      Q.   But I -- I'm puzzled about one thing.  You said

19  that you're only in there one time, and you run it during

20  that time.  You're only in the group during one session.

21      A.   Correct.

22      Q.   Was your testimony.

23      A.   Correct.

24      Q.   So if you're only in there during the one session

25  and you're running it, how do you know what kind of job I

1    do?

2        A.    Because I sat in and observed you for the first

3    nine times that you did it before I allowed you to sit in it

4    on your own.

5        Q.    And that is when I came out of the hole?

6        A.    Correct.  That is when -- no.  It is when you

7    transferred to D unit.  You were already out of RHU for

8    several months.  You were removed from the RHU, I believe,

9    in May of 2002.  You did not arrive on my unit until August.

10   And I believe correctly you didn't become my peer leader

11   until maybe October of '02.  Because I still had several

12   peer leaders that got moved to the R unit --

13       Q.    Right.

14       A.    -- and that's why you took over.  So I still had

15   my peer leaders running it, and when they left -- several

16   months after you got there.  So you were on my unit for a

17   while before you became a peer leader.

18       Q.    Okay.  I came on your unit in August -- on

19   August 18th of 2002.  In with Inmate Sherlock.  And I have

20   here my name, while I was teaching a citizenship group on

21   September 3rd.  That would be approximately three weeks

22   after I was let out of the hole.

23       A.    You were in the RHU pending transfer at that time,

24   not for your misconduct.  That's why you were in the RHU.

25   You hadn't had a misconduct since March of '02, correct?  Or

1   July?  I'm not sure.

2        Q.   You're incorrect.  I was -- I was only in RHU

3   pending transfer --

4             THE COURT:  All right.  We're way -- way off

5   point.  Where are you going?  What is your ultimate

6   question?

7             MR. DeFRANCO:  My ultimate question is why was I

8   teaching this group three weeks after I was let out of RHU.

9             THE COURT:  All right.

10       A.   Because you were the only peer leader I had on the

11  unit then, apparently, if that was the one you were running.

12  You had -- you had been trained.  You were one of the few

13  people at SCI-Albion that was specifically picked by

14  counselors to be trained for this program.

15            THE COURT:  Are you trying to show that you are a

16  model prisoner?  Is that what you're doing?

17            MR. DeFRANCO:  I don't want the Court to look at

18  me in a -- you know what I mean?  In a bad light.  I'm not

19  trying to present myself right now --

20            THE COURT:  Well, I just want to know where you're

21  going with this line of questioning.  Because if it's off

22  point, then -- but are you trying to show the Court that you

23  didn't do a good job on this, or you -- I'm not -- I don't

24  understand what this line of questioning --

25            MR. DeFRANCO:  I don't know -- I'm sorry.  I don't

know if I should have been teaching a citizenship group three weeks after I was let out of the hole.

A. Then why did you offer?

Q. I didn't. You advised me, because I had -- I went to school to teach it. When I was in Z code.

THE WITNESS: Can I say something, please?

THE COURT: Do you want to talk to her first? Go ahead.

THE WITNESS: We don't force inmates to run groups. I mean, it's that simple. Especially a peer-led group. I wouldn't want anybody in a peer-led group that didn't want to be there or didn't think that they could run a group. So, therefore, I can't force anyone to --

THE COURT: I want us to move on. This line of questioning --

MR. DeFRANCO: I didn't --

(Proceedings interrupted by the court reporter.)

THE COURT: I'm talking. When I talk, she listens to me and not to you. So you know.

This is going nowhere, that I -- what I need to make a determination for a preliminary injunction, so I'm going to have you move on. All right?

MR. DeFRANCO: Okay.

THE COURT: Thank you.

MR. DeFRANCO: I guess -- I guess -- and only a

```
 1    couple more minutes, Your Honor.

 2              THE COURT:  All right, thank you.

 3    BY MR. DeFRANCO:

 4        Q.  Miss Webb, there was testimony given during an

 5    evidentiary hearing concerning this case in October.

 6    Mr. Barr specifically told this Court that I was not staffed

 7    in March of 2004 for Z code.  He said to the Court it was my

 8    annual review.  Would that be accurate or inaccurate?

 9        A.  It would be accurate that you had both.  You had

10    an annual review, where your custody level was reviewed, and

11    you also had a separate Z code staffing held on March 10th

12    of 2004.  But you also had an annual review.

13        Q.  So if I had a request slip stating that -- in your

14    handwriting, that your annual review is in January and your

15    staffing in March is because of your request for a Z code,

16    that would be incorrect?

17        A.  We had to go back -- in 2004, policy was changed

18    that we went to the initial month of inception2 that is why

19    some people were getting annual reviews two or three times

20    in one year, because we -- they had changed policy and we

21    had to go back to the initial date of when you came into the

22    Department of Corrections, whether it was on your first

23    number, second number, third number, or fourth number.

24              So according to our state system, whether that's

25    accurate or not, January was the month.  So that is why it
```

1    is set to be reviewed in January.  Your annual would have

2    been in January.

3         Q.    Okay.  But my March review was specifically for my

4    Z code, right?

5         A.    You had a March 10th, 2004 Z code staffing, yes.

6         Q.    It wasn't an annual review?

7         A.    They are two separate things, Mr. DeFranco.

8         Q.    I understand that.  I'm telling you what Mr. Barr

9    testified to.

10        A.    And I am telling you, March 10, 2004, you had a Z

11   code staffing.

12        Q.    Okay.  So I just wanted to clear that up.

13        A.    That's fine.

14        Q.    All right.  So my last question is this:  You

15   voted favorably for me to have a Z code, and it was based

16   upon the two psychologists' and the psychiatrist's

17   recommendation.

18        A.    Correct.

19        Q.    And how did you get the psychiatrist's

20   recommendation?

21        A.    You handed me a paper that she had apparently

22   written in 2000, and I believe -- I'm not sure off the top

23   of my head, 2001, 2002, when you were originally trying for

24   a Z code, and you kept telling me to call her, call her,

25   call her.  So finally I called her, and we talked about it.

1      Q.    So she would have been lying on the stand if she
2    would have said she sent it to you?
3      A.    Correct.  You handed it to me.  You personally
4    handed me a paper from her.  You showed that -- you showed
5    me that paper.
6      Q.    I -- that paper did not come from Dr. Lindemuth?
7      A.    It was a paper written by Dr. Lindemuth --
8      Q.    That's not my question.
9      A.    -- that you were in possession of.  You asked me
10    how I knew her recommendation, and it was because you gave
11    it to me first and then told me to call her.
12      Q.    Dr. Lindemuth did not send you that paper?
13      A.    After I talked to her on the phone, yes.  But you
14    asked me how I originally got wind of it, and that was from
15    you, when you came to my office and handed me a paper from
16    her.  And then you told me to call her, which you repeatedly
17    told me to do on a daily basis.
18            Finally, I called Dr. Lindemuth.  She said
19    staffing for a Z code based off of this, and I will forward
20    the paper.  And I said, would it be this paper, and I read
21    it to her, and she said, exactly the same paper.
22      Q.    Her testimony was she called you.  I guess that's
23    for the Court to determine the credibility of witnesses, so
24    we'll let that go.
25            MR. DeFRANCO:  That would be my last question,

1   Your Honor.

2          THE COURT:  That's the last question?  Okay.

3   Redirect, Mr. Bareford?

4          MR. BAREFORD:  I have no further questions.

5          THE COURT:  Then you're excused.

6          THE WITNESS:  Thank you.

7          THE COURT:  You may step down.

8          MR. BAREFORD:  Actually, Your Honor, we do not

9   anticipate requiring her to be called back to the stand,

10  unless --

11         THE COURT:  I can't imagine why she would want to

12  stay around.  If she would like to return to Albion, she

13  may.

