1                    IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    ANTHONY DEFRANCO          :
            Appellant          :
4                              :
            v.                 :   Civ. No. 04-CV-00230E
5                              :
     WILLIAM WOLFE,            :
6    SUPERINTENDENT, et al.,   :
            Defendants         :
7

8

9             Motion Hearing in the above-captioned matter

10       held on December 17, 2004, commencing at 10:45 a.m.,

11       before the Honorable Susan Paradise Baxter, at the

12       United States Courthouse, 17 South Park Row, Erie,

13       PA 16501.

14

15

16   For the Appellant:

17       Anthony DeFranco, Pro Se

18

19

20   For the Defendants:

21       Christian D. Bareford, Esquire
         Office of Attorney General
22       6th Floor, Manor Complex
         564 Forbes Avenue
23       Pittsburgh, PA 15219

24

25                    Reported by Sonya Hoffman
                 Ferguson & Holdnack Reporting, Inc.

1                        I N D E X

2

3

4    ANGELA LINDEMUTH

5          Direct Examination by Mr. DeFranco . . . . . . . 5

6          Cross-Examination by Mr. Bareford. . . . . . .54

7          Redirect Examination by Mr. DeFranco . . . . .68

8          Cross-Examination by Mr. Bareford. . . . . . .80

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

10:27AM  1    MS. WALLEN:  The case before the Court is Anthony

2    DeFranco versus William Wolfe, et al.  It's docketed at

3    Civil Action No. 04-230E.  Mr. DeFranco is representing

4    himself pro se.  Representing the Defendants is Christian

10:45AM  5    Bareford of the Attorney General's office.

6    THE COURT:  Good morning.  We're here because the

7    temporary retraining order, as you know, elapsed after 10

8    days, and the preliminary injunction motion is still

9    pending.  And we need to have some evidence put forth on the

10:46AM 10    things that I heard on the telephonic hearing for the -- for

11    the TRO.

12    So the motion is actually yours, Mr. DeFranco.

13    It's you that has to begin the process.  Do you have some

14    folks you want to have to testify, or do you have any

10:46AM 15    evidence that you'd like to give us -- documentary evidence?

16    MR. DEFRANCO:  I have both, Your Honor.  I would like

17    to initially call Dr. Lindemuth.

18    THE COURT:  All right.  To the stand?

19    MR. DEFRANCO:  Yes.

10:46AM 20    THE COURT:  All right.  Dr. Lindemuth is here?

21    MR. DEFRANCO:  Yes.  May I -- if there's any witnesses

22    that the Attorney General is calling, I'd like them excluded

23    from the courtroom.

24    THE COURT:  Is there anyone in here that you're going

10:47AM 25    to be calling?

3

10:47AM  1        MR. BAREFORD:  Yes, ma'am.  We've got several officials

      2   from the State Correction Institution at Albion.  I don't

      3   know -- I'm not entirely certain whether or not it will be

      4   necessary to call all of them.  But I'd be more than happy

10:47AM  5   to --

      6        THE COURT:  To exclude them.

      7        MR. BAREFORD:  Yes.

      8        THE COURT:  There are seats out in the waiting area

      9   over there and in the hallway outside of Courtroom C, as

10:47AM 10   well.  Thank you.

     11        Is that everyone?  Dr. Lindemuth, can you come up

     12   here please and we'll swear you in.

     13

     14        A N G E L A   L I N D E M U T H, first having

10:48AM 15        been duly sworn, testified as follows:

     16

     17        THE COURT:  Please state your full name for the record

     18   and spell your last name.

     19        THE WITNESS:  My name is Angela Lindemuth,

10:48AM 20   L-I-N-D-E-M-U-T-H.

     21        THE COURT:  All right.  You may begin questioning her.

     22

     23                        DIRECT EXAMINATION

     24   BY MR. DEFRANCO:

10:48AM 25

10:48AM 1    Q.    Good morning, Doctor.

2    A.    Good morning.

3    Q.    I'd like to ask you if you recall in August of

4    2002 our discussion about a Z Code to a single cell being

10:48AM 5    lifted from me?

6    A.    Yes.

7    Q.    And do you recall agreements that I showed you

8    that you looked at and they may lobby that I planned on

9    filing against the Defendants in this case?

10:49AM 10    A.    Yes.

11    Q.    And that was approximately in August of 2002,

12    correct?

13    A.    Yes.

14    Q.    It came to my attention in the Defendants'

10:49AM 15    objections, in their pleadings, that you gave a notarized

16    statement to Mr. William Barr, I believe.

17    A.    Yes.

18    Q.    Which is -- sort of contradicts your letter of

19    recommendation I should be detained.  What I'd like to --

10:49AM 20    THE COURT:  Let me find that letter.  I have it here.

21    Is it attached to the -- do you have a copy for

22    Dr. Lindemuth to use?

23    MR. DEFRANCO:  Yes, I do, Your Honor.

24    THE COURT:  We will give that to her.  Do you have a

10:50AM 25    copy you can use as well?

10:50AM  1    MR. DEFRANCO:  Yes, Your Honor.

2    THE COURT:  And the affidavit is dated 11/8/04; is that

3    correct?

4    MR. DEFRANCO:  11/8/04.  We have it.

10:50AM  5    THE COURT:  Okay.

6    MR. DEFRANCO:  Your Honor, I'd ask since I'm not

7    represented by counsel --

8    THE COURT:  Yes, sir.

9    MR. DEFRANCO:  -- I'm on medication and my retention

10:50AM 10    expanse is not that good.  I have a family member that's a

11    physician that could help in me asking questions who's

12    sitting in the courtroom today.

13    THE COURT:  I can't allow that, I'm sorry.  You have to

14    represent yourself or be represented by an attorney.  And

10:50AM 15    those are the only people who can ask questions.

16    MR. DEFRANCO:  Okay.

17    THE COURT:  I'll give you opportunities to recess and

18    talk to him.  I'll give you that opportunity, but he can't

19    ask the questions.

10:50AM 20    MR. DEFRANCO:  I was going to ask if he could write

21    them down with me.

22    THE COURT:  Well, do you have any objections to that if

23    he sits by the --

24    MR. BAREFORD:  Yes, ma'am, I do.  And just for purposes

10:51AM 25    of identification of who this witness is, other than if it

10:51AM 1   is his brother.  And also to the degree that he's going to

2   provide assistance to the Plaintiff in the case, that the

3   manner in which that assistance is going to be provided may

4   present, or at least --

10:51AM 5       THE COURT:  Present a legal representation.

6       MR. BAREFORD:  Yes, ma'am.

7       THE COURT:  How about if we do it this way -- and also

8   I don't want to have anybody getting excited here about

9   security; so how about if we allow you to begin questioning

10:51AM 10  and then we'll take a short break and you can speak to your

11  brother.  Would we have any problem on that security-wise?

12      MR. BAREFORD:  I don't think so, Your Honor.

13      THE COURT:  If he writes down the questions, it's just

14  as though he's asking them, so that would be the same legal

10:51AM 15  problem we have since you are proceeding pro se, all right?

16      MR. DEFRANCO:  Okay.

17      THE COURT:  Okay.  That's how we'll solve that.  And

18  when you are at a brick wall and you need to, you tell me.

19      MR. DEFRANCO:  Okay.

10:52AM 20  BY MR. DEFRANCO:

21      Q.  Dr. Lindemuth, that affidavit that you have in

22  front of you was, I believe, signed by you on November the

23  8th.

24      A.  Correct.

10:52AM 25      Q.  And that would have been after a hearing was held

10:52AM  1    before Judge Baxter in this case.

2           A.   Yes.

3           Q.   Okay.  Can you -- did you write that affidavit

4    out?

10:52AM  5    A.   I -- I -- well, this is what --

6           MR. DEFRANCO:  Excuse me, I don't mean to interrupt

7    you.  Your Honor, I would like the record to reflect and I'd

8    like you to instruct the witness she's under oath and what

9    that means and what the penalty is.

10:53AM 10    THE COURT:  I think she understands what that means.

11   She'll answer it.

12          A.   I signed this.  Did I actually type this, no -- I

13   didn't type it, but I explained on my stance to Mr. Barr and

14   this was typed there and all of this information here is in

10:53AM 15   agreement with what I discussed with -- so whether I

16   actually took the typewriter and typed this out on my own,

17   is not really --

18          Q.   That was my question.

19          A.   This all concurs with what we discussed with

10:53AM 20   Mr. Barr regarding just before this affidavit was issued.

21          THE COURT:  All right.

22          Q.   Okay.  You've been treating me since 2001,

23   correct, Dr. Lindemuth?

24          A.   April of --

10:54AM 25   Q.   2001.

10:54AM   1        A.    2001, yeah.

          2        Q.    And I don't want to go back.  I guess I'll just go

          3   ahead with this line first jumping ahead; but can you tell

          4   me and the Court, your office is located in the med.

10:54AM   5   building, correct, medication -- or the health care

          6   facility, Room No. 1?

          7        A.    Yes.

          8        Q.    And your door is always open, correct, usually?

          9        A.    Usually open.

10:54AM  10        Q.    Right.  And there's another room adjacent to that

         11   where people come in and out?

         12        A.    Well, there was another office there with the

         13   infections control nurse.

         14        Q.    And the Xerox machine outside.

10:55AM  15        A.    There's a Xerox machine now outside there, yes.

         16        Q.    I just needed to verify that.  Do you recall our

         17   last meeting?  And I don't want to put you on the spot, I

         18   know that I am, but I don't mean to be with Mr. Barr being

         19   here, that we had a meeting on November 19th that would have

10:55AM  20   been after the hearing before Judge Baxter in which you told

         21   me about Mr. Barr meeting with you and another woman.  And

         22   that Mr. Barr --

         23        THE COURT:  Well, let's get that far; do you recall

         24   that meeting?

10:55AM  25        A.    Yes.  That was accurate and truthful, yes.

10:55AM 1        Q.   Could you tell me exactly what was said by

2       Mr. Barr to you during that meeting?

3        A.   Well, the issue of -- was that the -- the memo

4       which I directed to the Z Code committee had been applied in

10:56AM 5       your -- I guess, a Federal appeal in your case or something,

6       okay.

7            So I concurred with Mr. Barr that I didn't plan it

8       to lead to anything like this.  It was just basically a

9       simple memo addressed to the Z Code committee making a

10:56AM 10      recommendation, which they could either decline or grant.

11       Q.   So what you're testifying to is this, essentially

12      that it's okay if Mr. Barr or the DOC sees this document,

13      but it's not okay for a Federal judge to see it?

14       MR. BAREFORD:  Ma'am, just to the extent that -- just

10:57AM 15      to remind the witness that her testimony actually speaks for

16      itself, and with Mr. DeFranco, the way that he's

17      characterizing his following questions -- actually,

18      recharacterizing her answer and then asking --

19       THE COURT:  Well, he's asking her if that's what she

10:57AM 20      just said and she can answer that.

21       MR. BAREFORD:  Yes, ma'am.

22       THE COURT:  Overruled.  You can answer that.  Is it

23      that you believed -- or in rephrasing the question, that the

24      letter was meant only for the eyes of the committee and

10:57AM 25      Mr. Barr and not for the Court in a TRO hearing setting?

10:57AM

     A.   Well, yeah.  I had -- it didn't cross my mind that
it would be submitted to any higher legal entity.  It was
really directed, and that's how I addressed it, to the Z
Code committee that makes -- in fact, I conveyed my

10:58AM

skepticism of that to -- to Mr. DeFranco, that it's likely
not going to fly and the Z Code committee is really going to
accept it necessarily because there are so many other
individuals, many inmates, that are really very much the
same in their demeanor and conduct and history as

10:58AM

Mr. DeFranco, that they're unpredictable, they're volatile,
they're aggressive, and so on.
     And even though ideally all of these inmates would
probably be more -- it would be more suitable for these
individuals ideally to be in a single cell, it is not

10:59AM

practical.  So I did convey that to him.  I said, well, I
can give -- I can give this memo, but don't count on
anything changing.
     My -- my primary purpose was really kind of a
supportive therapy, and that was a -- that was a modality of

10:59AM

supportive therapy, which is to -- as a psychiatrist, to
validate a patient's concern and to do not just medication
therapy, but to put -- to apply any other input or drug
medication that I can even though the outcome is -- isn't
the -- lies in the hands of the Z Code committee.

