IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY DeFRANCO, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 04-230-ERIE |
| V. ) | |
| ) | Judge Maurice B. Cohill, Jr. |
| SUPERINTENDENT WILLIAM WOLF; ) | Mag. Judge Susan P. Baxter |
| STEVE REILLY; DENESE BRUNNER; ) | |
| MANAGER ROD SHOWERS; CASE ) | |
| MANAGER JUDY JACKSON; ) | |
| DR. JOHN DOE; JANE DOE, JEFFREY ) | |
| BEARD; ASSIST. SUPER. WILLIAM ) | |
| BARR; MARILAND BROOKS, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL
UNDISPUTED FACTS, AND COUNTERSTATEMENT OF UNDISPUTED MATERIAL
FACTS**

AND NOW, come the defendants, Superintendent William Wolfe, Steve Reilly, Denise Bunner (incorrectly identified as Denese Brunner), Unit Manager Rod Showers, Case Mgr.—GECAC Judy Jackson, Jeffrey Beard, Assistant to the Superintendent William Barr, and Marilyn Brooks (incorrectly identified as "Mariland") by their attorneys, Thomas W. Corbett, Jr., Attorney General, Mary Lynch Friedline, Senior Deputy Attorney General, and Susan J. Forney, Chief Deputy Attorney General, Chief Litigation Section, and respectfully submit the following Response to Plaintiff's Statement of Undisputed Material Facts, and Counterstatement of Undisputed Material Facts, in accordance with Local Rule 56.1:

Objection: Defendants object to plaintiff's statement to the extent that the paragraphs set forth allegations and legal conclusions, not facts. Without waiver of this objection, defendants respond as follows:

1. Denied. Plaintiff's allegations in his complaint and injunctive requests speak for themselves. Barr never threatened plaintiff. Barr did have a discussion with DeFranco following the October 22, 2004 hearing, at which Health Care Administrator Rebele was present. (Exh. 1, ¶12.) However, Barr simply explained the reality of how the Department worked, *i.e.*, one looks at the Department as a whole when looking for bed space, rather than an individual facility:

> I went on to explain that if he was given a z code, we could not guarantee that the cell would be at SCI-Albion. I explained that the single cell could be, for instance, at SCI-Dallas. To the extent that I made reference to SCI-Dallas, that was not said in any way to communicate a threat. It was nothing more than an observation of the reality of the situation at that time.

(Exh. 1, ¶ 12.)

2. Denied. The Report speaks for itself. Further, Barr did not threaten plaintiff as stated in response to #1.

3. Denied. The transcript from the hearing and the Magistrate's subsequent report speak for themselves. Further, Barr never stated in his testimony or in his declaration that there were no planned transfers. (Exh. 1; Exh. 2.)

4. Denied as stated. Plaintiff was transferred to SCI-Smithfield on or about March 8, 2005. The request had been initiated in mid-February. (Exh. 2.)

5. Admitted.

6. Denied. The grievance response speaks for itself.

7. Denied. While the Superintendent allowed plaintiff to be returned in resolution of his grievance, there was no admission that the transfer was improper or retaliatory.

2

8. Admitted.

9. Denied. The next sentence in the transfer petition, which speaks for itself, states that "Mr. Barr is the institutional Grievance Coordinator and doesn't want any potential problems between this inmate and future potential grievances." (Plaintiff's Motion for Partial SJ – Exh. D.)

10. Denied as stated. Barr had been involved in plaintiff's litigation, and had testified at his TRO hearing. Plaintiff had filed a second TRO motion in October 2004 indicating that he was going to sue Barr and accusing him of threats.

## COUNTERSTATEMENT OF MATERIAL UNDISPUTED FACTS

11. Plaintiff was transferred to SCI-Albion from SCI-Pittsburgh on October 20, 1999. (Exh. 1 – 2004 Barr Declaration, ¶4.)

12. On March 24, 2002, DeFranco received a misconduct for threatening to kill an officer. He pled guilty and was placed in the RHU pending transfer. (Exh 2 – 2006 Barr Declaration, ¶ 4; Doc. # 14 - 10/22/04 Hrg. Tr. at 8-9.)

