## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY DeFRANCO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 04-230-ERIE |
| V. | ) | |
| | ) | Judge Maurice B. Cohill, Jr. |
| SUPERINTENDENT WILLIAM WOLF; | ) | Mag. Judge Susan P. Baxter |
| STEVE REILLY; DENESE BRUNNER; | ) | |
| MANAGER ROD SHOWERS; CASE | ) | |
| MANAGER JUDY JACKSON; | ) | |
| DR. JOHN DOE; JANE DOE, JEFFREY | ) | |
| BEARD; ASSIST. SUPER. WILLIAM | ) | |
| BARR; MARILAND BROOKS, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' BRIEF (1) IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT
## and (2) IN SUPPORT OF THEIR CROSS MOTION FOR SUMMARY JUDGMENT

AND NOW, come the defendants, Superintendent William Wolfe, Steve Reilly, Denise

Bunner (incorrectly identified as Denese Brunner), Unit Manager Rod Showers, Case Mgr.—

GECAC Judy Jackson, Jeffrey Beard, Assistant to the Superintendent William Barr, and Marilyn

Brooks (incorrectly identified as "Mariland") by their attorneys, Thomas W. Corbett, Jr.,

Attorney General, Mary Lynch Friedline, Senior Deputy Attorney General, and Susan J. Forney,

Chief Deputy Attorney General, Chief Litigation Section, and respectfully submit the following

Brief in Opposition to Plaintiff's Partial Motion for Summary Judgment, and in support of their

Cross-Motion for Summary Judgment:

### COUNTERSTATEMENT OF THE CASE

Plaintiff DeFranco filed a civil rights complaint on or about August 10, 2004, asserting

claims for damages and injunctive relief under the First, Eighth and Fourteenth Amendments

relating to the loss of single cell ("Z code") status at SCI-Albion. He named as defendants

Department of Corrections Secretary Beard, former Albion Superintendent Wolfe, two Albion psychologists – Reilly and Bunner, Unit Manager Showers, and Counselor Jackson.

DeFranco alleges that his Z-code status was removed in June 2002 as punishment or in retaliation for his threat to a guard in March of 2002, claims which appear to be directed toward Wolfe, Showers and Jackson.  (Complaint ¶ 33;  Doc. # 14 - 10/22/04 Hrg. Tr. at 9.)  He also claims that the defendants (generally) ignored his mental health and medical needs, including his psychiatrist's directives and "orders", by not granting his request for Z-code status.  (Complaint ¶ 33, 42, 45, 47.)  DeFranco filed an Amended Complaint in March 2005 (Doc. #76), adding as defendants current Superintendent Brooks and William Barr, Assistant to the Superintendent.   In his Second Amended Complaint, DeFranco added a claim for retaliatory transfer against Barr and various John and Jane Doe defendants, relating to his March 2005 transfer to SCI-Smithfield.  (Doc. # 139.)

### 1. Pertinent Factual Background (See also Defendants' Counterstatement of Material Facts not in Dispute)

Plaintiff was transferred to SCI-Albion from SCI-Pittsburgh on October 20, 1999.  (Exh. 1 – 2004 Barr Declaration, ¶4.)   On March 24, 2002, DeFranco received a misconduct for threatening to kill an officer.  He pled guilty and was placed in the RHU pending transfer.  (Exh 2 – 2006 Barr Declaration, ¶ 4;  Doc. # 14 - 10/22/04 Hrg. Tr. at 8-9.)  Family members pleaded with defendant Barr to keep DeFranco at Albion.  With Barr's assistance and lobbying, it was determined that DeFranco would remain at Albion and be separated from the officer by housing assignment.  (Exh. 2 – ¶4; Doc. # 14 - 10/22/04 Hrg. Tr. at 24-25.)

Upon arrival at SCI-Albion in October 1999, DeFranco was housed in general population with a cellmate.  (Cplt. ¶17.)   After a few months, on February 7, 2000, he was staffed for single

cell status. (Exh 3 – Z-code vote sheets.) At that time, defendant Reilly indicated that Z-code status was highly recommended due to stress levels, and the Counselor noted "inmate complains of anxiety and previous use of meds." One corrections officer who voted against Z-code status stated "inmate appears to live with his current cell mate without a problem." The Deputy-Facility Management also voted no – "no apparent problem before he arrived." (Exh. 3, 2/7/00 vote sheet.)

On June 24, 2002, it was determined that plaintiff did not meet Z-Code criteria and his classification level was changed from 4YZ to 4Y. (Exh. 1 ¶¶ 7-8.) According to the June 24, 2002 vote sheet, no one, including psychologist Eichenlaub, supported a Z-code for DeFranco. (Exh. 3 – 6/24/02 vote sheet.) Staff noted that he was manipulative and that psychology indicated medication would be appropriate to handle his psychological needs. Id.

Plaintiff claims that he learned of the June 24, 2002 Z-code decision on or about August 15, 2002 when he was placed on D/A Unit. (Doc. # 14 - 10/22/04 Hrg. Tr. at 9.) Subsequently, at DeFranco's insistence, prison psychiatrist Dr. Lindemuth wrote a memo to the "Z-code Committee" dated September 23, 2002 recommending that he be conferred Z-Code status. (See Doc# 117 - 12/17/04 Hrg. Tr. at 51; Doc. #22 – Pltf. Appendix and Exhibits, App.3.)

Following repeated requests to his counselor and Dr. Lindemuth, plaintiff received another Z-code staffing on March 10, 2004. (Doc. #117 - 12/17/04 Hrg. Tr. at 69-70; Doc. #113 - 12/17/04 Hrg. Tr. Vol. II at 13-14, 47-48.) With the exception of his counselor and defendant Reilly (psychologist), the 3/10/04 vote sheet reflects that all staff, including deputies for centralized services and facilities management and the Deputy Superintendent, disapproved the Z-code request. (Exh. 3 – 3/10/04 vote sheet.) Staff voting against the Z-code noted that

DeFranco had successfully resided on D/A for several months, and that stress will be ongoing and needs to be managed.  Id.

### 2.      Procedural History

Shortly after filing his complaint in August of 2004, plaintiff filed a Motion for Temporary Restraining Order claiming that he should be reinstated Z-code status due to his medical and mental condition. (Doc. #7.)  The Magistrate Judge conducted a hearing on the TRO on October 22, 2004 at which defendant William. Barr (Assistant to the Superintendent) and Susanne Rebele, Health Care Administrator, testified on behalf of  SCI Albion as to the Z-Code issues.  Several days later, plaintiff filed another Motion for Immediate Temporary Restraining Order, claiming that following the October 22, 2004 hearing, during the course of "small talk," Mr. Barr threatened him, stating that there would probably be a single cell available for him at SCI-Dallas.  (Doc. #9.)   DeFranco further alleged that he was drafting an Amended Complaint naming Barr as a defendant after the "direct threat" of transfer.  Id.

On October 29, 2004, the Magistrate issued a Report and Recommendation recommending that both Motions for Temporary Restraining Order be granted, which recommendation was adopted by the District Court in its Order of November 2, 2004.  (Doc. #11, 13.)  However, following an evidentiary hearing on plaintiff's motion for preliminary injunctive relief (on December 17, 2004),  the Magistrate issued a Report and Recommendation on January 19, 2005, recommending that plaintiff's various motions for injunctive relief be denied.  (Doc #41.)     Notwithstanding his objections and request to stay, the District Court issued an Order dated February 28, 2005 adopting the Magistrate's January 19, 2005 R & R. (Doc. #62.)[1]

---

[1] Plaintiff appealed that Order, but recently filed a Motion to Withdraw which was granted by the Third Circuit. (Doc. #197.)

