IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY DeFRANCO,
          Petitioner,       06   OCT 16   A9 59      :

    V.                         : No. 04-230-E

                  CLERK     : Magistrate Judge Baxter

WILLIAM WOLFE, et al., DISTRICT COURT District Judge Maurice Cohill, Jr.
          Defendants.             :

---

## PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

AND NOW, comes plaintiff, pro se, who respectfully submits the following cross motion for summary judgment, and in support avers:

**Statement of The Case**

Plaintiff filed a civil rights complaint on August 10, 2004, asserting claims for damages and injunctive relief under the First, Eighth and Fourteenth Amendments.

Plaintiff alleges that his z-code status was removed as further punishment (retaliation) for allegedly threatening a prison guard and for advising defendant Showers of his intent to sue the DOC over missing personal property, and in response, defendant Showers made a threat of how plaintiff would see how the DOC deals with inmates' who sue (See, Cplt. ¶ 33, 42, 45, 47; and Amended Cplt. generally).

To state a claim under § 1983, a plaintiff must allege 1) the alleged misconduct was committed by a person or persons acting under color of state law, and as a result 2) he was deprived of rights, privileges or immunities secured by the constitution or laws of the United States, *West v. Atkins*, 487 U.S. 42 (1988). In this case, plaintiff challenges the decision to remove his medically required z-code as violative of his constitutional rights.

Plaintiff has alleged that the defendants had purposely removed his previous medically required z-code as a means to further punish (retaliate) against him for threatening a prison guard and because he advised defendant Showers of his intent to sue the DOC over missing property. He also alleges that the z-code staffing is in itself unsafe and inadequate. While single cell (z-code) status is not itself cruel and unusual punishment and does not rise to an Eighth Amendment claim, _Rhodes v. Chapman_, 452 U.S. 337 (1986), when single cell is medically required to meet a medical need and when that _treatment_ is taken away, it is actionable under the Eighth Amendment.

Conditions of confinement that impact "inmate health and safety" fall within the protections afforded by the Eighth Amendment. See, _Estelle v. Gamble_, 429 U.S. 97 (1976). In order to assert a constitutional violation in the form of a denial of medical care, plaintiff must show two elements: 1) that he was suffering from a serious medical need, and 2) that prison officials were deliberately indifferent to that medical need, _Id_. at 104.

It is undisputed that plaintiff was given a z-code at SCI Albion due to a serious medical need. That z-code remained in effect up until approximately three (3) months after plaintiff had allegedly threatened a prison guard and the threat made to him by defendant Showers. While housed on defendant Showers Unit, after being there about three (3) weeks, he was being "staffed" as to his z-code status. While Showers states in his Answers to Interrogatories that it is _not_ normal procedure for an inmates staffing be deferred to that inmates Long Term Housing Unit when an inmate is moved to a New Unit (See, Ex. "A", Showers 3rd Set A/I, ¶ 1 ). However, Unit Manager Skendall responded to a request slip that it is normal and standard procedure for an inmates staffing to be deferred back to that inmates Long Term Housing Unit (See, Ex. "B", Attached ). Plaintiff's June 2002 staffing should had been deferred back to his

Long Term Housing Unit where the staff were familiar with him. Under *Farmer v. Brennan*, 511 U.S. 825 (1994), our Supreme Court stated, "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from the circumstanial evidence…and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." There is no question that defendants Showers and Jackson knew plaintiff was z-coded for medical reasons (*inter alia*, high stress and panic disorder)---z-code is only given for medical and behavioral problems. When these specific defendants began a staffing to remove the z-code, they were not qualified to do so as plaintiff had only been on their Unit for weeks; they were unfamiliar with him, and plaintiff was just released from the RHU for allegedly threatening to kill a prison guard. Nothing in his situation warranted a review of the z-code as all indications at that time was that the z-code was still needed. Unless of course, if threatening to kill a prison guard is considered improvement by the defendants and DOC.

Defendant Showers and Jackson began this so-called z-code annual review with the sole purpose to further punish plaintiff for threatening the prison guard and plaintiff's statement to Showers of his intent to sue the DOC and Showers threat of how he would see how the DOC "deals with inmates who sue." They further incorporated the help of a Ms. Eichenlaub (psychologist) to support the z-code removal as punishment.

**Eighth Amendment Violation Based upon Z-Code Denial**

While being denied single cell status does not in and of itself amount to an Eighth Amendment violation, *Rhodes v. Chapman*, 452 U.S. 337 (1986); and an inmate is not entitled to treatment of his choice, *Young v. Quinlan*, 960 F.2d 351, 358 n. 8 (3rCir.1992), also *Monmouth County Correctional Institute Inmates v. Lanzaro*, 834 F.2d 326, 346 (3dCir.1987)("Mere

3

disagreements as to the proper medical treatment [does not] support an eighth amendment violation."). Here however, plaintiff was *prescribed* the medically required z-code in 2000. Only after plaintiff threatened a prison guard and advised defendant Showers of his intention of suing the DOC did they (defendant Showers, Jackson and those acting in concert with them) begin a "staffing" to remove the medically required z-code. It is undisputed that plaintiff had required and was given a medical z-code due to high levels of stress (of living with another person) and his mental health. This was a noted and established condition. Furthermore, the z-code was *prescribed* to him. Our Supreme Court, in *Estelle*, U.S. at 104-05, stated that the Constitution prohibits officials from "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."

In this case, there were non-doctors and non-specialists playing the role of "gatekeeper" in deciding if plaintiff would continue to receive the medical treatment of the z-code; this should not happen. Untrained officials are not qualified to make medical decisions, see, *Boswell v. Sherburne*, 849 F.2d 1117, 1123 (8thCir.1988)(evidence that "inadequate trained jailers were directed to their own judgment about the seriousness of prisoners' medical needs" supported claim of deliberate indifference). Also, *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762-63 (3rCir.1979)(jail required to provide inmates access to medical personnel qualified to diagnose and treat mental disorders).

This case provides and establishes that plaintiff did require a z-code as it was *prescribed* to him. It is also undisputed that it was removed by unqualified people, or at the least it was orchestrated by inadequate personnel to have it removed. Also, plaintiff was under psychiatric care and no one in the 2002 z-code vote process sought the medical opinion of his treating doctor regarding the z-code removal. This is deliberate indifference. Whether plaintiff was receiving

medication for his panic disorder has no relevance as to his z-code requirement. Plaintiff is not disagreeing about the treatment he received, he is asserting that once the medically needed z-code was removed by non-professionals he was not receiving <u>any</u> treatment and thus, suffered irreparable harm to his pre-existing heart condition. Plaintiff's medical condition was serious enough to require his receiving a z-code in 2000, and nothing in the record before this Court supports that anything changed warranting its removal.

