| Form DC-135A<br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br>INSTRUCTIONS<br>Complete items number 1-8 If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|
| 1. To: (Name and Title of Officer)<br>Mr. Ken Zimmerman (Counselor) | 2. Date:<br>3/17/05 |
| 3. By: (Print Inmate Name and Number)<br>Anthony DeFranco CZ 3518<br>[signature]<br>Inmate Signature | 4. Counselor's Name<br>Mr. Ken Zimmerman<br>5. Unit Manager's Name |
| 6. Work Assignment | 7. Housing Assignment<br>H/A 30 |

8. Subject: State your request completely but briefly. Give details.

Mr. Zimmerman – I am writing regarding our meeting on whether Mr. Compopiano agreed with you to by-pass the vote sheet and leave me on permanent Z-code status. Thank you for taking the time to talk with me + all your help

9. Response: (This Section for Staff Response Only)

He met with Psychology and the agreement is to have it remain for now, with a review of it in a month. Apparently, there were some medication adjustments made that Psychology wants to see how you adjust to before any review is made to determine if the Z code is still needed.

To DC-14 CAR only ☐ | To DC-14 CAR and DC-15 IRS ☒

Staff Member Name K.J. Zimmerman / [signature] CC II Date 3-18-05
Print Sign

Revised July 2000

# EXHIBIT "N"

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Commonwealth of Pennsylvania
Department of Corrections

INSTRUCTIONS
Complete items number 1-8 If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer) Mr. Campopiano (Unit Manager)

2. Date: 4/27/05

3. By: (Print Inmate Name and Number) Anthony DeFranco CZ-3518

Anthony DeFranco
Inmate Signature

4. Counselor's Name Mr. Zimmerman

5. Unit Manager's Name Mr. Campopiano

6. Work Assignment —

7. Housing Assignment C/A 16

8. Subject: State your request completely but briefly. Give details.

Mr. Campopiano,

thank you for taking the time to stop at my cell this afternoon to let me know that the Institutional staff have approved me for the Z-code. Would you be able to tell me the reason or reason's for the approval?

I deeply appreciate your time.

9. Response: (This Section for Staff Response Only)

Primary reason was your continued need for Mental Health treatment and counseling

To DC-14 CAR only ☐ To DC-14 CAR and DC-15 IRS ☐

Staff Member Name F. CAMPOPIANO (Print) F. Campopiano U.M. (Sign) Date 4/28/05

Revised July 2000

# EXHIBIT "O"

DC-135A

Release J

**INMATE'S REQUEST TO STAFF MEMBER**

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**

INSTRUCTIONS

*Complete Items Number 1-7. If you follow instructions in preparing your request, it can be disposed of more promptly and intelligently.*

1. TO: (NAME AND TITLE OF OFFICER) Dr. Steve Reilly (Psychologist)

2. DATE 8-15-02

3. BY: (INSTITUTIONAL NAME AND NUMBER) [redacted]

4. COUNSELOR'S NAME Mr. [illegible]

5. WORK ASSIGNMENT

6. QUARTERS ASSIGNMENT [redacted]

7. SUBJECT: STATE COMPLETELY BUT BRIEFLY THE PROBLEM ON WHICH YOU DESIRE ASSISTANCE. GIVE DETAILS.

Dr. Reilly, my counselor informed me that ? unit called and told him I lost my Z-code. We spoke about this on a number of occasions and I wasn't to worry — how could they take away my Z-code when my symptoms have worsened; my medication steadily increased? Please write to tell me how to proceed or would you please stop to see me Dr. Reilly?

Thank you.

8. DISPOSITION: (DO NOT WRITE IN THIS SPACE)

Dear Mr. [illegible]

Records indicate you were stopped for Z-code status at the Institution's suspended this cell arrangement. If you remain misconduct free and gain L-2 status, then you are in a better position to be considered again in the future.

S. Reilly
Psych

TO DC-14 CAR ONLY ☐ TO DC-14 CAR AND DC-15 IRS

MBER

DATE 8/22/02

# EXHIBIT "P"

57

| Form DC-135A<br><br>**INMATE'S REQUEST TO STAFF MEMBER** | Commonwealth of Pennsylvania<br>Department of Corrections<br><br>INSTRUCTIONS<br>Complete items number 1-8 If you follow instructions in preparing your request, it can be responded to more promptly and intelligently. |
|---|---|
| 1. To: (Name and Title of Officer)<br>Mr. Steve Reilly (Psychologist) | 2. Date:<br>12-20-02 |
| 3. By: (Print Inmate Name and Number)<br>ANTHONY DeFranco CZ-3518<br>Anthony DeFranco<br>Inmate Signature | 4. Counselor's Name<br>Mr. Hosey<br><br>5. Unit Manager's Name<br>Mr. Skendall |
| 6. Work Assignment<br>Law Library | 7. Housing Assignment<br>D/A 57 |

8. Subject: State your request completely but briefly. Give details.

Dear Mr. Reilly,

I am writing in hopes you will have time to see me. As you know, I appreciate your time and concern. Being in this situation (double celled) is taking a hard toll on me. I hope you will re-consider Dr. Luedemuller's report. Mr. Reilly, I need to talk over a few other topics & issues with you, please.

Thanks & Happy Holidays.