14         MR. BAREFORD:  Yes, ma'am.  The Defendants would

15  like to call Sue Ann Rebele.

16

17         S U E   A N N   R E B E L E, first having

18            been duly sworn, testified as follows:

19

20         THE CLERK:  Please be seated.  State your full

21  name and spell your last name for the record.

22         THE WITNESS:  My name is Sue Ann Rebele,

23  R-E-B-E-L-E.

24         MR. DeFRANCO:  Your Honor, I need to ask if

25  Mr. Barr is going to testify.  If he is, I would ask him to

1    be excluded from the courtroom.

2            MR. BAREFORD:  I have no objection to that.  I

3    don't know for certain whether or not I will require it,

4    but, obviously, I don't have any problem with it.

5            THE COURT:  His being out during the testimony?

6            MR. BAREFORD:  Yes, ma'am.

7            THE COURT:  Okay, Mr. Barr, will you please step

8    to the hallway.

9

10                       DIRECT EXAMINATION

11   BY MR. BAREFORD:

12

13       Q.   Miss Rebele, where do you work?

14       A.   I work at SCI-Albion.

15       Q.   And what do you do at SCI-Albion?

16       A.   Right now, I'm the first shift nursing supervisor.

17       Q.   And could you briefly describe what those duties

18   entail.

19       A.   I am in charge of the -- making sure that all of

20   the nursing -- the duties are done from 6:00 till 2:30.  I

21   schedule nurses, I make sure medication is where it's

22   supposed to be.  Conference with doctors, outside hospitals,

23   outside agencies.

24       Q.   Do you -- as part of the duties of that position,

25   have you had the opportunity to review the medical file of

1   Mr. DeFranco?

2       A.   Yes, I have.

3       Q.   And have you reviewed that medical file?

4       A.   Yes, I have.

5       Q.   Are you familiar with the contents of that medical

6   file?

7       A.   Yes.

8       Q.   Could you explain to the Judge what medication

9   Mr. DeFranco is on.

10      A.   Under the doctor -- medical doctor's care, he's on

11  aspirin, Nitroglycerin, and Lopressor.

12      Q.   What does he take aspirin for?

13      A.   It's a blood thinner.  He has a problem called

14  mitral valve prolapse, and it helps keep the blood thin

15  enough so that it won't clot and possibly throw blood clots

16  that could damage Mr. DeFranco.

17      Q.   So in laymen's terms, this is -- there's a valve

18  in his heart --

19      A.   Yes.

20      Q.   -- that does not --

21      A.   Doesn't close completely.

22      Q.   Therefore, blood thinning would be important?

23      A.   Yes, it would.

24      Q.   In order to avoid blood clots?

25      A.   Correct.

1       Q.    And that's the reason he takes aspirin?

2       A.    Correct.

3       Q.    How long has he been taking the aspirin?

4       A.    I believe since June of 2003.

5       Q.    What kind of problem is mitral valve prolapse?

6       A.    It's general -- generally a congenital problem.

7  He could have had it since he was born.

8       Q.    And does the need to take a blood thinner -- does

9  that have anything to do with a person's age for a condition

10 like mitral valve prolapse?

11      A.    Not necessarily.

12      Q.    So you wouldn't -- what -- why would, if at one

13 point he did not take an aspirin a day, and now he does take

14 an aspirin a day, what would trigger starting him on an

15 aspirin a day?

16      A.    Blood work.  Other conditions, such as

17 hypertension.

18      Q.    Okay.  So it would be -- you said he takes

19 aspirin.  He also takes --

20      A.    Lopressor.

21      Q.    -- Lopressor?

22      A.    Yes.  It's an antihypertensive.

23      Q.    And when did he start taking that?

24      A.    I believe he started that at the same time as he

25 started the aspirin.

1       Q.    Do you remember what the dosage of the Lopressor
2   was when he first started to take that?
3       A.    I believe it was 25 milligrams.  It was half of a
4   tablet.
5       Q.    How long was he taking a half a tablet?
6       A.    I am not quite sure.  I think it probably was for
7   a few months, and then he -- he went back to see Dr. Baker
8   or Dr. Bashline, and they increased it, due to -- he
9   complained of chest pain.
10      Q.    What was it increased to?
11      A.    To 50 milligrams.
12      Q.    Which is one tablet?
13      A.    Yes.
14      Q.    How often does he take Lopressor?
15      A.    Once a day.
16      Q.    So he takes one tablet of Lopressor a day and one
17  tablet of aspirin a day?
18      A.    Yes.
19      Q.    Do the aspirin and the Lopressor have to do with
20  the same condition of the heart?
21      A.    Yes.
22      Q.    And that condition being?
23      A.    The mitral valve prolapse.
24      Q.    And high blood pressure can affect that?
25      A.    Yes.

1    Q.    What about the Nitroglycerin?

2    A.    Nitroglycerin is taken for chest pain.  It's

3    typically prescribed for angina, which is a non-specific

4    chest pain.  However, while reviewing his chart, Dr. Baker

5    did make note that he has nontypical angina pectoris, okay,

6    which he correlates with anxiety and not actual chest pain.

7    Q.    Does Mr. DeFranco take Nitroglycerin for the high

8    blood pressure or the mitral valve prolapse?

9    A.    No.

10   Q.    And is that what you meant by he takes it for

11   anxiety --

12   A.    Yes.

13   Q.    -- versus -- now, how often does he take

14   Nitroglycerin?

15       MR. DeFRANCO:  Your Honor, I'm going to object.  I

16   don't know how this witness would know all this.

17   Q.    Could you explain to the Court exactly what type

18   of foundation or basis --

19   A.    Well, I'm a registered nurse.  I know

20   pharmacology.  I have read the physician's notes from your

21   chart.

22       MR. DeFRANCO:  Did Dr. Baker tell you any of this?

23       THE COURT:  Well, she said she read the chart.

24       THE WITNESS:  His note said that.

25       THE COURT:  Wait a minute.  Are you objecting to

 1  her --
 2          MR. DeFRANCO:  It's hearsay.
 3          THE COURT:  -- explaining medical -- you're saying
 4  you're objecting to her explaining the medication you're
 5  taking?
 6          MR. DeFRANCO:  That she knows why I'm taking
 7  Lopressor.
 8          THE COURT:  She said it's in your chart, is her
 9  testimony.
10          THE WITNESS:  It is in your chart.
11          THE COURT:  Why you are taking Lopressor.
12          MR. DeFRANCO:  Then I will withdraw my objection,
13  Your Honor, but --
14          THE COURT:  I mean, is that not the case?
15          THE WITNESS:  Correct.
16          THE COURT:  You said why he's taking it is in the
17  chart.
18          THE WITNESS:  Yes.
19  BY MR. BAREFORD:
20      Q.  I don't know if you answered the question.  How
21  often does he take Nitroglycerin?
22      A.  He takes it as he needs it.  It is generally
23  prescribed, and it is prescribed for Mr. DeFranco, as it
24  generally is, one tablet underneath your tongue.  And if
25  that does not relieve the pain, you can repeat that dose two

1   more times for a total of three tablets.

2       Q.   Over what kind of time period are we talking about

3   with three tablets?

4       A.   If it's not relieved within 15 minutes, because

5   the tablets are taken five minutes apart, then he should

6   come up to medical and be evaluated at that time.  Because

7   his chest pain is typically not going to go away after -- if

8   it's not relieved by three Nitros.

9       Q.   And that's -- did you say that was a -- as needed,

10  when he would take one?

11      A.   As needed, yes.

12      Q.   So if he doesn't feel chest pain, does he take the

13  tablet?

14      A.   No.

15      Q.   When did he first go on Nitroglycerin?  Is that

16  contained in the record?