11:00AM

     But just my act of accepting to write this and my

11

11:00AM  1  willingness and the fact that there's an alliance there and

2  reassurance, it was just, again, a -- amounted really to a

3  supportive therapy.  So it wasn't so much the result that

4  was what I intended, it was the act or the process of doing

11:00AM  5  something that would appease -- would appease the inmate.

6      Q.   So my heart problem, that doesn't concern you at

7  all, ma'am?

8      A.   Well, the heart problem -- again, I don't know how

9  you're going to tie it into the single cell status --

11:01AM 10      THE COURT:  Well, I can answer that.

11      Q.   You tie in --

12      THE COURT:  I can answer that.  This is what I

13  partially based my recommendation for the temporary

14  retraining order, which has expired, so I would appreciate a

11:01AM 15  response on this.

16          It was my understanding from the evidence that was

17  given to me at that hearing that having been in a two-person

18  cell for a period of time has increased his heart medication

19  and increased his heart problems that he didn't take as much

11:01AM 20  medicine, he didn't have as many problems, as in a

21  two-person cell.

22      THE WITNESS:  Yes.  Now, that could be coincidentally

23  because as individuals age and, you know, the progression of

24  heart disease is usually for the worse as times goes on.

11:02AM 25  But, again, any -- all cardiac patients are advised to

11:02AM 1    reduce stress, and in being in a double cell constitutes a

2    stress obviously that would be adverse to his cardiac

3    status.

4           But then there are stressors that are inherent to

11:02AM 5    prison life, and certainly we have all kinds of individuals

6    that have stress-related illnesses, which if they have to be

7    in an ideal condition, then they might not have as much

8    trouble controlling the sugar or not as much trouble

9    controlling the blood pressure, not as many episodes of

11:03AM 10   chest pain. So you could argue that -- I mean, this would

11   apply to all individuals that stress would have a negative

12   impact on their illness.

13        THE COURT: I have another question: When you

14   testified previously that there are a lot of prisoners who

11:03AM 15   would benefit from a single cell, but it's just not

16   practical and they have somewhat similar illnesses as the

17   Plaintiff, are any of those prisoners also exhibiting the

18   heart condition that the Plaintiff exhibits?

19        THE WITNESS: Oh, yes. There -- I mean, we have large

11:04AM 20   numbers of individuals who are cardiac patients, who are

21   diabetics --

22        THE COURT: And they're psychiatric patients as well?

23        THE WITNESS: And psychiatric patients as well,

24   absolutely.

11:04AM 25        THE COURT: Are they housed in a single cell?

11:04AM 1      THE WITNESS:  No.  Not unless they have met whatever

2    criteria, which mental health apparently is no longer a

3    criteria for a single cell.  If they -- for instance, if

4    they're homosexual, that would be a criteria, but there are

11:04AM 5    very, very few.

6      MR. BAREFORD:  Well, ma'am, if I may be heard on this.

7    We are prepared to call an additional witness who can

8    actually perhaps better explain the medical condition and

9    the medications --

11:05AM 10      THE COURT:  Well, I'll ask questions of that witness,

11    too.

12      MR. BAREFORD:  Yes, ma'am.  But just for purposes of

13    just to indicate that we're prepared to bring someone in and

14    that could probably also provide some additional context.

11:05AM 15      THE COURT:  Now, I'm going to be interrupting you, Mr.

16    DeFranco, regularly, because I do ask questions.

17      MR. DEFRANCO:  That's fine.

18      THE COURT:  But my point is to get it right.  We are

19    not in trial and we're not in front of a jury. So, go ahead,

11:05AM 20    excuse me.

21    BY MR. DEFRANCO:

22      Q.  Dr. Lindemuth, in your meeting with Mr. Barr, was

23    it specifically asserted to you that it was not going to be

24    tolerated by the DOC that these recommendations that you

11:05AM 25    wrote for me would set a dangerous precedent that they were

11:05AM 1    concerned about?  That's a yes or no answer, please.

2        THE COURT:  She's allowed to explain a yes or no, Mr.

3    DeFranco.

4        A.   Well, first of all, I was pretty astounded that

11:06AM 5    this had gone to the level of, you know, Federal

6    jurisdiction.  So I was the one who expressed my dismay

7    that -- that this had reached this level and that now it was

8    going to involve all of these people.  And basically, the

9    memo was just a memo and that there was nothing more

11:06AM 10   intended than that.

11            And when I was told that actually the Federal

12   Court had dictated that -- dictated to the State prison

13   that -- to -- for you to be granted a single cell, that

14   really astounded me and I said that this is not what I

11:07AM 15   intended.

16       Q.   This came from Mr. Barr, correct?  Mr. Barr told

17   you that the Federal Court intervened and told them what to

18   do.

19       A.   Well, he had to explain why he called me -- he

11:07AM 20   called me to -- I mean, I didn't know.  I went to the office

21   one day because I was called down.  And so I went down there

22   and, yes, he did explain why I was coming to the office.

23   And then I was very shocked that --

24       Q.   Well --

11:07AM 25       MS. WALLEN:  Sir, one at a time.  Let her finish and

11:07AM  then you can speak to the Court.

2  A. Yeah.  Of course, he had to tell me why -- he had

3 to explain to me why that this -- he explained to me your

4 view because this case is happening, and I was pretty

11:07AM  shocked that it had reached that level.  I had no idea that,

6 you know, the Federal Court would intervene.  Again, this

7 was directed -- this little note is --

8  Q. It's a recommendation.  It's not a note, it's a

9 recommendation and --

11:08AM THE COURT:  Her testimony is as it is.

11  MR. DEFRANCO:  Right.  But it says recommendation.

12  THE COURT:  You can testify.

13  MR. DEFRANCO:  Okay.  But my point is this, it's

14 obvious that the Defendants have spoken to this witness.

11:08AM THE COURT:  Well, you ask her that.  You ask her that.

16 And then you can make that argument to me after, okay?

17  MR. DEFRANCO:  Okay.

18 BY MR. DEFRANCO:

19  Q. How many of these memos have you written, Doctor?

11:08AM A. Well, this is your -- I had one before for you.

21  Q. You had two for me.  I'm talking about what

22 inmate, how many recommendations to the Z Code committee

23 have you written?

24  A. Well, I don't -- if -- if we can't get beyond the

11:08AM treatment because of the Z Code, Z Code is the total focus

11:08AM 1    of the individual, and as I said, this is a therapeutic

2    maneuver, a therapeutic modality.  It's a supportive

3    modality, it's not intended to dictate to the Z Code or

4    anyone, it's a recommendation for anyone that you have to --

11:09AM 5    it's a recommendation.  It's like validating your concern.

6        Q.    I understand that.

7        A.    And an example of that is taking your concern,

8    which constitutes a therapeutic --

9        Q.    I don't --

11:09AM 10       A.    -- conduct.

11       Q.    You're not answering my question.  My question is,

12    specifically:  How many of these recommendations have you

13    wrote for inmates to get a Z Code?

14       A.    Well, very few because of --

11:09AM 15       Q.    Approximately, how many?

16       A.    It's probably been maybe a handful.  I would say

17    about four or five at the most.

18       Q.    It's very rare that you do that?

19       A.    It is, because I'm aware of the fact that, you

11:09AM 20    know, even if they complain to me that, oh, I lost my Z

21    Code, I know that circumstances of the correctional system

22    are such that it's not possible for -- I mean, certainly

23    everyone who's in prison would prefer to be in a single

24    cell, of course.

11:10AM 25       Q.    Well, you were aware that I was Z Coded prior to

17

11:10AM  this.

2          A.   I'm aware of that.

3          Q.   And I was allegedly threatening -- they say it was

4    a true threat and ultimately they took it as a true threat

11:10AM  that I threatened an officer's life.  And according to

6    Mr. Barr's declaration, he stated that this happened in

7    March of 2002.  I went in the hole for 45 days, I come out

8    of the hole, so it would be approximately May 10th of the

9    same year.  The next month, according to Mr. Barr, my Z Code

11:10AM  is lifted.  Now, he said in his declaration that inmates are

11   reviewed annually, if they show significant progress that's

12   the only time a Z Code can be lifted.

13         Now, my question is this:  Threatening a staff's

14   life, does that constitute significant progress in your

11:11AM  eyes?

16         A.   Well, you've got to understand that with your

17   character logic disturbance, you know, being -- having a

18   propensity towards threatening and violence is going to be

19   persistent -- pervasive -- it's going to be pervasive,

11:11AM  right?

21         So that, I wouldn't -- you know, threatening -- I

22   mean, we can't -- everyone there is very aggressive -- or a

23   large percentage are very aggressive and a large percentage

24   will either threaten a cell mate or one of the staff or CO,

11:12AM  but that cannot constitute criteria for single cell, of

11:12AM  course, because --

2       Q.    You're missing the whole point, I was already Z

3   Coded.

4       THE COURT:  She's not answering the question.

11:12AM      Q.    You're missing the whole point, you're very

6   evasive.

7       THE COURT:  Excuse me, he asked you whether being

8   charged and spending time in restrictive housing for

9   threatening an officer would be considered significant

11:12AM  progress to have him placed outside of Z Code status.  So

11  answer that first and then you can explain.

12      A.    Progress -- see, with any social personality and

13  character style that is not -- I mean, we cannot change that

14  character logic disposition you have for -- in fact, that --

11:12AM      THE COURT:  So your answer is, no, that's not

16  significant if a person --

17      A.    Exactly.  That's not deemed in your case as

18  either -- it's just part -- it's part of your inherent

19  character style.  And, you know even in the most ideal

11:13AM  conditions, you still, if you were provoked, even with a

21  minor trigger, you would tend to use these defense

22  mechanisms of wanting to threaten or strike somebody.

23  That's why you're in prison, right, for violence.

24      THE COURT:  Do you understand her answer?

11:13AM      MR. DEFRANCO:  I understand her long answers, Your

11:13AM  1    Honor, yes.  And they're like confusing me because I'd

         2    like -- my questions are quite simple and --

         3        THE COURT:  She's allowed to explain.  I'm going to

         4    give a shot at re-iterating her answer.  And her answer was

11:13AM  5    no, but we can't -- basically, we can't reward it because

         6    that's part of the behavior that we are treating.

         7        MR. DEFRANCO:  So, we'll punish it -- we'll punish it

         8    by taking the Z Code after you do it?

         9        THE COURT:  I don't know.  That's the next question, I

11:14AM 10    guess.

        11    BY MR. DEFRANCO:

        12        Q.   Let me ask you this then, Doctor:  According to

        13    Mr. Barr's declaration, again, in those time frames, I was

        14    out of the hole for 44 days, he said they're reviewed

11:14AM 15    annually, which is a year, 365 days if I'm correct; I was

        16    out of the hole for 44 days and they took my Z Code.

        17        THE COURT:  Do you understand?  Do you know the answer

        18    to that question?

        19        Q.   That's my question to you.

11:14AM 20        A.   I don't know what goes into how long the duration.

        21    All those things are security decisions as far as how

        22    often --

        23        THE COURT:  You can ask someone else that question.  I

        24    understand your point.  Ask her specifically psychiatric

11:15AM 25    treatment questions that pertains to you.  Whether or not

11:15AM 1    they did something out of timeness -- unless you instituted

2    that, did you institute that?