13. Family members pleaded with defendant Barr to keep DeFranco at Albion. (Exh. 2 – ¶4; Doc. # 14 - 10/22/04 Hrg. Tr. at 24-25.) With Barr's assistance and lobbying, it was determined that DeFranco would remain at Albion and be separated from the officer by housing assignment. Id.

14. Upon arrival at SCI-Albion in October 1999, DeFranco was housed in general population with a cellmate. (Cplt. ¶17.)

15. On February 7, 2000, he was staffed for single cell status. (Exh 3 – Z-code vote sheets.)

16. On June 24, 2002, plaintiff was again staffed and found to not meet Z-Code criteria; his classification level was changed from 4YZ to 4Y. (Exh. 1 ¶¶ 7-8.)

17. The psychologist, Ms. Eichenlaub, did not support a Z-code for DeFranco in the June 2002 staffing. (Exh. 3 – 6/24/02 vote sheet.)

18. At DeFranco's insistence, prison psychiatrist Dr. Lindemuth wrote a memo to the "Z-code Committee" dated September 23, 2002 recommending that he be conferred Z-Code status. (See Doc# 117 - 12/17/04 Hrg. Tr. at 51; Doc. #22 – Pltf. Appendix and Exhibits, App.3.)

19. Following repeated requests to his counselor and Dr. Lindemuth, plaintiff received another Z-code staffing on March 10, 2004. (Doc. #117 - 12/17/04 Hrg. Tr. at 69-70; Doc. #113 - 12/17/04 Hrg. Tr. Vol. II at 13-14, 47-48.)

20. With the exception of his counselor and defendant Reilly (psychologist), the 3/10/04 vote sheet reflects that all staff, including deputies for centralized services and facilities management and the Deputy Superintendent, disapproved the Z-code request. (Exh. 3 – 3/10/04 vote sheet.)

21. On or about February 15, 2005, defendant Barr requested an Administrative/Separation transfer for plaintiff. (Exh. 2; Exh. D to plaintiff's Motion for Partial Summary Judgment (MSJ).) According to the transfer petition, which was approved on February 23, 2005:

> An Administrative/Separation transfer is being requested due to litigation against William Barr, SCI-Albion's Superintendent's Assistant. Mr. Barr is the institutional Grievance Coordinator and doesn't want any potential problems between this inmate and future potential grievances.

(Exh. D to plaintiff's MSJ.)

4

22. Ever since the October 22, 2004 hearing on plaintiff's TRO, DeFranco had become obsessed with Barr and perceived Barr as threatening and conspiring with others to cause DeFranco harm. (Exh. 2, ¶ 9, 10.)

23. DeFranco believed that Barr had tampered with witnesses and was lying. Id.

24. The stated purpose and policy behind DC-ADM 804, which establishes the prison grievance procedure, is to ensure that all inmates have access to an avenue through which resolution of specific problems can be sought. (DC-ADM 804 §§ II, V.)

25. Barr's request to have DeFranco transferred was not intended as a punishment or because of DeFranco's litigation to seek a Z-code, but to avoid compromise of the grievance process. (Exh. 2.)

26. The transfer request was approved by Superintendent Brooks "to avoid any conflict with the grievance system." (Exh. 5 – Brooks' Response to Pltf's 2nd Set of Interrogatories.)

27. Barr had resolved previous grievances in DeFranco's favor, giving him the benefit of the doubt on lost property claims and making sure that DeFranco was compensated. (Exh. 6 – Requests to Staff and Responses dated 7/3/02, 7/11/02 and 11/04/02.) Barr agreed to work with DeFranco to give him extra phone time for discussion of certain legal cases. (Exh. 6.)

28. Barr also advised and encouraged DeFranco while he was in the RHU, urging him to evaluate what he could do to maintain himself at Albion. (Exh. 6 – 7/11/02 Request and 7/12/02 Response.)

29. Barr never testified at the TRO hearing that DeFranco would not be transferred, only that Albion could place DeFranco in a single cell if necessary. (Exh. 2.)

30.     When the TRO was issued, Barr and Unit Manager Skendall had to take steps to have another inmate move in order to free up a single cell temporarily for plaintiff. (Exh. 2.)