On or about February 15, 2005, defendant Barr requested an Administrative/Separation transfer for plaintiff. (Exh. D to plaintiff's Motion for Partial Summary Judgment (MSJ).) According to the transfer petition, which was approved on February 23, 2005:

> An Administrative/Separation transfer is being requested due to litigation against William Barr, SCI-Albion's Superintendent's Assistant. Mr. Barr is the institutional Grievance Coordinator and doesn't want any potential problems between this inmate and future potential grievances.

(Exh. D to plaintiff's MSJ.) Plaintiff was advised of his transfer on March 7, 2005 and was transferred to SCI-Smithfield on March 8, 2005. (See Plaintiff's Motion for Temporary Restraining Order filed on 3/17/05, Doc. # 68.) The docket also reflects that plaintiff filed a Motion for Leave to file an Amended and Supplemental complaint on March 7, 2005, adding Mr. Barr as a defendant, among others, based on the alleged threat by Barr following the October 22, 2004 hearing. (Doc. # 63.)

Plaintiff filed a grievance dated March 15, 2005 (#112276) challenging the transfer as retaliatory (Exh. 4 - grievance # 112276 and subsequent responses and appeal documents.) On May 10, 2005, SCI-Albion Superintendent Brooks advised DeFranco that she was allowing him to return to Albion in resolution of his grievance. Id. The transfer took place on August 2, 2005. (Plaintiff's MSJ, pp. 2-3.)

In January 2006, plaintiff filed a Second Amended and Supplemental Complaint (Doc. # 139) in which he alleged that defendant Barr, working with unknown conspirators, had conspired to have him transferred to SCI-Smithfield in retaliation for his lawsuit. (2nd Amended Complaint, ¶¶ 64-65, 77.)

Plaintiff has now filed a Motion for Partial Summary Judgment with respect to his retaliatory transfer claim against Barr in the Second Amended Complaint, claiming that

the transfer petition's reference to "litigation" establishes retaliation as a matter of law. (Doc. #191.)

Plaintiff's motion should be denied and defendant's cross motion for summary judgment on this claim should be granted because the record establishes that defendant Barr's actions were based on legitimate penological interests and would have been taken regardless of plaintiff's protected conduct. Alternatively, plaintiff's motion should be denied because he cannot establish causation or, at the very least, there are issues of fact in dispute as to the element of causation, *i.e.*, whether Barr acted with a retaliatory motive and requested the transfer with the intent to punish DeFranco for seeking a Z-code classification.

## ARGUMENT

### DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT ON THE *RETALIATORY TRANSFER CLAIM*

**I.     Plaintiff's Retaliatory Transfer Claim Fails As A Matter Of Law; Alternatively, There Are Disputed Issues Of Fact Precluding Summary Judgment**

**A.     The Transfer was in Furtherance of Legitimate Penological Interests**

Undoubtedly, retaliation is a violation of a prisoner's constitutionally protected rights. See Rauser v. Horn, 241 F.3d 330 (3d Cir. 2001); White v. Napoleon, 897 F.2d 103, 112 (3d Cir. 1990). A proper retaliation claim must contain a showing of three factors by the plaintiff: (1) that he was engaged in a constitutionally protected activity; (2) that he was subjected to adverse action; and (3) the protected activity was a substantial motivating factor in the state actor's

decision to take the adverse actions.  See Rauser, 241 F.3d at 334; *adopting*, Mt. Healthy City

Board of Educ. v. Doyle, 429 U.S. 274, 287 (1977).

However, "[o]nce a prisoner demonstrates that his exercise of a constitutional right was a

substantial or motivating factor in the challenged decision, the prison officials may still prevail

by proving that they would have made the same decision absent the protected conduct for

reasons reasonably related to a legitimate penological interest."  Id.  This last element of Rauser

is a burden-shifting paradigm wherein, "[t]he prisoner bears the initial burden of showing that his

constitutionally-protected activity was a substantial or motivating factor for the adverse action;

then the burden shifts to the defendant to show it would have taken the same disciplinary action

absent the constitutionally protected activity."  Jordan v. Horn, 2005 WL 2250693, *1 (W.D.Pa.

Sept. 15, 2005), *citing*, Rauser, 241 F.3d at 333.   In other words, defendant can avoid liability by

showing that the action furthered a legitimate penological interest.   Rauser, 241 F.3d at 334.

Here, there is no dispute as to prongs one and two under Rauser.  Plaintiff engaged in

protected activity when he filed suit and the March 2005 transfer to SCI-Smithfield would

qualify as "adverse action" in connection with a retaliation claim.[2]   Causation (whether Barr

acted with a retaliatory motive, *i.e.*, with intent to punish DeFranco for seeking a Z-code

classification) is very much in dispute, however, and will be addressed in Section I.B, *infra*.

Nonetheless, if it is assumed for purposes of defendant's cross motion for summary judgment

that plaintiff has met the relatively modest pleading hurdle for causation, the burden then shifts

to the defendant to prove that he would have taken the same action regardless of the protected

activity.

---

[2] While a prisoner has no right to dictate where he will be housed, the Third Circuit has held that government action which standing alone does not violate the Constitution may nonetheless be unconstitutional if motivated in substantial part by a desire to punish the inmate for exercising a Constitutional right.  Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir.  2000).

At the outset, it must be noted that in deciding the penological interest issue in retaliation cases, "courts should afford deference to decisions made by prison officials who possess the necessary expertise." See Rauser, 241 F.3d at 334. As a matter of law, "maintaining order and security within the prison system" is a "legitimate penological interest." Fraise v. Terhune, 283 F.3d 506, 516 (3d Cir. 2002), citing, O'Lone v. Estate of Shabazz, 482 U.S. 342, 350-351 (1987); Turner v. Safley, 482 U.S. 78, 91-92 (1987).

Defendant Barr requested an Administrative Separation/Transfer from DeFranco in mid-February 2005. (Exh. 2, Barr Declaration, ¶10.) This occurred after the Magistrate Judge had issued her January 19, 2005 Report and Recommendation which denied DeFranco's motion for injunctive relief, a Report which clearly was favorable to the DOC defendants. (Doc. #41.) Mr. Barr had not yet been named as a defendant in the case.

According to defendant Barr, ever since the October 22, 2004 hearing on plaintiff's TRO, DeFranco had become obsessed with him and perceived Barr as threatening and conspiring with others to cause DeFranco harm. (Exh. 2, ¶ 9, 10.) DeFranco filed numerous pleadings insisting that Barr had threatened him with transfer, lied to the Court and tampered with witnesses. Id. Understandably, Barr grew concerned that DeFranco would not be able to accept any decision or recommendation by Barr or other staff, particularly in the grievance context. DeFranco would inevitably view Barr's decisions (and the grievance process itself) as tainted or driven by conflict of interest, which could seriously compromise Barr's effectiveness, particularly as grievance coordinator. (Exh. 2, ¶10, 11.)

Based upon DeFranco's increasingly irrational mindset toward him, Barr felt that DeFranco would never believe that he was getting a fair shake at SCI-Albion. (Exh. 2, ¶11.) His

only purpose in seeking the transfer was to enable DeFranco to start fresh and pursue his concerns in a setting free of what he perceived to be conflict of interest and conspiracy.  Id.

The stated purpose and policy behind DC-ADM 804, which establishes the prison grievance procedure, is to ensure that all inmates have access to an avenue through which resolution of specific problems can be sought.  (DC-ADM 804 §§ II, V.)  Certainly, promoting the efficient operation of this grievance system (the avenue through which inmates can resolve concerns and problems) helps to promote and preserve institutional order and thus security, which are legitimate penological interests.  Jewell v. Gonzales, 420 F.Supp.2d 406, 421 (W.D. Pa. 2006.)  Likewise, keeping morale high within the prison population and eliminating inmate perceptions of disparate treatment by prison officials promote institutional order and security and thus, help advance legitimate penological interests.  Holy Name Society v. Horn, 2001 WL 959408, p. 10 (E.D. Pa. 2001).