**2002 Z-Code Vote**

On May 20, 2002, defendant Jackson began the z-code removal by requesting an annual review of it (Def.'s Motion Summary Judgment (MSJ) Ex. "9" A/I, ¶ 5). At that time, plaintiff had only been on this Housing Unit for about three (3) weeks. In that time, plaintiff and defendant Showers (defendant Jackson's supervisor) had a conversation in which Showers threatens plaintiff, stating words to the effect that plaintiff would see how the DOC deals with inmates who sue. Reading the comment section of the 2002 vote sheet is very revealing. For example, defendant Jackson stated plaintiff manipulated an entire z-code committee upon his arrival to get the z-code. Likewise, defendant Showers couched his comments in the same manner, calling plaintiff manipulative and claiming high stress levels do not meet the z-code criteria. They both made comments calling plaintiff manipulative—which has absolutely nothing to do with a z-code. And, as this Court knows, there would be no way for anyone to manipulate an entire z-code committee, as defendant Jackson stated in the comment section of the 2002 vote sheet. However, in 2000, the Chief Psychologist recommended the z-code due to high stress levels and it was approved. Now, for whatever reason (punishment and retaliation) the high stress levels no longer meet the z-code "criteria". Something is fundamentally wrong here. And that is defendant Showers and Jackson made up that "high stress levels" do not meet

the z-code criteria. Obviously the Chief Psychologist would know if high stress levels met the z-code criteria and it does as plaintiff was given a z-code partly due to high stress levels. For argument sake, assuming plaintiff was manipulative, that is not a criteria to deny a z-code. These comments were put in place to sway the other non-professionals into removing plaintiff's z-code. Whether plaintiff was or is manipulative is irrelevent to the z-code issuance. An inmate either needs it or does not. Nonetheless, defendant Showers and Jackson were not qualified to make any qualified decision regarding plaintiff's z-code need. The defendants claim is a Ms. Eichenlaub met with plaintiff and stated he does not meet the z-code criteria. However, plaintiff denies a meeting ever transpired and they used this Ms. Eichenlaub's "vote" to aid them in further punishing plaintiff by removing the medically required z-code. There is factual dispute as to whether a meeting ever transpired between Eichenlaub and plaintiff (See, Ex. "Z", Attached, plaintiff's declaration stating no meeting occurred between Ms. Eichenlaub and plaintiff). Psychologist, defendant Bunner, admitted that if a psychologist does not meet a client that it would place the psychologist in a difficult position to make any recommendation if a z-code is required or not (See, Def.'s MSJ, Ex. "8" ¶ 15). Inmates are actually interviewed by a "staffing team" when consideration is being made about its continued need. However, in plaintiff's case, there was no "staffing team" meeting. In every other inmates z-code "review", prior to it being voted on to remove it, his staffing team, consisting of at least the unit manager, counselor, etc. have a meeting with the inmate. This never transpired with plaintiff.

Also, according to defendant Reilly's Answers to Interrogatories, defendant Jackson sent psychology a request for annual review. Defendant Jackson is a corrections "counselor" not a doctor. Defendant Jackson authored the following in regards to plaintiff for the z-code committee to read:

> 3. DC-97 Sent to the psychology department on May 20, 2002. It was sent by corrections counselor, Judy Jackson, regarding annual Z Code review. Action taken indicates panic disorder—doing time for murder—stated family is the Dr. Defranco family—condescending—*his medication should be addressing his need for panic disorder.* Circulate vote sheet to determine continued need of Z Code.

(Def.'s Ex. "11", Reilly's A/I, ¶ 3). The state of defendant Jackson's mind is particularly telling in what she had written. First she claims plaintiff is "condescending" and goes further to offer her "medical" opinion on plaintiff's medication handling his panic disorder. This DC-97 form regarding plaintiff's required z-code need was suppose to be submitted with information relative to whether he still required the medical z-code. The DC-97 lists inflammatory comments designed to induce the other "voters" to remove the z-code. These comments and medical opinion relating to plaintiff's medication offered by Jackson, *a prison counselor*, shocks the conscience. As stated she is not a doctor or medical specialist in any capacity and should never render a medical opinion without consulting a doctor. Statements such as "condescending" and alleging plaintiff stated he is "a member of the Dr. Defranco family" are clearly not needed for a decision as to whether plaintiff still needed the medical z-code. Defendant Reilly stated that Jackson authored these notes (Def.' MSJ, Ex. "12" ¶ 7). Plaintiff specifically asked Reilly who had written the comments in the DC-97 and he stated, "Ms. Jackson." (Id., at ¶ 7). Additionally, defendant Jackson wrote the following on plaintiff's z-code vote sheet:

> "Does not meet criteria for z-code, manipulated Albion staff upon his arrival. History of incarcerations did not necessitate a z code. Incarcerated since '96 w/one misconduct on record. high levels of stress does not meet z code criteria. (See psych eval.)."

(See Ex. "C", Vote #2, Attached). These are the words of defendant Jackson in regards to the 2002 z-code vote that removed plaintiff's medical z-code. Her state of mind is clear from her very own handwriting. She states "high levels of stress does not meet z-code criteria", however, defendant, Chief Psychologist Reilly recommended z-code due to high stress levels (Ex. "C" #1).

Defendant Bunner states that high stress levels would be a reason for a z-code and agreed with defendant Reilly's 2000 z-code vote (Def.'s MSJ Ex. "9" ¶ 9). Bunner and Reilly are psychologists and their "votes" and reasoning carries great weight in the z-code staffing. Based upon these facts, defendant Jackson's above handwritten comments show that she purposely wanted to remove plaintiff's medical z-code; in complete contradiction to her "comments" on the vote sheet, high levels of stress does meet z-code criteria according to psychologist Bunner and Chief Psychologist Reilly.

   As stated, she is not a medical professional. A medical official without specialized training should not make decisions about conditions that require a specialist's attention (psychiatrist). See, _Inmates of Allegheny County Jail v. Pierce_, _supra._, at 762-63. She made these statements in this DC-97 as a means to help punish plaintiff by swaying the other "voters" to remove his medically needed z-code. The Supreme Court wrote that the Constitution prohibits officials from "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." _Estelle_, 429 U.S. at 104-05. Even Ms. Eichenlaub, while listed as a psychologist, was not a doctor and therefore not qualified to render a medical opinion regarding plaintiff's medication and whether his medication would handle his panic disorder. Ms. Eichenlaub never met with plaintiff while the defendants claim that she did one (1) time, this simply did not happen. See plaintiff's declaration, Ex. "Z", stating that he never met with Ms. Eichenlaub. These people were deliberately indifferent, and were mandated to seek a doctors advise. Under _Farmer_, supra., inference from circumstantial evidence is an important factor to consider by a factfinder.

   In fact, according to Unit Manager Skendall, an inmate who is moved from his Long Term Housing Unit and has a staffing shortly thereafter, the New Housing Unit (under normal

procedures) will actually defer the staffing back to that inmates Long Term Housing Unit where staff are more familiar with him (See, Ex. "B", Attached). This did not happen in plaintiff's case; he was released from the RHU at the end of April 2002 and the staffing of his z-code began on May 20, 2002. While defendant Showers stated in his answers to interrogatories that the above stated practice of deferring a staffing is not procedure at Albion, his answer conflicts at its core with Unit Manager Skendall's request response (Ex. "A", Showers 3rd Set, A/I ¶ 1). Why was plaintiff's case treated differently and his staffing not deferred back to his Long Term Unit? This shows the state of mind of Showers and Jackson. And it shows how inadequate and dangerous the z-code voting system is at Albion. And, because Unit Manager Skendall is not a defendant in this case, his request response is particular telling as he has no reason to misrepresent the truth as does defendant Showers.

**2000 Z-Code Vote**

Unlike the 2002 vote, the 2000 vote sheet shows almost unanimous yes, that plaintiff requires a medical z-code. The Counselor, Unit Manager, Block Officer, Program Manager, Major, Deputy Superintendent and Chief Psychologist voted "yes" and plaintiff was given the z-code. Only a Block Officer who personally disliked plaintiff and one Deputy voted "no." The z-code was "highly recommended" due to stress levels by the Chief Psychologist. And even plaintiff's mental health was noted by his counselor. Many of the z-code voters relied upon the recommendation of the Chief Psychologist's recommendation. There is no question, from a medical standpoint, that plaintiff needed the z-code. Notably, the Chief Psychologist is defendant Reilly. He recommended z-code due to "high stress levels." However, in the 2002 vote, the "voters" stated that high stress levels do not meet the z-code criteria. Something is very wrong with this entire matter. Plaintiff was given the z-code, at least partly, due to high stress

levels. But only after he threatened a guard and had a conversation with defendant Showers who threatened him about inmates who sue, did the high stress levels suddenly not meet the z-code criteria. In fact, plaintiff asked Showers about "high stress levels" not meeting the z-code criteria as indicated by his staffing Unit, and Showers admitted that he based his "vote" to remove plaintiff's z-code off of the alleged psychologist's vote, where she stated that plaintiff's medication for panic disorder should be taking care of his stress (Ex. "A", A/I, ¶5). This psychologist is not a doctor and not qualified to render any medication opinion; the defendants have shown deliberate indifference by their purposeful actions in not seeking medical advise. This further shows that defendant Showers was inadequate to cast any meaningful vote, as he stated he casted his vote off of the psychologist. And he should have deferred this staffing back to plaintiff's Long Term Unit where the staff were familiar with him.