9. Response: (This Section for Staff Response Only)

Dear Mr. DeFranco: I am not able to see you at this time, please write me again in the future. Also please be specific in your request, so I can address your concerns.

S. Reilly
[illegible]

To DC-14 CAR only ☐ To DC-14 CAR and DC-15 IRS ☐

Staff Member Name ________ Print / ________ Sign Date 1-2-03

Revised July 2000

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Commonwealth of Pennsylvania
Department of Corrections

INSTRUCTIONS
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer) Ms Bunner Psychologist
2. Date: 6/22/03
3. By: (Print Inmate Name and Number) Anthony DeFranco CZ-3518
[signature]
Inmate Signature
4. Counselor's Name Mrs Webb
5. Unit Manager's Name M. Standell
6. Work Assignment law library
7. Housing Assignment D/A 57

8. Subject: State your request completely but briefly. Give details.

Would you please schedule me for an Apt? I am having a difficult time dealing w/ this situation, living w/ other people.

Thank-you very much, Ms. Bunner!

9. Response: (This Section for Staff Response Only)

I'm sorry that I did not respond to your request in a timely manner. My workload has been pretty heavy and I did not have the time to schedule a lot of individual appointments. If you still need to talk to someone, please submit another request and I will schedule an appointment for you.

To DC-14 CAR only ☐ To DC-14 CAR and DC-15 IRS ☐

Staff Member Name ______ Print [signature] Sign Date 9/29/3

Revised July 2000

I received this on Sept 29th, 2003

# EXHIBIT "Q"

# AFFIDAVIT

On, July 15, 2003, at approximately 8:30am, I was instructed to take the Citizenship Group, that I was leading, to the D/B tv room and finish the group there, as it was not being used. Upon entering the tv room, I noticed that there were a couple of people still in the room, i.e. the D/B counselor, Ms. Bunner, and a prisoner. After a conversation in which Ms. Bunner indicated that they were indeed finished with the group, that next week and thereafter they would be using the tv room until 9:30am. I acknowledged the scheduling and then asked Ms. Bunner if she had received my request from June 23, 2003. She stated that she had received the request, but was not seeing prisoners individually and would not for quite some time. Prisoners Liberto and Flasher were present for this conversation.

I needed to speak with Ms. Bunner, as she is the D-Unit's designated psychologist and I have been experiencing extreme difficulty being housed with other prisoners and needed her assistance in the matter.

Sworn to and subscribed before me,

This 15th day of July, 2003.

This 15th day of July, 2003

[signature] 7-15-03

[signature]
Notary Public

Notarial Seal
Jo Anne R. Bickel, Notary Public
Conneaut Twp., Erie County
My Commission Expires Sept. 23, 2006
Member, Pennsylvania Association Of Notaries

# EXHIBIT "R"

AFFIDAVIT

I, Anthony DeFranco, on October 8, 2002, saw Mr. Steve Reilly on the walk at approx. 1300 hrs. (I was on my way out to the yard while Mr. Reilly was on his way to conduct a group meeting on my block (D-unit). While at the top of the walk, I stood and waited to speak with Mr. Reilly---on his walk towards me he was using both hands (fingers) saying 'shame on you'. I asked what? And he said, "you went to Dr. Lindemuth trying to get your z-code. Haven't I always played straight up with you?" I explained to him that I did not mean for it to appear that I was 'playing dirty'; that I "need" a single cell and am having trouble copping with a cellmate. I asked if he was mad at me and he replied no---I asked if I could speak with him one day soon and he said he would see. When he was finished with his meeting, I agree saw him on the walk (I went to the door and asked if I could send him a request to speak with me; he said yes).

It seems funny how he knew my psychiatrist was pushing to have me single celled...and why he apparently took it a bit personal that I went to her. I am placing a request to see Mr. Reilly this date and hope to resolve the matter soon.

Anthony DeFranco

10-10-02

Sworn and subscribed before me this 10th day of October, 2002.

Jo Anne Bickel, Notary

Notarial Seal
Jo Anne R. Bickel, Notary Public
Conneaut Twp., Erie County
My Commission Expires Sept. 23, 2006
Member, Pennsylvania Association Of Notaries

# EXHIBIT "S"

Form DC-135A

**INMATE'S REQUEST TO STAFF MEMBER**

Commonwealth of Pennsylvania
Department of Corrections

INSTRUCTIONS
Complete items number 1-8. If you follow instructions in preparing your request, it can be responded to more promptly and intelligently.

1. To: (Name and Title of Officer) ~~Mr. Steve Reilly (Psychologist)~~

2. Date: 3/2/04

3. By: (Print Inmate Name and Number) Anthony DeFranco CZ-3518

[signature]
Inmate Signature

4. Counselor's Name: Mrs. Webb

5. Unit Manager's Name: Mr. Skendall

6. Work Assignment: Law Library

7. Housing Assignment: D/A 57

8. Subject: State your request completely but briefly. Give details.

Dear Mr. Reilly,
per our conversation today, I am writing to you as you instructed so you could begin a Z-code staffing. I really do appreciate your help + concern. And understanding my mental frustration.
Please see me soon. Thanks Mr. Reilly