17      A.   It is.  I am not exactly sure of the date.

18      Q.   Would it have been -- did it correspond in time

19  with the -- the other medication that he would start, the

20  Lopressor or the aspirin?

21      A.   I believe it was.

22      Q.   How many pills does a person receive upon getting

23  a prescription of Nitroglycerin?

24      A.   There is a little brown bottle to keep the light

25  out, and it contains 25 tablets.

1     Q.   25 tablets.  Does it sound familiar, if he started

2 that on June 2003 -- I don't want to put words in your

3 mouth.  Does that refresh your recollection?

4     A.   Yes, it does.

5     Q.   Is that --

6     A.   On or around June 13th.

7     Q.   Okay.

8     A.   Because I believe he got his first bottle June the

9 19th.

10     Q.   Did you happen to notice when he -- the next time

11 he refilled his Nitroglycerin?

12     A.   I want to say in July.  But I'm not sure.  After

13 that, it was a very lengthy time.

14     Q.   Next time, would that have been November of 2003?

15     A.   Yes.

16     Q.   And then again not until --

17     A.   I believe it was September the 16th of this year.

18     Q.   Of 2004.

19     A.   Yes.

20     Q.   So when he refilled it in November, how many

21 tablets did he obtain at that point?

22     A.   25.

23     Q.   So 25 tablets.  He did not refill again, according

24 to his medical chart, until the 6th of September, 2004?

25     A.   Correct.

1      Q.   And that is nine, 10 months later?

2      A.   Yes.

3      Q.   And he could potentially take upwards of three of

4  them at a time.

5      A.   Yes.

6      Q.   Or he could just take one at a time.

7      A.   Right.

8      Q.   Does his medical record also indicate when he

9  would go see a doctor for a physical?

10     A.   Yes.

11     Q.   Did you happen to see whether or not he had

12  obtained physicals in the last two years?

13     A.   Yes, as a matter of fact he did.  He is -- he is

14  regularly scheduled to be seen every 180 days, because

15  that's the maximum that the physicians will order his

16  medication for2 at that time they are called medication

17  reviews.  He goes in, has a set of vital signs done by the

18  nurse, and sits down and talks with the doctor.

19     Q.   What do the vital signs include?

20     A.   Vital signs consist of blood pressure, pulse,

21  respiration.

22     Q.   Did he have an under-50 physical in September of

23  2003?

24     A.   Yes, I believe he did.

25     Q.   Is that memorialized in his medical records?

1      A.   Yes, it is.

2      Q.   Does that memorialize whether or not he voiced any

3  complaints at that point?

4      A.   Yes, it does.

5      Q.   What does it say?

6      A.   He says -- the physician wrote that he had no

7  complaints, his condition was stable, his vital signs were

8  stable, and he was sent back to his housing unit.

9      Q.   What about again in May of 2004; did he have a

10 physical at that point?

11     A.   Yes.

12     Q.   What is memorialized in his medical records?

13     A.   No complaints voiced.

14     Q.   What about in October of 2004?

15     A.   The same thing.

16     Q.   He had a different injury in October of 2004?

17     A.   I believe he had a knee problem.

18          THE WITNESS:  A knee problem?

19          MR. DeFRANCO:  I fell out of my bunk trying to get

20 my Nitro pills.  I was on the top bunk --

21          THE COURT:  You're not testifying.  If she knows,

22 yes, if she doesn't know, that's it.

23          MR. DeFRANCO:  Sorry, Your Honor.

24          THE COURT:  That's okay.  She was looking to you

25 for help.  She can't do that.

1    BY MR. BAREFORD:

2        Q.    Does his medical record indicate that he did, in

3    fact, sustain an injury falling out of a bunk --

4        A.    Yes, they do.

5        Q.    -- for that injury?

6        A.    Yes, they do.

7        Q.    Okay.  Does it indicate when he first came into

8    the custody of the Department of Corrections, what kind of

9    medical intake -- what he obtained at Camp Hill?

10       A.    Yes, a very brief one.

11       Q.    What does it describe at that point?

12       A.    To the best of my recollection, it did say that he

13   had a heart murmur, but he had no psych. history.

14       Q.    So what do you mean by -- when it say "no psych.

15   history", how does that normally work?  What does that mean?

16       A.    He was not under any care for any type of mental

17   health problem.

18            THE COURT:  What date was that?

19            THE WITNESS:  I believe it was 1993.

20       Q.    Would he have been asked as part of that intake --

21       A.    Yes.

22       Q.    -- whether or not he had a condition?

23       A.    Yes.

24       Q.    Is that answer that's reflected in there

25   indicative of the response that was memorialized?

```
 1        A.    Yes.

 2              MR. BAREFORD:  Ma'am, that's all I have.

 3              THE COURT:  Any cross-examination?

 4              MR. DeFRANCO:  Yes.

 5

 6                         CROSS-EXAMINATION

 7    BY MR. DeFRANCO:

 8

 9        Q.    This is very interesting, because I didn't go to

10    Camp Hill.

11        A.    Well, wherever the CDCC was.  Okay?

12        Q.    Well, it's interesting.  And it's interesting for

13    a number of reasons.  One is --

14              THE COURT:  Questions.  Remember to ask questions.

15        Q.    Dr. Lindemuth would have been lying when she said

16    that I was put on at a different prison Paxil, Celexa, et

17    cetera, et cetera?  Who would prescribe those to me?

18        A.    A physician would prescribe that.

19        Q.    A psychiatrist wouldn't?

20        A.    A psychiatrist is a physician.

21        Q.    I mean, there is a difference to me, and to this

22    Court, I think --

23        A.    But a physician can also prescribe them.  It

24    doesn't necessarily have to be a psychiatrist.

25        Q.    So your testimony is, is that when I was at
```

1    Western Penitentiary, I was not seen by psychiatry and put

2    on a number of different psychotropic drugs?

3        A.    No, Mr. DeMarco [sic], that's a

4    mischaracterization.

5            THE COURT:  You're going to object to this

6    mischaracterization?

7            MR. BAREFORD:  Yes.

8        Q.    It's DeFranco.

9        A.    That is not my testimony, no, Mr. DeFranco.

10        Q.    I believe you said I came from Camp Hill, and I

11    was not indicated --

12        A.    That's why I asked the date.  I asked the date,

13    and it was in 1993.  Yes, it was 1993.  And it was the

14    intake note.  It was from the CDCC, and I generally

15    correlate the intake and reception with Camp Hill.  Okay?

16    Back then, back in 1993, I honestly don't know where that

17    was then.

18            THE COURT:  Hold on.

19            MR. BAREFORD:  I would just ask her to explain

20    what the CDCC is.

21        A.    It's the Correctional Diagnosis Center.  When

22    they -- when an inmate is sentenced, they go to the

23    classification center, and then they are sent to a different

24    prison.  They spend a few months there.

25            THE COURT:  So the testimony was, when he first

1  came into the prison system after sentencing --

2          THE WITNESS:  Yes.

3          THE COURT:  -- he did not have a psychiatric

4  history.

5          THE WITNESS:  Correct.  That's what it indicates

6  on the record.

7  BY MR. DeFRANCO:

8      Q.   Okay.  Do you recall giving testimony in this case

9  in October over the phone?

10     A.   Yes, I do.

11     Q.   And do you recall, ma'am, specifically telling

12  Judge -- I was explaining to Judge Baxter that a

13  Dr. Palamere (phonetic) -- if I'm mispronouncing his name, I

14  apologize -- that he wrote in my file something about double

15  cell, and you said, Your Honor, I'm looking at it right now,

16  and it does not say that?  Do you recall saying that?

17     A.   Yes.  And then you pointed it out to me, and I did

18  say, yes, I did see it.