3         THE WITNESS:  No.

4         MR. DEFRANCO:  Well, she was -- when we had our last --

11:15AM 5         Q.   Let me ask you this, Doctor:  Do you have my

6    medical chart?

7         A.   We have your medical chart.  I reviewed it before

8    and also earlier today I reviewed it.

9         MR. DEFRANCO:  Your Honor, can she read from that, her

11:15AM 10   notes?

11        THE COURT:  You don't have a copy of that?  You're not

12   allowed to have a copy of your psychiatric chart.

13        THE WITNESS:  Your Honor --

14        THE COURT:  Hold on a second, that's interesting, hold

11:15AM 15   on one second.  Typically, the party has a copy of the

16   document; how do we deal with that?

17        MR. BAREFORD:  Actually, might I suggest that he at

18   least ask the question in the event that she cannot answer

19   the question without referring to the medical file.

11:16AM 20        THE COURT:  He wants her to read a passage from her

21   chart.

22        MR. BAREFORD:  If he can just sort of more specifically

23   identify what it is that he's attempting to accomplish here.

24        THE COURT:  What is it you want her to read?

11:16AM 25        MR. DEFRANCO:  I would like to see if she was

11:16AM  1    consistent in her notes about me being worried about the

      2    possibility of me not saying these words to her, not that I

      3    ever --

      4        Q.   And I'll ask the Doctor, did I ever tell you that

11:16AM  5    I was going to hurt anybody?

      6        A.   Well, I believe, when I read through the notes, I

      7    did indicate that -- that you had -- you felt or you

      8    expressed to me that you felt like you are so frustrated, so

      9    annoyed and irritated by having to cohabit with someone,

11:17AM 10    that you felt it could result in a blowup or an explosive

     11    temper that you could hurt the other individual in your

     12    house -- in your room.

     13        THE COURT:  Here's where we're going with this:  The

     14    medical files are different, the psychiatric records in the

11:17AM 15    DOC, as you know, are confidential and off limits to the

     16    patient.  The patient in this case is also the attorney, so

     17    it's a difficult -- and the Court has no authority to change

     18    the rules of the Department of Corrections.

     19            Now, we could, if you -- I mean, we could have the

11:17AM 20    Court look at the psychiatric record in camera, which means

     21    on my own back in my chambers, but I don't have the

     22    authority to let you look at that which you are not allowed

     23    to look at under DOC regulations; are you following me?

     24        MR. DEFRANCO:  I'm following you, Your Honor.

11:18AM 25        THE COURT:  And is that an accurate portrayal of DOC

11:18AM  regulations?

2        MR. BAREFORD:  Yes, ma'am.  And I think even perhaps

3        to -- if I might add to perhaps even help Mr. DeFranco out,

4        what he was just asking about actually is consistent with

11:18AM  the statements that were included in the two letters that

6        Dr. Lindemuth had actually written on his behalf to the Z

7        Code committee.

8                So for purposes of the fact that she actually

9        memorialized it, actually does, in fact, demonstrate that he

11:18AM  indicated that to her on at least the occasions prior to --

11       MR. DEFRANCO:  I would object to that.  It might be in

12       her interpretation of talking to me, but what did I

13       specifically assert in there.

14       THE COURT:  Yes.  That might be in her notes as well,

11:18AM  that would be her interpretation as well.  So if you want me

16       to look at those records, I will look at those records, but

17       I can't let you look at them.

18       MR. DEFRANCO:  I would like you to look at the record.

19       THE COURT:  All right.

11:19AM  MR. DEFRANCO:  I don't know, I can't approach the

21       witness.

22       THE COURT:  That's all right, the courtroom deputy can.

23       BY MR. DEFRANCO:

24       Q.   Doctor, does that accurately portray what you

11:19AM  wrote?

11:19AM    1    A.    Yes.

2    THE COURT:  What is that that has been handed?

3    MR. DEFRANCO:  I've handed Dr. Lindemuth a report dated

4    August 20th, 2004.

11:19AM    5    THE COURT:  I have it in front of me.  That's the

6    recommendation to the Z Code committee?

7    MR. DEFRANCO:  That's the latest one.

8    Q.    That's a recommendation, not a suggestion -- and

9    there's a difference, correct, Doctor?  Is there a

11:20AM   10    difference in the medical and the legal profession between a

11    suggestion and a recommendation?

12    A.    Well, there's nothing that makes a rec -- a

13    recommendation is not a compulsory --

14    Q.    It's directory.

11:20AM   15    A.    It's not -- it's a rec -- I don't know what you

16    mean.  A suggestion -- if it was much more like a

17    suggestion, it would be like something that is absolutely

18    imperative, that is necessary.

19    Q.    It would be adversary and directory.  That would

11:20AM   20    be the definition, I believe.

21    THE COURT:  Do you understand your recommendation to be

22    a direct request or a direct order, or do you understand

23    your recommendation to be a suggestion?

24    Q.    And do you know the difference?

11:21AM   25    THE COURT:  Well, which did you understand this to be,

11:21AM  1  because it says recommendation?

2        THE WITNESS:  Yeah.  My recommendation is a

3  recommendation.  Like I could have interchanged

4  recommendation to -- the word recommendation to suggestion.

11:21AM  5  My suggestion is I didn't mean it to be an absolute.

6        THE COURT:  Let me ask you this:  Do you have the power

7  to direct that the committee take any action?

8        THE WITNESS:  No.  It's always been input.  They can

9  take --

11:21AM  10       THE COURT:  That's what you've always said, but do you

11  have the power to direct them to do anything?

12       THE WITNESS:  No.

13  BY MR. DEFRANCO:

14       Q.  Does any doctor have the power to do that?

11:21AM  15       A.  I don't believe.

16       Q.  Is there a doctor on that panel of Z Code

17  committee?

18       A.  No.

19       Q.  So none of them are medically qualified to make a

11:22AM  20  determination whether a person should or should not be Z

21  Coded?

22       THE COURT:  You can make that argument, but that's not

23  a question she can answer.

24       MR. DEFRANCO:  Okay.  I would suggest she --

11:22AM  25       A.  Well, that's the structure.  Now, whether it's

25

11:22AM 1  right or wrong, that's the structure of Z Code.

2      Q.  Do you believe that's a dangerous structure,

3  Doctor?

4      A.  Well, that's a personal opinion.

11:22AM 5      Q.  That's what I'm asking.

6      A.   I can't -- that's --

7      MR. BAREFORD:  He's actually asking for a hypothetical,

8  not entirely an --

9      THE COURT:  I concur.

11:22AM 10      MR. BAREFORD:  -- and an opinion as to something that

11  is beyond what she can control because the Department of

12  Correction policy is what the policy is.

13      THE COURT:  That's an objectionable question under the

14  Federal rules, so I'll sustain.  I'm giving you a lot of

11:22AM 15  leeway, but she's not here as an expert witness to give her

16  opinions on how the prison is run.  I don't know that she

17  would be approved for that.

18      MR. DEFRANCO:  My problem -- my whole problem is this,

19  Your Honor, I --

11:23AM 20      THE COURT:  You can make an argument.  I understand

21  where you're going on this and I understand the argument

22  that you make.  And I'm telling you it wouldn't matter if

23  she had that opinion or not, but you can still make the

24  argument and I will still take that as one side of that

11:23AM 25  story that I have to decide.  Are you following what I'm

11:23AM 1    saying?

2        MR. DEFRANCO:  Yes.

3        THE COURT:  Her opinion would hold little weight on the

4    best way for a prison to run because she's not a prisoner

11:23AM 5    specialist.  Are you following what I'm saying?

6        MR. DEFRANCO:  I'm following.

7        THE COURT:  So under the rules of evidence, we don't

8    ask laypersons -- I mean, she's a physician, we don't ask

9    them questions that require expertise on another field that

11:23AM 10   they're not experts in.  She's an expert in psychiatry.

11       MR. DEFRANCO:  See, I came from Western Penitentiary,

12   and down there the psychiatrists were the ones who decided

13   with the superintendents --

14       THE COURT:  The Z Code.

11:24AM 15   MR. DEFRANCO:  Right.  It was the program committee guy

16   who I have and deputies, and no --

17       THE COURT:  But you have -- you've elicited the

18   testimony from this witness that there no were psychiatrists

19   on that committee.

11:24AM 20   MR. DEFRANCO:  Right.  No doctors --

21       THE COURT:  And so that's the important point and you

22   can make your argument at the closing, okay?

23   BY MR. DEFRANCO:

24       Q.   What did that recommendation --

11:24AM 25   MR. DEFRANCO:  Let me just digress one minute, Your

11:24AM 1    Honor.  Isn't there a significant difference between the

2    words suggestion and recommendation?

3        THE COURT:  You can make that argument, too.  She

4    doesn't see one, her testimony was that it's the same.  Was

11:24AM 5    that your testimony?

6        THE WITNESS:  Yes.  I could have put suggestion instead

7    of the word recommendation in this case because it wasn't

8    like a compulsory intervention or a compulsory move that had

9    to be made, it was going to be a more optimal thing.

11:25AM 10        MR. DEFRANCO:  But that doesn't --

11        THE COURT:  You can disagree with her about that, but

12    you can't argue with her on the stand.  So she disagrees

13    with you, so let's move on.  Do you want to speak with your

14    brother for a few minutes?

11:25AM 15        MR. DEFRANCO:  Yes.

16        THE COURT:  I'll stay on the bench and we'll go off the

17    record.

18            (Brief recess taken.)

19        THE COURT:  All right.  We're ready to go back on.  All

11:33AM 20    right.  We're back on the record, and we'll continue with

21    the examination of the witness.  Mr. DeFranco.

22        MR. DEFRANCO:  Thank you, Your Honor.

23    BY MR. DEFRANCO:

24        Q.   Dr. Lindemuth, I take it on your direct

11:33AM 25    examination a moment ago that your testimony was that you

11:33AM  1    wrote this letter as a therapeutic --

2              A.    Modality.

3              Q.    -- intervention, I think you used.

4              A.    Well, an intervention, yes.

11:33AM  5     Q.    And it would seem to me that would be manipulating

6      me.

7              A.    No.  The end result, as I said, is not up to me.

8      The end result is the decision of the Z Code committee.  But

9      my valuation of your concern and my action of -- as you

11:34AM 10    requested it, to give my input to the Z Code committee, that

11     in itself -- I don't know you if understand it in that form,

12     but that in itself is a form of supportive therapy.

13             Q.    Did you believe that -- or what exactly is your

14     testimony because it's somewhat confusing to me?

11:34AM 15     A.    Okay.

16             Q.    You said it was intervention -- did you believe

17     your report?  Is your report accurate?

18             A.    My report is very accurate.

19             Q.    Do you stand by your report?

11:34AM 20     A.    Yes.  But as I explained to you, the ultimate --

21     or the final decision rests on the Z Code committee.  But

22     part -- but even though I had kind of -- I was skeptical as

23     it so happens that it wouldn't be accepted because I

24     realized that what I'd written in here fit the profile of so

11:35AM 25     many other inmates.

11:35AM  Q.   Well, let me stop you there.

2  THE COURT:  You can't, she's allowed to finish.  Go

3  ahead.

4  A.   Because it fits the profile of so many other

11:35AM  inmates, this wasn't distinctive or was nothing unusual or

6  atypical.

7  So -- but -- and I knew that it likely was not

8  going to result in a positive outcome for you, but at least

9  by my action of accepting your request, accepting the

11:35AM  distress that you were experiencing, understanding it, and

11  validating it, and going with your request of conveying my

12  input to the Z Code committee, which all of this is true,

13  right, was in itself a therapeutic modality.

14  Now, you may not have understood, but the

11:36AM  psychiatric term, that conduct of mine, is rendered to be a

16  therapeutic modality.