31.     DeFranco's physical condition has been stable since 2001. (10/22/04 Hrg. Tr. at 13, Rebele Testimony.) In semi-annual physicals and medication reviews DeFranco indicated he is doing well and voiced no complaints. (10/22/04 Hrg. Tr. at 19, Rebele Test; 12/17/04 Hrg. Rebele Test. at 58-59.)

32.     Dr. Baker, Medical Director, prescribed nitroglycerin under the tongue, as needed only, for his atypical chest pain, *i.e.,* nontyppical angina pectoris, meaning the pain correlates with anxiety, not actual chest pain. (12/17/04 Hrg. Rebele Test. at 53-54; Exh.7 Baker Declaration.)

34.     DeFranco had a stress test while at Pittsburgh in 1997 with negative results. He also had an Echocardiogram in May 1996 which showed only trace bicuspid regurgitation – clinically insignificant. He had a repeat EKG at Albion in May 2003 that was also clinically insignificant. **(**Exh. 7.)

35.     Because of his chest pain complaints, Dr. Baker ordered another Echocardiogram for DeFranco which was completed on January 27, 2004. (See report attached to Exh. 7 - Baker Dec.) This reflected no definitive evidence of mitral valve prolapse, mitral stenosis or obstructive cardiomyopathy and only trace mitral insufficiency. Id.

36.     Dr. Baker never made a recommendation of medical need for Z-code to staff relating to DeFranco. (Exh. 7.)

37.     Baker recommends double celling for DeFranco, should he experience a problem while sleeping. (Exh. 7 – Baker Dec; 10/22/04 Hrg. Rebele Test. at 6.)

38. There has never been any significant mental illness and/or mental health diagnosis generated by the Psychology Department. (Exh. 8, Bunner A/I 1st set ¶ 9.)

39. DeFranco's prominent diagnosis in 2002 was Panic Disorder without Agoraphobia. His current diagnosis is Delusional Disorder. (Exh. 9, Bunner A/I 2nd set, ¶ 3, 6.)

40. DeFranco asked to be referred to psychiatry in 2001 due to stress (while single-celled) and began seeing Dr. Lindemuth, who prescribed increasing doses of valium. (12/17/04 Hrg., Lindemuth at 56-57.)

41. DeFranco's medical and mental health conditions were no more serious than those of most of other inmates Dr. Lindemuth sees. (12/17/04 Hrg. Lindemuth Test. at 11-13, 29-30, 44.)

42. Dr. Lindemuth's memos in September 2002 and August 2004 were not physician's orders but simply recommendations or suggestions, addressed to the Z-code committee "which they could either decline or grant." (12/17/04 Hrg. Lindemuth Test. at 10.)

43. Lindemuth wrote these memos at DeFranco's insistence because the Z-code issue became a stumbling block in his treatment. (12/17/04 Hrg. Lindemuth Test. at 51-52.) Her primary purpose in writing the memos was a "supportive therapy." (Id., at 11-12.)

44. During the Z-code staffing process, DeFranco's medical and mental health status was considered. (Exh. 10 – Skendall Declaration; Exh. 3.)

45. Z-code classification is not permanent and is not a right. (Exh.10. ¶4.)

46. A committee of staff members participates in classification reviews for Z-code status. The committee consists of the inmate's Counselor, Unit Manager, three (3) regular housing unit officers, a Psychologist, the Program Manager, Major, Deputy-Facility Management and Deputy-Centralized Services. A vote sheet is prepared reflecting individual

7

member recommendations. This is sent to the Superintendent (or Deputy Superintendent), who considers the recommendation of the committee, as well as the information presented to the committee, and then makes his or her own decision on the Z-code status. (Exh. 10, Skendall Declaration, ¶3.)

47.   Whether to provide Z-code status to a particular inmate is a decision made by institution Corrections Officials in the day-to-day operation of the institution, and is made based upon the assessment of the individual inmate. Security and safety concerns are primary issues and often the driving force in determining the status. (Exh. 10 at ¶6.)

48.   In the Z-Code review process, facility staff review appropriate documentation including, without limitation, misconduct reports, **recommendations from medical and/or psychiatric or psychological staff**, and reports from other staff who have knowledge of the inmate's behavior. (Exh. 10 ¶4.)