These important interests are also implicated in this record, where the evidence (described above) demonstrates that Barr's request for transfer was not intended to punish plaintiff, but to foster order and maintain the effectiveness and integrity of the grievance procedure.  Thus, summary judgment should be entered in favor of the defendant Barr.

**B.      Plaintiff Cannot Establish Causation;  Alternatively, Issues of Fact Exist With Respect to Barr's Motives**

Proof of causation mandates examination of Barr's intentions and motives in requesting the transfer, and based on this record, plaintiff cannot establish that his protected conduct was a "substantial or motivating factor" in Barr's decision to request an Administrative Separation in February 2005.  Alternatively, there are disputed issues of fact precluding summary judgment.

In Floyd v. Dugal, 2003 WL  23101802 (E.D. Pa), the District Court addressed a similar causation question in a retaliation case.   The defendant Lieutenant (Dugal) had filed a

misconduct against the plaintiff. The misconduct was dismissed, and on the same day, the Lieutenant requested a support team hearing to attempt to remove plaintiff from his dry cleaning plant job. The Court summarized the issue presented as follows: "If Dugal requested a support team hearing regarding plaintiff's employment **with the intent to punish plaintiff for defending himself at the misconduct hearing** and in retaliation for the dismissal of plaintiff's misconduct charges, Dugal is liable for unconstitutional retaliation." (Floyd, p. 5, emphasis added.)

The Court in Floyd found that the plaintiff had not presented evidence that the exercise of his constitutional rights (defending himself at the misconduct hearing) was a substantial motivating factor in the decision to hold a support team hearing; futher, the temporal proximity of plaintiff's exercise of his rights and the alleged retaliation was not probative. (Floyd, p. 8.) The Court also found that Dugal presented evidence that the motivating factor for him was not that plaintiff exercised his constitutional rights at the misconduct hearing, but the fact that plaintiff had been allowed to again work in the dry cleaning facility (the misconduct was based upon inappropriate behavior by Floyd in that job). Thus, the Court granted summary judgment in favor of the defendant because plaintiff failed to satisfy the third prong of Rauser – with proof of a causal link between the exercise of his constitutional rights and the support team hearing that resulted in the loss of his job. Floyd, p. 9. In addition, the Court found that the record established that Dugal had legitimate penological reasons for trying to have Floyd removed from that position. Id.

As in Floyd, the key issue here is whether Barr requested the transfer with an intent to punish DeFranco for filing his lawsuit. Like the plaintiff in Floyd, DeFranco cannot establish that the exercise of his constitutional rights was a substantial motivating factor in Barr's request

for the transfer. At the very least, there are disputed questions of fact in the record before this Court.

Barr's Declaration makes it clear that his request to have DeFranco transferred was not intended as a punishment or because of DeFranco's litigation to seek a Z-code. (Exh. 2.) As stated, ever since Barr testified in the October 22, 2004 hearing, DeFranco had become obsessed with him and perceived Barr as threatening and conspiring with others to cause DeFranco harm. DeFranco was convinced that Barr had threatened him with transfer, lied to the Court and tampered with witnesses. (Exh. 2, ¶¶9, 10.) Barr's concern (particularly as Grievance Coordinator) was that DeFranco would not be able to accept any decision or recommendation by Barr or other staff. DeFranco would inevitably view Barr's decisions (and the grievance process itself) as tainted, which could seriously compromise Barr's effectiveness, particularly as grievance coordinator. (Exh. 2, ¶ 10, 11.) Barr concluded that DeFranco would never believe he was getting a fair shake at SCI-Albion, and Barr's only purpose in seeking the transfer was to enable DeFranco to start fresh and pursue his concerns in a setting free of what he perceived to be conflict of interest and conspiracy. (Exh. 2, ¶ 11.) This request was approved by Superintendent Brooks who recognized that the transfer was "to avoid any conflict with the grievance system." (Exh. 5 – Brooks' Response to Pltf's 2nd Set of Interrogatories, ¶2.)

In support of his Motion, plaintiff DeFranco relies upon Barr's alleged "threat" following the October 22, 2004 hearing and the transfer petition's inclusion of the phrase "due to litigation" as presumptive evidence of retaliatory motive. Even setting aside Barr's own explanations, however, the record simply does not support DeFranco's conclusions. Indeed, Barr's long history with DeFranco is one of assistance and compassion, not retaliation. Barr had a prior opportunity to encourage a transfer of DeFranco but actually fought against it, for example.

DeFranco had received a misconduct for threatening to kill a corrections officer and was placed in the Restricted Housing Unit pending transfer in March of 2002. Several members of his family called and pleaded with Barr to keep DeFranco at Albion. Barr spoke with the corrections officer in question and after further discussion with the administrative staff, it was agreed that DeFranco would continue to be housed at SCI-Albion and be separated from the officer by housing assignment. (Exh. 2, ¶4.)

Barr's concern is also reflected in his handling of DeFranco's grievance responses and requests. Barr had resolved previous grievances in DeFranco's favor, giving him the benefit of the doubt on lost property claims and making sure that DeFranco was compensated. (Exh. 6 – Requests to Staff and Responses dated 7/3/02, 7/11/02 and 11/04/02.) Barr agreed to work with DeFranco to give him extra phone time for discussion of certain legal cases. (Exh. 6.) He also advised and encouraged DeFranco while he was in the RHU:

> Mr. DeFranco: Please use the time in R.H.U. to evaluate what you can do to maintain yourself at SCI-Albion. I believe you do become too familiar with staff. You should not even think of staff on a first name basis . . . . I would personally like to see you stay at SCI-Albion to keep from creating a hardship on your family. They call and show concern for you. Most inmates are not that lucky.

(Exh. 6 – 7/11/02 Request and 7/12/02 Response.)

Further, the various filings of record do not support DeFranco's claim that retaliatory motive must be presumed. For instance, Plaintiff has repeatedly claimed that defendant Barr misrepresented his intentions to transfer DeFranco to the Court during the course of the preliminary injunction and TRO proceedings in the fall of 2004. However, that is not borne out by the record. Barr did have a discussion with DeFranco following the October 22, 2004 hearing, at which Health Care Administrator Rebele was present. (Exh. 1, ¶12.) However, Barr

simply explained the reality of how the Department worked, *i.e.*, one looks at the Department as a whole when looking for bed space, rather than an individual facility:

> I went on to explain that if he was given a z code, we could not guarantee that the cell would be at SCI-Albion.  I explained that the single cell could be, for instance, at SCI-Dallas.  To the extent that I made reference to SCI-Dallas, that was not said in any way to communicate a threat.  It was nothing more than an observation of the reality of the situation at that time.

(Exh. 1, ¶ 12.)

Earlier that day, during the hearing, the issue of whether DeFranco could or would be transferred was not addressed.  Barr simply advised the Court that Albion could shift DeFranco into a single cell if necessary.   (Exh. 2, ¶ 6;  Doc. # 14 – 10/22/04 Hrg. Tr. at 22.)  In making that response, Barr was attempting to explain what could be done at Albion on a temporary basis, if so ordered by the Court; he did not intend to suggest or give the impression that Albion had a permanent Z-code cell opening.  It did not.   (Exh. 2, ¶ 6, 7.)   In fact, when Barr was given the Court Order which granted the TRO and ordered a Z-code,   Unit Manager Skendall had to approach an inmate in one of the single cells regarding moving to a higher custody level unit.  The inmate refused to make the move and was sent to the RHU for disobeying a direct order.  This action was necessary to free up a single cell temporarily for DeFranco as Barr had promised the Court when he said "we can actually shift Mr. DeFranco to a Z-code cell if necessary."  (Exh. 2, ¶ 7.)