Plaintiff would point to the Court a very disturbing factual matter: if the Court looks at the bottom part of the 2000 vote sheet (Ex. "C", Vote Sheet "1"), it will see that the Deputy Superintendent (Victoria Kormanic) voted "yes", and she actually approved the z-code, acting on behalf of the Superintendent. Then, in the 2002 z-code removal, she (Victoria Kormanic) voted "no", that plaintiff should not continue to keep his z-code, citing to the other staff members who voted no. Then, when plaintiff is transferred to SCI Smithfield in 2005, this same Deputy is now there and actually voted "yes", once again, that plaintiff required the z-code. Compare the 2000 Vote, 2002 Vote and 2005 Vote (Ex. "C", Attached), and the Court will note that it is the same person. Deputy Kormanic voted favorably, that plaintiff requires the medical z-code. This goes to show that either Deputy Kormanic joined defendants Showers and Jackson in denying plaintiff the z-code in 2002 as further punishment for threatening the guard and plaintiff advising Showers of his intent to sue, or that these prison officials are unqualified to make or vote on

medical required z-code. SCI Albion, at the behest of defendant Showers and agents, wanted to punish plaintiff further for threatening one of their guards and for his assertion of plainning to sue the DOC. There is no other reason for this very inconsistent vote immediately after plaintiff went to the RHU for the incident involving the guard and the threat made by defendant Showers. The proximity between the constitutional violation and the protected conduct (having a medical z-code and asserting to defendant Showers of the intent to sue) is clear. See, *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280 (3rCir.2000)(stating that suggestive timing is relevant to causation in retaliation case). Also, as this Court is aware, the defendants have a history of retaliation. Coincidentally, defendant Showers has a history of threatening inmates who sue the DOC; he had made the same type of threat to *Ryan Kerwin*, (See, *Kerwin v. McConnell*, No. C.A. 05-93-E; Cplt. ¶5) a plaintiff who has sued Albion personnel, and made reference to Showers threats to him as well. Before the Court is the retaliatory transfer of plaintiff involving the litigation of this case. There had never been a stated reason for plaintiff's z-code removal until defendant Reilly answered an interrogatory, some two (2) years after this lawsuit is filed, in the eleventh hour, stating the reason for removal was "Medication compliance, good attendance with the psychiatric appointments and no evidence of serious mental or emotional maladjustment." (Def.s Ex. "12" A/I, ¶ 15). The definition of maladjustment is, "bad or unsatisfactory adjustment." Unless continued need of increased medication and being sent to the RHU for threatening to kill a prison guard constitutes better behavior and more mental stablility, than defendant Reilly's explaination fails. It's obvious self-serving and comes in the eleventh hour of this lawsuit. Moreover, this "new reason" offered by defendant Reilly is not reflected anywhere in the defendants prior statements, interrogatories, and is not even indicated on plaintiff's June 2002 z-code vote sheet removal (See, Ex. "C", Attached).

**There is a Serious Medical Need for Z-Code Status**

During most of plaintiff's incarceration he had been housed in a single cell. About three months after his arrival at Albion it was determined by the Chief Psychologist, defendant Reilly, that plaintiff required a medical z-code. Defendant Reilly is the prison's Chief Psychologist and most qualified person on the z-code committee. It was due to his specific recommendation that plaintiff was given the z-code. A medical need is serious when it "has been diagnosed by a physician as mandatory treatment or…is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.", See *Momouth County Correctional Inst. Inmates. v. Lanzaro*, 834 F.2d 326, 347 (3dCir.1987). Also, in *Estelle*, supra., the Court wrote that the "denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose" which means that prison officials may not deny medical care to save money or as punishment; 429 U.S. 97 (1976).

While the defendants claim that plaintiff's heart condition is "minor" and Dr. Baker claims the anxiety plaintiff suffers while double celled does not exacerbates his angina, this simply is not true. First, plaintiff has had a heart mumur since child birth. He has received continued cardiac care, prior to his incarceration and afterwards. While at SCI Pittsburgh he was on the Chronic Care list, seeing a Specialist regularly due to his heart. While the defendants claim that plaintiff's heart conditon is minor and that anxiety (stress) does not affect his cardiac pain, would be to ignore all medical evidence stating that anxiety/stress are dangerous for angina sufferers. See *infra.*, Declaration of inmate Nicholas April (See, Ex. "U", Attached) where Dr. Baker had him placed in a single cell due to his heart condition so he would not face more stress. Dr. Baker, by his actions in placing inmate April in a single cell due to his heart and stress, admits that stress and anxiety are dangerous for cardiac patients. Dr. Baker signed a declaration

for the defendants saying stress/anxiety would not effect plaintiff, and went further to recommend plaintiff be double celled "with his minor heart condition" but put inmate April in a single cell due to a major heart problem/condition. This clearly shows that Dr. Baker knows that anyone with cardiac trouble needs to avoid stress and double celling constitues an obvious stress. His declaration in Plaintiff's case (Def.'s MSJ, Ex. "7", ¶7) and his actions in recommending single cell status for Mr. April are inconsistent and show his bias to state whatever will help the defendants. Doctor Lindemuth testifed that stress would be adverse to plaintiff's cardiac state (Pre. Inj. Hr. Trans. 12/17/04, at 13). The doctor further stated, in response to the Court's question, that plaintiff had more trouble with his heart *after* in a two person cell, Id. at 13. And further, "and being in a double cell constitutes a stress obviously that would be adverse to his cardiac status", Id. at 13. The defendants claim plaintiff's heart condition does not require single cell status, the evidence before this Court certainly contradicts those assertions. For example, plaintiff was never prescribed nor needed Nitroglycerin or Aspirin due to to his cardiac trouble. Those were only prescribed in June of 2003 (Def.'s. MSJ [Dr. Baker] Ex."7" ), approxiamtely nine (9) months after his z-code was removed. While the defendants would have this Court believe that Nitroglycerin prescribed by Dr. Baker was for "anxiety", such is a ridiculous statement given the fact that Nitroglycerin is only prescribed for cardiac related chest pain (See, Ex. "D", Attached, Xeroxed page from PDR showing what Nitroglycerin is used for). Attached hereto is the Report authored by Richard J. DeFranco, M.D., who has reviewed plaintiff's medical history and prescriptions, and is very familiar with it and plaintiff's past. Dr. DeFranco has a completely different medical opinion than Dr. Baker. Dr. DeFranco opines that based upon the record and a reasonable degree of medical certainty that by the defendants forced double celling of plaintiff caused irreparable harm to his pre-existing heart condition. (See, Doctor

DeFranco Report, Ex. "E", Attached). Dr. DeFranco's opinion is consistent with psychiatrist,

Dr. Lindemuth's August 20, 2004 Report and her October 2, 2005 Declaration. Dr. DeFranco's

report is very detailed and explains the total history and what the medical condition of plaintiff

is. He further explains what the drug Nitroglycerin is prescribed for. And by comparing the

time of heart medication prescription and increased use, states is the result of forced double

celling. His Report further notes the decrease of Nitroglycerin intake and the Loresssor being

reduced in 2006 while plaintiff was returned to a single cell status, show that z-code status is

medically needed (Ex. "E" ). Dr. Lindemuth's *pre*-preliminary injunction hearing Reports

likewise state plaintiff's z-code need  (Ex. "F", Attached, Doctor Lindemuth Reports).