9. Response: (This Section for Staff Response Only)

my response: I would contact your team regarding this matter. S. Burlingame

To DC-14 CAR only ☐ To DC-14 CAR and DC-15 IRS ☐

Staff Member Name ____________ / [signature] Date 3-8-04
Print Sign

Revised July 2000

# EXHIBIT "T"

AFFIDAVIT

On September 26, 2002, On D-Unit at SCI-Albion, at approx. 3 p.m., I, Anthony DeFranco, spoke with Superintendent Wolfe regarding my z-code, missing property and the lack of response to my grievance regarding the z-code. I explained that I was not trying create "waves" but that I am having a very hard time being in a double cell. I advised him that my psychiatrist was in the process of sending out a recommendation that my z-code be reinstated and he told me that he believes that he had already received it or heard about it. He went on to explain that the prison was experiencing some serious over-crowding and that they were in the process of opening new dorms (making our t.v. rooms into dorms). He said that he would look into it further but do to over-crows
ding it may take some time. I told him my concern about possible retaliation over my z-code pursuit and he assured me that there would not be. He also advised me that he would check on my grievance. Our conversation lasted approx. 10 minutes; witnessed by Ofc. Coll, Sgt. Christopher and counselor Hosu. They were near the officers desk while the Superintendent and I talked. Mr. Wolfe stated that he would look into the z-code matter and why I have not received a response to my grievance. To his benefit, he did say that if he had his way that all lifers would be given single cells.

[signature] 10-6-02
Anthony DeFranco

Sworn and subscribed before me this 6th day of Oct., 2002.

[signature]
Notary Public

Notarial Seal
Jo Anne R. Bickel, Notary Public
Conneaut Twp., Erie County
My Commission Expires Sept. 23, 2006
Member, Pennsylvania Association Of Notaries

# EXHIBIT "U"

IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY DeFRANCO, Plaintiff,

v.

WILLIAM WOLFE, et al., Defendants.

CA-04-230-ERIE
Magistrate Judge Baxter
District Judge Cohill

DECLARATION OF NICHOLAS APRIL

I, Nicholas April, make the following declaration, under penalty of perjury, with information that is truthful and accurate, to the best of my knowledge and belief:

1. On March 26, 2004, I suffered a severe heart attack and required emergency heart treatment.

2. On or about March 31, 2004, I was moved to F/B Unit, cell 31 (a single cell).

3. On April 16, 2004, I saw Dr. Mark Baker at SCI-Albion. During this examination, among other issues, I advised Dr. Baker that I was in a single cell and he replied that he knew that and it was because he did not want me to have any other stressors that could harm my heart. I advised him that I did not want to be in a single cell because I felt safer in a double cell. He stated again that he felt that due to my heart condition that I would do better by myself.

4. About two weeks living in the single cell, I wrote my prior unit manager, John Skendall and advised him that I wanted to move back to his unit and have a cellmate due to my heart condition.

5. I even advised my counselor on F/B of my worry and want of a double cell. No one, not Dr. Baker, my counselor (Mr. Baker), or Mr. Skendall helped me. Everyone thought it better for me to be in a single cell due to my heart. I argued this in my civil rights complaint (No. C.A. 06-68-E).

6. It took me 3½ months to finally convince SCI Albion staff to

put me back in a double cell, and it was only because I was finally moved back to D/A unit where I was first placed in a dorm.

Signed pursuant to 28 U.S.C. § 1746.

Date: 9-18-06

Nicholas April

~~Nicholas April~~

# EXHIBIT "V"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

NICHOLAS APRIL, )
)
Plaintiff, )
)
v. ) Civil Action No. 06-68E
) Judge Susan J. McLaughlin
SUPERINTENDENT MARILYN ) Magistrate Judge Susan Paradise Baxter
BROOKS, DR. MARK BAKER, AND )
HEALTH CARE ADMINISTRATOR )
MAXINE OVERTON, )
)
Defendants. )

**DOC DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS**

**STATEMENT OF THE CASE**

*Pro se* Plaintiff, Nicholas April, is suing Superintendent Marilyn Brooks and Health Care Administrator Maxine Overton ("DOC Defendants") under 42 U.S.C. § 1983 for violations of his Eighth Amendment rights that allegedly occurred while he was in the custody of the Department of Corrections at the State Correctional Institute at Albion ("SCI-Albion").

Plaintiff alleges that around 10:30 p.m. on March 26, 2004, he began having a burning sensation across his chest which grew stronger. (Complaint, p. 1.)[1] His roommate called the officer on shift to the cell around 10:45 p.m and prison medical staff (unidentified) arrived approximately ten minutes later. *Id.* After taking Plaintiff's vitals, the medical staff informed Plaintiff that they wanted to take him to the Medical Department. *Id.* He claims he was forced to walk down fourteen steps out of the housing unit to a medical transport, where he was told to lay on a wet and open gurney on the

[1] A 3-page, typed "complaint" without numbered paragraphs is attached to the complaint form and contains the details of plaintiff's allegations.

transport vehicle and transported in the night air and rain approximately ¼ mile to the medical department. (Cplt. §IV.C, and p.1). Once Plaintiff arrived at the Medical Department, he was required to walk to the examination room where he was hooked up to an E.K.G. machine, tested, and given aspirin and nitroglycerin. (Cplt. p.1.) According to plaintiff, unidentified medical staff said he was having a heart attack and left him to wait for an unspecified time. *Id.* "Sometime later," he was given another nitro pill and told that he would be taken to a hospital. *Id.* Plaintiff claims he is "not sure" how long he waited to be taken to an outside hospital, or "how much time was wasted by the institution's staff in getting an ambulance and getting me into it." *Id.* However, he says he "waited quite a while" and the security team forced him to change into a yellow jumpsuit before leaving, a further waste of time. (Cplt. §IV.C and p.1.)