19     Q.   Okay2 I asked you, what does it say, and you said,

20  I can't read the writing.

21     A.   Correct.

22     Q.   Right?

23     A.   Yes.

24     Q.   Then I asked for permission to read it2 then I

25  could read the writing.  I'm not a physician2 I

1   specifically --

2       A.   Saw two words that said "double cell".

3       Q.   Right.  So you could read it after I read it.

4       A.   Yes.

5       Q.   Can you explain that.

6       A.   When you deal with physicians, especially with

7   physicians who write all day long, okay, and you're looking

8   at a bunch of chicken scratch, it tends to all run together.

9   If someone can specifically point out a word or two, then

10  it's much easier, for me, at least, to actually see those

11  words then.  I still could not read anything else in that

12  note, other than those two words.

13      Q.   So you read the -- your testimony is this, then:

14  I told -- I informed the Judge about what it said.

15      A.   Um-hum.

16      Q.   And you broke in and said Your Honor --

17           THE COURT:  I got it the first time.  You don't

18  have to review it.  I do.

19  BY MR. DeFRANCO:

20      Q.   The double cell -- is that file here?

21      A.   Yes, as a matter of fact, it is.

22      Q.   Because the word "double cell" --

23           THE COURT:  It was sent to me.  I was looking at

24  the transcript of that hearing.

25           MR. DeFRANCO:  I never got a copy of that either,

1    Your Honor.

2            THE COURT:  Well, I asked them to send it to me.

3    I didn't necessarily ask them to send it to you.

4            MR. BAREFORD:  Actually, just for purposes of

5    completion, I didn't get a copy of that either.

6            THE COURT:  You didn't?

7            MR. BAREFORD:  No.  That went from -- that record,

8    straight to the Judge.

9            THE COURT:  Straight to me.

10           THE WITNESS:  Yes, it was faxed, because I

11   actually left the hearing room then and then came back.

12           THE COURT:  I do recall when it came.  But the

13   testimony from October.

14           MR. DeFRANCO:  Counsel, you never got that

15   transcript?

16           THE COURT:  You have to pay for it if you want it.

17   I get it, though.  The parties have to pay for it.  Once you

18   read it to her or pointed it out to her, she agreed; there

19   it is2 then she explained that it was out of context,

20   because it comes right after the list of drugs.

21               What was the date of that entry?

22           THE WITNESS:  I can point it out to you.

23           MR. DeFRANCO:  I think it was April.

24           THE WITNESS:  There is the drugs, and there is

25   where it says "double cell".

1          THE COURT:  You know, I thought I was going to be

2     able to read this.  My husband is a doctor.  I thought I was

3     going to be able to read this.  Anger --

4          MR. DeFRANCO:  Impulsivity.  I can recall some of

5     it, Your Honor.  It is easier to read in the ink.  I know it

6     is a little --

7          THE COURT:  "Out of hole."  Mr. Barr will love

8     that.  Then it has a list of your drugs.  Then it says

9     "double celled".  He makes no comment about the double cell.

10    He's just listing it as a fact.

11         MR. DeFRANCO:  Right.

12         THE COURT:  Do you have a different read on that?

13         MR. DeFRANCO:  I have asked other -- like my

14    brother, and I even asked Dr. Lindemuth about that, and she

15    said the only reason a psychiatrist would make mention of it

16    is if there was a concern about it.

17         THE COURT:  And that's the psychiatrist?

18         MR. DeFRANCO:  Yes.  That's the head psychiatrist

19    for the Western District of Pennsylvania DOC.

20         THE COURT:  Okay.  Well, that's not testimony, so

21    I can't -- you can make that argument to me, but I can't --

22    you know.  All right.  So where are we going?

23         MR. DeFRANCO:  Okay.

24    BY MR. DeFRANCO:

25         Q.   At any rate, I wanted to point that out; I

1    received an affidavit, ma'am, signed by you.  Do you know

2    who it was written by?  Your affidavit?

3              THE COURT:  Is this the affidavit dated 11/8/04?

4              MR. DeFRANCO:  Yes, ma'am.  Your Honor.

5        A.    Mr. Barr and I wrote that.

6        Q.    You guys sat down together and typed it out

7    together?

8        A.    We didn't sit down.  We did it over the phone.

9        Q.    And it's your testimony here today that you were

10   in a room when Mr. Barr told me, after he got done

11   testifying to the Court, that there were available single

12   cells in SCI-Albion, that he engaged me to a conversation,

13   just explaining to me that I could go anywhere, like

14   SCI-Dallas?

15       A.    Yes, I was in the room when he said that.

16       Q.    Your testimony under oath is you were in the room

17   when he said that?

18       A.    Absolutely.

19             MR. DeFRANCO:  Can I get a chart, Your Honor?

20   Because I'm going to have Mr. Barr show where everybody was

21   seated.

22             THE COURT:  Pardon me?  What do you want?

23             MR. DeFRANCO:  I want a chart.  I want her to show

24   me where everybody was seated when he said that.

25             THE COURT:  She can say it out loud.  She can say

1    it out loud.  Where was everyone seated when --

2    BY MR. DeFRANCO:

3        Q.   Was everybody seated?  Was everybody sitting?

4        A.   I don't recall --

5        Q.   You don't recall?

6        A.   I don't recall if we were all sitting.  I know

7    during the testimony, you sat on this side of the --

8        Q.   I'm talking about the discussion, obviously, when

9    Judge Baxter was not on the phone any longer --

10       A.   Correct.

11       Q.   -- and Mr. Barr was waiting for Mr. Osborne to

12   show up --

13       A.   Yes.

14       Q.   -- because there was another hearing scheduled.

15       A.   Yes.

16       Q.   Okay.  And I'm talking about at that time, when

17   this discussion, according to you, took place, where were

18   we?  Were we still seated?  Were we standing?

19       A.   I believe I was standing.

20       Q.   You were standing?

21       A.   Yes, I believe I was standing.

22       Q.   Mr. Barr and I were -- what?

23       A.   Probably sitting.  I can't --

24       Q.   You don't remember that?

25       A.   As best as I recall --

1    Q.   We were sitting?

2    A.   Yes.  Because I had left the room to actually copy

3    and fax those papers to the Judge.  I came back because I

4    was having a problem with the telephone number.

5    Q.   Okay.

6    A.   Okay?  So I was in and out of that room --

7    Q.   But the Judge was still on phone then.

8    A.   Yes.  I was in and out of that room.  Okay?  After

9    we hung up, after the Judge was -- was no longer on the

10   phone --

11   Q.   Right.

12   A.   -- I came back and double-checked to make sure

13   that I had the right area code.  But the conversation --

14   Q.   After Judge Baxter told you that the fax machine

15   was working, you came back in to see if you had the right

16   area code?

17   A.   Yes, sir.  Because I had my secretary do both area

18   codes, 814 and 412.

19   Q.   It's not making any sense to me, because I could

20   hear the fax going over the machine at that time.

21   THE COURT:  You couldn't have, because it's not in

22   the same room.

23   MR. DeFRANCO:  Well, I thought I did.  I thought I

24   heard something in the background.  You said it was coming

25   in right now.  But maybe it was you saying it, Your Honor;

1    it's coming in now.

2            THE COURT:  I do recollect something to that

3    effect, that it was coming in.

4            MR. DeFRANCO:  Because maybe I didn't hear the

5    machine, but I know I -- it was conveyed --

6            THE COURT:  All right.  But what is your point for

7    her?

8            MR. DeFRANCO:  Well, my point is when Mr. Barr

9    testifies, I want to see if they all go together, everything

10   fits.