17  THE COURT:  I have a question:  Would you have agreed

18  to write that recommendation if you had known that it would

19  be used as a basis for a motion to have a Federal judge sign

11:36AM  an order to require Z Code status?

21  THE WITNESS:  No.  Because, again, this was -- this

22  would apply to so many that if it was -- if it would apply

23  to Mr. DeFranco, there would be dozens of others and that

24  was not practical to accommodate everyone in an ideal,

11:37AM  optimal condition in a prison setting.

11:37AM  1      THE COURT:  If you were not asked by Mr. DeFranco to

2       write the recommendation, how do you give a recommendation

3       to the Z Code committee when it meets?

4           THE WITNESS:  I don't give -- basically, I don't

11:37AM  5      give -- it's not required that I give any recommendation to

6       Z Code committee.  Z Code committee is independent.

7           THE COURT:  And they don't ask you for your opinions

8       on --

9           THE WITNESS:  No, because their mental health criteria

11:37AM 10     or mental health state is not -- or no longer -- or I don't

11      know if it was or not, it's not a criteria.

12          THE COURT:  For Z Code status.

13          THE WITNESS:  In fact, I know that homosexuality is,

14      but I don't know what other --

11:38AM 15     THE COURT:  Mental health status is not a criteria for

16      Z Code status.

17          THE WITNESS:  That's how it has been at our facility.

18      BY MR. DEFRANCO:

19          Q.   Let me ask you this:  You say -- now, you claim

11:38AM 20     that my situation meets a dozen or so other inmates,

21      however, out of those dozen or so other inmates that you're

22      referring to, how many are convicted of beating a person to

23      death?  That's what I'm convicted of; how many are convicted

24      of beating a person to death without a weapon?  How many of

11:38AM 25     them had a Z Code that was lifted a month after they come

11:39AM 1    out of the hole?  Tell me how I fit in that dozen inmates

2    that you're referring to.

3        A.    I mean, there are many that I see that have been

4    convicted of a homicide.  There are -- there are just a

11:39AM 5    number of individuals that have been convicted of homicide.

6    They're also very aggressive within the prison system.

7    They're in and out of RHU for assaulting another inmate or

8    assaulting a staff member.

9            But, again, these individuals are not granted a Z

11:39AM 10   Code status and you can understand why.  Because even if you

11   just took -- even if it was a matter of assaulting someone

12   and that would give you a Z Code status, then, well, since

13   everyone wants a Z Code status, there would be so many that

14   would, you know, engage in such a conduct, aggressive

11:40AM 15   conduct, so that then they would qualify for Z Code.  That's

16   why --

17       Q.    I was already Z Coded.  I was already Z Coded.  I

18   wasn't trying to get a Z Code --

19       A.    Okay.  Right.

11:40AM 20       THE COURT:  Is there a question?

21       Q.    Yes.  I was already Z Coded, and how does --

22       THE COURT:  Were you Z Coded at this facility?

23       MR. DEFRANCO:  Yes, I was Z Coded at this facility.

24       THE COURT:  Are any of the patients that you have, the

11:40AM 25   dozen or so that have similar behavior patterns to the

11:40AM 1    Plaintiff, were they Z Coded previously at this facility?

2        Q.    And have it taken away after they threaten an

3    officer?

4        A.    They -- well, again, it would be best to put this

11:41AM 5    question to -- be addressed by the unit managers and unit

6    officers and counselors because the misconduct system and

7    who has assaulted who is really not something that I'm well

8    versed in.  I just get it primarily --

9        Q.    You just testified --

11:41AM 10        A.    Yes, I do, but --

11        Q.    -- that the dozen or so other inmates --

12        A.    Yes.

13        Q.    -- that have similar mental situations as

14    myself --

11:41AM 15        A.    Yes.

16        Q.    -- let me finish my question, that have similar

17    mental health problems and heart conditions, out of those is

18    what I'm asking you, who have you seen that were Z Coded,

19    subsequently threatened the life of a prison guard, and had

11:41AM 20    that Z Code removed 44 days after they were released from

21    the hole?

22        THE COURT:  Anyone, yes or no?  Do you know of anyone?

23        A.    I'm not aware of anyone, but I never researched

24    that either.

11:42AM 25        Q.    Of your patients, the people you see -- the 12

11:42AM  1    people that you see that you're testifying to that meet my

2    criteria, don't meet my criteria; do they?

3        A.   Well --

4        Q.   They don't meet my criteria?

11:42AM  5        MR. BAREFORD:  Ma'am, I think he's already asked the

6    question and she's already answered it.

7        THE COURT:  She's already answered that she doesn't

8    know of any, it's over, move on.

9        MR. DEFRANCO:  Okay.  So then my situation basically

11:42AM 10   sticks out then.

11       THE COURT:  Well, you can make that argument after

12   questioning.  You can illicit information while someone is

13   on the stand.

14       MR. DEFRANCO:  Your Honor, I have a psychological

11:42AM 15   report that I'm supposedly not even allowed to have but I

16   was given it by my attorney back in 1986.  The pertinent

17   parts are highlighted on Page No. 2.

18       MR. BAREFORD:  That was previously included in one of

19   the filings.

11:43AM 20       THE COURT:  Do I have it?

21       MR. DEFRANCO:  I would have sent it to you, Your Honor.

22   I don't know if it's in the preliminary injunction.

23       MR. BAREFORD:  I believe it was one of the first ones

24   that was filed that this was brought up.

11:43AM 25   BY MR. DEFRANCO:

11:43AM 1    Q.   Once the Court finds that, I would like you to

2    read it out loud.

3        MR. BAREFORD:  Ma'am, if I --

4        THE COURT:  I have it.  I have it.  In the first

11:44AM 5    paragraph it references March 1, 1986.

6        MR. DEFRANCO:  Yes.  The second page is the pertinent

7    part of it.  I have it highlighted for the Doctor.  If it's

8    okay with the Court, I ask that she read that and if she

9    agrees with it.

11:44AM 10    Q.   Would you read it out loud.

11    A.   Yes.  "The personality tests suggest that the

12    client is a very unstable young man and that he was --

13    appeared to be much more prone to overreact and in many

14    cases tends to be easily inundated by his stressing

11:44AM 15    feelings.  Can sometimes become confused at the press of the

16    feelings.  Findings suggest that he is hypersensitive, that

17    such touchiness can sometimes border on the paranoidal,

18    which is to say that the client can misconstrue and

19    misinterpret events because of his quote, touchiness.

11:44AM 20        The client, under these circumstances, is usually

21    convinced that his interpretations is a valid one.  This is

22    not meant to imply that the allegation he made in reference

23    to his parole officer is a fabrication, but simply that the

24    client is capable of misconstruing events quite seriously.

11:45AM 25        Other findings suggest that the client is a

11:45AM  1    gregarious individual, one who lies to socialize despite the

2    type of sensitivities, one who would appear to be quite

3    close to the parent figures, especially the mother figure,

4    and one who would appear to have a strong sexual drive and

11:45AM  5    sexual interests; yet one who harbors at hidden levels some

6    basic misgivings regarding his own adequacy as a male.

7            The findings suggest that he is an affiliative

8    person in that he likes to be liked and approved by others,

9    one who is capable of responding in kind, yet one whose

11:46AM  10   instability and suspiciousness quite likely lead to a lot of

11   the erratic in his behavior with the consequences people who

12   know him, may know -- not know what to expect from him from

13   one minute to the next.

14           And in this context, the client does appear to

11:46AM  15   harbor some pretty intense hostile aggressions and impulses

16   which usually are reasonably well-controlled.  But findings

17   suggest that he does have a potential for explosivity, even

18   to the point where he could injure someone.

19           The diagnosis is as follows:  Mixed personality

11:46AM  20   disorder with features of the borderline paranoid.  The

21   client should be referred for a psychiatric exam with a

22   possible prescription of a medical regimen to ameliorate his

23   instability, which is exacerbated by the presenting

24   situation.  Additionally, the client is an individual in

11:46AM  25   need of psychotherapy, even though prognosis was a limited

11:46AM 1    improvement, such vehicle would be poor by virtue of his

2    personality makeup."

3    　　　THE COURT:  What's your opinion on that, Doctor?

4    　　　THE WITNESS:  This is -- I think this is a wonderful

11:47AM 5    description.  Primarily, it indicates that he has --

6    　　　A.  Yes -- as I explained to you before, you have a

7    personality disorder that has a propensity of being

8    aggressive, being unpredictable, and being explosive.

9    That's nothing -- that doesn't come as a surprise, right?

11:47AM 10   And basically this re-iterates that kind of character trait

11   in his report.

12   　　　　So, yes, I agree with this 100 percent.  But the

13   thing is that if we were to -- if we were to look at the

14   incarcerated population, 80 percent would fulfil these

11:48AM 15   criteria.  One of the reasons that they're incarcerated is

16   because they're impulsive --

17   　　　Q.  I haven't asked you a question.

18   　　　A.  Yes.  I agree fully with this report.

19   　　　Q.  All right.  My question is this:  Does your

11:48AM 20   report -- is your report consistent -- the one that you now

21   claim to be a therapeutic intervention based to appease me,

22   is consistent with that report?

23   　　　MR. BAREFORD:  Ma'am, I'm going to object --

24   　　　THE COURT:  You're going to object to his description

11:48AM 25   of her report?

11:48AM 1      MR. BAREFORD:  Precisely.

2      THE COURT:  Sustained.  Is your report consistent with

3  this opinion?  Is your recommendation consistent with this

4  opinion?

11:48AM 5      THE WITNESS:  Yes, because I --

6      MR. DEFRANCO:  Your Honor --

7      THE COURT:  Let her answer.

8      THE WITNESS:  -- I express -- if you look, it expresses

9  his unsocial traits.  As it says in this one, too, are

11:48AM 10  affected by his prominent volatile, aggressive, and physical

11  aggression, volatile violence, including murder --

12  BY MR. DEFRANCO:

13      Q.   Excuse me, this is what you wrote?  This is your

14  report, correct?

11:49AM 15      A.   This is -- right.

16      Q.   I wanted it for the record.  What date was your

17  report written?

18      A.   Well, there's August 20, 2004.

19      Q.   2004, this past August, you wrote that?

11:49AM 20      A.   Yes.

21      Q.   When was that written?

22      A.   This?

23      Q.   Yes.

24      A.   '86.

11:49AM 25      Q.   Okay.  So --

11:49AM 1        THE COURT:  But she says her report is consistent with

2    the doctor -- that her recommendation is consistent with the

3    doctor.

4        Q.    Are you familiar with a Dr. Paul Mueller

11:49AM 5    (phonetic)?

6        A.    Paul Mueller?

7        Q.    If I'm pronouncing it wrong, I apologize.

8        A.    How familiar am I?

9        Q.    Who is he?

11:50AM 10       A.    He is the, I guess, clinical director, or -- yeah,

11    for psychiatric services for the company -- the managed care

12    organization, which I'm employed by.

13       Q.    He's a psychiatrist, is what I'm getting at?

14       A.    Yes.

11:50AM 15       Q.    Is he the head psychiatrist or what's his --

16       A.    Well, he's not -- he's not more qualified or less

17    qualified.  He's a psychiatrist and he happened to have an

18    administrative position, also.

19       Q.    Okay.

11:50AM 20       A.    Of being the -- you know, the director for the

21    western region of Pennsylvania.

22       Q.    So he basically oversees the DOC and inmates being

23    seen by psychiatrists in the western district of

24    Pennsylvania, correct?

11:50AM 25       A.    Well, I guess you could say that; but really what

11:50AM 1  his task is, is to guide and if there's a problem --

2       Q.   Same thing?

3       A.   Yeah.

4       Q.   Let me ask you this:  The Judge allowed me to read

11:51AM 5  this into the record during our October 22nd hearing that

6  Ms. Sue Evans couldn't read, that I was able to read, and in

7  his report he stated he had seen me for about an hour.  And

8  he said -- and if I'm wrong, I believe you'd remember it,

9  that I'm impulsive, aggressive, anti-social, and named a

11:51AM 10  bunch of medications that I've been on.