49.   Z-code assignments are based upon documented behavior of an inmate in an institutional or similar setting or upon staff's evaluation of the inmate and review of available information which indicates an inability to be housed in a cell with others, which can include information reflecting medical, mental health, victimization concerns, and behavioral problems, etc., which may indicate a need for single-celling. (Exh. 10 at ¶5.)

50.   The Psychiatry department is contacted in connection with Z-code staffing when the inmate has a significant mental history. (Exh. 11, Reilly A/I 1st set - ¶1.)

51.   Doctors, psychiatrists and other medical staff can and do make recommendations on whether a Z-code would be warranted. (Exh. 7; Exh. 8, Bunner A/I 1st set, ¶7.)

52.   Unit managers, counselors and correction officers are very qualified to make determinations on whether to issue Z-code status to an inmate. These individuals have the

opportunity to observe the inmate on a regular basis and are in a good position to determine whether an inmate is adjusting to his cell situation. (Exh. 8, Bunner A/I 1st set - ¶12; Exh.9, Bunner A/I 2d set - ¶ 1.)

53.    Staff members involved in the voting process may vote as they choose and do not influence, nor are influenced by, the votes of other staff.   (Exh. 10 ¶ 6.)

54.    John Skendall has been DeFranco's Unit Manager since August of 2002 (with minor exceptions), and voted against Z-code status in the March 10, 2004 staffing. (Exh. 10, ¶7.)

55.    The Z-code staffing on March 10, 2004 was conducted at the request of the inmate through his psychiatrist, Dr. Lindemuth, who sought "re-evaluation for Z-code due to the increased Anxiety, etc."   (Exh. 10 ¶ 8 ; Exh. 3.)

56.    DeFranco was receiving ongoing medical and psychological treatment, including anti-anxiety medications, in March 2004.  In addition to that, he was (and still is) maintaining successful employment in the institution library as a law library clerk.    (Exh. 10 ¶9.)

57.    In discussions with counselor Webb, DeFranco constantly brought up his need for a Z-code in his discussions with her, urged her to talk to his psychiatrist and questioned Webb as to how she would vote.  (12/17/04 Hrg. Tr., Webb Test. at 13-14.)

58.    In connection with the June 24, 2002 staffing, Jackson requested input from psychology.  (Exh. 11, Reilly A/I, 1st set - ¶3.)

59.    Ms. Eichenlaub (a psychologist) met with DeFranco twice (Exh.12, Reilly A/I 2nd set - ¶ 3) and voted "no" in the June 24, 2002 staffing, as did all other staff members.  (Exh. 3.)

60.    In her report,  Eichenlaub noted that "his medication should be addressing his need for panic disorder." (Exh. 11,  Reilly A/I 1st set ¶ 3.)

61. The only defendants who voted on Z-code staffing for DeFranco were Reilly, Jackson and Showers. (Exh. 3.)

62. Jackson and Showers voted No in the 6/24/02 staffing. (Exh. 3.)

63. Reilly voted yes in the 3/10/04 staffing. (Exh. 3.)

64. Plaintiff received medical treatment while incarcerated at Albion, including cardiac testing and evaluations, psychiatry and psychology evaluations and sessions, and medications. (Exh. 7, 8 and 9.)

65. DeFranco never pursued any grievance relating to the denial of Z-code status through final review. (Exh.13 - Declaration of Tracy Pollock ¶7.)

          Respectfully submitted:

          Thomas W. Corbett, Jr.
          Attorney General

By:   /s/ Mary Lynch Friedline_____
      MARY LYNCH FRIEDLINE
      Senior Deputy Attorney General
      Attorney I.D. No. 47046
      Susan J. Forney
      Chief Deputy Attorney General
      Litigation Section

Office of Attorney General
6th Fl., Manor Complex
564 Forbes Avenue
Pittsburgh, PA  15219
Date:   August 1, 2006

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 1, 2006, I electronically filed the foregoing *Response to Statement of Material Undisputed Facts and Counterstatement* with the Clerk of Court using the CM/ECF system. This document will be mailed via U.S. mail to the following non CM/ECF participants:

Anthony DeFranco, CZ-3518
SCI-Albion
10745 Route 18
Albion, PA 16475-0001

                                         By:    /s/  Mary Lynch Friedline
                                                        MARY LYNCH FRIEDLINE
                                                        Senior Deputy Attorney General

Office of Attorney General
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219