In the January 19, 2005 Report and Recommendation which denied plaintiff's requests for preliminary injunctive relief,  the Magistrate Judge indicated in footnote 2 that she "accepted Defendant Barr's testimony that no such transfer is planned" citing immediately to Barr's November 8, 2004 Barr declaration. (Exh. 1 hereto.)   However, it is respectfully submitted that the Magistrate misread Barr's Declaration, particularly the cited portion, as it reflected just the

opposite, *i.e.*, that DeFranco could have been transferred if there was no single-cell opening at Albion. (See Exh. 1, ¶ 12.)

Plaintiff subsequently filed another TRO concerning his transfer to SCI-Smithfield in March 2005. Citing to that same footnote in the January 19, 2005 Report, DeFranco incorrectly stated that Barr had "assured" the Court in November 2004 that there would be no transfer. (Doc # 68, ¶¶ 3, 4.) During the April 21, 2005 on the TRO, plaintiff continued to mischaracterize Barr's November 8, 2004 declaration as a promise of "no transfer." (Doc. # 142, 4/21/05 Tr. at 23.) The Magistrate unfortunately repeated that misstatement, stating "when he [Barr] told me he had no plans to transfer you, I believed him." (Id. at 23-24.)

Finally, there is no legitimate temporal basis on which to infer that the transfer to Smithfield in March 2005 was retaliatory. As the Magistrate Judge correctly noted in the April 21, 2005 hearing, the January 19, 2005 Report and Recommendation and the February 28, 2005 Order of Court adopting it were **favorable** to defendants, not to plaintiff – it found that he was not entitled to an injunction on the z code status. (Doc. #142 - 4/21/05 Transcript at 6.) Thus, there was no apparent connection between those ruling and the transfer on March 8, 2005. Moreover, the transfer was initiated on February 15 2005 (Exh. D to Pltf's MSJ), and Barr was not added as a defendant until plaintiff sought leave to file a second amended complaint on March 7, 2005.

Finally, Mr. Barr's explanation for the transfer request is consistent with the documentation generated in the transfer process. While the transfer petition noted that "the Administrative/Separation transfer is being requested due to litigation against William Barr, SCI-Albion's Superintendent's Assistant, the phrase "due to litigation" is clearly qualified by the subsequent sentence, which reflects Barr's concern that DeFranco would never believe he was

getting a fair shake at Albion: "**Mr. Barr is the Institutional Grievance Coordinator and doesn't want any potential problems between this inmate and future potential grievances.**" (Pltf's MSJ - Exh. D;  see also Exh. 2, ¶ 11.)

As in <u>Floyd</u>, the record simply does not support plaintiff's causation argument, which is based simply on temporal proximity, a mischaracterization of Barr's original affidavit filed with the Court in November 2004, and a selective reading of the transfer petition which ignores the stated rationale.  Alternatively, it is submitted that the record contains disputed issues of fact on this issue, and a jury should be permitted to decide whether Barr's motives were, in fact, retaliatory.

## DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT ON ALL
## REMAINING CLAIMS

To state a claim under § 1983, a plaintiff must allege:   1) the alleged misconduct was committed by a "person" acting under color of state law; and  as a result   2) he was deprived of rights, privileges, or immunities secured by the Constitution or laws of the United States.  *West v. Atkins*, 487 U.S. 42 (1988);  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981), overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330-331 (1986).

In this case, plaintiff challenges the decision refusing him Z-code status as violative of his rights under the First, Eighth and Fourteenth Amendments.  Construing his *pro se* pleadings broadly, he appears to be asserting:

> 1)      an Eighth Amendment claim for deliberate indifference to a serious medical need against all defendants for not granting him Z-code status;

> 2)      an Eighth Amendment inadequate medical care claim against Reilly and Bunner;

> 3)      a Fourteenth Amendment Due Process claim relating to the denial of Z-code status;

> 4)      a First Amendment retaliation against Showers and Jackson in connection with the June 2002 vote denying him a Z-code; and

> 5)      retaliation and conspiracy claims against Showers relating to threats and misconducts occurring prior to August 2002.

For the reasons stated herein, defendants are entitled to summary judgment on all of these claims.

## II.     Plaintiff's Eighth Amendment Claim Fails as a Matter of Law

### A.     Plaintiff Cannot Establish an Eighth Amendment Violation Based upon Z-code Classification

Plaintiff attempts to raise an Eighth Amendment challenge to the denial of Z-code status, claiming that the defendants ignored his psychiatrist's "order" for a Z-code.  (Cplt. ¶ 43, 45.)  He also maintains that the Z-code staffing process is "unsafe and inadequate" because medical doctors do not participate in the vote.  (Id. ¶ 27-29.)

The denial of Z-code status, by itself, is not cruel and unusual punishment and does not rise to the level of an Eighth Amendment violation.  Seawright v. Stachelek, 1992 WL 6796, p.2 (E.D. Pa.), citing Rhodes v. Chapman, 452 U.S. 337 (1986).  Here, however, plaintiff attempts to equate single cell status with medical treatment and insists that a Z-code is necessary to address his serious medical need, as described by psychiatrist Lindemuth in a memo dated September 23, 2002.  (Cplt. ¶ 30, 42-44.)

The Eighth Amendment, as applied to the states through the Fourteenth Amendment, guarantees incarcerated persons humane conditions of confinement, meaning that prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and cannot deny "the minimal civilized measure of life's necessities.".  Farmer v. Brennan, 511 U.S. 825, 832 - 34 (1994), citing Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).  In particular, conditions of confinement that impact "inmate health and safety" fall within the protections afforded by the Eighth Amendment.   Id.; see also  Estelle v. Gamble, 429 U.S. 97 (1976).  Thus, in order to assert a constitutional violation in the form of a denial of medical care, Plaintiff must show two elements: 1) that he was suffering from a "serious" medical need; and 2) that prison officials were "deliberately indifferent" to that serious medical need.  Estelle v. Gamble, 429 U.S. 97, 104 (1978).

1.      There is no "serious medical need" for Z-code status

DeFranco's claim that being double celled exacerbates his angina and worsens his heart condition is not supported by the record.  From a medical standpoint, DeFranco's physical condition has been stable since 2001.  (10/22/04 Hrg. Tr. at 13, Rebele Testimony.)  In semi-annual physicals and medication reviews DeFranco indicated he is doing well and voiced no complaints.  (10/22/04 Hrg. Tr. at 19, Rebele Test;  12/17/04 Hrg. Rebele Test. at 58-59.)

According to DeFranco's medical chart, he has a history of mitral valve prolapse (a heart murmur) and began taking aspirin, Lopressor and nitroglycerin in June 2003.  The Lopressor (an antihypertensive) and aspirin work to thin the blood and avoid blood clots.  (12/17/04 Hrg. Rebele Test. at 51-52.)  Dr. Baker, Medical Director prescribed nitroglycerin for non-specific chest pain, *i.e.,* nontyppical angina pectoris, meaning the pain correlates with anxiety, not actual chest pain.  (12/17/04 Hrg. Rebele Test. at 53-54;  Exh.7  Baker Declaration, ¶5.)

DeFranco's complaints of chest pain are noted in his medical chart from SCI-Pittsburgh and were also attributed to anxiety.  He had a stress test while at Pittsburgh in 1997 with negative progressive results.  He also had an Echocardiogram in May 1996 which showed only trace bicuspid regurgitation – clinically insignificant.  (Exh. 7, ¶4.)  He had a repeat EKG at Albion in May 2003 that was also clinically insignificant.  Id.  Because of his atypical chest pain complaints, Dr. Baker ordered another Echocardiogram for DeFranco which was completed on January 27, 2004.  (See report attached to Exh. 7.)  This reflected no definitive evidence of mitral valve prolapse, mitral stenosis or obstructive cardiomyopathy and only trace mitral insufficiency. (Exh. 7, ¶3,5.)