    The defendants nurse, Ms. Rebele, testified during the TRO hearing regarding plaintiff's

heart condition stating;

    "Right. Anyone who has heart condition such as Mr. Defranco, if God forbid, he does
have a heart attack, it's much easier to get help when you have a roommate to summon
someone."

(10/22/04 TRO Hr. at 7). Ms. Rebele's testimony is more revealing where she states that there

has been no changes in plaintiff since 2001 "other than the angina, which is what he takes

Nitroglycerin for and the Lopressor…" Id. at 13-14. The nurse admits through her testimony

that plaintiff's heart condition became worse since 2001 (after the z-code was removed and

forced to double cell). During this testimony plaintiff's heart condition sounded serious

however, now, the defendants claim it to be minor. The Court questioned plaintiff about his

heart condition;

    The Court: When were you diagnosed with your heart condition?"
    Mr. DeFranco: I was born with a heart murmur, and only in 2003. I believe, I was—this
    is a year after—or nine months after or so after they took my Z Code that they put me on

Nitroglycerin, aspirin, and Lopressor. It was only after they took the Z Code, Your Honor."

The Court: That's interesting.

(Id. at 13).

Then when the Court tried to find out why the z-code was removed,

The Court: "I guess what I'm trying to find out is, what was different about Mr. Defranco premisconduct and postmisconduct that caused the Z Code status to be removed? Do you recall what the Z Code committee found that had changed?"

Mr. Barr: "No, Your Honor."

And the Court went even further regarding the z-code process stating;

The Court: I agree with the statement of law, Mr. Bareford, but I don't know that a Z Code status instituted by a committee that doesn't have a bunch of doctors is medical treatment. I think it goes to whether or not we would consider that deliberate disregard.

(Id. at 10-11). And the Court asked the following about why the z-code was removed;

The Court: Let me ask this: Explain to me how the decision was made when he came out of the hole two years ago to take him off of Z Code status, and why you would argue that it was not punishment.

(Id. at 24-25).

The defendants did not have an answer for the Court.

The Report written by Dr. DeFranco completely and accurately states plaintiff's history, medical need and the harm done. While Dr. Lindemuth did testify at the preliminary injunction hearing and gave conflicting and confusing testimony, she did admit that defendant Barr had previous to the hearing summon her to a room and admonish her about writing reports on inmates, worrying that it could set a dangerous precedent for other inmates to follow, that it has never happened before and ordered the doctor not to write reports again (Trans. Hr. 12/17/04 at 74-76). It is clear that the defendants resort to underhanded and illegal tactics in order to defeat legitimate claims. They were not concerned about plaintiff's health, they were concerned about

a dangerous precedent and being ordered what to do.  However, because Dr. Lindemuth no

longer works for the DOC, she provided plaintiff with a Declaration dated October 2, 2005, that

clarifies her testimony and opinion.  (See, Ex. "G", Attached).  This Declaration was signed

subsequent to the doctor's testimony and should therefore be considered the doctor's most recent

testimony regarding this matter.  The doctor did not have defendant Barr and others intimidating

her into testifying a certain way when she signed this Declaration.  Of interest is the fact that the

Court asked the doctor during the preliminary injunction hearing whether she would have signed

her reports for a federal court to issue a single cell.  At that time Dr. Lindemuth answered "no",

that she would not have (Trans. 12/17/04 at 30).  However, as stated, she was under duress to

testify a certain way and the fact that she has signed a subsequent Declaration (knowing it will be

used for Federal Court) is particularly telling.  Dr. Lindemuth testified during the preliminary

injunction hearing that mental health was not a z-code criteria (Trans. 12/17/04 at 31).  She

specifically told the Court that mental health was not a criteria for z-code at Albion.  However,

defendant Reilly, in his Answers to Interrogatories stated that it was a criteria and that the

psychiatrist (Dr. Lindemuth) was involved in meetings every 120 days (Def.'s MSJ, Ex. "11", A/I

¶ 8 ).  It is clearly obvious that Dr. Lindemuth, during her testimony at this hearing, testified to

appease her superiors.

The defendants cannot escape the following facts; 1) they removed a medically required

z-code in 2002, 2) that approximately nine months after forcing plaintiff to double cell he was

prescribed Nitroglycerin, Aspirin and Lopressor for his pre-existing heart condition becoming

worse, 3) that they had notice of the medical need by the prior approval of the z-code, the

grievance plaintiff filed on August 25, 2002,  alerting the prison to Dr. Lindemuth's

recommendation, 4) Dr. Lindemuth's September 2002 recommendation, and 5) the harm caused by the wrongful removal of the z-code.

**March 10, 2004 Z-Code Staffing**

Plaintiff was again staffed for a z-code in March 2004. This was done because Dr. Lindemuth and Chief Psychologist Reilly requested the Counselor to do it (Trans. 12/17/04 at 68), Dr. Lindemuth spoke to Reilly about the z-code staffing. In the 2004 Vote Sheet, plaintiff's Counselor recommended the z-code as did Chief Psychologist Reilly (Ex. "C", Vote "3"). In the comment section, the Court will note that Unit Manager Skendall had wrote that plaintiff had resided on his Unit for "several months", and had successfully resided on the Unit. This was in March 2004. As the Court is aware and Mr. Skendall himself admits in his declaration (Def.'s MSJ Ex. "10") plaintiff had lived on his Unit since August 2002. Mr. Skendall, in his vote comment stated plaintiff had lived on his Unit for "several months" when in fact plaintiff had resided there for almost two (2) years. This goes to show the Court that these people are unqualified to make medical z-code votes. Moreover, plaintiff had begged Mr. Skendall and alerted him to his extreme troubles of double celling each time a single cell opened up on his Unit. (See, Ex. "H" , Attached, 6 requests to Skendall asking for a single cell). In one request plaintiff advised that his psychiatrist recommended single cell status and that plaintiff was experiencing a hard time dealing with cellmates. Mr. Skendall responded to that particular request, 'Mr. DeFranco, We already have plans for it---but thanks for the request.' That is the type of "care" plaintiff had received in regards to his z-code needs. Also, as attached to plaintiff's amended complaint, were affidavits signed by two inmates that after the December 17, 2004 preliminary injunction hearing, Mr. Skendall had told these inmates to be sure and thank plaintiff for him and the Counselor not being on the Unit because plaintiff had them in court

(obviously attempting to cause harassment for plaintiff). (See, Ex. "I", Attached, Affidavits). The bottom line is that by Mr. Skendall's very own comments in the Vote Sheet, he did not know plaintiff had been housed on his very own Unit for almost two years, thinking he had only been housed there for "several months". Noteworthy is that many other "voters", during this 2004 z-code vote, based their votes off of Mr. Skendall's vote, which is clearly inaccurate.

Also, Skendall's declaration was inaccurate in other ways; for example, Skendall claimed plaintiff posed no threat to any cellmate or himself. Before the Court, attached to plaintiff's Objections, are the affidavits of numerous prior cellmates. One cellmate (John Rodgers) actually took protective custody because of plaintiff (he was plaintiff's cellmate at the time). Additionally, a Mike Miley had to be moved out of plaintiff's cell by Mr. Skendall himself due to plaintiff's aggressiveness (See Ex. "J", Attached, Affidavits of prior cellmates). So, Skendall was aware of prior cellmate problems, contrary to his declaration. And, as evidenced by plaintiff's medical file, he had inflicted self injury while double celled (noted by SCI Smithfield medical staff and SCI Albion). While Skendall in his declaration (Def.'s MSJ, Ex. "10" ¶9) and defendant Barr, in his declaration (Def.'s MSJ, Ex. "1" ¶8) state that plaintiff has not had any self injurious behavior, nor threatening to any cellmates, are untrue. The prior cellmate affidavits prove these assertions less than true. Also, in plaintiff's medical file, it is noted that he had self injurious behavior, with scars on his wrists, forearm. Plaintiff noted his suicidal past in his complaint (See, cplt., ¶34). The self injurious acts occurred while double celled, as reflected by his medical records and staff notations at SCI Smithfield and Albion. See, *Gregoire v. Class*, 236 F.3d 413, 417 (8thCir.2000)(well established "that a risk of suicide by an inmate is a serious medical need.").