According to the Complaint, paramedics treated plaintiff once he was in the ambulance, and he was delivered to Millcreek Hospital (he does not say when). (Cplt. p.2.) Plaintiff alleges that the Millcreek Hospital staff again checked his vitals and then informed him that he was having a major heart attack, and that they could not provide the needed treatment but would transport him to St. Vincent's Hospital in Erie. *Id.* He also states that he was left to wait "unnecessarily" at Millcreek Hospital, that he was transported to St. Vincent's and arrived at about 2:10 am. *Id.* He underwent a catheterization over an hour later, at 3:21 am, which revealed various blockages. *Id.* He received a stent in his left anterior descending artery. *Id.* Plaintiff was discharged from St. Vincent's three days later, on March 30, 2004, and returned to SCI-Albion, where he spent an additional night in the infirmary. (Cplt. p.2.)

On March 31, 2004, after release from the infirmary, plaintiff complains that he was forced to push his personal belongings, approximately 45 pounds, to his new housing unit. (Cplt. §IV.C and p. 2.) Plaintiff also alleges he was assigned to a single cell in that unit for 3 ½ months, where he was placed under unnecessary stress and "in a position where, if I were to have another heart attack, there would be no one there to aid me." *Id.* Finally, he alleges that no one from SCI-Albion notified anyone on his "emergency notification" form about his condition or hospitalization. (Cplt. p. 2.)

Plaintiff does not specify what defendants Overton or Brooks did wrong, but identifies the following **conduct** as "deliberate indifference to serious medical needs":

- **as to the night shift security team**, making plaintiff change into a jumpsuit which wasted more time (Cplt. §IV.C);

- **at to SCI-Albion policy**, taking him first to Millcreek Hospital, "knowing all along that Millcreek 'would not be able to help me with may MAJOR HEART ATTACK. . . ." *Id.*

- **as to SCI-Albion,** not taking his "major" heart attack as a serious matter and allowing close to 5 hours to pass before getting him to St. Vincent's Hospital. *Id.*

- **as to SCI-Albion Administration**, not informing plaintiff's emergency contact about his condition. *Id.*

- **as to unidentified SCI-Albion staff**, making him push his personal property to the new housing unit 72 hours after having a major heart attack, and placing him in a single cell for 3 ½ months with no cell mate to help him if he had another heart attack. *Id.*[2]

Plaintiff insists he is permanently disabled due to "lengthy loss of blood-flow to the left side of my heart" that could have been avoided had staff only responded in a more swift manner. (Cplt. p.2.)

[2] Plaintiff also alleges that unidentified **medical staff** were deliberately indifferent in forcing him to walk down 14 steps while having a heart attack, and "not taking this as a serious medical emergency," and that Dr. Baker's discontinuance of Plavix constituted indifference. (Cplt. §IV.C)

Based upon the foregoing, it appears that Plaintiff's Eighth Amendment claims against the unidentified SCI-Albion staff and administration fall into two general categories: (1) **delay in medical treatment**, including sending him to Millcreek Hospital rather than directly to St. Vincent's; and (2) **post-hospitalization decisions concerning plaintiff**, including failure to notify his emergency contact, assigning him to single-cell status for 3 ½ months, and requiring him to move his belongings to a new unit.

DOC defendants move to dismiss under Fed. R. Civ. Pr. 12(b)(6) because plaintiff fails to state a claim under the Eighth Amendment and in particular, against Brooks and Overton.

## STANDARD OF REVIEW

A motion under Rule 12(b)(6) tests the legal sufficiency of a plaintiff's complaint by asking whether the plaintiff could prove that he is entitled to recovery under any legal theory of relief consistent with the allegations contained in his complaint. Markowitz v. Northeast Land Co, 906 F.2d 100, 103-104 (3d Cir. 1990). The issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support his claim. See Neitzke v. Williams, 490 U.S. 319 (1989); Scheuer v. Rhodes, 416 U.S. 232, 236 (1974). The complaint must be read in the light most favorable to the plaintiff and all well-pleaded, material allegations in the complaint must be taken as true. See Estelle v. Gamble, 429 U.S. 97 (1976); Carino v. Stefan, 376 F.3d 156, 159 (3d Cir. 2004).

*Pro se* pleadings are construed more liberally than pleadings drafted by lawyers. Haines v. Kerner, 404 U.S. 519, 520-521 (1972). Notwithstanding this liberality, *pro se* pleaders are not relived of their obligation to allege sufficient facts to support a

cognizable legal claim. See, e.g., Taylor v. Books A Million, Inc., 296 F.3d 376, 378, (5th Cir. 2002); Riddle v. Mondragon, 83 F.3d 1197, 2102 (10th Cir. 1996).