11   BY MR. DeFRANCO:

12       Q.   So then what happened?  After Mr. Barr was so kind

13   enough to point out to me that I could go to SCI-Dallas,

14   across the state, as opposed to, say, SCI-Forest that just

15   opened up, which is an hour away, right, that he was just

16   being real nice to me.

17           THE COURT:  Is there a question?

18           MR. DeFRANCO:  That was the question.

19       Q.   Why would he pick out Dallas, across the state?

20       A.   I can't answer that question.

21       Q.   Okay2 then what happened after -- after that

22   discussion happened?

23       A.   I don't recall.  But I do recall the --

24       Q.   You asked --

25           (Proceedings interrupted by the reporter.)

1          THE COURT:  Let her answer the question.

2      A.   I do recall the conversation, and the conversation

3  was that if SCI-Albion had no single cells, in order for you

4  to get a single cell, the possibility of a transfer to

5  SCI-Dallas or another prison would be possible.

6      Q.   Okay.  What don't make sense to me is this:  If

7  Mr. Barr just got done testifying to Judge Baxter that there

8  were available single cells at SCI-Albion that he could put

9  me in that day, which the Judge wrote in her report and

10 recommendation, why would he engage me in that conversation?

11     A.   You would have to ask him.

12          MR. BAREFORD:  Your Honor, this is a --

13          THE COURT:  Sustained.  Keep going.

14 BY MR. DeFRANCO:

15     Q.   And then what happened -- we were on the star

16 phone.  What do you call them phones --

17          THE COURT:  They do not have to be nice to you,

18 Mr. DeFranco.  They typically are not nice when they are not

19 happy, so -- there's no law that makes them be nice to you.

20          MR. DeFRANCO:  That, Your Honor, I don't

21 understand.

22          THE COURT:  Well, you were saying why would he say

23 something that mean.  It was just a comment.  Go ahead.

24 BY MR. DeFRANCO:

25     Q.   Can you tell the Court what happened immediately

1    after this conversation took place.

2        A.    I believe I left.

3        Q.    Did we leave together?

4        A.    I don't recall that.

5        Q.    You don't recall if we left together?

6        A.    No, I generally don't recall when I walk out with

7    an inmate.

8        Q.    Your affidavit specifically says I thanked

9    Mr. Barr and went back to my housing unit.

10       A.    I don't have that piece of paper in front of me.

11   That happened in October, and a lot has happened since then.

12           THE COURT:  Your question was whether she walked

13   out with you.

14       Q.    Did you walk out of the room with me and witness

15   me walk back to my housing unit, as your affidavit says?

16       A.    No.  I assumed you went back to your housing unit.

17       Q.    Are you supposed to make assumptions when you make

18   out affidavits?

19           THE COURT:  No, that is an improper question.

20   Come on.  We have been through this over and over.  The

21   sentence reads, "Inmate DeFranco thanked Mr. Barr for his

22   time and returned to his housing unit."

23       Q.    And just so we're clear --

24           THE COURT:  That's her testimony.  You can

25   cross-examine her on that testimony.  Well, you did.  You

1    have asked her, did you know for sure that I went back to my

2    housing unit.  She said, no, I assumed it.  Anything else?

3    BY MR. DeFRANCO:

4        Q.    Okay.  Did you leave with me, or did you stay in

5    the room with Mr. Barr?

6        A.    I do not recall.

7        Q.    You don't recall?

8        A.    No, I don't.

9        Q.    But you recall -- where was Mr. Barr and I when we

10   had this discussion about SCI-Dallas?

11       A.    You were in the teleconference room.

12       Q.    Where were we at?  Were we seated or standing?

13       A.    I do not recall whether you were sitting or

14   standing.

15       Q.    You just don't recall that?

16       A.    No, I don't.

17       Q.    And did you leave with Mr. Barr, or did you leave

18   by yourself?

19       A.    I don't recall that either.

20       Q.    Wow.  Hum.  That's amazing.  You recall a lot

21   about my medical history --

22       A.    That's because I just went over your medical

23   history.

24       Q.    And you're pretty good at that.

25       A.    Because it's in writing.

1          MR. BAREFORD:  Actually, Your Honor, now this

2     is --

3          THE COURT:  Now this is harassment.  This is

4     harassment.  Do you have a question?

5     BY MR. DeFRANCO:

6          Q.   Miss Rebele, I got a couple signed affidavits that

7     say that you left that room and went back to the medical

8     department before Mr. Barr and I.  That means you left the

9     room first --

10          THE COURT:  Do you have those affidavits?

11          MR. DeFRANCO:  Yes, I do.

12          THE COURT:  Who are they by?

13          THE WITNESS:  One is by an inmate employee, who

14     their security levels are very -- to work out where they

15     work at, Your Honor, they work in the strip-and-search

16     areas.

17          THE COURT:  And they were there?

18          MR. DeFRANCO:  Yes.  I have to resubmit this,

19     because I made a mistake and tried to send it to the clerk,

20     and I forgot to send two copies, so I had to resubmit it.

21          THE COURT:  Okay.  So they sent it back.

22          MR. DeFRANCO:  But this is the affidavit of what

23     he witnessed.

24          THE COURT:  All right.  Who is the other one?

25          THE WITNESS:  You have it too.  It's by -- well,

1    Officer Campbell, who I wanted to testify today, I had an

2    affidavit where he said everything in it was accurate, but

3    he didn't want to sign it at the fear of losing his job.

4            THE COURT:  And where was Officer Campbell?

5            MR. DeFRANCO:  He was in the strip-and-search room

6    that day.

7            THE COURT:  And you were in the strip-and-search

8    room?

9            MR. DeFRANCO:  These rooms are adjacent to one

10   another.

11           THE COURT:  All right.  Now, let's go further.

12   What is your point by -- I think I have asked this to you

13   already.  What are you trying to show me by telling me that

14   she went out of the room before you and Mr. Barr did?

15           MR. DeFRANCO:  She -- she was not there when

16   Mr. Barr threatened me.  She wasn't there for a discussion,

17   that nice discussion when Mr. Barr's demeanor was very nice

18   and --

19           THE COURT:  Okay.  So you are --

20           MR. DeFRANCO:  Impeaching.

21           THE COURT:  You are trying to impeach her

22   testimony in the affidavit.  All right.

23           MR. BAREFORD:  Ma'am, if I could be heard on this.

24           THE COURT:  All right.

25           MR. BAREFORD:  He's asking her to testify -- if

1    I'm following this, he's asking her to testify about

2    something that -- even assuming that everything that he says

3    is true, would have occurred after she had already left the

4    room.  So I'm not entirely certain --

5                THE COURT:  Yes, I'm not following that.

6                MR. BAREFORD:  And if I may.

7                THE COURT:  All right.

8                MR. BAREFORD:  He's got this affidavit from this

9    guy, this inmate, this fellow inmate who is working in the

10   vicinity, and included in that affidavit is an explanation

11   that he saw, quote, the lady from medical leave the room

12   before Mr. Barr, as well as Inmate DeFranco.  What exactly

13   that means, that speaks for itself.  It's not entirely

14   certain whether or not -- because that level of detail is

15   not included in that -- whether or not he saw her going to

16   the fax machine and coming back in, or whether or not he saw

17   her leaving for good.

18                But the point that he's trying to make -- and

19   he can still make this point.  He just can't do it through

20   this witness.  The point that he's trying to make is there

21   was some kind of conversation that would have taken place

22   after Miss Rebele left the room, because this fellow inmate

23   saw her leave the room, but there was a period of time --

24                THE COURT:  But this inmate doesn't have any idea

25   whether a conversation took place before she left.

1          MR. BAREFORD:  Yes, ma'am.

2          THE COURT:  I understand.  Well, the testimony is

3    as it is for this.  Do you have a question for her in regard

4    to this?