11       A.   Uh-huh.

12       Q.   And then it said "double celled", the words

13  "double celled", it just said, double celled.

14       A.   Correct, I remember.

11:51AM 15       Q.   It didn't go on to say that -- the double celled

16  was in line all by itself and at the time I was double

17  celled; and why would that be there under a doctor --

18       MR. BAREFORD:  I'm going to object to this line of

19  questioning just because -- what's really relevant here,

11:52AM 20  especially in light of what Dr. Lindemuth is actually

21  testifying about, is what was basically her reasoning and

22  her justification for writing the two documents --

23       THE COURT:  Sustained.  She can't testify, Mr.

24  DeFranco, to what somebody else wrote and why because she's

11:52AM 25  not that person.

40

11:52AM    1        MR. DEFRANCO:  Am I allowed to ask -- it came in

2    through the evidentiary hearing, am I allowed to ask her

3    knowledge of it, if she's aware of it?

4        THE COURT:  You can ask if she's aware of that report.

11:52AM    5    BY MR. DEFRANCO:

6        Q.   Are you aware of that report?

7        A.   I am.

8        MR. DEFRANCO:  Am I allowed to ask her if that's

9    consistent with her report, Your Honor?

11:52AM    10       THE COURT:  Yes.

11       Q.   Is what he wrote consistent with what you wrote in

12   those other reports?

13       THE COURT:  To the best of her recollection.

14       Q.   To the best of your recollection.

11:52AM    15       A.   Yes.  He indicated the same character traits.

16       Q.   Which were; can you name them.

17       A.   Impulsivity, a volatility, unpredictability.

18   Again, consistent with the psychologist here and within what

19   the anti-social personality disorder is about.  These are

11:53AM    20   just criteria, you know, for that character disorder, which

21   Dr. Pazad (phonetic) concluded what was troubling you and I

22   think -- and also Dr. Paul Mueller.

23       We all agreed that primarily your behavior is a

24   manifestation or is a function of your anti-social character

11:53AM    25   disorder.

11:53AM  1    Q.   Okay.  I want to hand you now, if I could, a

2    report.  This is your September 2002 report.

3    A.   Okay.

4    Q.   About a month after my Z Code was taken or two

11:54AM  5    months.

6    MR. DEFRANCO:  I believe that's also part of the

7    preliminary injunction, Your Honor.

8    THE COURT:  All right.

9    Q.   Is that your report, Doctor?

11:54AM 10    A.   Correct.

11    Q.   Is it your testimony that you then -- when you

12    gave that report, that was also a therapeutic intervention

13    to appease me, or was that a diagnosis?  Are these

14    diagnoses -- by the way, are they diagnoses?

11:54AM 15    A.   This is a description of your behavior, okay.

16    This is --

17    THE COURT:  By that you mean no then, this is not a

18    diagnosis.  Are these -- is this a diagnosis?

19    THE WITNESS:  The diagnosis that I have here?

11:54AM 20    Q.   Both of the reports, are they diagnoses?

21    A.   Well, a diagnosis is like panic disorder or

22    generalized anxiety, that's a diagnosis.

23    THE COURT:  So is that a yes or no that it's a

24    diagnosis?

11:55AM 25    A.   Yeah.  You could consider -- because I am

11:55AM mentioning here what disorder I'm treating you for.

2    Q.    Because the attorney here in his objections said

3    that they were not diagnoses --

4    A.    Well --

11:55AM    Q.    -- to Judge Cohill --

6    THE COURT:  She just answered the question.

7    MR. DEFRANCO:  I'm just letting you --

8    THE COURT:  You can beat the horse to death.

9    Q.    Dr. Lindemuth, I've got a question:  Based on what

11:55AM you know, based on our meetings due to my health and my

11    mental health, do you think I should be single celled or

12    double celled?  Do you go with your report that you wrote or

13    do you now retreat off of it that would be for the Federal

14    Court?

11:56AM    THE COURT:  Is the question, do you agree with your

16    recommendation, or is the question do you think I should be

17    single celled or double celled?

18    MR. DEFRANCO:  Right, both.

19    THE COURT:  No, they're two different things.  She

11:56AM explained that that was two different things, so we have to

21    take her testimony under oath.  Which is your question?

22    Q.    My question is:  Do you believe that I should be

23    in a single cell or a double cell?

24    THE COURT:  That's the question.

11:56AM    A.    Well, that's a difficult -- ideally, optimally --

11:56AM 1        Q.   Would you want to be my cellmate?

2        THE COURT:  Let her answer the question.

3        A.   Ideally, anyone of your profile would be better

4   off -- see, my problem is that, yeah, we can talk in ideal

11:57AM 5   and optimal terms, but how is that possible?  We --

6        Q.   I'm in a single cell now, it's very possible.

7        A.   Okay.  But what I'm saying is that anyone that

8   represents this profile would be better off in a single

9   cell.  I mean, that is a no-brainer.

11:57AM 10       THE COURT:  And my question is:  Would he be more

11  appropriate for a single cell than your other patients?

12       A.   No.  I have individuals that are of -- have the

13  same history, the same presentation, except that they

14  don't -- even though they do begrudge the fact that are

11:57AM 15  in -- that they are cohabiting, they just never have made

16  that sole, prominent in their sessions that we have and

17  never requested that I intervene.

18            So I do not do it voluntarily.  This was, again --

19  there was a persistence.  Every time you met with me,

11:58AM 20  primarily the focus of the interaction was how -- how this

21  cohabitation with another inmate is distressing you.  That

22  was the focus of it.  So in order to surpass that -- you

23  couldn't move beyond anything, so I said, okay, I know

24  that -- I knew, and I think I expressed to you, that mental

11:58AM 25  health criteria are not given that much weight or any

11:58AM 1    weight -- I don't think, given hardly any weight anymore

2    because of the space problems, you know, the overcrowding.

3         Q.   Right.

4         A.   So I think I expressed to you that that would

11:59AM 5    likely not be given much consideration, my input, because of

6    that fact.  But I did it, I wrote this memo because then you

7    can move beyond because it would be an ongoing thing, every

8    time we met, the focus would be this.

9         Q.   The thing was this, right Doctor, and tell me if

11:59AM 10   I'm mistaken, I was worried about transfer for how long,

11   that the Defendants were going to retaliate and transfer me;

12   was that made known to you at the many, many times I saw

13   you, was that a concern of mine?

14        THE COURT:  Was he concerned about a transfer to

11:59AM 15   another institution?

16        A.   Yes, we were.

17        Q.   If I pursued the Z Code, correct?

18        A.   What was that?

19        Q.   If I pursued the Z Code.

11:59AM 20   A.   If you pursued the Z Code.

21        Q.   Kept it up.

22        A.   Yeah.  You mentioned something like that.

23        Q.   That there were threats of me being transferred,

24   correct?

12:00PM 25   A.   Okay.  Well, that, I did not witness anything.

12:00PM 1     Q.   That's what I told you, correct?

2     A.   Yes, you told me that.

3     Q.   And I told you that they were basically, in my

4 view, holding me double celled and if I acted out on a

12:00PM 5 cellmate that I'd be transferred, that would give them the

6 reason to transfer me.

7     A.   Well, that's how you perceived it.

8     Q.   If I got caught harming a cellmate, I would be

9 moved from my family.

12:00PM 10   THE COURT:  Sir, what is your question?

11     Q.   My question is --

12   THE COURT:  Did you say that her?

13     Q.   Did I say that to you?

14     A.   Yes.  And, you know, that was your interpretation

12:00PM 15 and I can't -- I don't know what events happened because I

16 was never in any of those meetings.  Again, if we're going

17 to --

18   THE COURT:  No, that's -- we don't need to go over

19 that.

12:01PM 20     A.   The paranoid ideation that's defined could also

21 apply in how you -- what you felt about what was going on,

22 too.  So I was not there, I can't --

23     Q.   I didn't ask you that.  I asked you only what

24 pertained between me and you.

12:01PM 25     A.   Verbally, yes, you told me that statement.  Yes.

12:01PM 1        Q.    Right.  And my concern was, as I told you this, my

2    mother's bad health.

3        A.    Right, I remember.

4        Q.    They would have to travel far away, and that it

12:01PM 5    was basically holding me back -- in my view, the DOC was

6    using that over my head that if you act out, you're going

7    far away from them.

8        A.    Okay.  Now, again, that's what you expressed to

9    me.

12:01PM 10       Q.    That's all I'm asking.  How many times?

11       A.    You told me that.  Whether that took place or --

12       THE COURT:  He's not asking you that.

13       A.    You did tell me that.

14       Q.    How many times?

12:02PM 15       A.    You told me more than once, yes.

16       Q.    Was it a worry of mine, was it a concern of mine?

17       A.    Yes.  It was a concern of yours because your

18   family is in the Erie area and you were concerned if you

19   were to be moved you wouldn't have the contact with your

12:02PM 20   family as much.

21       Q.    And I told you, although you did not hear it from

22   anybody else, that I was threatened with being transferred.

23       A.    You did say that, yes.

24       Q.    I told you that in a consult, right?

12:02PM 25       A.    Yes.

12:02PM  1      Q.   Then, I'm going to wrap up this with this, Your

2   Honor:  Can you please point out, because I notice in your

3   affidavit, I believe, Paragraph 6, that I manipulated your

4   letter.  Can you show me where I changed your letter of

12:03PM  5   recommendation for Z Code.

6         What part of your recommendation -- two and a half

7   months ago I'm talking, two and a half months before I had a

8   hearing before the Honorable Judge Baxter, you had written a

9   report, a recommendation, that I become a Z Code.  You were

12:03PM  10   worried about my explosivity, you were worried about my

11   heart, you said --

12       THE COURT:  That document stands for itself, let's not

13   get into it again.  So in Paragraph 6, you say -- and I'm

14   reading, "I feel that he has misused my letter and has

12:03PM  15   manipulated his way into single-cell status."  In what way

16   has he manipulated your letter, he's asking.

17      Q.   Did I change it?

18      A.   It was addressed to the Z Code committee.  I

19   didn't expect that it was going to be applied in any other

12:04PM  20   fashion.  And, you know, I felt that it was -- it was going

21   around the policy and around the auspices of what the

22   structure and procedures of the institution are, so that is

23   what this statement is referring to.

24      Q.   So I manipulated your letter --

12:04PM  25      THE COURT:  Well, you don't argue with her, that's her

12:04PM  1    explanation.  And then you take it and you argue with me in

2    an argument.

3         MR. DEFRANCO:  I don't want to argue with you.

4         THE COURT:  Well, make your argument to me.  But you

12:04PM  5    don't argue with her about her answer, her answer is what it

6    is, it's under oath; do you understand?

7         MR. DEFRANCO:  Okay.

8         Q.   And I'm just going to wrap this up.  And so in

9    your medical -- or you're an expert, you're a forensic

12:04PM 10    psychiatrist, and I'm not going to dictate the law to you

11    because you're not a lawyer, and it was your testimony that

12    the DOC, under press for space and money, but

13    notwithstanding that, let's say they had all the money in

14    the world, right, would you say I should be in a single

12:05PM 15    cell?  Or would you be concerned about me harming a cell

16    mate?  Are you --

17         THE COURT:  Which question?

18         Q.   Are you worried about me harming a cellmate; is

19    that a concern of yours?

12:05PM 20         A.   It was a concern that I have with many

21    individuals, and you were also one of those individuals

22    that, yes, because what's the best predictor of future

23    violence, past violence, right?

24         Q.   I'm asking you to stick with me.

12:05PM 25         A.   Anyone has --

12:05PM  1     Q.   We're talking about me.