In sum, DeFranco does not have a medical condition or need that warrants single-celling. Dr. Baker does not agree that DeFranco's minor heart condition, which has not been diagnosed through echocardiogram testing, is aggravated by the anxiety he experiences when double celled. (Exh. 7, ¶6,7.)    Although the medical department does not actually vote on Z-code classifications, if an inmate has a serious medical condition which Dr. Baker believes would be relevant to his classification, he would inform staff involved in the Z-code review.  As inmate DeFranco does not have such a condition warranting single cell status, he has never made such a recommendation to staff on that issue.  (Exh. 7, ¶7.)  In fact, Dr. Baker believes that it would be better for DeFranco, with his minor heart condition, to be double celled, should he experience a problem while sleeping.  (Exh. 7, ¶7; 10/22/04 Hrg. Rebele Test. at 6.)

As to DeFranco's mental health, there has never been any significan mental illness and/or mental health diagnosis generated by the Psychology Department.  (Exh. 8,  Bunner A/I 1st set ¶ 9.)  DeFranco's prominent diagnosis in 2002 was Panic Disorder without Agoraphobia.  His current diagnosis is Delusional Disorder.  (Exh. 9,  Bunner A/I 2nd set, ¶ 3, 6.)  DeFranco asked to be referred to psychiatry in 2001 due to stress[3] and began seeing Dr. Lindemuth, who prescribed Valium.   (12/17/04 Hrg. Tr. at 56-57.)

While DeFranco asserts in his complaint that Dr. Lindemuth's September 23, 2002 memo was a directive or order establishing a serious medical need for single cell status, Dr. Lindemuth herself contradicted those assertions when she testified at the preliminary injunction hearing on December 17, 2004.   She acknowledged that DeFranco's medical and mental health conditions were no more serious than those of most of other inmates she sees.  (12/17/04 Hrg. Lindemuth Test. at 11-13, 29-30, 44.)    The Court stated:  "And my question is:  Would he be more appropriate for a single cell than your other patients?"  Dr. Lindemuth answered:

---

[3] Notably, he was single-celled at this time.

No. I have individuals that are of – have the same history, the same presentation, except that they don't – even though they do begrudge the fact that are in – that they are cohabitating, they just never have made that sole, prominent in their sessions that we have and never requested that I intervene.

(12/17/04 Hrg. Lindemuth Test. at 44.)   Dr. Lindemuth further testified that her memos in September 2002 and August 2004 were not physician's orders but simply recommendations or suggestions, addressed to the Z-code committee "which they could either decline or grant." (12/17/04 Hrg. Lindemuth Test. at 10.)

Lindemuth acknowledged that she wrote these memos at DeFranco's insistence because the Z-code issue became a stumbling block in his treatment. (Id., at 51-52.)   Every time she interacted with DeFranco, his chief focus was obtaining a Z-code and he could not move beyond that. (Id., at 44.)   She explained that her primary purpose in writing the memos was a "supportive therapy " – in which "it wasn't so much the result that was what I intended, it was the act or the process of doing something that would appease…the inmate."   (Id., at 11-12.) Psychologist Bunner's experience with DeFranco was similar:

> When Inmate DeFranco attended individual sessions, he did not present as excessively anxious or stressed out.  He appeared to have one issue to address and that issue was his being given a Z-code.  Whenever an attempt was made to work on ways that he could cope with living with a cellmate, he was disinterested and would not follow through with any of the stress-reducing recommendations.  Any suggestions that were made that pertained to coping methods; relaxation, etc., were immediately dismissed by inmate DeFranco.

(Exh. 8, Bunner A/I  1st set ¶ 10.)

This record plainly establishes that Z-code status was not an issue of medical necessity for DeFranco.   At best, plaintiff's complaints regarding the denial of his Z-code request are really complaints over his preferred course of treatment (assuming for the sake of argument that cell status even qualifies as medical treatment).  However, the right to be free from cruel and unusual punishment does not include the right to treatment of one's choice.  Young v. Quinlan,

960 F.2d 351, 358 n.18 (3d Cir. 1992)(an inmate's disagreement with prison personnel over the exercise of medical judgment does not include the right to the treatment of one's choice); <u>Monmouth County Correctional Institute Inmates v. Lanzaro</u>, 834 F.2d 326, 346 (3d Cir. 1987)("Mere disagreements as to the proper medical treatment [does not] support a claim of an eighth amendment violation.").

### 2. Plaintiff cannot establish deliberate indifference

Furthermore, Dr. Lindemuth's testimony qualifying and explaining her recommendations, along with the evidence of record reflecting no serious medical need for single cell status, combine to extinguish plaintiff's claims of deliberate indifference. Above all, the staffing process itself establishes that due consideration was given to DeFranco's medical and mental health status.

Z-code classification is not permanent and is not a right. (Exh. 10, Skendall Declaration at ¶4.) A committee of staff members participates in classification reviews for Z-code status. The committee consists of the inmate's Counselor, Unit Manager, three (3) regular housing unit officers, a Psychologist, the Program Manager, Major, Deputy-Facility Management and Deputy-Centralized Services. A vote sheet is prepared reflecting individual member recommendations. This is sent to the Superintendent (or Deputy Superintendent), who considers the recommendation of the committee, as well as the information presented to the committee, and then makes his or her own decision on the Z-code status. (Exh. 10, ¶3.) Generally, whether to provide Z-code status to a particular inmate is a decision made by institution Corrections Officials in the day-to-day operation of the institution, and is made based upon the assessment of

the individual inmate.   Security and safety concerns are primary issues and often the driving force in determining the status.   (Id. at ¶6.)

Contrary to plaintiff's assumptions in his complaint, in the Z-Code review process, facility staff  review appropriate documentation including, without limitation, misconduct reports, **recommendations from medical and/or psychiatric or psychological staff**, and reports from other staff who have knowledge of the inmate's behavior.   (Id. ¶4.)   Generally, assignments are based upon documented behavior of an inmate in an institutional or similar setting or upon staff's evaluation of the  inmate and review of available information which indicates an inability to be housed in a cell with others, which can include information reflecting medical, mental health, victimization concerns, and behavioral problems, etc., which may indicate a need for single-celling.  (Exh. 10 at ¶5.)

According to defendant Reilly, although psychiatry does not vote, that department is contacted in connection with Z-code staffing when the inmate has a significant mental history. (Exh. 11, Reilly A/I 1st set - ¶1.)  Indeed, doctors, psychiatrists and other medical staff can and do make recommendations on whether a Z-code would be warranted.  (Exh. 8,  Bunner A/I 1st set, ¶7.)  From the psychology department's perspective, however, unit managers, counselors and correction officers are very qualified to make determinations on whether to issue Z-code status to an inmate.  These individuals have the opportunity to observe the inmate on a regular basis and are in a good position to determine whether an inmate is adjusting to his cell situation.  (Exh. 8, Bunner A/I 1st set - ¶12;  Exh. 9, Bunner A/I 2d set - ¶ 1.)

Staff members review and evaluate the total picture of the inmate's background, behavior and history, as it affects and is affected by Z-code status.  They must also take into consideration all input provided by other institutional staff and departments, including Psychology, Psychiatry

and Health Care practitioners. All input is reviewed and considered, but the final decision (vote) by staff members is an individual one, and need not be in agreement with recommendations or suggestions from the aforementioned areas or departments. In fact, any staff member involved in the voting process may vote as they choose and do not influence, nor are influenced by, the votes of other staff. (Exh. 10, ¶ 6.)

      a)     3/10/04 staffing

John Skendall has been DeFranco's Unit Manager since August of 2002 (with minor exceptions), and voted against Z-code status in the March 10, 2004 staffing. (Exh. 10, ¶7.) The Z-code staffing on March 10, 2004 was conducted at the request of the inmate through his psychiatrist, Dr. Lindemuth, who sought "re-evaluation for Z-code due to the increased Anxiety, etc." (Id. ¶ 8.) Skendall did not agree that inmate DeFranco needed to be Z-coded. From his own personal experience, DeFranco had successfully resided on Unit D for some time, while sharing a double cell. He could interact with other inmates without being disruptive and he certainly was not threatening to himself or to other inmates. Based on his records, he was receiving ongoing medical and psychological treatment, including anti-anxiety medications. In addition to that, he was (and still is) maintaining successful employment in the institution library as a law library clerk. (Id. ¶9.)