**Dr. Lindemuth's September 2002 Report**

While Dr. Lindemuth's Report urging z-code status did not "come out" until after the defendants voted to remove it, they could and should have held a "re-staffing" based upon the recommendation. There is nothing in policy that would have prohibited the defendants from holding a new staffing based upon this recommendation by the psychiatrist. In fact, all of the 2002 "voters" were deliberately indifferent by not doing anything after its production. As they were the staffing committee, they were notified by Dr. Lindemuth via her Recommendation of this serious medical need. Defendant, Chief Psychologist Reilly, admitted to receiving Dr. Lindemuth's Recommendation but did not remember what (if any) action was taken (Def.'s MSJ Ex. "12", ¶ 1 & 2). It is clear that the defendants were made aware of Dr. Lindemuth's September 2002 recommendation but nothing was done as a result. It went ignored by these defendants. Also, contained inside plaintiff's August 2002 grievance, he placed the prison on notice of Dr. Lindemuth's opinion that he required z-code status. Specifically, that grievance places the defendants on notice of his prior diagnoses by Dr. Pizzat. It further references Dr. Lindemuth agrees that plaintiff should be converted back to z-code status and that the doctor had read this grievance and agreed with it's content (See, Ex. "K", Attached, plaintiff's notarized grievances dated August 25 and December 18, 2002). The December 2002 grievance also attached Dr. Lindemuth's report and placed the defendants on direct notice of the harm. Plaintiff can file a grievance at any time he is effected by an alleged wrong in the DOC. In other words, while plaintiff did file a *timely* August 2002 grievance, that fact would not render a future grievance moot if he continued to receive problems or pain. The defendants were placed on notice of plaintiff's medical needs by both the August 2002 grievance and Dr. Lindemuth's September 2002 Recommendation. And they *chose* to do absolutely nothing. That constitutes

deliberate indifference. They had the opportunity to respond or review plaintiff's medical needs but decided to ignore it, and they should not escape liability.

**Correctional Staff Support Z-Code**

The defendants have submitted answers to interrogatories stating that correctional officers possess good z-code voting ability as they see and interact with the inmate daily (Def.'s MSJ Ex. "8" ¶ 12). Since the time of receiving these answers, plaintiff had sent out a number of request slips asking correctional officers whether they believed plaintiff required z-code status. They responded "yes". One Sgt. (Sgt. Betts) stated in response, "I have known I/M DeFranco for six years and in my opion I feel it is in the best interests of I/M DeFranco, other inmates and the institution to maintain his "Z" Code status." Another officer (Officer Grebnier) "strongly recommened" z-code status, stating that plaintiff was his Unit clerk. Officer Fies states that plaintiff would "not be able to cell with another person for any length of time", stating it is best to keep his z-code. Officer McLaurin, plaintiff's Unit Officer, recommends z-code. Officer Paskorz, who has known plaintiff from being his Housing Unit Officer for years states that "yes", plaintiff requires a z-code in his opinion. And Officer Burger, who has known plaintiff for approximately six (6) years, states that in his opinion, "for the best interest of the Institutions and Inmate DeFranco" that plaintiff be z-code status. As stated, the psychologists and even defendant, Secretary Beard state that officers are "***very qualified***" at determining a need for inmates z-codes (Def.s MSJ, Ex. "8", ¶12). (See, Ex. "L", Attached, 6 Requests from staff supporting z-code).

**2005 Z-code Staffing**

When plaintiff was transferred to SCI Smithfield, upon his reception, he was given a "temporary" z-code (See, Ex. "C", vote sheet # 4). It was only after the staff had the opportunity to interview and review plaintiff's mental and physical health that they convened a Psychiatric Review Team (PRT) which consisted of doctors, including psychiatrist, psychologists and other specialists to determine if plaintiff required a z-code. That was a unanimous "yes", that plaintiff in fact required a z-code. While the vote sheet does make reference to this Court's previous TRO Recommendation, it goes further to state that they did a complete review and determined (independently) that the z-code was required (Ex. "C", vote sheet # 4). The defendants would have this Court believe that SCI Smithfield based their unanimous vote on the Report and Recommendation by this Court, put in plaintiff's file (by the defendants) was because of the TRO ruling. A review of that vote sheet shows differently. For example, plaintiff's Counselor voted yes, stating plainff does better living alone and cited the PRT recommendation. Frank Campopiano, the Unit Manager, Counselor Supervisor and CCC Director stated, "Z Code originally approved Feb. 2000 for MH (Mental Health) reasons. M.H. concerns continue on active roster." And he voted "yes", plaintiff needed a z-code. (See, Ex. "C", vote # 4). Also, J. Whitesel, Inmate Classification Manager voted "yes". And, as stated, the entire PRT (Psychiatric Review Team) held a meeting and stated that plaintiff should keep the z-code. Further, Deputy Superintendent Kormanic voted "yes", plaintiff should keep the z-code; Deputy Superintendent Briggs voted "yes", and the Superintendent voted "yes", plaintiff requires the medical z-code. This is all reflected in that vote sheet. As stated, the defendants argument that because this vote sheet reflected this Court's previous TRO Report and Recommendation was the basis for all of these people to vote favorably for plaintiff's z-code is outrageous. First, the TRO ruling said nothing about SCI Smithfield; it only mentioned SCI Albion. Second, plaintiff

was given a temporary z-code upon reception at Smithfield but only *after* a complete review did

Smithfield vote that he should keep the z-code. Moreover, unless filing a lawsuit is a z-code

criteria, that is if an inmate files suit that he qualifies for z-code status, the defendants argument

is meritless. Plaintiff also had a counseling session with his Counselor from Smithfiled (Mr.

Zimmerman) in which the Counselor stated that he had reviewed all of plaintiff's files and that

based upon his opinion and past z-codes, that he believed plaintiff's z-code was of such an

obvious need that no "formal" vote sheet would be required but would check with the Unit

Manager. Plaintiff sent the Counselor a request dated 3/17/05. The Counselor responded on

3/18/05, stating:

> He (Unit Maganger) met with Psychology, and the agreement is to have it (z-code)
> remain for now, with a review of it in a month. Apparently, there were some medication
> adjustments made that psychology wants to see how you adjust to before any review is
> made to determine if Z Code is still needed." Signed K.J. Zimmerman.

(See Ex. "M", Attached). This shows that Smithfield staff made an independent review and

determined plaintiff indeed required the z-code.

Moreover, plaintiff received a request response from his Unit Manager while at

Smithfield asking what the reason was for the z-code approval and his answer was, "Primary

reason was your continued need for Mental Health treatment and counseling." Signed, F.

Campopiano. (See, Ex. "N", Attached). It is clear that plaintiff was staffed appropriately and

given the z-code based off of his *need* for such, which had nothing to do with this Court's prior

Order.

**There is Support for Inadequate Medical Care**

Plaintiff's Cplt. ¶ 37-40---there is evidence that all of the defendants did intentionally

deny and delay access to medical care and interfered with the treatment once prescribed. See,

Report and Recommendation, C.A. 03-11-E, *Hayden v. Cerami*, (quoting *Estelle*, 429 U.S. at

105-06): "While an intentional refusal to provide any medical treatment to an inmate suffering from a serious medical need manifests deliberate indifference and is actionable under the Eighth Amendment, the Eighth Amendment does not require that a prisoner receive every medical treatment that he requests or that is available elsewhere." Id.