**ARGUMENT**

**I. Plaintiff's Complaint Fails to State a Claim under the Eighth Amendment for Delay in Medical Treatment**

It is well established that the "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain,' proscribed by the Eight Amendment" and "states a cause of action under 42 U.S.C. § 1983." Estelle v. Gamble, 429 U.S. 97, 104-105 (1976). Deliberate indifference requires more than ordinary lack of due care; "to act with deliberate indifference is to recklessly disregard a substantial risk of serious harm." Farmer v. Brennan, 511 U.S. 825, 839-840 (1994). In other words, violations of the Eighth Amendment are based on "obduracy and wantonness," Whitely v. Albers, 475 U.S. 312, 319 (1996), not upon mere accident, negligence, or medical malpractice. See Estelle, 429 U.S. at 106.

**A. Plaintiff's Allegations of Deliberate Indifference are Insufficient as a Matter of Law**

The Third Circuit has found deliberate indifference under various circumstances, including where prison officials (1) know of a need for medical treatment but deliberately refuse to provide it; (2) delay necessary medical treatment for a non-medical reason; and (3) prevent a prisoner from receiving needed and recommended medical treatment. Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999). In particular, with respect to allegations of improper delay, the Court in Petrichko v. Kurtz, 117 F.Supp.2d 467, (E.D.Pa. 2000), an issue of fact existed with respect to deliberate indifference because one of the prison-official-defendants actually witnessed plaintiff's shoulder injury, instructed another

prisoner to reset plaintiff's dislocated shoulder, and delayed the inmate's access to professional help for over two weeks. Petrichko, 117 F.Supp.2d at 471-472. Similarly, in Lee v. Sewell, a deliberate indifference claim survived a motion to dismiss when the prisoner alleged that a prison doctor made him wait over a year to begin medication for Hepatitis C, at which point the disease was untreatable. Lee v. Sewell, 159 Fed.Appx.419, 421 (3d Cir. 2005) (Non-precedential).

Plaintiff's allegations of "delay" in the instant case fall far short of the scenarios which supported a finding of deliberate indifference in Lee and Petrichko. Plaintiff admits that medical staff arrived at his cell within ten minutes after his cell mate called the officer on the unit (approximately 10:55 pm). (Cplt. p. 1.) The medical staff took his vitals and decided he should be moved to the medical department. *Id.* Over the next three hours, plaintiff admits to the following: he was hooked up to an E.K.G. machine, tested, and given medication at SCI-Albion, he was transported by ambulance to Millcreek Hospital where he was again checked, and he was sent to St. Vincent's Hospital where he could receive the necessary treatment. *Id.* He arrived at St. Vincent's about 2:10 am., and underwent a catheterization over an hour later, at 3:21 am, which revealed various blockages. *Id.* He received a stent in his left anterior descending artery. *Id.* Plaintiff was discharged from St. Vincent's three days later, on March 30, 2004, and returned to SCI-Albion, where he spent an additional night in the infirmary. (Cplt. p.2.)

Plaintiff claims that the three hour and forty minute lapse between his heart attack and his arrival at St. Vincent's is evidence of defendants' deliberate indifference (Cplt., p. 2). However, the only relevant time frame here, which would be the period between receiving first notice of plaintiff's chest pain and the provision of medical care by Albion

medical staff (even if extended to the decision to transport him to a hospital and the actual phone call to an ambulance) is obviously much less. In well under three hours, this plaintiff was evaluated, tested, medicated and steps were taken to get him to an outside hospital. Indeed, he would have arrived at the first hospital (Millcreek) in well under three hours given the allegation that he arrived at the second hospital (St. Vincent's) by 2:10 am.

Based on these allegations, no reasonable fact finder could determine that this amounted to deliberate indifference to plaintiff's serious medical needs. The gravamen of this complaint is that plaintiff should have been sent to a different hospital and he should have arrived sooner, which at best, is an attempt to assert a claim of medical malpractice. As stated, such allegations simply do not rise to the level of an Eighth Amendment violation. See Estelle, 429 U.S. at 106.

Alternatively, plaintiff's complaints concerning when he was treated, and in particular, the hospital to which he was sent, are really complaints over his preferred course of treatment. He disagrees with the decisions of medical professionals who were treating him and evaluating his condition. Such allegations fail to state an Eighth Amendment claim as the right to be free from cruel and unusual punishment does not include the right to treatment of one's choice. Young v. Quinlan, 960 F.2d 351, 358 n.18 (3d Cir. 1992) (an inmate's disagreement with prison personnel over the exercise of medical judgment does not include the right to the treatment of one's choice); Monmouth County Correctional Institute Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987) ("Mere disagreements as to the proper medical treatment [does not] support a claim of an eighth amendment violation.").

### B. Plaintiff Does Not Allege Personal Involvement as to the Non-Medical Defendants

Plaintiff never mentions defendants Brooks or Overton in the complaint, except in the caption. At Section IV.C of the civil rights complaint form, where he is to list the "persons" involved and tell what each person did, he only makes general references to SCI-Albion, administration and staff. This is insufficient to support a claim for individual liability under 42 U.S.C. §1983.

Individual liability in a civil rights action requires a showing by the plaintiff that defendants "have a personal involvement in the alleged wrong doing." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3rd Cir. 1988). See Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3rd Cir. 1997). "Liability cannot be predicated solely on the operation of respondeat superior." Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005). "A plaintiff must show "personal involvement ... through allegations of personal direction or of actual knowledge and acquiescence." Rode, 845 F.3d at 1207. Moreover, a civil rights complaint should contain the time, conduct, place, and persons responsible in order to be deemed adequate. Evancho, 423 F.3d at 354. Bald assertions or conclusory allegations of alleged personal involvement, without more, are not sufficient to impose liability. See Evancho, 426 F.3d at 354-355.