5          MR. DeFRANCO:  Yes.

6    BY MR. DeFRANCO:

7      Q.    Let me ask you this:  Did I leave you and Mr. Barr

8    alone after that hearing, or did you leave first?  Who left?

9      A.    I believe I left first.

10     Q.    So then you don't know what was said between

11   Mr. Barr and me.

12     A.    Not after I left, no.  But I do know what

13   conversation took place while you were in the room2 I --

14   now, granted, I did leave the room and came back twice.

15     Q.    But you don't know where Mr. Barr and I were

16   seated or where -- what -- when he was telling me this nice

17   thing about SCI-Dallas, this nice place I can go to.

18     A.    No, I don't recall where everyone was standing

19   during that conversation, but I did hear the conversation

20   about the single cell and the possibility of a transfer.

21     Q.    Can I ask you a question?

22     A.    Yes.

23     Q.    Did you hear Mr. Barr testify to the Judge that if

24   he felt that I needed a single cell, he could put me in a

25   single cell at SCI-Albion that day?

1           MR. BAREFORD:  Ma'am, this is asking for the

2    witness to agree with what has been transcribed as part of

3    the original --

4           THE COURT:  Yes.  It's a matter of record, what

5    was said in here.

6           MR. DeFRANCO:  I don't have the record.

7           THE COURT:  I have the record.  But the point is,

8    it doesn't forward anything.  If she heard that, and then

9    she testifies, which she has, that she heard Mr. Barr say

10   that, so what?  That's what I'm trying to get to.

11          MR. DeFRANCO:  If Mr. Barr --

12          THE COURT:  So is she going to say that Mr. Barr

13   did something wrong?  She can't say that.  I mean, that's

14   not her -- he said what he said.  All she can tell you is

15   what she heard.

16          MR. DeFRANCO:  Okay, but my point is, Your Honor,

17   if --

18          THE COURT:  You can make the argument, then, that,

19   therefore, he said something that he shouldn't have said at

20   one time or the other.

21          MR. DeFRANCO:  Right.  But the thing is this:  He

22   just got done testifying to you that there is available open

23   single cells at SCI-Albion.  Why would he talk to me about

24   sending me to --

25          THE COURT:  I don't know that.  But neither does

1  she.  She doesn't know why he said that either.  If you

2  wanted to know that, you should have called Mr. Barr when it

3  was your case in chief, when you were --

4          MR. DeFRANCO:  Well, I didn't know I could do

5  that.

6          THE COURT:  I told you, you could call anybody who

7  was here.

8          MR. DeFRANCO:  That's why I asked him if he was

9  going to testify to -- and, I apologize, I don't know --

10  this is the first time I have been through this.

11          THE COURT:  I understand that.  But I did say, do

12  you have anybody else you want to --

13          MR. DeFRANCO:  I didn't know I could just call

14  those people.  I thought I had to call my own witnesses if I

15  wanted them.

16          THE COURT:  Well, you called Dr. Lindemuth.

17          MR. DeFRANCO:  Right.  I asked for her.  I told

18  you, I believe -- I didn't subpoena her, I asked -- and I'm

19  just --

20          THE COURT:  All right.  All right.  But your case

21  is over.  I mean, you have done your motion, 2 then you

22  said, that's all I have, 2 so we're on the defense.  If he

23  doesn't call Mr. Barr, we don't have his testimony, other

24  than what he said in this hearing and his affidavit.  Do you

25  understand?

1              MR. DeFRANCO:  Right.  Okay.

2              THE COURT:  Okay.  I just want to get this moving.

3    I don't want it to go down, you know, empty alleys, and I --

4    and stay here till 5:00, if we can get this moving.  I want

5    the information I need to make a correct decision.

6                   So I don't know why Mr. Barr said that, but I

7    have testimony from Mr. Barr in a hearing, and I have

8    testimony from him in an affidavit, and those speak for

9    themselves.  If you have questions of -- you disagree with

10   her about where she was, but that's her testimony.  All

11   right?

12             MR. DeFRANCO:  All right.  I apologize.  I just

13   have -- I just -- I just get frustrated with --

14             THE COURT:  Well, it's very frustrating asking

15   questions as an attorney, because you never get the answers

16   you want.

17             MR. DeFRANCO:  I want the truth.

18             THE COURT:  You take the facts as they come.

19             MR. DeFRANCO:  I'm as truthful as I can be.

20             THE COURT:  I understand.

21             MR. DeFRANCO:  It's one thing after another.

22             THE COURT:  But I'm concerned about Miss Rebele

23   right now.  You asked her questions.  If you have no more

24   questions for her, then we'll go back to redirect.  All

25   right?

1          MR. DeFRANCO:  I have no further questions for her

2     then, Your Honor.

3          THE COURT:  All right.  Do you have any redirect?

4          MR. BAREFORD:  No, ma'am.

5          THE COURT:  Then you are excused.  Thank you very

6     much.

7          All right.  Your next witness.

8          MR. BAREFORD:  Nothing further.  Defendant has

9     called its witnesses.  We don't intend to call anyone else.

10         THE COURT:  Then I'm going to ask for you each to

11    make argument to me now.  I want to hear -- and you can have

12    the rest of the folks out in the hall, if there are any,

13    come on in.  They are allowed in at that point.

14         I am going to ask you each to make argument.

15    This is where you tell me all those things that you were

16    thinking along the way.

17         My decision today is based on this:  I have

18    to know if under the Farmer v. Brennan standard, if the

19    Defendants are being deliberately indifferent to a serious

20    threat or medical need.  Do you understand?

21         MR. DeFRANCO:  Yes, ma'am.

22         THE COURT:  And I discussed that with you in our

23    last hearing2 we have the law actually quoted from that case

24    in the filing since then.  Now -- and in my order.

25         So I need to know whether or not there is

1    substantial likelihood of success on the merits of that

2    claim -- of those claims, and whether you will be

3    irreparably harmed unless a preliminary injunction issues.

4    All right?  So that's what I want to talk about.  I don't

5    want to talk about any peripheral things.  I want -- stick

6    to that issue.  All right?

7              You know, I always have the -- well, criminal

8    cases, we always have the -- the prosecutor always gets the

9    last word.  In the civil case, I'm going to turn it around a

10   little bit, and I'm going to let the Plaintiff have the last

11   word, so he can respond to you.  I think it will be easier.

12             MR. BAREFORD:  Yes, ma'am.

13             THE COURT:  As he is not an attorney.  All right?

14             MR. BAREFORD:  May it please the Court.  Ma'am, we

15   have previously filed objections to the report and

16   recommendation.  That's part of the record2 for purposes of

17   the legal argument, we stand on that brief.

18             What I would like to do is in light of the

19   evidence that we have heard -- that was presented today,

20   explain the factual context for the --

21             THE COURT:  And before we go -- let me interrupt

22   you.  I'm sorry.  But for Mr. DeFranco's benefit, the

23   difference between this hearing and the TRO -- a TRO is an

24   emergency and can be done without the other party there.

25   Because if we don't do something fast, something serious is

1    going to happen.  So we did that without the opportunity

2    that they had today of presenting evidence.  Because those

3    are done in a little more biased way.  In other words, the

4    other side doesn't get the opportunity to prepare.  They

5    automatically lapse after 10 days.

6              Now, it's my understanding that you are still

7    in a single cell, even though that has lapsed a month ago.

8    But that order lapsed 10 days after it was signed2 so we're

9    here to put a -- whether or not a preliminary injunction

10   similar to that issue, and a preliminary injunction then

11   would last until the case is decided.

12             That's how -- those are the differences

13   between those two.  All right?  I'm sorry.

14        MR. BAREFORD:  Yes, ma'am.  We have briefed the

15   law -- I'm just getting slightly out of sequence into the

16   matter of whether or not he can ultimately prevail on the

17   merits.  We have briefed procedural default, and the

18   documentation this Court has included is in our objections

19   to the Court recommendations.