2     A.   You, yes.

3     Q.   We're talking about me.

4     THE COURT:  Her answer is yes.  Quickly, next question.

12:05PM  5     Q.   So in your medical opinion, should I be in a

6  single cell due to my --

7     THE COURT:  Should he be in a single cell if there

8  enough cells for everyone that needed to have a single cell

9  to have one; is that your question?

12:06PM  10     MR. DEFRANCO:  Basically.

11     THE COURT:  If money were not an object.

12     THE WITNESS:  Well, I think naturally everyone would

13  agree with that.

14     THE COURT:  Do you agree that you would recommend that

12:06PM  15  he be in a single cell.

16     THE WITNESS:  Yes, that would be optimal, yes.

17     A.   No only for you, but --

18     Q.   I'm just asking about me.

19     A.   Yes, yes.  I think it goes without saying that

12:06PM  20  that would be ideal.

21     MR. DEFRANCO:  Your Honor, that's all.

22     THE COURT:  We'll begin cross-examination after I hold

23  this hearing.  So I'm going to -- we're going to adjourn for

24  a moment, but you're still under oath and I'm going to ask

12:06PM  25  you not to speak to anyone about your testimony outside

12:06PM  1  until my hearing is finished.  And I'm going to ask you

2  all -- is this under seal?

3      MS. WALLEN:  Yes.

4      THE COURT:  This is under seal, so everybody has to

12:06PM  5  wait outside.

6          (Recess taken from 12:07 p.m. to 12:22 p.m.)

7      THE COURT:  So you have finished your direct

8  examination, you will have redirect.  And your brother has

9  to go back to that seat.  Cross-examination -- this is

12:22PM  10  cross-examination by Mr. Bareford.

11

12                   CROSS-EXAMINATION

13  BY MR. BAREFORD:

14

12:22PM  15      Q.   Doctor, would you have written those two

16  letters -- and by those two letters, I mean the letter of

17  recommendation from September of 2002 and the letter of

18  recommendation from August of 2004, would you have written

19  those two letters had Mr. DeFranco not insisted that you

12:23PM  20  write those letters?

21      A.   No.  I don't voluntarily write letters like that

22  because I would be doing letter writing for whatever job

23  changes or unit changes or single -- it's just so -- that's

24  not my task.  My task is to diagnosis and treat psychiatric

12:23PM  25  illness.

12:23PM  1          And in his case, if that ended up being the

2    stumbling block to ongoing treatment because of this, this,

3    this, was always that, that, and recommending that I do it,

4    I did do it, but it's very, very unusual.  It's only when

12:23PM  5    the inmate persists, and this has been, I think -- I think

6    there was just one other one in the past that was as

7    persistent, but that didn't go anywhere -- but no.  The

8    bottom line is, no, I don't voluntarily write to the Z Code

9    committee on my own unless it's in a case like Mr. DeFranco,

12:24PM  10    who was persistent in, you know, asking me to convey input.

11          Q.   Could you just describe for the Judge how

12    persistent he was to get you to write those letters of

13    recommendation.

14          A.   Well, in looking over my notes, that became a

12:25PM  15    focus in virtually every interaction we had, which must have

16    been at least 20 or so interactions or more since I first

17    met with him.  The majority -- in those, the majority of the

18    session was really spent on how begrudged he was after --

19    that was after he lost his Z Code, how begrudged he was that

12:25PM  20    now he had to cohabit with someone else.  And that was

21    understandable, yes, but we couldn't get beyond that and

22    that was the focus.

23          Again I, as a therapeutic modality, did come up

24    with this memo and thinking and anticipating that it was

12:26PM  25    just going to result in the same -- the same result that

12:26PM    1    happened with the couple or three others that I had done in

       2    the past.  And that because I knew that mental health

       3    criteria weren't going to be considered and the fact that

       4    this profile that Mr. DeFranco has is very similar to the

12:26PM    5    vast majority of the inmates that are housed in our prison.

       6        Q.    Some of the descriptions of Mr. DeFranco that you

       7    included in your letters -- more specifically I'm talking

       8    about the bitterness and resentment, frustration, tolerance

       9    reaching its limits, that kind of stuff.

12:27PM   10        A.    Correct.

      11        Q.    I'm going to ask you a question about that:  Did

      12    Mr. DeFranco describe that to you and want that to be

      13    contained in his letter?

      14        A.    Well, yeah.  Because psychiatry is like the --

12:27PM   15        THE COURT:  Actually, did he specifically tell you to

      16    put that in his letter?

      17        THE WITNESS:  He described having these symptoms to me

      18    and asked me to -- if I could do this memo with a

      19    description.  He didn't dictate, no.  He didn't dictate the

12:27PM   20    letter, but he gave me the material.  Like he presented to

      21    me the material that he wanted included in a memo so that it

      22    had some -- it had a little bit of both.

      23            I mean, obviously, why would I write a memo if

      24    there was nothing pertinent to say.  So, yeah, he asked me

12:28PM   25    that I would put in there all of the symptoms -- and you

12:28PM 1    see, he may not have described it in that exact terminology.

2    I'm just putting in more professional terminology.  He may

3    have used words like, I'm going to snap out, I'm so angry,

4    I'm mad, I can't tolerate.  So this kind of wording, I put

12:28PM 5    in more professional terms to be, you know, a more

6    sophisticated memo.

7        Q.  Let me ask it a little bit more precisely:  In

8    asking you to write the recommendations to the Z Code

9    committee, did he describe his own feelings to you for you

12:29PM 10   to include that in the letter even though he did not

11   specifically write the letter, nor did he specifically use

12   the exact language that was in your letter; is that a fair

13   way to character what you're explaining?

14       A.  Yes.

12:29PM 15       Q.  And what other kind of treatment have you been

16   giving to Mr. DeFranco in the last two years?

17       A.  Well, we couldn't -- again, it's because of this

18   issue, we have to use a supportive therapy.  As per Dr.

19   Pazad, psychotherapy in anti-social character disorder is

12:29PM 20   not much benefit.

21       Primarily, we try to attenuate -- attenuate, not

22   limiting, but attenuate the extremes of lability by

23   chronological measures.  But as far as therapy goes,

24   sometimes some supportive group therapy can be of modest

12:30PM 25   benefit, but nothing that would be so robust as to make a

12:30PM 1    marked change in their underlying personality or behavior.

2        Q.    And September of 2002, on or about that time

3    frame, after you wrote the first letter of recommendation,

4    did he continue to come see you for therapy?

12:30PM 5        A.    Well, he came to see me for follow up of his

6    psychotropic treatment.  And my task there is primarily to

7    follow up on the pharmacology treatment -- yeah, I tried to

8    fit in a little bit of discussion and talk therapy, but that

9    isn't really primarily what I'm wanted there for.

12:31PM 10            The psychology department is really assigned that

11    aspect of the mental health treatment.  I'm primarily to do

12    the diagnosis, the evaluation -- the psychiatric evaluation,

13    the diagnosis, and the pharmacologic treatment because I'm

14    given only 15 minutes -- after the first evaluation, I'm

12:31PM 15    given only 15 minutes per patient, per follow up.  So how

16    can you -- you can't really conduct an effective therapeutic

17    session.  And with what limited means I have, I will do

18    some, but can't really call my -- you know, my self as a

19    psychotherapist in this setting.

12:32PM 20        Q.    And you've made some -- I hope I'm not going to

21    butcher this word, but you were just describing

22    pharmacological --

23        A.    Medication treatment.

24        Q.    Could you just explain that; if you could.

12:32PM 25        A.    Well, like, for instance, the symptomatology that

12:32PM 1  one would present, for instance, a generalized anxiety

2  disorder, if that is what I conclude the person is

3  exhibiting then I would apply a medication to treat this

4  condition.  And after a month on the medication, usually

12:32PM 5  then I follow them up to see if the symptoms have responded

6  to the medication, if an adjustment is to be made, if the

7  person tolerates the medication, if an alternate regimen is

8  needed, that kind of thing.

9      Q.    And what kind of medication is Mr. DeFranco on?

12:33PM 10     A.    He's on Valium because he had been on -- he had

11  been tried on alternative medications like -- you know,

12  which are noncontrolled medications, which are meant like to

13  be preventative like Prozac, or Zoloft, or Paxil.  So that's

14  a -- and he either did not respond to those medications or

12:33PM 15  could not tolerate those medications.

16     Q.    Let me ask you this:  You were not the one that

17  put him on those medications though, right?

18     A.    No, I was not.  That was what was noted in the

19  history and, therefore, I proceeded to go with the then

12:34PM 20  anti -- he did not have a substance abuse history, so it

21  wasn't like it was contraindicated.  And it was in a

22  controlled environment, he has a life sentence, so it's not

23  like he's going to go out there and have a substance

24  dependence that was introduced in the prison setting.

12:34PM 25     Q.    So you put him on Valium.

12:34PM 1        A.    I put him on Valium, yes.

2        Q.    When did you do that?

3        A.    I believe it was shortly either the first -- after

4    my first evaluation with him, I believe.

12:34PM 5        Q.    Was that on or about the springtime of 2001?

6        A.    Yeah.

7        Q.    Was he in a Z Code status in 2001?

8        A.    Yeah, because the Z Code problem didn't begin

9    until later.  I don't remember when he lost his Z Code.  I

12:35PM 10   don't -- was it 2002?

11       Q.    The actual date is probably more precise.  You

12   started to see him early in 2001 -- the first half of 2001.

13       A.    Yes.

14       Q.    And it's on or about that same time period that

12:35PM 15   you put him on the Valium.

16       A.    Yes, because he presented symptoms consistent with

17   panic disorder and generalized anxiety disorder.  You've got

18   to understand that much -- in psychiatry we depend a lot on

19   history.  We depend a lot on people's subjective perception

12:35PM 20   of what's happening to them.  He described he was having the

21   shortness of -- he had episodes where he's been --

22   experiencing an overwhelming fear, he had shortness of

23   breath, heart palpitations, chest tightness, tingling,

24   sweating, and, you know, stomach, et cetera.

12:36PM 25       So -- and he was describing these symptoms that

12:36PM  1    would take -- that would climax in 10 minutes and would

2    occur like once or twice a week.  And the fact that he ended

3    up in the emergency room in the past because he almost felt

4    like he was experiencing a heart attack, that is a classic

12:36PM  5    history of a panic disorder, panic attacks.  So I took that

6    as being, you know, accurate since.

7          And unless you actually witness, are actually

8    there at the time, you take the history as being what is

9    happening to the individual.  Could he have made all those

12:36PM  10    things up, read a book perhaps, so I'm not going to practice

11    in assuming that everyone is conning me.  I couldn't work in

12    that.  I can rule it out, you know, but I'm not going to

13    take that and assume it when it sounds sincere.

14          So, yeah, the diagnosis comes primarily from the

12:37PM  15    presentation, the history, his account of events that took

16    place, so, yes, that's psychiatry --

17    Q.   So -- I'm sorry, go ahead.

18    A.   It's not like radiology or pathology where you see

19    a tissue specimen, it's not like concrete where you see a

12:37PM  20    radiological image and say, okay, this is a fact.  It's not

21    like that, it's very abstract.  So you depend a lot on the

22    subjective information.

23    Q.   And that was this baseline upon which -- and if my

24    question doesn't make sense, let me know; but was that the

12:38PM  25    baseline on which your entire relationship with the times

12:38PM 1    you would interact with Mr. DeFranco, did that form his

2    subjective reports to you, as well as the history that was

3    contained in his medical or psychological folder?

4        A.    Yeah.    That was, and, you know, his description --

12:38PM 5    yes, and it's consistent with my notes, yeah.

6        Q.    And he went into the restricted housing unit in

7    the first half of 2002, and he asked you some questions

8    about that.    I'm going to ask you some questions about that.