Over his many years of experience with inmate DeFranco, Skendall found that DeFranco was extremely manipulative with staff; he persistently lobbied for Z-code, constantly badgering staff about the process, sending multiple and at times repetitive requests and correspondence to the unit staff and institution staff, including the Superintendent. (Exh. 10, ¶ 10.) This is evident from the testimony of DeFranco's counselor Webb, who stated that DeFranco constantly brought

up his need for a Z-code in his discussions with her, urging her to talk to his psychiatrist and questioning Webb as to how she would vote. (12/17/04 Hrg., Webb Test. at 13-14.)

      b)      6/24/02 staffing

Likewise, the June 24, 2002 staffing also involved input from psychology. Defendant Jackson actually requested that input. (Exh. 11, Reilly A/I, 1st set - ¶3.) Ms. Eichenlaub (a psychologist) met with DeFranco (Exh.12, Reilly A/I 2nd set - ¶ 3) and voted "no" in the June 24, 2002 staffing, as did all other staff members. (Exh. 3.) In her report, Eichenlaub noted that "his medication should be addressing his need for panic disorder." (Exh. 11, Reilly A/I 1st set ¶ 3.) According to psychologist Reilly, the changes that warranted removing the Z-code status in 2002 would have been "medication compliance, good attendance with psychiatric appointments and no evidence of serious mental or emotional maladjustment." (Exh. 12, Reilly A/I 2nd set - ¶ 5.) According to the June 24, 2002 vote sheet, staff noted that DeFranco was manipulative and pointed to the statement from psychology indicating that medication would be appropriate to handle his psychological needs. (Exh. 3 – 6/24/02 vote sheet.)

Other than defendant Reilly (discussed in Section II.B, *infra*), the only two defendants who actually voted on Z-code staffing for DeFranco were Jackson and Showers, and they only participated in the June 24, 2002 staffing. (Exh. 3.) Plaintiff alleges that Jackson and Showers were not qualified to vote, although he admits that they had known him for a month. (Cplt. ¶24.) Jackson and Showers voted no to Z-code status in June 2002, but their votes were consistent with the psychologist's recommendation. (Exh. 3.) Above all, plaintiff's allegations of deliberate indifference against Jackson and Showers are rooted on the premise that the committee's refusal to provide Plaintiff a single cell was contrary to the Dr. Lindemuth's memo. Yet it is clear that

Lindemuth wrote that memo, at DeFranco's request, on September 23, 2002, long after the staffing vote involving Showers and Jackson was on June 24, 2002. (Exh. 3.) These defendants cannot be deliberately indifferent because they failed to heed a memo that did not exist.

In sum, on this record, plaintiff simply cannot establish deliberate indifference in connection with Z-code staffing process or in connection with defendants' involvement in that process. While plaintiff may point to the April 18, 2005 staffing at SCI-Smithfield where he was placed in a single cell, that vote sheet is particularly telling. The Staff notes indicate that DeFranco had filed a civil action against several Albion staff members and "DeFranco has indicated that the "Z" code was ordered by the court to be assigned to him." Staff then noted that a copy of the Magistrate Judge's Report was in the file and under the Conclusion section it indicates that it was the judge's recommendation that "Defendants should be ordered to return Plaintiff to z-code status in a single cell at SCI-Albion immediately." (Exh. 3, 4/18/05 vote sheet.) Apparently, the Magistrate's subsequent report in January 2005 which recommended dismissal of the claims for injunctive relief (and the district court's order adopting that recommendation) were not in DeFranco's file, and DeFranco made no effort to inform Smithfield of those rulings.

### 3.   Plaintiff has failed to establish personal involvement as to defendants Beard, Wolfe, Brooks and Barr

It has long been held a "defendant in a civil rights action must have personal involvement in the alleged wrongdoing." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Evancho v. Fisher, 2005 U.S.App.LEXIS 19585 (3d Cir. Sept. 12, 2005). Section 1983 liability requires that a defendant be personally involved or have actual knowledge of or acquiesced in the commission of the wrong. See Rizzo v. Goode, 423 U.S. 362 (1976). Liability can only be

imposed if that official played an "affirmative part" in the complained of misconduct. <u>See</u> <u>Chincello v. Fenton</u>, 805 F.2d 126, 133 (3d Cir. 1986).

A supervisory official's misconduct cannot be merely a failure to act. <u>See</u> <u>Commonwealth of Pennsylvania v. Porter</u>, 659 F.2d 306, 336 (3d Cir. 1981), cert. denied, 458 U.S. 1121 (1982). The supervisor must be personally involved in the alleged misconduct. <u>See</u> <u>Rode v. Dellarciprete</u>, 845 F.2d 1195, 1207 (3d Cir. 1988). To impose liability on a supervisory official there must be "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's assertion could be found to have communicated a message of approval to the offending subordinate." <u>Colburn v. Upper Darby Township</u>, 838 F.2d 663, 673 (3d Cir. 1988), <u>cert</u>. <u>denied</u>, 489 U.S. 1065 (1989).

Moreover, in a recent decision adjudicating similar allegations of "supervisory liability," our Eastern District counterpart held that liability is "unjustified" "[w]here the only role of supervisory prison officials in the alleged misconduct of their subordinates is the denial of plaintiff's administrative grievances and a concomitant failure to act to remedy the alleged misconduct." <u>Abuhouran v. Acker</u>, 2005 U.S.Dist.LEXIS 12864, *19 (E.D.Pa. June 29, 2005), *citing*, <u>Shehee v. Luttrell</u>, 199 F.3d 295 (6th Cir. 1999).

As stated, in connection with plaintiff's allegations of an Eighth Amendment violation arising out of his Z-code staffings, the only defendants who had a role and participated in the vote process were Jackson and Showers (June 24, 2002) and Reilly (March 10, 2004). Plaintiff named Secretary Beard as a defendant solely because Beard **failed to act** on DeFranco's letter dated January 22, 2004 (Doc. #22, Pltf's Exhibits – G) which "alerted him to the problem he was having at SCI-Albion, including, but not limited to, the lack of response to his complains

(grievances) and the threats of transfer." (Am. Cplt. ¶49.) According to the plaintiff, "Defendant Beard was specifically advised by plaintiff of the Report by Doctor Linemuth [sic], he was therefore deliberately indifferent, violating plaintiff's 8th Amendment right, and 14th Amendment for not responding to his request for help." Id.

Likewise, plaintiff alleges only that defendant Brooks read a staff packet in or around August 5, 2004 containing Dr. Lindemuth's report, which put her on notice of his alleged condition. Her **failure to act**, so he claims, also constituted deliberate indifference to his medical need. (Am. Cplt. ¶50, Exh. A to Am. Cplt.) As to former Superintendent Wolfe, the vote sheets (Exh. 3) reveal without question that he never even voted on DeFranco's Z-code status. Plaintiff simply implies that Wolfe failed to act on grievances (Cplt. p. 9 "Exhaustion), which is insufficient to establish personal involvement on behalf of the Superintendent. See Abuhouran v. Acker, supra.

Finally, in the Amended Complaint which first named defendant Barr, DeFranco's only allegations against Barr that conceivably fell under the Eighth Amendment were that he had failed to respond to greivances and committed an Eighth Amendment violation "for knowing about Dr. Lindemuth's report and doing nothing." (Am. Cplt. ¶51.)

The allegations against these four supervisory defendants are simply "failure to act" assertions, which cannot establish "personal involvement" in the alleged Eighth Amendment violation.