This record reflects that the only medical treatment given to plaintiff after August 2002 was his medication for "panic disorder". The defendants denied (took away) his medical treatment for the high levels of stress, attributated to double celling and did not give *any* treatment for that. This record establishes that plaintiff needed a medical z-code due to high stress levels because of his inability of cohabitation due to his mental and physical make up, and when they removed the z-code they failed to provide any treatment for it all together.

In addition to not supplying any treatment for plaintiff's high stress levels of having cellmates, which caused his heart condition to become worse, the defendants also failed to provide needed counseling. Defendant Reilly answered a request in August 2002, in reply to plaintiff's inquiry about his z-code, claiming if plaintiff remained misconduct free and became a level 2 (low custody level) that he would be in a better position for z-code reinstatement. His reply reads:

> "Dear Mr. Defranco, Records indicate you were staffed for z-code status and the Instituion suspended this cell arrangement. If you remain misconduct free and gain L-2 status, then you are in a better position to be considered again in the future." S. Reilly, Psyche. Dated: 8-23-02

(See, Ex. "O", Attached, Reilly's Response). This is a complete false and misleading answer. Having a low custody level and staying misconduct free are not z-code criteria. The psychology department also failed to see and provide counseling to plaintiff. They also sent replies back to plaintiff saying they did not have time to see him (Ex. "P", Attached, Psychology Responses). Plaintiff actually saw defendant Bunner and advised her that he needed one on one counseling

but she stated that she did not have time to see inmates (See, Ex. "Q", Attached, Affidavit by

plaintiff). Also, on October 8, 2002, plaintiff saw and spoke to defendant Reilly on the walk way

where Reilly shook his fingers at plaintiff for Dr. Lindemuth sending out her Recommendation

that plaintiff be converted back to z-code. (See, Ex. "R", Attached, Affidavit by plaintiff).

     Defendant Reilly also replied to a request sent by plaintiff about being re-staffed for the

z-code in March 2004. It is clear from the request response that Chief Psychologist Reilly

agreed that plaintiff needed the z-code. In plaintiff's request, he indicated a converstaion he had

with Reilly where Reilly agreed plaintiff needed the z-code and would begin the z-code process.

Plaintiff wrote a request to him on March 2, 2004, stating:

> "Dear Mr. Reilly, per our conversation today, I am writing to you as you instructed so
> you could begin a z-code staffing. I really do appreciate your help + concern. And
> understanding my mental frustration."

Reilly Responded on March 8, 2004, stating:

> "Mr. DeFranco, I will contact your Unit Team regarding this matter."

(See, Ex. "S", Attached, Reilly's Response 3/8/04 to request). And on March 10, 2004, two (2)

days after Reilly's above response, plaintiff was being re-staffed for z-code status. (Ex."C",

Vote # 3). This request shows that defendant Reilly did support, and in fact, aided plaintiff in

being re-staffed for the March 2004 z-code. Defendant Reilly is the Chief Psychologist and most

qualified person on the prison z-code committee to render an opinion about mental health

required z-codes, and he supported plaintiff's need for it, and in fact, voted that plaintiff required

the z-code in the March 2004 z-code re-staffing (Ex. "C", # 3). The retaliatory action of the z-

code removal in 2002 is shown by all of the evidence, including the changing postion of Reilly---

only in 2002, after plaintiff threatened the guard and was himself threatened by defendant

Showers, was the z-code determined not required any longer. Circumstanial evidence supports this and should be considered by this Court, See, *Farmer*, supra. 511 U.S. 825.

It is clear that the defendants failed to provide medical treatment, and would not even give plaintiff counseling sessions for extended periods of time. While plaintiff did receive treatment in the form of medication for his panic disorder, the treatment for his high stress levels (cardiac condition) went ignored. This is not a disagreement over the type of treatment, it is the fact that plaintiff received no treatment for his high stress levels of having the z-code removed which led to his cardiac condition becoming so bad that it required medications. Once the defendants took away the treatment (z-code removal) they did not even try to replace that treatment with any medical care. It did cause plaintiff's pre-existing heart condition to become worse where he required medication such as Nitroglycerin that he had not required previous. The structure of the "z-code committee" and their failure to properly receive a doctors opinion regarding whether medication would handle plaintiff's mental health needs involving the z-code removal, and in not "interviewing" plaintiff by the "staffing team", as is done in all other inmate z-code reviews, constitutes deliberate indifference. As stated *supra.*, Dr. Baker signed a declaration that stress/anxiety does not effect plaintiff's heart condition and went further to recommend plaintiff be double celled due to "his minor heart condition" (Def.'s MSJ Ex. "7"). However, as stated in the Declaration of inmate April, after suffering a major heart attack in March 2004, Dr. Baker and others placed him in a single cell to avoid stress which could exacerbate his heart condition (See, Ex. "U", Attached). Inmate April argued and fought with prison officials, including Dr. Baker, to be put back in a double cell. Mr. April met with Dr. Baker about his celling arrangement in April 2004, at which time Dr. Baker advised Mr. April that he was concerned about him being double celled because of stress (Ex. "U"). It took inmate

April over 3 months to finally be placed back in a double cell. In Plaintiff's situation, with a supposedly "minor" heart condition, Dr. Baker recommends him being in a double cell in case he has a problem while sleeping (Def.'s MSJ Ex. "7"). The defendants in the *April* case, filed a Motion to Dismiss (Ex. "V", Attached) and cited to the portions of his complaint where Mr. April requested the double cell but was denied it (See, Ex. "V", at 3, 4 and 10). The defendants admit that inmate April complained over being single celled. It is clear that the defendants will take different positions in order to defeat an inmates claims. Dr. Baker's admission to Mr. April, and the very fact that he recommended that he be single celled, due to stress (such as being double celled) is adverse to a cardiac patient shows he is aware that stress is adverse to a heart condition (Ex. "U", Attached). Clearly Dr. Baker's prior decision to single cell an inmate suffering from heart problems (in order to avoid stress which could exacerbate his condition) is proof that he believes, in fact knows, that such treatment is warranted and that he is taking a contradictory position in the declaration he submitted in the instant case merely to avoid civil liability. The indifference is manifested, not merely by the failure or refusal to treat the injuries properly, but also by the conduct of prison staff. "Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury state a cause of action under § 1983." *Estelle*, 429 U.S. at 105.

**Dr. Polmueller's Progress Notes**

The Department of Corrections head psychiatrist, Dr. E. Polmueller, met with plaintiff one (1) time in April 2004. (Def.s MSJ Ex. "14") During this meeting, the first diagnoses made by Dr. Polmueller was "Anger and Impulsivity" regarding plaintiff. Impulsivity is defined as: "Actuated or swayed by emotional or involuntary impulses; inciting to action." Webster's Unabridged Dictionary. This diagnosis represents a dangerous personality or mental instability

in and of itself. Any person that is impulsive and acts under anger represents a clear danger. Dr. Polmueller also noted that plaintiff had a "clear" antisocial personality disorder. While the defendants and Dr. Polmueller state that most inmates share an antisocial disorder, it can certainly be inferred by Dr. Polmueller's April 2004 progress notes done on plaintiff, that for this doctor to note a "clear" Antisocial Personality Disorder, it would have to be so robust for him to note it in just one meeting and use the wording "clear"---that is, without doubt and clearly seen by this doctor. The doctor's notes speak for themselves and the attempts to down-play their specific meaning in Dr. Polmueller's subsequent declaration is evident, since his boss, Secretary Beard, is a named defendant in this civil rights action.