By naming the Superintendent and Healthcare Administrator as defendants, without any allegations of knowledge or personal involvement in the medical decisions concerning his treatment and hospitalization, plaintiff appears to be attributing liability to these individuals based solely on their supervisory roles within the prison system, which is impermissible under 42 U.S.C. §1983. See Evancho, *supra*.

In any event, defendants Brooks and Overton are administrators, not medical defendants, and thus, would be governed by the analysis set forth in Spruill v. Gillis:

> . . . absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official like Gooler will not be chargeable wit the Eighth Amendment scienter requirement of deliberate indifference.

Spruill v. Gillis, 372 F.3d 218, 236 (3d Cir. 2004). By plaintiff's own admission, he received medical treatment for his condition, although he finds fault with that treatment. However, plaintiff does **not** allege that either of these defendants knew or had reason to know about his medical condition on March 26, 2004, or that they took steps to delay his access to medical care, or intentionally interfered with the treatment once it was prescribed.

## II. Plaintiff Fails to State an Eighth Amendment Claim Based on Post-Hospitalization Incidents (Failure to Notify an Emergency Contact, Pushing Personal Property, and Single-Cell Status for 3 ½ Months)

To the extent that the Complaint can be read to include a violation of plaintiff's Eighth Amendment right based on a failure to notify his emergency contact, it is clear that such a "deprivation" is not the type contemplated by the protections of the Eighth Amendment. The Eighth Amendment prohibits, among other things, treatment or punishments "which are incompatible with evolving standards of decency that mark the progress of a maturing society." Estelle, 429 U.S. at 102. Failure to notify Plaintiff's emergency contact could not possibly be considered such a punishment.[3]

[3] Even if plaintiff's allegations could be construed as a substantive due process violation, the alleged failure to notify an emergency contact does not rise to the level of conduct which can be said to "shock the conscience."

Likewise, the allegation that plaintiff was placed temporarily (for 3 ½ months) in a single cell upon his return to SCI-Albion does not state a claim under the Eighth Amendment. It has been recognized that the denial of single-cell status, by itself, is not cruel and unusual punishment and does not rise to the level of an Eighth Amendment violation. Seawright v. Stachelek, 1992 WL 6796, p.2 (E.D. Pa.), citing Rhodes v. Chapman, 452 U.S. 337 (1986). Certainly, the same reasoning applies to decisions to house an inmate in a single cell (*i.e.*, denying double celling). Also, requiring plaintiff to push his possessions into a new housing unit hardly affronts standards of decency. Estelle, *supra*.

Nonetheless, even if these allegations could be viewed as implicating protections of the Eighth Amendment, it is clear from plaintiff's allegations that he suffered no **physical injury** as a result of these alleged Constitutional violations. In order for these claims (failure to notify his emergency contact, placing him in a single cell, or requiring him to push belongings) to be considered cognizable under the Prison Litigation Reform Act (PLRA), 42 U.S.C. §1997e(e), plaintiff must establish actual physical injury, which he cannot do. With respect to the temporary single cell situation, plaintiff admits that this was only a potential dangerous condition, as he would have had no one to help him **in the event of another heart attack**. (Cplt. p.2.) In fact, plaintiff fails to allege any injury arising from these post-hospitalization occurrences and even concedes that these particular incidents are being raised as "indicative of staff/DOC's deliberate indifference for my life, health, and welfare." (Cplt. p.3.)[4]

[4]Plaintiff again fails to allege any facts to suggest personal involvement on the part of either DOC defendant as discussed in Section I.B. above.

WHEREFORE, it is respectfully submitted that plaintiff's complaint as to

DOC defendants Brooks and Overton should be dismissed with prejudice.

Respectfully submitted,

Thomas W. Corbett, Jr.
Attorney General

BY:     /s/ Mary Lynch Friedline
MARY LYNCH FRIEDLINE
Senior Deputy Attorney General
PA I.D. No. 47046

SUSAN J. FORNEY
Chief Deputy Attorney General
Chief Litigation Section

OFFICE OF ATTORNEY GENERAL
6th Floor, Manor Complex
564 Forbes Avenue
Pittsburgh, PA  15219
(412) 565-3520
Date:  September 11, 2006

**CERTIFICATE OF SERVICE**

I hereby certify that on September 8, 2006, I electronically filed the foregoing DOC Defendants' ***Brief in Support of Motion to Dismiss*** with the Clerk of Court using the CM/ECF system. This document will be mailed via U.S. mail to the following non CM/ECF participants:

Nicholas April
FB-3263
SCI-Albion
10745 Route 18
Albion, PA 16475-0002

By: /s/ Mary Lynch Friedline
MARY LYNCH FRIEDLINE
Senior Deputy Attorney General

Office of Attorney General
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219

# EXHIBIT "W"

# FORM OF AFFIDAVIT

**COMMONWEALTH OF PENNSYLVANIA** )
) SS
**COUNTY OF ERIE** )

Before me the subscriber personally appeared **Jo Anne R. Bickel**, a Commissioned Pennsylvania Notary Public, to me known, or satisfactorily proven to be, who being duly sworn according to law, doth depose and say that she performed Notary Service for Anthony DeFranco, #DZ-3518 on the following dates:

| | |
|---|---|
| 08/25/02 | Inmate Grievance – Camp Hill |
| 12/18/02 | Grievance – |
| 01/28/04 | Statement to Dr. Beard |
| 03/23/04 | Inmate Grievance – Camp Hill, dated 3-23-04 |

These dates and items are taken from the Official Notarial Register.