20             So what I'd like to do now is just make

21   reference to the facts of this particular situation to

22   demonstrate how there can possibly be no irreparable injury2

23   I say that because, frankly, the Plaintiff hasn't even

24   gotten his story straight.  And I don't mean that in a

25   pejorative sense2 I apologize.  I don't mean that as a shot,

1    because that's not what I mean.  However, what I do mean is

2    that throughout this entire episode, he's attempting to have

3    it both ways.

4              When it comes to actively courting an agent

5    to support his efforts to obtain a Z code, he demonstrates

6    his situation as one thing.  When that -- when that is not

7    the context, his behavior is something else.  More

8    specifically, as he even asserted here today, he confronted

9    Dr. Lindemuth with the fact that on one hand, he's a violent

10   offender, because he's been convicted of criminal homicide,

11   and yet, on the other hand, he still asserts his innocence.

12             So when it comes to Dr. Lindemuth's

13   consideration of whether or not he poses a threat to others

14   because he's a violent offender, he wants her to give him

15   credit for being a violent offender, but at the same time he

16   continues to assert his innocence.  So he's trying to have

17   it both ways.

18             He pulls out this psychological report from

19   20 years ago and, once again, presents that to

20   Dr. Lindemuth.  And, once again, for context of having her

21   justify the recommendation for a Z code status for

22   Mr. DeFranco, drives home the point that he is antisocial

23   and demonstrates antisocial traits.  So for that particular

24   context, he's antisocial.  But you have also heard he is a

25   peer leader for a citizens group back on the pod.  He also

1    works within the law library and helps other inmates with

2    their legal files in generation or whatever.  There, he is

3    not antisocial.  He is anything but that.  He is a leader

4    among peers, and he helps other.

5            He wants Dr. Lindemuth -- he wants to prove

6    to her that he is taking Nitroglycerin for anxiety and chest

7    pains, and yet when he actually goes to the physical with

8    the medical doctors, he doesn't voice any complaints, any

9    kind of problems with the chest pains.  The last time he did

10   that was in November of 2003.  He has had three -- or two or

11   three physicals since then; no voiced complaints.  And yet

12   he wants to make sure that she understands the fact that

13   he's taking Nitroglycerin for anxiety.  Why?  Because he

14   wants to emphasize those points that actually will help her

15   give him a stronger recommendation for the Z code.

16           As a matter of fact, he confronts her with

17   the question of I threatened a staff member; doesn't that

18   seem like the kind of thing that is good for a Z code, for a

19   candidate to go into a single cell?  2, yet, she didn't know

20   that his own explanation, from what Miss Webb testified to,

21   was that it was just joking around.  There was nothing

22   violent to it.

23           He wants the description of his behavior from

24   that misconduct, to quote that he threatened another

25   staff -- or threatened a staff member, to amplify the point

1    just with Dr. Lindemuth that he needs to have a single cell.

2    And yet when he is actually facing the music at the

3    misconduct hearing, he wants it to be cast in a completely

4    different light; that there was no violence associated with

5    it.  It was -- he was joking around.  He has got kind of a

6    relationship with this corrections officer that was perhaps

7    a little too familiar, more than anything else.

8            So when he wants to and he's able to identify

9    basically a weapon in his efforts to obtain a single cell,

10   he -- he relentlessly pursues it.  He would do it with

11   Miss Webb, but he certainly did it with Dr. Lindemuth.

12           However, Dr. Lindemuth's explanation for

13   doing it is different than what his justification for having

14   it is, even with what he presents to the Court.

15           You have heard Dr. Lindemuth testify that he

16   is so persistent when it comes to seeking this

17   recommendation for a Z code that she can't get to any other

18   useful conversation with him2 it's therapeutic for some of

19   her patients to actually just have someone demonstrate

20   something helpful, which is what she was talking about with

21   the modality of therapy.

22           If they can see someone actually help them by

23   agreeing and doing just a gesture, a helpful gesture of

24   citing a recommendation to the Z code committee, then that

25   will help them move past just the hangup that a patient may

 1  have with respect to seeking it.

 2              She wrote that recommendation solely -- and

 3  she testified to that -- solely because he was so persistent

 4  to get her to do that.

 5              However, his physicals, he didn't have any

 6  problems, any recent problems discussing his anxiety or his

 7  chest pains.  He certainly -- it took him the better part of

 8  10 months to make his way through one of the prescriptions

 9  of the Nitroglycerin, and from November to September, so

10  it's not like he had a whole lot of panic attacks from that

11  period.

12              The heart of this issue is whether or not Dr.

13  Lindemuth's recommendation is a demonstration of the

14  irreparable harm that he is attempting to present to this

15  Court and prove to this Court in order to justify the single

16  cell.

17              Now that we have got the full context of

18  exactly what Dr. Lindemuth did and why she did it, her

19  ability to explain it, it becomes very clear,

20  Dr. Lindemuth -- there is being helpful to your patients and

21  then there is being too helpful to your patients.

22              It should be fairly obvious that she was

23  being too helpful, trying to extend basically a courtesy to

24  one of her patients that has since become the basis of

25  exactly why we are here today.  That's not why she did that,

1    though.  She didn't do that out of any medical necessity or

2    anything like that.  She did that simply because he hounded

3    her to do it2 then, of course, she agreed to do so.

4              But like I said, he -- he has not

5    demonstrated why he could possibly have an irreparable

6    injury, because he -- like I said before, he can't even get

7    his stories straight on exactly what his situation is.  His

8    situation in the context of having the conversations with

9    Dr. Lindemuth are much more serious than they are with his

10   behavior back on the pod.  Therefore, a preliminary

11   injunction is not necessary at this point, and his motion

12   should be denied.

13             THE COURT:  All right.  Mr. DeFranco.

14             MR. DeFRANCO:  Your Honor, first of all, I would

15   like to point out that the Defendants have not -- I'm still

16   begging to hear why my Z code was lifted to begin with.

17   They have not presented why it was lifted.  It was lifted,

18   according to Mr. Barr's declaration -- this is before the

19   Court -- approximately 44 days after I came out of the RHU

20   for threatening to kill an officer.

21             Now, I was not put on Nitroglycerin or

22   aspirin or Lopressor before this.  I never had -- I never

23   had that.  I was put on afterwards.

24             I am in a cell with somebody, and I'm like

25   this (indicating)2 I'll tell you -- and my mom will tell

1    you.  She is scared to death I am going to be transferred

2    for filing this.

3          They took my Z code away because I made an

4    error, and I threatened a staff member, and they took it

5    serious enough to put me in RHU for 45 days.  Then they take

6    me out and put me in a new unit where the staff don't know

7    me.  Defendant Showers.  And we have conversations, and he

8    makes indirect threats about -- I was missing property, but

9    that's a whole other issue. And they staffed me out of my Z

10   code.

11         Now, according to Mr. Barr's declaration,

12   which is appended to their objections, says that inmates are

13   reviewed annually for a Z code.  If they show significant

14   progress, Mr. Barr -- that is his words -- Z code will be

15   lifted.  They have not shown one witness to show why my Z

16   code was taken.

17         The Z code was taken because of my behavior

18   towards a guard.  It was retaliatory.  They retaliated2 it

19   was held over my head.  And it was felt even by my mother,

20   who has a bad heart, and my whole family, that if you do

21   something to a cellmate, you're going to -- across the

22   state2 then -- so it came to this:  I had to tell my mother,

23   mom, I'm filing a lawsuit, because if I do act out, and I

24   hurt the cellmate, they are going to have a justified reason

25   to transfer me2 then comes this case.

1          THE COURT:  And how long have you been in a double

2   cell?