9            Mr. DeFranco asked you earlier as far as whether

12:38PM 10    or not someone who had threatened a staff member, if that's

11    something you would deem to be important with respect to

12    making a recommendation for a single cell; do you remember

13    that question?

14        A.    No.    I'm -- see --

12:39PM 15        Q.    And that wasn't -- well, basically, I'm going to

16    ask a question in light of his question he asked you on

17    direct.

18        A.    Okay.

19        Q.    First of all, how much do you know about that

12:39PM 20    incident that landed -- that was the situation involving

21    that misconduct before?

22        A.    See, I don't know the particulars of the incident.

23        Q.    Okay.

24        A.    But the point is he had conducted himself in a

12:39PM 25    manner that was grounds for RHU placement.    I can't tell you

12:39PM  1    the particulars because --

2         Q.   Did you see his conduct report of that incident?

3         A.   I don't recall that I did.

4         Q.   So did you hear about that incident from anyone

12:40PM  5    other than Mr. DeFranco?

6         A.   Well, only Mr. DeFranco because I'm not involved

7    in the security interworkings.  I'm -- you know, it's not so

8    much relevant to my practice that -- you know, so many of

9    the patients go in and out of RHU.  The point is that

12:40PM 10    something significant happened that was grounds for --

11   whether it was some type of assaultive, sometimes foul

12   language, but they violate the rules in some form.

13        Q.   Whenever Mr. DeFranco, if you can remember -- and

14   if you can't remember, obviously, that's what the answer is,

12:40PM 15   but did he ever explain to you whenever he was discussing

16   this incident that he jokes around with that sergeant in

17   that manner from time to time, or that he always jokes

18   around in that manner with that officer, who was the subject

19   of the threat, and another officer knows that he was joking

12:41PM 20   around and may have routinely joked around; did he ever

21   describe that misconduct -- let me rephrase the question:

22   Did he ever describe his role in that misconduct as simply

23   joking around with someone else and that's the reason he got

24   punished with you?

12:41PM 25        A.   No.  That's the first I've heard of the joking.

60

12:41PM       Q.   When he was asking -- or, I'm sorry, let me

2        rephrase the question:  When he would come in and express

3        concerns about being transferred, I'm going to ask you some

4        questions about that, did he ever explain to you that he

12:41PM  5   could have been transferred in 2003 and yet, but for the

6        intervention of the staff at the prison, he was not?  Did

7        you know that he was -- let me rephrase the question:  Did

8        you know that he was due to be moved in the summer of --

9        actually, it was 2002, I misspoke when I said 2003; did you

12:42PM  10  know that he was due to be moved in the summer of 2002 and

11       yet the staff allowed him to stay because his family had

12       requested that he be allowed to stay at Albion?

13            So my question is:  Did he ever explain that

14       context to you when he was talking about his anxiety of

12:42PM  15  being transferred?

16       A.   I don't recall.  I don't recall the details.  He

17       might have mentioned to me that -- I --

18       MR. DEFRANCO:  Objection, Your Honor.  If she doesn't

19       know, she doesn't know.

12:42PM  20  A.   No, I don't.  I don't recall -- it doesn't ring a

21       bell.

22       THE COURT:  All right.

23       Q.   Do you remember -- I'm going to hit you with a

24       date, the precise date is not that important, tell me

12:43PM  25  whether or not you recall this though, June 30, 2003, he

12:43PM   expressed a concern that -- or made some kind of comment to

2         the effect of he was wondering what he could do to meet the

3         other criteria of the Z Code committee; do you recall that?

4              A.   Yes.  He did inquire about how he would qualify

12:43PM   for Z Code.  And --

6              Q.   And -- I'm sorry.

7              A.   And I said to him, well, you know there has to be

8         somewhere where there's a set of criteria.  All I know is

9         that I'm not part of the Z Code committee, I know mental

12:43PM   health criteria was removed.  And so whoever -- I referred

11        him to the counselor and the unit manager to indicate -- or

12        whoever knew what the requirements are other than

13        homosexuality.

14             Q.   In your September -- I'm sorry August of 2004

12:44PM   letter, the most recent recommendation that you made,

16        there's language to the effect of internalizing and

17        suppressing anger also exacerbates his angina.  Now, how do

18        you know that that exacerbates his angina?

19             A.   It's not necessarily -- any stressor -- I mean, it

12:44PM   doesn't have to be specific, but any stressor, is known

21        that -- you know, because he had anginal episodes, that

22        any -- and I'm sure you're aware, everybody is, that

23        emotional stress or even physical stress is going to -- in a

24        person that's compromised in his cardiovascular status, is

12:45PM   going to experience chest tightness, shortness of breath.

12:45PM   1   That's nothing new.

2       Q.   How did you know he has angina?

3       A.   Well, he described that he has chest pain.   I

4   looked in the record that -- that was the case and that he

12:45PM   5   was on nitroglycerin and that is another medication,

6   Lopressor, I believe, for that.   So that was an established

7   condition.

8       Q.   How did you know what kind of effect that his

9   pursuit of the Z Code had on his angina?

12:45PM  10       A.   Do you mean --

11       THE COURT:   You can ask a different question.

12       Q.   Did you include this language that his angina acts

13   up, or words to that effect, because he asked you to?

14       A.   Oh, yeah.   He said -- well, I thought that that

12:46PM  15   was legitimate to put in here.   Like I didn't think that

16   there was anything -- I mean, this is, again, all real and

17   truthful and he asked if I would also include that, and I

18   said, you know, just assure me it's just another fact.   I

19   mean, these are a bunch of facts.   And that is true,

12:46PM  20   suppressing anger is an effect on the angina and it would be

21   in everybody's case.   And that's what's advised in cardiac

22   patients to prevent especially hostility is one of the worst

23   feelings as far as it's impact.

24       Q.   The facts that are contained -- the way that you

12:46PM  25   described it, the facts that are contained in these letters,

12:47PM   1   are those as related to you by Mr. DeFranco?

          2       A.   Well, yeah, because a lot of -- everything here is

          3   subjective, hostility, emotions.   Have I ever seen him in

          4   action, well, no, but the history reveals consistence of

12:47PM   5   angina.

          6       THE COURT:   I'm going to interrupt.   For example, on

          7   the angina, would you have gone to the medical records to

          8   look up whether or not he was using more nitroglycerin

          9   tablets, or did you write in that he was using more

12:47PM  10   nitroglycerin because he told you?   Do you understand?

         11       THE WITNESS:   Well, he told me he was using more

         12   nitroglycerin.

         13       THE COURT:   So you wouldn't have gone to check that.

         14   You wrote that in because he related it to you.

12:47PM  15       THE WITNESS:   Yeah.   That was legitimate to put in

         16   there.

         17       THE COURT:   I just wanted to know where that came from,

         18   okay.

         19       MR. BAREFORD:   If I could have one moment, Your Honor,

12:48PM  20   I think I'm close to being finished.

         21   BY MR. BAREFORD:

         22       Q.   I just want to run some dates past you.   Tell me

         23   whether or not this sounds consistent with your memory,

         24   August 20, 2004 he expressed bitterness over the prospect of

12:48PM  25   being transferred if he pursues his Z Code --

64

12:48PM   1    A.    Yes.

2    Q.    -- through a Federal Court action.

3    A.    Uh-huh.

4    Q.    September 3, 2004, he expressed fear that he could

12:48PM   5    get transferred as a result of pursuing a Z Code.

6    A.    Yes.

7    Q.    October 8, 2004, once again, he expressed a fear

8    that his persistence would get him transferred.

9    A.    Yes.

12:48PM  10    Q.    All of those dates were before October 23, 2004.

11    A.    Yes.

12        MR. BAREFORD:  That's all that I have.  Thank you, Dr.

13    Lindemuth.

14        THE COURT:  All right.  Now, on redirect, you must ask

12:49PM  15    only questions having to do with the cross-examination.  You

16    can't open up a new area of questioning; do you understand?

17        MR. DEFRANCO:  Yes.

18

19                    REDIRECT EXAMINATION

12:49PM  20    BY MR. DEFRANCO:

21

22    Q.    Doctor, Counsel just asked you if those are the

23    only dates that I've ever expressed my worry about transfer

24    was in 2003, or was it not?  Did I express concern --

12:49PM  25        THE COURT:  Actually, he asked, do you recall.

65

12:49PM 1          MR. DEFRANCO:  He was specifically saying 2003.

2          MR. BAREFORD:  If I might explain:  To the extent my

3   question was less than clear, I'll start by -- I asked her

4   specifically about particular dates.  I didn't mean to limit

12:49PM 5   her testimony only to those dates.

6          THE COURT:  All right.

7   BY MR. DEFRANCO:

8          Q.  Did I express to you -- and you came to the RHU to

9   see me after the alleged threat on the staff member,

12:49PM 10  correct?

11         A.  Uh-huh.

12         Q.  After I got out of RHU, did I express to you a

13  worry about being transferred; this would be in 2002?

14         A.  Yes.

12:50PM 15         Q.  Has that been a consistent worry of mine --

16         A.  Well --

17         Q.  -- starting with 2002 since the instance -- the

18  time I went to the RHU?

19         A.  Yes, because very frequently there's a separation,

12:50PM 20  right?  If you assault somebody or threaten somebody, it's

21  very usual that --

22         Q.  No.  My question is this --

23         A.  Yes.

24         Q.  -- I had since 2002 consistently expressed a worry

12:50PM 25  about being transferred; incorrect or correct?

12:50PM  A.   Correct.

2  Q.   Okay.  Now, on cross-examination, Counsel stated

3  that it -- and it was implied that I somehow put words in

4  your mouth, to make this report.  Can you tell me which

12:51PM  words I put in that report.

6  A.   Well, I don't think you put words in my mouth.

7  But he mentioned to add, and I thought that was legitimate.

8  I mean, it's not that you put words in my mouth, there's

9  nothing here that isn't reflective already in my notes of

12:51PM  you.  And nothing that medical -- basically, I've taken the

11  main points of my notes, of my impressions, and the

12  impression of the medical department, and put it in a memo

13  form.

14  Q.   Let me ask you this:  When I was asking you what

12:51PM  the criteria was for the Z Code, was that it?  They don't

16  tell people what the criteria is, because you don't even

17  know.

18  A.   I don't know, it might be official.  I don't know.

19  That is, again, since I'm not part of the committee, I

12:52PM  cannot speak for them.  They may have a set of -- I know,

21  for instance, homosexuality I know.  But if there's other

22  criteria, I don't know because -- since the mental health is

23  not -- you know, really that kind of leaves me out.

24  Q.   I understand that.  And my point is this:  I think

12:52PM  what Counsel was getting at was I was trying to somehow

12:52PM 1    figure out a way to get a Z Code -- and I'm assuming this,

2    and I was asking you what the criteria was.

3         My question to you was:  When I was asking you

4    what is the criteria, was it a question based upon like I

12:52PM 5    don't know what it is, what is the criteria?

6         THE COURT:  Do you recall that discussion between the

7    two of you about criteria of the Z Code status -- for the Z

8    Code status; do you recall that conversation with him?

9         A.    Yes.

12:53PM 10        Q.    And I wanted to know what the criteria was because

11   no one would tell me?

12        A.    Yes.  And I wasn't much help because I didn't

13   know.

14        Q.    And I agree with that.  Let me ask you this:  In

12:53PM 15   regard to these reports as Counsel indicated earlier, the

16   staffing in 2004 for Z Code, this March 2004, and can you

17   tell the Court, did you speak with Psychologist Riley and

18   did you, in fact, speak with my counselor, Ms. Hostu

19   (phonetic), and did you fax Ms. Hostu a copy of your report

12:53PM 20   and recommendation?

21        THE COURT:  Sir, one at a time.  Did you speak with Dr.

22   Riley?

23        Q.    Regarding the status of my Z code in March of this

24   year?