**B.      Defendants are Entitled to Summary Judgment on Plaintiff's Claim for Inadequate Medical Care**

Although paragraphs 37 through 40 of the Complaint are captioned "inadequate medical care," there is simply no support in the record for such a claim. There is no evidence that any of the defendants intentionally denied or delayed access to medical care, or intentionally

interfered with the treatment once it was prescribed.  See  Report and Recommendation, <u>Hayden</u> <u>v. Cerami</u>, Civ. A. 03-11 Erie, filed April 13, 2005, (*quoting* <u>Estelle</u>, 429 U.S. at 105-106): "[W]hile an intentional refusal to provide <u>any</u> medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere."  <u>Id.</u> (emphasis original).

Indeed, it is beyond dispute that Plaintiff received medical treatment while incarcerated at Albion, including cardiac testing and evaluations, psychiatry and psychology evaluations and sessions, and medications.  (Exh. 7, 8 and 9.)    In his complaint, plaintiff freely admits receiving continuous medical treatment throughout his confinement with the Department of Corrections. <u>See, e.g.</u> ¶¶ 14 -16 (Plaintiff received therapy and medicine while at SCI-Pittsburgh); ¶ 17 (seen by psychologist Defendant Reilly upon arrival at SCI-Albion); ¶ 20, 33, 34 (began therapy and medicine treatment with Dr. Lindemuth); ¶ 30 (Plaintiff cites Dr. Lindemuth as his treating psychiatrist); ¶ 35 (Plaintiff was seen by the medical department and given medication following his "panic attack" in his cell); ¶ 37 (Plaintiff prescribed an aspirin a day, Lopressor, and "nitro pills" for his heart by the prison doctor); ¶ 39 (Plaintiff given an echo-cardiogram in January of [2004]).

Plaintiff's complaints of inadequate treatment against the medical defendants (Reilly and Bunner)  are really complaints over his preferred course of treatment, as opposed to an unconstitutional denial of treatment.   Plaintiff merely asserts that both defendants failed to take any action on his behalf, by essentially ignoring the memo of  Dr. Lindemuth.  (Cplt. ¶ 48.)   As noted above, Plaintiff does not raise a constitutional claim by merely asserting disagreement over his method of treatment.  <u>Young</u>, 960 F.2d at 358.

Plaintiff's argument that these two psychologists were somehow guilty of deliberate indifference in connection with his Z-code status is even further weakened by the fact that Steven Reilly actually did "take action" on DeFranco's behalf and voted "yes" in the Z-code staffing on March 10, 2004.  (Exh. 3.)   Denise Bunner was never even assigned from Psychology to vote on any Z-codes, rendering her involvement  particularly tenuous.   Id.

### III.    Plaintiff Has No Due Process Right to Z-code Status

Plaintiff makes general references to the Fourteenth Amendment in his complaint.  To the extent he is suggesting a "right" to Z-code status, that claim would fail as a matter of law. According to  the District Court in Austin v. Chesney, 1995 WL  498720, *1 (e.D. Pa. 1995), "because living in a double cell is an expected ordinary incident of prison life, retaining single cell status isnot a protected liberty interest."   Likewise, in Rhodes v. Chapman, 452 U.S. 337, 347 (1981), the Court, discussing a challenge to double celling, held:  "to the extent that such conditions are restrictive and even harsh, they are part of the penaly that criminal offenders pay for their offenses against society."

### IV.    Plaintiff's First Amendment Claim Concerning the June 24, 2002 Z-Code Vote Fails

### A.    DeFranco Did Not Engage in Protected Activity

In paragraph 33 of his Complaint, Plaintiff appears to be asserting a First Amendment Retaliation claim as to the June 24, 2002 Z-code staffing decision, stating that defendants "have retaliated against plaintiff for the incident with the guard. . . ."   DeFranco had received a misconduct on March 24, 2002, for threatening to kill C.O. Fry.   At his disciplinary hearing, DeFranco pled guilty (also contending that he was joking) and was placed in the RHU pending

transfer. (Exh 1 – Barr Declaration, ¶ 4; Doc. # 14 - 10/22/04 Hrg. Tr. at 8-9.) Plaintiff contends that his Z-code status was removed several months later, on June 24, 2002, as punishment or in retaliation for his threat in March of 2002. (Complaint ¶ 33; Doc. # 14 - 10/22/04 Hrg. Tr. at 9.)

While a principal function of free speech under our system of government is to invite dispute and even stir people to anger, Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949), the First Amendment has never protected:

> face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitute a breach of the peace by the speaker-including 'classical fighting words', words in current use less 'classical' but equally likely to cause violence, and other disorderly words, including profanity, obscenity and threats.

Chaplinsky v. State of New Hampshire, 315 U.S. 568, 573 (1942).

In the prison context, it is generally accepted that filing grievances with prison administrators and petitioning the court are protected activities. See, e.g., Atkinson v. Taylor, 316 F.3d 257, 269 (3d Cir. 2003). However, threats and other inflammatory statements that pose security risks are not protected speech. See, e.g., U.S. v. Orozco-Santillian, 903 F.2d 1262, 1265-1266 (9th Cir. 1990) (repeated threats to INS agents from deportable alien were unprotected.); Riggs v. Miller, 480 F.Supp 799, 804 (E.D.Va. 1979) (bickering and argumentative complaints are not protected.); Durkin v. Taylor, 444 F.Supp 879, 882-883 (E.D.Va. 1977) (complaint reading "I am tired of chicken-*ecxplitive* rules" is not protected.); and In re Parmalee, 63 P.3d 800, 807-808 (Wash. Ct. App. 2003) (inmate's language, referring to correctional officer as a "piss ant" and "*expletive* head" who should be fired "before his attitude gets him *expletive*-ed up," was a true threat and thus not protected.). Such language is obviously

inconsistent with basic, legitimate penological interests of maintaining order and security.  Fraise
v. Terhune, 283 F.3d 506, 516 (3d Cir. 2002).

It is clear that DeFranco was not engaged in any constitutionally protected activity when
he threatened to kill C.O. Fry.  Rather, he merely uttered unprotected fighting words to a
corrections officer, and, in so doing, posed a substantial security risk to the institution.  Because
plaintiff fails to meet this threshold requirement, i.e. proving the conduct that led to the alleged
retaliation was constitutionally protected, see Allah 229 F.3d at 224-225, defendants would be
entitled to summary judgment on this claim.

> **B.      In Any Event, the Record Does not Establish a Causal Link Between the
> Misconduct and the Z-Code Vote in June 2002**

The Z-code vote on June 24, 2002 was a unanimous "no."  (Exh. 3.)  There is nothing in
the record except plaintiff's unsupported beliefs and assumptions to suggest that Jackson or
Showers' votes were motivated by a desire to impose further punishment or that they dictated the
votes of the other staff members.  In any event, as stated in section II, infra at pp. 24-25, the vote
was supported by valid rationale[4], in furtherance of legitimate penological interests.  Rauser,
supra.

> **V.      Plaintiff's Civil Conspiracy and Retaliation Claims for  2002 are Barred by the
> Statute of Limitations**

Plaintiff raises additional claims with his amended complaint that are barred by the
statute of limitations.  Plaintiff's original complaint, dated August 10, 2004, was received by the
Clerk of Courts on August 26, 2004.  On March 23, 2005, permission was granted for Plaintiff to
supplement and amend his complaint.  In so doing Plaintiff added various allegations for the first

---

[4] E.g., the psychologist's indication that medications could handle plaintiff's needs, and staff observations of his
manipulative behavior.

time that occurred more than two years prior to the date of his original complaint.  Accordingly, these new claims are barred by the statute of limitations.

In ¶¶ 52 – 55, Plaintiff suggests that Showers retaliated against him in the form of some kind of threat made to Plaintiff.  In placing this activity within a particular timeframe, Plaintiff explains that the alleged threat by Defendant Showers occurred immediately after a request that he made to Major Gates.  (Am. Cplt, ¶ 54.) That particular request, attached as Exhibit B to the amended complaint, was written by Plaintiff on May 7, 2002.   Plaintiff also bracketed the period of time in which Defendant Showers made the alleged threat as occurring before he filed a grievance regarding the loss of his shoes.  (Am. Cplt, ¶ 55.0  That particular grievance, attached as Exhibit C to the amended complaint, was written by Plaintiff on May 16, 2002.