Dr. Polmueller also attributes the "double celled" comment written by him in April 2004 as something plaintiff told him; it is without question that plaintiff advised him of that fact (of being double celled) prompted by this doctor asking him that specific question. Plaintiff spoke many words in the 45 minute interview with Dr. Polmueller however, all of his words were not noted by the doctor. Dr. Polmueller expressed a concern over plaintiff's double celling to plaintiff at that time (See, Ex. "Z", Attached, Dr. Polmueller expressed a concern to plaintiff over his being double celled). While his notes, writing "double celled" may have not been a recommendation for single cell status, by the doctor writing that fact down in plaintiff's medical file certainly shows a "concern" over that fact. Why else would he have written it down unless he felt it important to note? The bottom line is that Dr. Polmueller and the rest of the defendants knew by the Chief Psychologist and all Psychiatrists that plaintiff needed to be z-code status. Dr. Polmueller's new declaration *supports* a deliberate indifference claim, even in its altered state (his comment section). Dr. Polmueller states at the end of his declaration that characterizing plaintiff's presentation as a serious mental illness would be "questionable". He

was only considering a portion of plaintiff's mental illnesses, i.e., Antisocial Personality and

Panic Disorders, he was reviewing his progress notes, one (1) page of plaintiff's medical file

while considering his declaration; he did not take into account plaintiff's 1986 diagnosis by Dr.

Pizzat listing plaintiff as having a Mixed Personality with the Features of the Borderline and

Paranoid.  There is little question that had Dr. Polmueller taken into account plaintiff's complete

mental illnesses, that plaintiff's presentation would have risen above the "questionable" standard;

however, he still would not state plaintiff's mental illness was not serious.  Def.'s MSJ, Ex. "14",

¶3(e), Dr. Polmueller states:

> "e) psychiatric recommendation for single cell status should be based on *demonstration*
> **or** *expection* of dangerous behavior derivative of a serious mental illness;"

Regarding "demonstration", certainly plaintiff's history of mental illness and recent alleged

threatening to kill a prison guard and self injurious (suicidial past) are demonstrations.  Further,

in regards to "expectation", Dr. Lindemuth and Dr. Pizzat had Reports in plaintiff's medical file

which glaringly satisfies the "expectation" of dangerous behavior.   Which supports a deliberate

indifference claim.

**There is Personal Involvement as to Beard, Wolfe, Brooks and Barr**

Plaintiff has established sufficient evidence to support liability to defendant's Beard,

Wolfe, Brooks and Barr.  Plaintiff must demonstrate personal involvement in the wrongdoing in

a civil rights action, See, *Sutton v. Rasheed*, 323 F.3d 236, 249 (3rCir.2003).  Section 1983

liability requires that a defendant be personally involved or **have actual knowledge of** or

acquiesced in the commission of the wrong; *Beer-Capitol v. Whetzel*, 256 F.3d 120, 133 (C.A.

3(Pa.)2000); also, *Rizzo v. Goode*, 423 U.S. 362 (1976).  Subjective knowledge on the part of the

official can be proved by circumstanial evidence.

This is not a failure to act argument, as stated by the defendants. Each of these defendants had actual knowledge of the wrong, and/or acquiesced in it. For example, in regards to defendant Beard, it has been shown that plaintiff mailed him a three (3) page notarized letter, detailing the abuse and wrongs being done to him (Cplt. Ex. "10"). Also attached to that letter (exhibit) is the mailing receipt as proof of it being mailed to defendant Beard. That particular letter places the defendant on notice of the abuses, neglect and harm that was being done to plaintiff. Defendant Beard is the Secretary and has an absolute duty to protect inmates from abuses and wrongs being perpetrated upon them at any of the Institutuions in Pennsylvania. Beard received this letter (plea for help), alerting him to the numerous wrongs being done to plaintiff---he therefore had actual knowledge of the commission of the wrong. He is thus liable under § 1983. A supervisor may be liable under 42 U.S.C. § 1983 for his subordinate's unlawful conduct if he directed, encouraged, **tolerated**, or acquiesced in that conduct; See, _Neuburger v._ _Thompson_, 305 F.Supp.2d 521, 535 (W.D. Pa. 2004), also, _Blanche v. Bensalem twp._, 57 F.3d 253, 263 (3rCir.1995).

Like Beard, defendant Brooks also had personal knowledge of the wrong and actually admitted to reading plaintiff's staffing packet (which contained Dr. Lindemuth's recommendation) and she had _personal knowledge_ of the wrong. This is what her response stated to plaintiff's request:

> "Mr. DeFranco, I understand that you are a peer leader for citizenship and doing well. Also, you are employed in the library and doing well. I review the vote sheet packet w/Mr. Skendall. At this time, you are functioning very well. Although you have anxiety, we do not support you for a "Z" Code. You may request reconsideration in 12 months. Your team will review at that time."

(See, Amend. Cplt., Ex. "A"). Brooks had reviewed plaintiff's file and had knowledge of Dr. Lindemuth's Recommendation and the fact that plaintiff needed help in the way of having his

medically needed z-code reinstated. She had admitted knowledge and should not escape liability, _Neuburger_, supra. Even this Court stated that the defendants had "notice" and were liable if anything happened to plaintiff:

> The Court: But legally, you know, under Farmer v. Brennan, we're looking here at actual notice to the Superintendent and to the institution.
>
> Mr. Bareford: Yes, ma'am.
>
> The Court: And with actual notice, if anything happens to him, you're liable.

(Trans. Hr. 10/22/04, at 23-24).

Defendant Barr, like Brooks, had personal knowledge of the overall wrong being done to plaintiff, as admitted during the October 2004 TRO hearing. He had _actual knowledge_ to plaintiff's heart condition and mental instability, as the other defendants.

Defendant Wolfe, while still acting Superintendent, had a converstaion with plaintiff in September 2002 where plaintiff detailed the troubles he was experiencing, including the lack of grievance responses; Dr. Lindemuth's report and the very difficult time plaintiff was experiencing in a double cell. Approximately one (1) week after this discussion with Wolfe, plaintiff actually memorialized this converstaion in a notarized affidavit, including the date, time and topics discussed (See, Ex. "T", Attached). Additionally, as the Court is aware, during the August 24, 2006 hearing, the defendants stated they would concede that defendant Wolfe had been on plaintiff's Unit _everyday_ (Trans. 8/24/06). Wolfe had direct, _personal knowledge_. These defendants should not be allowed to escape liability. They all had actual knowledge of the commission of the wrong and under _Beers-Capitol_, cannot escape liability.

### Record Shows link Between Misconduct and June 2002 Z-Code Removal

The proximity between the March 2002 misconduct, plaintiff's release from the RHU at the end of April 2002, defendant Showers threat regarding how plaintiff would see how the DOC

deals with inmates' who sue them, is particularly telling.  It is undisputed that in March 2002,

when plaintiff was sent to the RHU for threatening to kill a prison guard, he still had and

required the medical z-code.  When he was released from the RHU at the end of April 2002, he

was placed on a New Housing Unit in which defendant Showers and Jackson were in charge of.

Plaintiff was then threatened by Showers for stating his intent to sue the DOC, and  then a

"staffing" begins to remove the medical needed z-code on May 20, 2002 (Def.'s Ex. "11", A/I ¶

3).  See, *Farrell*, supra., stating that suggestive timing is relevant to causation in retaliation cases.

The retaliation is clearly shown by the timing of the described events; plaintiff threatens a guard

in March 2002; plaintiff is let out of the RHU in April 2002; defendant Showers threatens

plaintiff in May 2002 and on May 20, 2002 the z-code (annual review) removal begins.  Every

"voter" did vote "no", that plaintiff should not keep his z-code.  That shows that defendant

Showers and Jackson, with the alleged help of Ms. Eichenlaub, dictated or swayed the other

voters to remove the z-code.  In every other z-code vote process plaintiff had some people who

voted favorably, except for this particular vote.  When, according to Unit Manager Skendall,

plaintiff's z-code vote staffing should had been deferred back to his Long Term Housing Unit

(See, Ex. "B").  Defendant Showers and Jackson should have deferred the staffing back to

plaintiff's Long Term Unit where staff were familiar with him.