And further deponent sayeth not.

Jo Anne R. Bickel
Jo Anne R. Bickel

May 3, 2005
(Date)

**Sworn and Subscribed before me, a Notary Public of this Commonwealth**

**On this** 3 **day of** May **, 2005 A.D.**

Margaret A. Roward

Notarial Seal
Margaret A. Roward, Notary Public
Conneaut Twp., Erie County
My Commission Expires July 12, 2006

My Commission expires on the ~~July~~ 12 M.R. day of July 20 06.

# EXHIBIT "X"

physical contact that may occur during a search of an inmate's person, in accordance with Department policy, **DC-ADM 203**.

5. You will receive information on how to avoid sexual contact in prison, how to report an incident of sexual contact, and what to do if you are the victim of sexual assault.

6. If you are the victim of sexual contact you should report it to a staff member as soon as possible. All inmates, staff, visitors, contractors, and volunteers have a duty to report an incident of sexual contact. All complaints and allegations of sexual contact with an inmate will be investigated confidentially, thoroughly and promptly in accordance with Department policy **DC-ADM 008**.

**C. Inmate Grievance System (DC-ADM 804)**

1. If you have an emergency you should speak to the nearest staff person as soon as possible.

2. These procedures do not apply to issues under **DC-ADM 801, DC-ADM 802, "Administrative Custody Procedures"** or any other Department policy that states that the **DC-ADM 804** does not apply.

3. You should first try to solve a problem by speaking or writing to staff about it. If you write to staff, use a **DC-135A**.

4. If you choose to file a grievance, you must use form **DC-804, Part 1 – Official Inmate Grievance Form**. This form can be found on your housing unit. You must sign and date the form, keep the goldenrod copy and send the remaining copies of the form to the Facility Grievance Coordinator. The pink copy will be given back to you.

5. You must file the grievance within 15 days after the event on which the claim is based. If you wish to file an appeal, it must be done within 10 days from the date of the response to your grievance or appeal. You may only file your grievance or appeal after these timeframes if you are on a temporary transfer from the facility where the grievance should have been filed, you were permanently transferred to another facility from the facility where the grievance should have been filed, or you were on authorized temporary absence (ATA) for an extended period, or there were delays with mail delivery.

6. A grievance must be filed at the facility where the event occurred.

7. You must limit the facts of your claim or appeal to two pages. Your grievance or appeal will not be accepted if it cannot be read or is not courteous or understandable.

8. You should state the name of anyone who may have information about your claim. You should state what steps you used to try to solve it before filing a grievance. You may state any claim you wish to make about Department policies, rules, court orders or law. You may ask for money or any other legal relief available from a court.

9. You may only file your own grievance. A group of inmates may not submit a grievance together.

10. You should submit a different form for each different event, unless it is necessary to combine the events to support the claim.

11. All grievances and appeals must be made in good faith and for good cause. You will not be punished or otherwise sanctioned for good faith use of the grievance system.

12. You may be disciplined if you misuse the grievance system or fabricate facts in your grievance. If you file five frivolous grievances within a 30 day period, you may be limited to filing no more than one grievance each 15 working days. A grievance is frivolous when the allegations or the relief sought lack any arguable basis in fact. If your grievance is found to be frivolous you may appeal that finding to the Facility Manager within 10 days. If you are placed on a grievance restriction, you may appeal the restriction to the Facility Manager within 10 days.

13. At any point in the grievance process, you may withdraw the grievance. You must do this in writing, sign it and date it. You may either write on the original grievance form "I wish to withdraw this grievance" or you may send a request form to the Facility Grievance Coordinator with the number of the grievance asking for it to be withdrawn.

14. You will receive a response to your grievance. You must wait until you have a response from the Grievance Officer before you can appeal that response to the Facility Manager. You may only appeal issues that were raised in your grievance, or a decision that a grievance was frivolous, or a grievance restriction.

15. An appeal must be clearly labeled as an appeal at the top of the first page and include the grievance number. It must identify what response

you are appealing and why you are appealing. You may only appeal once. If your grievance was about personal property or a publication denial, you must state if you will appeal the issue to the Secretary's Office of Inmate Grievances and Appeals so that the item can be held pending a final decision.

16. You must wait until you have received a response from the Facility Manager before you appeal to the Secretary's Office of Inmate Grievances and Appeals. The appeal must be filed within 15 days from the date of the Facility Manager's decision.

17. All appeals to the Secretary's Office of Inmate Grievances and Appeals must be addressed to the:

    **Chief, Secretary's Office of Inmate Grievances and Appeals**
    **Department of Corrections**
    **2520 Lisburn Road, P. O. Box 598**
    **Camp Hill, PA 17001-0598**

    You must include photocopies of the initial grievance, all responses and all appeals. You may receive copy service if you are indigent. The Secretary's Office of Inmate Grievances and Appeals has 30 working days from receipt of your appeal to respond. Further information about the grievance procedures can be found in **DC-ADM 804.**

## V. Inmate Services/Privileges

### A. Alcohol and Other Drug Testing

While you are in the Department, you will be subject to random and/or planned alcohol and drug testing. If you test positive for alcohol and/or other drugs, you will be issued a misconduct and your visiting privileges will be restricted to "non-contact" visits for a certain period of time. Repeated positive tests will result in your contact visits being restricted permanently. For more information about visiting restrictions for positive alcohol and other drug tests, refer to the **DC-ADM 801**, and **DC-ADM 812, "Inmate Visiting Privileges"** policies.