3          MR. DeFRANCO:  I was in a double cell approximate

4   from August 18th until November 2nd of this year.  August

5   18th, 2002.  I went through 10 cellmates.  One took

6   self-lockup --

7          THE COURT:  In two years.

8          MR. DeFRANCO:  Yes.

9          THE COURT:  Plus.

10         MR. DeFRANCO:  Including -- included in my

11  objections are -- are notarized -- or declarations from

12  former cellmates that tell about my history.  The counselor

13  even admitted -- although she only said a couple -- didn't

14  want me in the cell.

15             I'm not capable of living in a bathroom with

16  another male or a female.  I'm not -- it's just -- I'm not

17  capable of doing that.  I can't function that way.  It's

18  hurting my heart.

19             Nitroglycerin, they say, oh, Your Honor, nine

20  months.  Well, my mother had triple heart bypass, and she's

21  gone through a bottle -- in maybe a year, hasn't even used a

22  bottle.  I have had my fourth bottle since 2003.  The guards

23  have it in their hand.  Four bottles.  That's along with

24  my -- and that ain't for panic attacks.  That's for my

25  heart.  I know the difference between the feelings now.  I

1    didn't before.  One is longer than the other.

2              So I filed suit, and I did it at the risk of

3    being transferred, with the threats of being transferred,

4    but I did it because I can't live like that2 if I blow up,

5    get caught, I'm going to get in trouble, and they are going

6    to have a reason to send me to SCI-Dallas.

7              In addition to that, my heart -- my mom is

8    really worried about my heart, as I am2 you're right, Your

9    Honor, I -- the medication they have me on, as far as with

10   Nitroglycerin and the Lopressor and the aspirin, do help my

11   heart.  But I still -- I'm pumping this stuff into me that I

12   didn't have to pump into me before.  My Valium is

13   60 milligrams a day.  I don't take all 60 a day.

14        THE COURT:  You are still on the medication in the

15   single cell, though.

16        MR. DeFRANCO:  Yes.  So until -- as counsel

17   pointed out, until June of 2003, which is nine months after

18   they took -- after I got double-celled, my heart -- I

19   started on Nitro pills.  They gave me -- they forgot to tell

20   you about the echocardiograms done on it that they performed

21   at SCI-Albion2 if you notice, Mr. Barr didn't take the

22   stand.  That's kind of -- I'm wondering why.

23        MR. BAREFORD:  Your Honor, this is -- not to take

24   advantage of it, but just ask that he be reminded that

25   because the Defendants don't have the burden in this case,

1   the Defendants don't necessarily need to produce witnesses

2   to respond to his motion.

3        THE COURT:  That is the law.  But you're allowed

4   to make that argument to me.  It's not a criminal trial.  He

5   can make that argument.  Go ahead.

6        MR. DeFRANCO:  Well, I'm just curious why they

7   didn't, after we put Miss Rebele on the stand, when he

8   couldn't hear what she had to say2 it's interesting that

9   some of the witnesses, as you heard, were inconsistent with

10   each other.  Very much so.  Miss Rebele can't tell you if we

11   were sitting or standing, if she was going or coming, if she

12   had the right number.

13        And what is very, very, very telling in the

14   whole tale is Mr. Barr.  What does he do?  He calls out the

15   doctor who wrote the recommendation that you granted a TRO

16   on, and he tells her, we cannot have this, you can't write

17   letters like this, this is setting up a dangerous precedent.

18   Other inmates are going to do this.  You can't do this2 now

19   we have a new affidavit that says somehow I manipulated it.

20   If that's the case, people have been manipulating her for

21   Oxycontins, the jail would be -- it doesn't make any sense.

22   As you can see, she didn't want to say what she said about

23   Mr. Barr.  You had to tell her it was okay.

24        I think what Mr. Barr did is definitely

25   wrong.  He was tampering with a witness2 ultimately got the

1    witness to sign an affidavit and come in here and give
2    testimony that didn't make a lot of sense a lot of times, to
3    me anyway, but she stuck by it.  She told you -- the doctor
4    told you that she stands by her report and recommendation.
5    That due to my past, that I am antisocial, I can explode
6    and -- my heart condition.  That she stands by that report
7    that she wrote2 she's the doctor2 while she signed an
8    affidavit that was sort of watered down, like the original
9    recommendation stated, she stood by.  In her new affidavit,
10   she still says she stands by him.  I'm internalizing my
11   anger with a cellmate, and it's causing me to take more
12   Nitroglycerin.  Which she looked at my chart on her own and
13   came up with that conclusion.  She didn't say any of that
14   was false.  She said that was true2 I think based upon that
15   testimony and the last part of the testimony in particular
16   where she pointed out what actually transpired again between
17   her and the Defendant -- well, Mr. Barr and an unknown
18   female, got her to sign an affidavit.  Although she stood by
19   it, now she's saying that -- why would you do that?  Why
20   would you call in a doctor and tell her -- and dictate to a
21   doctor what she can and can't do?  You can't do that.  You
22   can't write them recommendations.  She's only wrote four.
23   If -- if what she said is true, it was only to appease me,
24   her stamps -- her signature and her stamp is all over the
25   report.

1    I think she went back on it a little bit
2  because she was intimidated by the Defendants.  But she
3  still stood by it.  She said it's all true, it's all
4  accurate.  Yeah, I'm going to point it out.  She's the only
5  one listening to me.  She's my psychiatrist.  Mr. Reilly,
6  they don't want -- they don't call me down for psychotherapy
7  and have one-on-one's.  It's with her.  Yes, that's a big
8  deal to me.
9    I want to be a nice person, and at heart I am
10  a nice person2 I try to be nice.  I just got -- I can't
11  function living in a bathroom-sized space with another
12  individual.  It frustrates me, it's harmed me, it's hurting
13  me2 I can be nice outside of that2 I try to be nice2 I don't
14  want to be mean.  But being forced in that situation is
15  hurting me.  And I was single-celled for a reason.  And if
16  it was only for anxiety, as Miss Webb testified to, that the
17  staffing committee thought was my only problem, then they
18  were wrong.  Because I have panic disorder, antisocial.
19  That doesn't mean -- I don't know the real definition of
20  antisocial.
21    I guess you pick and choose -- you can't
22  associate yourself with anybody.  I have to -- my job at the
23  law library isn't to help all inmates with legal work.  I
24  manually do the inventory.  I manually put all the new law
25  books that come in -- the new ones go out [sic].  The PA Law

 1    Reporters, the Fed. Supps, that's my job.  But I do run a
 2    citizenship group, and I try to be a good person.
 3            The problem with the whole thing is, is I was
 4    Z-coded for a reason, and they have failed to say why I was
 5    taken.  Other than it was retaliatory.  It happened 44 days,
 6    Your Honor, after I came out of RHU.
 7            THE COURT:  All right.  All right.  Now, you
 8    understand, some of the arguments both of you made today is
 9    information that will -- that bears on the ultimate decision
10    in the case2 for a preliminary injunction, I have to make a
11    decision whether that extraordinary relief, which is giving
12    you relief early on before its tried by the jury, is
13    warranted.  So it's an extraordinary relief2 to do that, I
14    have to go through the testimony today, and I have to
15    determine whether, in fact, irreparable harm has been shown
16    by you and, in fact, whether or not there is a substantial
17    likelihood of success on the merits when we finally get to
18    trial2 I can't do that until I review everything, including
19    some of the things that were referred to today, but not put
20    into evidence itself; some of the affidavits and some of the
21    arguments.
22            So I will take this under advisement, and I
23    will rule as quickly as I can2 I thank you all for your time
24    and we're adjourned.
25            MR. BAREFORD:  Thank you.

1

2          (Hearing concluded at 4:30 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25