12:54PM 25        A.    Yeah, but --

12:54PM  1        MR. DEFRANCO:  He's not a doctor, Your Honor, he's a

      2   psychologist.

      3        A.    Yeah, but he wasn't -- that still was something

      4   that was initiated by you, the inmate, right?

12:54PM  5        Q.    My question is:  Did you speak to him regarding my

      6   Z Code?

      7        A.    Regarding the Z Code.

      8        THE COURT:  In March?

      9        Q.    In March?

12:54PM 10        A.    It wouldn't have been anything very --

     11        Q.    Did you, yes or no?

     12        A.    Yes.  I think there are many issues in -- well, I

     13   can't clearly remember, but it could have been so because we

     14   have meetings.

12:54PM 15        Q.    Did you speak to my counselor regarding my Z Code

     16   sometime this year?

     17        A.    Over the phone, yeah, about -- that you were

     18   interested in having another staffing.

     19        Q.    And subsequent to that phone call, did you send

12:55PM 20   her your memo of recommendation that I be Z Coded to be put

     21   in my file?

     22        A.    Yes, because, you know --

     23        Q.    It went that far?

     24        A.    Yes, because it was -- it was --

12:55PM 25        Q.    You took it to -- I wasn't done with my question.

12:55PM 1    You took it this far as to speak with Mr. Riley, who was

2    chief psychologist -- he's not a doctor.

3        THE COURT:  He's not a Ph.D?

4        Q.    No.  And you spoke to him, and you spoke to my

12:55PM 5    counselor, and then you faxed her -- or sent her somehow a

6    report where I needed to be Z Coded.

7        A.    Yeah, because I need to get --

8        Q.    Yes or no, first.

9        A.    Well, yes, but --

12:55PM 10       THE COURT:  She's allowed to say what --

11       A.    I got to get both sides of the story here because

12   it could be that you're telling me that you need a Z Code

13   and then maybe there's something that the unit manager or

14   counselor knows that would be inappropriate for you to be in

12:56PM 15   a single cell and that, for instance, it made no difference.

16   I wanted to get their perspective.

17       Q.    Did my counselor indicate to you that I didn't

18   need to be Z Coded?

19       A.    That, I didn't -- no.  It was basically that I

12:56PM 20   indicated to her that you were interested in being staffed

21   for a Z Code and that she was going to arrange that.

22       Q.    Okay.  And in my file -- when we have our

23   meetings, in my file, is it in my file how much

24   nitroglycerin I'm taking?  Is that -- is my medical chart

12:57PM 25   before you so you can see it?

12:57PM 1    A.    Well, we have the medical chart.

2    Q.    And have we gone -- you and I together, walked

3    into the medical chart room so you could pull my old chart

4    out so you could review it?

12:57PM 5    A.    Yeah.

6    Q.    So my question is this:  The nitro. I was

7    taking -- nitroglycerin pills, didn't just come from my

8    mouth, you also saw it, right?

9    A.    Yes.  It's in the record.

12:57PM 10    Q.    It's there, correct?

11    A.    Absolutely.

12    Q.    And if I'm having chest pain and I have never

13    taken nitro and all of a sudden I'm talking it now, and I'm

14    pretty healthy, I play sports, I'm not overweight, I'm

12:57PM 15    taking nitro., aspirin, and Lopressor, these medications

16    that I was not pumping in my body before, I am nine months

17    approximately after the Z Code was removed, would that be

18    consistent with your report about my -- how did he word it,

19    with my heart, internalizing, whatever it is you wrote?

12:58PM 20    A.    Okay.  You've got to understand that all of these

21    are risk factors.

22    Q.    Were those your words or my words?  When you came

23    up -- when we went over the nitro aspect of --

24    THE COURT:  She answered the question.  She said they

12:58PM 25    were her words.

12:58PM   A.    Yes, they were.

2         Q.    Okay.

3         A.    But what I'm saying is the risk factor -- you

4    mentioned, well, I'm not obese, being inactive and being

12:58PM   overweight, smoking, high blood pressure, those are risk

6    factors, but that doesn't mean you're going to 100 percent

7    develop any type of heart disease, just that these are risk

8    factors.  Stress is a risk factor.  And naturally, it would

9    exacerbate, whether it's -- you know, if you have

12:59PM   physical -- putting physical stress on the heart, right, by

11   physical -- like if you decided to run, I don't know if your

12   heart could take it.

13        THE COURT:  Any other questions?

14        Q.    Yes.  I just want to know this:  Did I tell you to

12:59PM   put that in your memo -- or your report, did I tell you to

16   put that there?

17        A.    No.  Basically, you offered another point, which I

18   thought was okay, I'll throw this point in.

19        Q.    Did I tell you to do that?

12:59PM   THE COURT:  She said you offered.

21        A.    You also --

22        THE COURT:  This is another point.

23        A.    -- made reference to the point you need more

24   nitroglycerin these days because you were in a double cell.

1:00PM    So you asked if I would also point that out, and I thought

1:00PM  that that's fine to point -- that it's the truth.

2           Q.   Was it manipulative for me to tell you that?

3           THE COURT:  No, no.  You've asked her that question,

4      you're asking her again.  The ultimate issue is mine to

1:00PM  decide whether or not that's the case.

6           MR. DEFRANCO:  I'm getting to where she -- where

7      Counsel was trying to take it to.

8           THE COURT:  Well, that's the argument he's going to

9      take and you're going to argue the opposite.  We just need

1:00PM  the facts from her; do you understand that?  You get the

11     facts out, then he says, yes, he was being manipulative, and

12     you say, no, I wasn't.  She said, I was just -- you know,

13     that's how we do it.  We don't ask her to make that

14     decision.

1:00PM      MR. DEFRANCO:  Fair enough, Your Honor.

16          THE COURT:  All right.  Any other questions?

17     BY MR. DEFRANCO:

18          Q.   Just to make it clear, and not to belabor the

19     issue, I just want to make sure I'm clear, you did talk to

1:01PM  my counselor this year about me being Z Coded, you did talk

21     to Mr. Riley, the psychologist --

22          THE COURT:  Those are all asked and she answered yes to

23     all of those.

24          MR. BAREFORD:  Your Honor, if I may, with respect to

1:01PM  the one, Riley, I don't think she recalled whether or not --

1:01PM  1    she recalled speaking with him, but I don't think she

2    specifically recalled whether or not they talking about his

3    Z Code status.

4        A.    I think it was you were interested in it and that

1:01PM  5    needed to be staffed -- to initiate the staffing process.

6    But as far as -- that's really all about it.  I mean --

7        THE COURT:  She didn't specifically recall March.

8        A.    That's why this memo is there because in its

9    original or verbal form that Mr. Riley is part of the Z

1:01PM 10    Code, right, yeah.

11        Q.    And, Your Honor, I've got one last question:  And

12    if you could just -- and I don't know if I'm going out of

13    cross-examination or not --

14        THE COURT:  I'll tell you.

1:02PM 15        Q.    -- but if I am, it's something I brought up.  It's

16    important to this case I believe in this respect:  You wrote

17    this report, this last report, in August of 2004

18    supporting -- or getting a recommendation that I be Z Coded,

19    I have a hearing subsequent to that before Your Honorable

1:02PM 20    Judge Paradise Baxter --

21        THE COURT:  In November.

22        Q.    -- right, and November 8th you sign an affidavit

23    and met with Mr. Barr, and you never answered the question

24    on direct, I wanted to know what Mr. Barr said -- who was

1:03PM 25    present and what did Mr. Barr say to you to get you to sign

1:03PM    that affidavit?

2              A.    Well, it was my decision to sign the affidavit

3         because --

4              Q.    My question was:  What did Mr. Barr say to you?

1:03PM         A.    He had to tell me the reason why he was asking me

6         to come to the office and what the particulars were.

7              Q.    I want to know what that is.

8              A.    Well, that you had taken the memo beyond the Z

9         Code and went to argue for -- in the judicial Federal lairs

1:03PM    of the system and that it was -- you know, it was a --

11             Q.    Was there a precedent?  Did he say that it was a

12        dangerous precedent and it's never happened before?  Did he

13        say your memo created a dangerous precedent that never

14        happened before?

1:04PM         THE COURT:  Did you tell the Plaintiff that Mr. Barr

16        told you that it was a dangerous precedent?

17             A.    I had to tell him that, you know, this was --

18             Q.    This is a yes or no.

19             A.    -- appropriate.

1:04PM         THE COURT:  Did he say that to you?

21             Q.    Mr. Barr told you that.

22             A.    Well, how else was this -- yeah, he had to tell me

23        that.

24             Q.    And by you making that recommendation was going to

1:04PM    open the floodgate for other inmates to follow through,

1:04PM 1    correct?

2    THE COURT:  If he said that, he said that.  Did he say

3    that?

4    Q.    You have to be honest.

1:04PM 5    A.    Yeah.  But I agree with that.

6    Q.    I'm not asking what you agree with.

7    A.    It's not possible, and it would be impractical.

8    Q.    Did Mr. Barr call you into a room with another

9    female that's unknown to me, that's unknown to you, and tell

1:05PM 10    you that what you did is unacceptable about these memos and

11    that what happened at Albion has never happened before?

12    THE COURT:  That's a lot of things; did he say all

13    those things?

14    Q.    I'm just trying to make it faster, was this a

1:05PM 15    conversation that we had?

16    A.    Yes, that's true.  And that's what was significant

17    about it and I -- yes.

18    THE COURT:  You had written that in one of your --

19    MR. DEFRANCO:  That's obstruction of justice, Your

1:05PM 20    Honor, and intimidating this witness.

21    THE COURT:  Mr. DeFranco, you can make that argument to

22    me at another point.  Let's finish this; do you have any

23    other questions for the witness?

24    MR. DEFRANCO:  I have no other questions, Your Honor.

1:05PM 25    THE COURT:  All right.  Anything else from you?

1:05PM     1          MR. BAREFORD:  Yes, ma'am.

           2

           3                      RECROSS-EXAMINATION

           4   BY MR. BAREFORD:

1:05PM     5

           6      Q.   Dr. Lindemuth, to the extent that you can answer

           7   this question with a yes or no, that's perfectly fine, I

           8   don't want to limit your answer, but if a yes or no is

           9   sufficient, that's fine.

1:06PM    10          When you took this walk down to where the medical

          11   records are maintained and saw that Mr. DeFranco was taking

          12   nitroglycerin, did you choose to do that on your own or was

          13   that -- let me rephrase the question:  Did you do that

          14   because he insisted that you go down and look at what other

1:06PM    15   medications he was on?

          16      A.   I didn't go down to look at anything.  The medical

          17   records and the psychiatric records are in the same chart

          18   because psychiatry is considered a medical discipline.  So

          19   all I had to do is flip some pages to see where the medical

1:06PM    20   section was, and, yeah, that was in there.

          21      Q.   Was --

          22      A.   Yeah.  It wasn't initiated -- did he bring that to

          23   my attention?

          24      Q.   That's my question.

1:06PM    25      A.   Yes.

                                                                      77

1:06PM  Q.   And to the extent when anyone would ever contact

2  you about Z Code, these other folks during the staffing or

3  even Mr. DeFranco himself, was it always a result of someone

4  coming and contacting you to query about the Z Code status,

1:07PM  or did you ever initiate and push out a recommendation for Z

6  Code that no one asked you to prepare?

7  A.   Never.  That would be -- no.  I can't do that

8  because that's -- it's just -- even though, as I said,

9  ideally, yeah, but there's no possibility.  And plus,

1:07PM  knowing that mental health is not going to be considered why

11  even do that, no.

12  THE COURT:  All right.  Thank you.  We are going to

13  take a recess until 2:15 and we'll be ready to start up

14  again.  You are excused.

1:07PM

16  (Recess taken at 1:08 p.m.)

17

18

19

20

21

22

23

24

25