In ¶¶ 56 – 59, Plaintiff further alleges that he received retaliatory misconducts during the summer of 2002.  Without associating the allegation of ¶ 56 with a particular date, Plaintiff describes a situation in which he received a threat from two individuals not named as defendants. Plaintiff does, however, provide a chronological frame of reference for these complaints in ¶ 57, when he alleged that he pleaded with Defendant Barr to move him to a different housing unit, to which Defendant Barr responded, "No".  (Am. Cplt, ¶ 57.)   Plaintiff included a copy of the document in which Defendant Barr did respond to his 'pleas', which was dated July 10, 2002. (Am. Cplt. Ex. D.)   In ¶ 59, Plaintiff alleges that he received discipline following a false misconduct report.[5]  (Am. Cplt. ¶ 59.)  While Plaintiff was serving his disciplinary custody time,

---

[5] While not specifically identified as such within the complaint, this misconduct appears to be the misconduct report A297960, dated July 8, 2002.  *See* Exhibit B of the Jan. 28, 2005 Plaintiff's Appendix to Objections to the Report and Recommendation (Doc # 46).  In that document, Plaintiff refers to this incident as "a retaliatory misconduct while Plaintiff was still in a single cell", describing the misconduct report in the same manner as in the complaint.  Id.

he corresponded with Defendant Barr over the aforementioned loss of his property.  Id.

Defendant responded to Plaintiff on July 31, 2002.  (Am. Cplt. Ex. E.)

A two-year statute of limitations applies to §1983 claims brought in Pennsylvania.  Smith

v. City of Pittsburgh, 764 F.2d 188, 194 (3d Cir. 1985), cert. denied, 474 U.S. 950 (1985); 42

Pa.Cons.Ann. §5529.  All allegations contained in ¶¶ 52 – 59 are barred by the statute of

limitations, as they occurred more than two years prior to the complaint.  As such, these claims

should be dismissed.

## VI.     Plaintiff Failed to Exhaust his Z-Code Issues

The Plaintiff is required to administratively exhaust issues raised in a civil rights

complaint before bringing suit.  It has been determined by the Third Circuit that the inmate

grievance system, DC-ADM 804, is an adequate administrative remedy for the purposes of

satisfying the Prison Litigation Reform Act.  See Booth v. Churner, 206 F.3d 289, 293 (3d Cir.

1997), aff'd 532 U.S. 731 (2001).  The DC-ADM 804 grievance system consists of three stages.

First, the prisoner is required to timely submit a written grievance for review by the

facility or regional grievance coordinator, who responds in writing.  A timely filing is one made

within 15 days of the alleged occurrence giving rise to the grievance.  Second, the prisoner is

required to timely submit a written appeal to the facility manager, and again receives a written

response.  Finally, the prisoner is required to submit a timely appeal to the central office review

committee, and will receive a final determination in writing.  See Booth, 206 F.3d at 293, n.2.

Regardless of the disposition of these appeals, it is only after completing the process in its

entirety that the prisoner can commence a §1983 action.

The exhaustion requirement under the PLRA carries with it a procedural default

component.  Spruill v. Gillis, 372 F.3d 218 (3d Cir., June 18, 2004).  Considering the PLRA's

legislative history, the Third Circuit noted Congress' three interrelated objectives with the PLRA: 1) to return control of the inmate grievance process to prison administration, 2) to foster the development of an administrative record, and 3) to reduce the burden on federal courts by erecting barriers to frivolous lawsuits. Id. To that end, procedural default is measured by the "law" of the state prison grievance system, in this case the Grievance System Policy, DC-ADM 804. Id.

Plaintiff claims that he filed three grievances relating to the denial of Z-code status (to which he received no response). He has produced grievance forms dated August 25, 2002, December 16, 2002 and March 23, 2004, but none of the forms contains a grievance number. (See Doc. #22 - Pltf. Appendix and Exhibits, A, B, D.) The Department of Corrections has no record of any grievances by DeFranco relating to the Z-code issue, and the records reveal that DeFranco never pursued any grievance through final review. (Exh.13 - Declaration of Tracy Pollock ¶7.)

Even if the first grievance (dated 8/25/02) could somehow be considered filed, it cannot possibly have involved the issue of deliberate indifference. This grievance *pre-dates* Dr. Lindemuth's first memo recommending single cell status which was dated September 23, 2002. (See Appendix 3 to Plaintiff's Appendix and Exhibits -Doc. # 22.) As stated herein, plaintiff's allegations of deliberate indifference are rooted on the premise that the committee's refusal to provide Plaintiff a single cell was contrary to the Dr. Lindemuth's "diagnosis" that Plaintiff required a single cell. As such, it is legally impossible for a grievance to complain about the prison staff's refusal to provide the sought-after medical treatment *before* the so-called recommendation was made.

This record reveals that Plaintiff actively courted Dr. Lindemuth's assistance (in the form of her recommendation) *after* he was denied his request for a single cell (12/17/04 Hrg. Tr. at 51), and then he recasts the sequence as one in which the denial occurred in spite of Dr. Lindemuth's recommendation, thereby constituting deliberate indifference. Plaintiff cannot escape the following chronology: Plaintiff learns that his request for a single cell was denied on August 15, 2002; he has a grievance form notarized on August 25, 2002; on September 23, 2002, Dr. Lindemuth writes a letter recommending a single cell; and finally, plaintiff signs the original complaint on August 10, 2004, averring that the 2002 denial of his request for a single cell constituted deliberate indifference because it was contrary to Dr. Lindemuth's recommendation.

The grievance Plaintiff suggests was filed on December 18, 2002, ostensibly complaining about the unconstitutional denial of medical treatment (in the form of not providing a single cell), was 'filed' four months after the date Plaintiff cites as the date in which he learned that he was denied a single cell. As such, it was not timely filed, and Plaintiff cannot rely on that attempt to grieve as an attempt to satisfy the exhaustion requirement. The December 18, 2002, grievance is one in which Plaintiff insurmountably procedurally defaulted.

In any event, as stated, DeFranco failed to appeal any of his grievances through the final stage of review, which also constitutes procedural default. (Exh. 13 – Pollock Declaration.) His suggestion that he received no response and thus, took no further action is not supported by the record, which reveals his familiarity with the grievance process. Moreover, over fifteen (15) months passed between the December 18, 2002 grievance form and the March 10, 2004 staffing and subsequent grievance form on March 23, 2004. This lengthy, unexplainable gap is inconsistent with plaintiff's claim that he was simply waiting for a response.

## CONCLUSION

For the reasons sated herein, plaintiff's Motion for Partial Summary Judgment on his retaliatory transfer claim should be denied. Further, summary judgment should be entered in defendants' favor as to all of plaintiff's remaining claims.

Respectfully submitted:

Thomas W. Corbett, Jr.
Attorney General

By: /s/ Mary Lynch Friedline
MARY LYNCH FRIEDLINE
Senior Deputy Attorney General
Attorney I.D. No. 47046
Susan J. Forney
Chief Deputy Attorney General
Litigation Section

Office of Attorney General
6th Fl., Manor Complex
564 Forbes Avenue
Pittsburgh, PA  15219
Date:  August 1, 2006

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2006, I electronically filed the foregoing *Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment and in Support of their Cross-Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system.  This document will be mailed via U.S. mail to the following non CM/ECF participants:

Anthony DeFranco, CZ-3518
SCI-Albion
10745 Route 18
Albion, PA 16475-0001

By:    /s/  Mary Lynch Friedline
       MARY LYNCH FRIEDLINE
       Senior Deputy Attorney General

Office of Attorney General
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219