**Plaintiff's Conspiracy and Retaliation Cites are Not Barred**

In plaintiff's amended complaint, ¶¶ 52-59, should not be barred by the statute of

limitations because these claims are not per se "claims", they are put forth to show a continued

course of conduct by the defendants that lead up to the constitutional violations.  These events

were not being brought forth as causes of action, but only as a means to show a pattern of

conduct by the defendants that support the claims brought by plaintiff.  Plaintiff has to make

sense out of the issues and in order to do so he needs to show the conduct of the defendants. Because the paragraphs outlined supra., are not brought as claims, they are not barred by any statute of limitations. Defendant Showers threat of "seeing how the DOC deals with inmates who sue" was not a constitutional violation. The constitutional violation occurred when the medically required z-code was taken away. Further, while the retaliatory misconducts could have been raised as a cause of action, plaintiff did not raise them as such. He made reference to these events as a means to further prove his retaliation claim as it pertains to the z-code removal, showing the defendants state of mind. Therefore, these statement of events are not barred by the statute of limitations.

**Exhaustion**

Under the Prison Litigation Reform Act, 42 U.S.C. § 1997(e), provides that, "no action shall be brought with respect to prison conditions under [§1983] or any other Federal law, by a prisoner…until such administrative remedies are *available* are exhausted." 42 U.S.C. § 1997(e). The key wording is *available*. Plaintiff has stated in his complaint that he filed numerous grievances that went unresponded to by prison officials. (See Cplt., under "Exhaustion"). This created a bar to the grievance process. Thus, plaintiff did exhaust all available administrative remedies that were made *available* to him. See, *Mitchell v. Horn*, 318 F.3d 523, 528-29 (3rCir.2003), where the Court stated, "the availability of administrative remedies to a prisoner is a question of law." The Court went on to say if prison officials failed to provide a grievance form that exhaustion is excused. And stated further that the District Court in that case was premature in dismissing *Mitchell's* complaint. Also see, *Camp v. Brennan*, 219 F.3d 279 (3rCir.2000), stating that prisoner's need only exhaust those remedies that are available to them. In the case *sub judice*, the prison officials have failed to respond to plaintiff's grievances, rendering the grievance process *unavailable* to him. SCI Albion officials effectively prevented

plaintiff from utilizing the grievance system regarding the issues raised in this case. Plaintiff took a further step in the grievance process by having them notarized. (See, Ex. "W", Attached, Notary's Affidavit stating plaintiff had these grievances notarized). Once the prison officials failed to respond they made the grievance system unavailable; by not providing him with a "grievance number" left plaintiff unable to appeal anything. The policy clearly states that a prisoner must wait to receive a grievance number and reply before any appeal can be taken. (See, Ex. "X", Attached, DC-ADM-804 DOC policy regarding grievance appeals). Since SCI Albion did not respond, plaintiff was unable to take any appeal. The grievance process works by the inmate first filing a grievance (Ex. "V", ¶5); "You **must** wait until you have a response from the Grievance Officer before you can appeal.." (Id. at ¶14). Then, "you **must wait** unitl you receive a response from the Facility Manager before you appeal to the Secreatry's Office.." (Id. at ¶16). The grievance system policy speaks for itself. It clearly establishes that an inmate must wait for a response before any appeal can be taken (any appeal, to any office). Once the prison did not respond nor issue a grievance number it effectivly left the grievance process *unavailable* to plaintiff.

The defendants have the burden of pleading and proving plaintiff has not exhausted all of his available remedies in the grievance process; this is a question of law and fact. In *Ray v. Kertes*, 285 F.3d 287, 295 (3dCir.2003)(holding that failure to exhaust is an affirmative defense and finding that the District Court erred in imposing heightened pleading standard that required the prisoner not only to plead, but also prove, exhaustion in the complaint).

Our sister-Circuits have stated that "prison officials' failure to respond to a prisoner's claim can render administrative remedies unavailable." *Brengettcy v. Horton*, 423 F.3d 674, 681 (C.A.Ill.) 2005). Also, "administrative remedies [are] exhausted when prison officials fail to

respond to inmate grievances because those remedies had become 'unavailable'…we join them (Eighth and Fifth Circuits) on this because we refuse to interpret the PLRA so narrowly as to…permit [prison officials] to exploit the exhaustion requirement through indefinite delay in responding to grievances." _Foulk v. Charrier_, 262 F.3d 687, 698 (8thCir.2001); _Underwood v. Wilson_, 151 F.3d 292, 295 (5thCir.1998)(per curiam).   Plaintiff submits that he had filed grievances and they had gone unresponded to; even the prison Notary gave an Affidavit to this point (See, Ex. "W").

As stated, plaintiff's August 2002 notarized grievance put the defendants on notice of Dr. Lindemuth's opinion and stated z-code requirement.  They chose to ignore the grievance and stated assertion referenced by Dr. Lindemuth.  Further, because the defendants failed to respond to the August 2002 grievance, and because plaintiff continued to suffer in a double cell, he filed the December 2002 grievance. This time Dr. Lindemuth's Recommendation was attached.  A prisoner can file a grievance each and every time he is felt wronged, hurt, in pain, etc..  There is no grievance "bar" that prevented him from filing a second grievance in December 2002 since he was still being harmed and needed help.  See, _Griswold v. Morgan_, 317 F.Supp.2d 226, 231 (W.D.N.Y.2004), under the "continuing violation" doctrine, otherwise untimely claims may not be time-barred if the plaintiff can show that the claims arise out of unlawful acts that form part of an ongoing practice, provided that the plaintiff can also show, "some non-time barred acts taken in furtherance of that policy"; citing _Harris v. City of New York_, 186 F.3d 243, 250 (2ndCir.1999); See also, _Dobrich v. Walls_, 2005 WL 1812933, page 6 (D Del.2005)(Under the continuing violation doctrine, a plaintiff can pursue claims based on conduct that began prior to the limitations period, if the plaintiff can show that the conduct is part of an ongoing practice). Nonetheless, inside of the timely August 2002 notarized grievance, plaintiff placed the prison on

notice of Dr. Lindemuth's Recommendation and even stated the doctor had read and agreed with that grievance (See, Ex. "K", bottom portion of grievance form).

It is clear that the defendants had "notice" well before this hearing and did nothing. Based upon the foregoing law regarding the grievance compliance, plaintiff had exhausted all *available* remedies that were made available to him. Of course there were no "appeals" taken, that was because the prison failed to issue a grievance number or even respond, rendering the grievance system unavailable to him. *Mitchell*, supra. Also see plaintiff's declaration certifiying that he had filed these grievances and other material matters. (See, Ex. "Y", Attached).[1]

Plaintiff incorporates by reference his Exhaustion argument set forth inside of his Motion For Partial Summary Judgment and Response, as if fully stated herein.

WHEREFORE, plaintiff prays this Honorable Court will grant summary judgment in his favor, as he is entitled to such based upon the facts of this case. Alternatively, there are material facts in dispute precluding summary judgment, as the attached exhibits and this record shows. Signed pursuant to 28 U.S.C. § 1746, under perjury.

Date: 10/10/06

Respectfully submitted,

Anthony DeFranco CZ-3518
10745 Route 18
Albion, Pa. 16475-0002

**Certificate of Service**

Service of the foregoing was served by US First
Class Mail, this date, to the Attorney General's
Office, 564 Forbes Ave., Manor Complex, Pgh., Pa. 15219

---

[1] Also attached, see exhibit "Z", plaintiff's sworn declaration regarding his meeting with Dr. Polmueller, and averrment of not ever having a meeting with Ms. Eichenlaub.