### B. Cable Television (DC-ADM 002)

1. The use of the cable television system is a privilege. Misuse of the system or violations of the rules may lead to denial of this privilege as

# EXHIBIT "Y"

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANTHONY DeFRANCO, Plaintiff,** | : |
| | **: No. C.A. 04-230-E** |
| | **: Magistrate Judge Baxter** |
| **V.** | **: District Judge Cohill** |
| | : |
| **WILLIAM WOLFE, et al., Defendants.** | : |
| | : |

**DECLARATION OF ANTHONY DeFRANCO**

I, Anthony DeFranco, make the following Declaration under the penalty of perjury, to the best of my information and belief:

1. I am the plaintiff in the above entilted case. I filed this civil rights actions due to the prison and DOC's retaliation and deliberate indifference to my serious medical needs.

2. In August of 2002 I filed a notarized grievance with the prison alerting them to my z-code status requirement and let them know Dr. Lindemuth's opinion and agreement with the grievance contents inside of the August 2002 grievance.

3. Dr. Lindemuth actually read the grievance and agreed with it (see August 2002 grievance, bottom portion stating same).

4. I had done all I was able to do in filing and appealing the grievance. The prison failed to respond which left the grievance system unavailable, and leaving me with no means to appeal.

5. I had also filed another grievance, in December 2002, notarized, with an attached Recommendation by Dr. Lindemuth. The prison failed to respond to that grievance as well.

6. In September 2002, I persoanlly spoke with Superintendent Wolfe and alerted him to the grievance troubles and the fact that Dr. Lindemuth was drafting a recommendation to the prison that I have my z-code reinstated. Mr. Wolfe stated that he believed that he had already read the doctor's recommendation. He further stated that due to the over-crowding that it would be hard to have my z-code at that time. But stated he would look into the matter.

7. I sent Secretary, Jeffrey Beard, in January 2004, a notarized letter, alerting him to the serious problems I was experiencing with lack of grievance responses and notified him about the

deliberate indifference I was receiving by SCI Albion in failing to properly staff me back into the medically required z-code.

8.  Unfortunately, Mr. Beard had not responded to my letter for help, and simply tolerated the abuse placed upon me.

Signed pursuant to 28 U.S.C. § 1746.

Date: September 6, 2006

Anthony DeFranco CZ-3518
10745 Route 18
Albion, Pa. 16475-0002

# EXHIBIT "Z"

**IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANTHONY DeFRANCO,** | : |
| **Plaintiff,** | : **No. 04-230-E** |
| | : **Magistrate Judge Baxter** |
| **V.** | : **District Judge Cohill** |
| | : |
| **WILLIAM WOLFE, et al.,** | : |
| **Defendants.** | : |

## DECLARATION OF ANTHONY DeFRANCO

I, Anthony DeFranco, make the following Declaration, subject to the penalites of perjury, made to the best of my information and belief.

1. My name is Anthony DeFranco and I am the plaitniff in the above captioned matter.

2. It has been alleged by the defendants that a Ms. Eichenlaub, a purported prior psychologist had met with me one time in 2002 regarding my z-code need.

3. I have never met this Ms. Eichenlaub, and there was never any meeting between her and I regarding my z-code in 2002.

4. It is my belief that the defendants had this Ms. Eichenlaub "sign off" on my z-code vote to have it removed. This being done without any consultation with myself nor my treating doctor.

5. Ms. Eichenlaub was not a doctor and was not able to render any opinion regarding an inmates medication. Nor were any of the other "voters" in 2002 doctors, nor did any seek a doctors opinion.

6. In April 2004 I met with a Dr. Polmueller, the head psychiatrist for the Department of Corrections. This meeting was due to SCI Albion wanting inmates' taking anxiety medications cut down. However, during this April 2004 interview, when Dr. Polmueller entered the exam-room he stated he was "the cut man" when I inquired who he was. When Dr. Polmueller made that statement I took that as a physical threat I and hit the desk and exclaimed, "I am the cut man too, that is what they call me on the street." The doctor rolled back in his chair and stated that he

was a doctor and was here to determine my medication need. I told him to not threaten me again, by saying he was "the cut man" (which means in the prison setting a person who "cuts" others). It was after about 10 minutes that things calmed and we were able to talk.

7. Dr. Polmueller specifically asked if I was double celled and I stated that I was and I further explained how the prison took away my z-code. He told me that he did not understand why my z-code was removed but his presence at the prison was for anxiety medication reductions.

8. During this interview, Dr. Polmueller clearly expressed a concern over my being double celled and not z-coded.

Signed pursuant to 28 U.S.C. § 1746.

Date: 9/24/06

Anthony DeFranco CZ-3518
10745 Route 18
Albion, Pa. 16475-0002

**Certificate of Service**
Service was made by U.S. First
Mail to Attorney General at
564 Forbes Ave., Pgh. Pa. 15219, this date