IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY DeFRANCO, )<br>)<br>Plaintiff, )<br>)<br>V. )<br>)<br>SUPERINTENDENT WILLIAM WOLF; )<br>STEVE REILLY; DENESE BRUNNER; )<br>MANAGER ROD SHOWERS; CASE )<br>MANAGER JUDY JACKSON; )<br>DR. JOHN DOE; JANE DOE, JEFFREY )<br>BEARD; ASSIST. SUPER. WILLIAM )<br>BARR; MARILAND BROOKS, )<br>)<br>Defendants. ) | Civil Action No. 04-230-ERIE<br><br>Judge Maurice B. Cohill, Jr.<br>Mag. Judge Susan P. Baxter |

**DEFENDANTS' BRIEF IN OPPOSITION
TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

AND NOW, come the defendants, Superintendent William Wolfe, Steve Reilly, Denise Bunner (incorrectly identified as Denese Brunner), Unit Manager Rod Showers, Case Mgr.—GECAC Judy Jackson, Jeffrey Beard, Assistant to the Superintendent William Barr, and Marilyn Brooks (incorrectly identified as "Mariland") by their attorneys, Thomas W. Corbett, Jr., Attorney General, Mary Lynch Friedline, Senior Deputy Attorney General, and Susan J. Forney, Chief Deputy Attorney General, Chief Litigation Section, and respectfully submit the following Brief in Opposition to Plaintiff's Cross-Motion for Summary Judgment:

**OVERVIEW**

Plaintiff's Cross Motion is actually a response to defendants' Motion for Summary Judgment. In that response, plaintiff raises several arguments that were not clear from the various complaints:

1)  Defendant Showers influenced the 6/24/02 annual Z code review and caused DeFranco to lose his Z code status in retaliation for DeFranco's earlier statement to Showers about suing SCI-Albion over the loss of his tennis shoes while in the RHU. (Plaintiff's Cross Motion, pp. 30-31.)

2)  Plaintiff's Z code is "medically required" and was "prescribed" by Psychologist Steve Reilly in February 2000. (Pltf Cross Motion, pp. 2, 4, 10.)

3)  Plaintiff's heart condition worsened during the 2+ years he was double celled. (Pltf Cross Motion, pp. 12-13, 24-25.)

I.  **Plaintiff's Claims of Retaliation by Showers Fail as a Matter of Law[1]**

Although the crux of plaintiff's claim has been that the June 24, 2002 annual review of his Z code status was further punishment for his threat to a guard in March 2002, he has shifted focus (apparently in response to defendants' Motion for Summary Judgment) to a new and different retaliation claim – that Showers somehow orchestrated and dictated the 6/24/02 annual Z code review and caused DeFranco to lose his Z code status in retaliation for DeFranco's earlier statement to Showers about suing SCI-Albion over lost tennis shoes.

A retaliation claim requires a showing of three factors: (1) that plaintiff was engaged in a constitutionally protected activity; (2) that he was subjected to adverse action; and (3) the protected activity was a substantial motivating factor in the state actor's decision to take the adverse actions. Rauser v. Horn, 241 F.3d 330, 333-34 (3d Cir. 2001). However, "[o]nce a prisoner demonstrates that his exercise of a constitutional

---

[1] In the first place, any claim for retaliation based on the June 24, 2002 staffing should be barred by the statute of limitations, as set forth in defendants' previous brief at Section V.

right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Id. Jordan v. Horn, 2005 WL 2250693, *1 (W.D.Pa. Sept. 15, 2005), *citing*, Rauser, 241 F.3d at 333. In other words, defendant can avoid liability by showing that the action furthered a legitimate penological interest. Rauser, 241 F.3d at 334.

Here, the alleged comment to Showers (that DeFranco was going to sue the institution for losing his tennis shoes) can hardly be deemed protected activity. Although the Third Circuit has held that the filing of a lawsuit by a prisoner is protected activity under the First Amendment (see Anderson v. Davila, 125 F.3d 148, 161 (3d Cir.1997); Milhouse v. Carlson, 652 F.2d 371, 373-74 (3d Cir.1981)), a verbal encounter with an officer or counselor regarding lost tennis shoes, which supposedly led to plaintiff's threat that he would sue, does not constitute protected First Amendment speech. See Oriakhi v. Wood, 2006 WL 859543 *5 (M.D. Pa.) To construe DeFranco's alleged comment as the equivalent of filing suit "would elevate every verbal exchange between a prison employee and a prisoner to the level of protected speech under the First Amendment." Id. Thus, it has been held that in order to receive First Amendment protection, an ==inmate's speech== must relate to a matter of public concern. Id., citing McElroy v. Lopac, 403 F.3d 855, 858 (7th Cir.2005) (inmate's inquiry about pay for lost job was not a matter of public concern.)

Furthermore, plaintiff cannot establish causation, *i.e.,* that the comment or threat he made to Showers about the tennis shoes was a substantial motivating factor in the votes that came out of the June 24, 2002 staffing. The Z-code vote on June 24, 2002 was a unanimous "no." (Deft. Exh. 3.) There is nothing in the record except plaintiff's unsupported beliefs and assumptions to

3

suggest that Jackson or Showers' votes were motivated by a desire to impose further punishment or that they dictated the votes of the other staff members. Plaintiff can only point to the timing, which he calls suggestive. (Pltf Cross Motion, p. 11, 31.) However, temporal proximity alone is generally insufficient to establish the causal connection unless it is unusually suggestive. Krouse v. American Stabilizer, 126 F.3d 500, 503 (3d Cir. 1997).

Here, plaintiff left the RHU on April 25, 2002 and had the alleged discussion about tennis shoes with Showers sometime in May. The annual review which led to the Z Code vote was just that – **an annual review in accordance with DOC policy** – did not occur until June 24, 2002. (Deft. Exh. 15 - Jackson Declaration.)  Indeed, the DC-97, which DeFranco grossly mischaracterizes, contradicts any suggestion of causation and further establishes the legitimate penological purpose behind the June 24, 2002 staffing. Jackson started the annual review process on May 20, 2002 **in accordance with DOC policy and procedure** by sending a DC-97 to psychology seeking their evaluation and recommendation. Id. The psychologist, Ms. Eichenlaub, met with DeFranco on May 29, 2002, and completed the form on June 21, 2002 with her own observations and recommendations. Id. In particular, the psychologist noted:

> Panic Disorder – doing time for murder – states his family is the Doctor DeFranco family – also reports that Mr. Reilly guaranteed him he would never loose [sic] his Z-code. Condescending – his medications should be addressing his needs for his panic disorder. Circulate vote sheet to determine continued need for Z-code.

(Exh. 15 - Jackson Declaration, with DC-97 attached.)

Not surprisingly, several staff voting during the June 24, 2002 staffing referred to the psychologist's report and conclusions that his current medications should be sufficient to deal with his panic issues. (Deft. Exh. 3.) Above all, there is simply nothing to suggest that Showers somehow influenced or dictated these votes (which would be contrary to the

4

annual review process – see Skendall Declaration, Deft. Exh. 10), or that Jackson did anything other than what she was supposed to do.[2]

DeFranco tries to manufacture a conspiracy or inconsistency in how the June 24, 2002 staffing was handled, claiming that it should have been "deferred" to the Unit he had been in prior to March 2002 when he went to the RHU. However, the record clearly establishes that DeFranco was in the new Unit (J Unit) for two months when the annual review was performed. Furthermore, in response to a hypothetical question posed by plaintiff – *i.e.*, when an inmate is suddenly moved off of a long term housing unit "and has a staffing shortly thereafter" is it normal and standard procedure to defer the staffing process to the old unit? - both Showers and Reilly explained that his June 24, 2002 staffing was handled according to standard procedure. Jackson explained that the current Unit Counselor process paperwork for staffing. (Exh. 16 - Jackson A/I 3rd Set ¶1, 2.) Showers stated "There is no requirement as to the length of time an inmate is on a unit for staffing. J-Unit had sufficient experience with this inmate, as well as access to relevant records, to make staffing recommendations." (Pltf Exh. A - Showers A/I 3rd Set ¶ 1, 2.)

Unhappy with these answers, plaintiff improperly circumvented the discovery process (including counsel for defendants) and tried to elicit contradictory responses to this inaccurate hypothetical from other staff. He used the internal provided for "Inmate Requests to Staff" to conduct trick Albion staff into providing further discovery, which is certainly not an intended or proper use of the process. As such, plaintiff's exhibits B and L should be stricken. In any event, the response of John Skendall (Pltf. Exh. B) does **not**

---

[2] Indeed, plaintiff's grounds for asserting liability against Jackson are nonexistent. All he can offer are bald, unfounded conclusions that she conspired for reasons unknown with Showers, who for inexplicable reasons, was motivated to retaliate when DeFranco told him he was going to sue Albion (not Showers himself) for losing his tennis shoes in the RHU.

support plaintiff's argument. While Skendall responded "that's normally how its's done" he went on to caution that "there <u>could</u> be exceptions, due to circumstances."

Under the circumstances, this record clearly precludes a finding of causation and instead establishes the legitimate penological interest in the June 24, 2002 staffing decision to discontinue DeFranco's Z code status. See <u>Floyd v. Dugal</u>, 2003 WL 23101802 (E.D. Pa), discussed at pages 9-10 of defendants' original brief.

**II.    The Record Does not Support Plaintiff's Claim that Z Code Status was "Medically Required" or "Prescribed"**

In support of his claim under the Eighth Amendment, plaintiff argues that defendant Reilly recommended Z code status in February of 2000 because it was "medically necessary." Therefore, DeFranco argues that he is entitled to permanent Z code status, and anyone who votes against continuing the Z code in subsequent annual reviews is deliberately indifferent to his medical needs.

Defendants addressed at length the fallacies in this argument in their original brief at pp. 17-25. The undisputed medical evidence establishes, without question, that there was no medical or psychiatric need for DeFranco to be Z-coded. Dr. Baker, SCI-Albion's medical director, does not believe that DeFranco's minor heart condition, which has not been diagnosed through echocardiogram testing, is aggravated by the anxiety he experiences when double celled. (Exh. 7 - ¶6, 7.) Likewise, Dr. Polmueller stated that a psychiatric recommendation for single cell status should be based upon an inmate's demonstration of dangerous behavior (or the expectation of such behavior) resulting from a "serious medical illness" – **which DeFranco does**

6

**not have**. (Exh. 14 - ¶3.)[3]  According to Psychologist Denise Bunner: "there was never any significant mental illness and/or mental health diagnosis of inmate DeFranco generated by the Psychology Department." (Id. ¶ 9.) Indeed, while DeFranco was and is on the mental health roster (inmates who have a stability rating of "C" and a history of mental health treatment), he was **not** on the Psychiatric Review Team roster, which is for inmates who have a "D" mental health stability rating and possess serious mental health adjustment difficulties. (Deft. Exh. 9 ¶ 7; Exh. 11 ¶ 10 – Reilly A/I; Exh. 12 ¶ 8, 9 – Reilly 2nd A/I).

Moreover, DeFranco's assumptions about Psychologist Reilly's recommendations are simply not warranted. Reilly's recommendation for Z code in February 2000, a few months after DeFranco's arrival at Albion, was a temporary recommendation. DeFranco appeared to be experiencing high levels of stress in connection with his life sentence and recent transfer and recommending Z code in such situations may help with the inmate's adjustment. Z code is not permanent but is subject to annual review. (Deft. Exh. 17, ¶ 4 – Reilly Declaration.)

Bunner agreed that Reilly' recommendation for Z code in 2000 would have been made in order to help DeFranco to adjust to a stressful situation:

> The responding defendant would agree that an inmate suffering from high levels of stress would be given a Z code for a short period of time in order to help that individual adjust to a certain stressful situation. In Mr. DeFranco's case, if Mr. Reilly felt that he would benefit from having a Z code for a while, this defendant does not see any reason to disagree with that decision. However, policy recommends that Z codes be reviewed on a yearly basis. In accordance with policy, this defendant feels that an inmate should not consider their Z code to be permanent.

(Deft. Exh. 9, ¶9.)

---

[3] Even Dr. Lindemuth acknowledged that DeFranco's mental and medical health conditions were no more serious than those of most of other inmates she sees. (12/17/04 Hrg. Lindemuth Test. at 11-13, 29-30, 44.)

A year later, based on DeFranco's specific request to see a psychiatrist and possibly obtain psychotropic medication, Reilly requested a psychiatric referral. (Deft. Exh. 17 - ¶ 5.) By the time of the June 2002 Z code annual review, DeFranco's records reflected medication compliance, good attendance with psychiatric appointments and no evidence of serious mental or emotional maladjustment.  (Exh. 17, ¶6; Deft. Exh. 12, ¶ 4, 5.) When Reilly subsequently recommended Z code for DeFranco in March 2004, that recommendation would also have been on a temporary basis and subject to annual review. At that time, when Reilly noted "anxiety disorder, persistent stress" on the vote sheet, he was considering DeFranco's **current** adjustment and psychiatric treatment with Dr. Lindemuth. (Exh. 17, ¶7.)

Finally, although DeFranco makes a passing reference to self-injurious behavior at page 18 of his brief, no medical professional, including Dr. Lindemuth, has ever made reference of such behavior from DeFranco. Although there is an indication in the SCI-Smithfield record that plaintiff may have reported a history of "self-mutilation" upon his transfer in March 2005, Chief Psychologist Reilly states that DeFranco never mentioned this to Reilly, and there is no indication of such behavior in DeFranco's file at SCI-Albion. (Exh. 17 – Reilly Declaration, ¶8.)

### III. Plaintiff's Medical Condition Did not Worsen While Double-Celled

In his Cross Motion, DeFranco cites to the fact that he started taking Nitroglycerin and Lopressor in June 2003, nine months after losing Z code status. This is proof, he claims, that his heart condition was deteriorating due to being double celled.[4]

---

[4] Plaintiff attaches as Exhibit E a letter from his brother, an obstetrician, to support his argument that double celling worsened his heart condition. Notably, plaintiff's brother does not and has not had access to plaintiff's medical records and instead, relies upon plaintiff's own account of his medication use. This is insufficient to create a question of fact in light of the overwhelming medical and psychiatric evidence of record.

Once again, plaintiff's argument is contradicted by the record. Inmate DeFranco did not just suddenly begin to experience angina attacks in 2002 or 2003, after the Z code was removed. The angina had been occurring for years – **even while single celled**. At the December 17, 2004 hearing in this case, Dr. Lindemuth testified that when she first started seeing DeFranco in the early part of 2001 **(while he was on Z-code)**, DeFranco described having episodes where he experienced overwhelming fear, shortness of breath, heart palpitations, chest tightness, tingling, sweating – symptoms that would climax and occur 1 to 2 times per week. He felt like he was experiencing a heart attack and supposedly ended up in the ER. (12/17/04 Hrg. Tr. 57-58.) As a result, she started him on Valium. (Id., at 57.) According to Dr. Baker, these nontypical angina episodes, which correlate with anxiety, have been noted in DeFranco's medical record for many years, even while at SCI-Pittsburgh. (Deft. Exh. 7 - Baker Declaration, ¶ 4.)

In June 2003, nearly ten months after returning to double cell status, the medical staff started a new medication for the angina symptoms – nitroglycerin, and started him on preventative doses of Lopressor and aspirin. (Deft. Exh. 7.) However, those doses did not increase while double-celled as plaintiff claims. During the 12/17/04 hearing, Suzanne Rebele, R.N., made it clear that plaintiff's nitroglycerin prescriptions and intake had not increased over time while double celled, but had **decreased**. (12/17/04 Hrg. Tr. at 54-57.) According to his medical chart, DeFranco had only sought one refill of nitroglycerin in the ten months between November 2003 and September 2004. Id.

**CONCLUSION**

For the reasons stated herein and in defendants' prior brief in support of their Motion for Summary Judgment, plaintiff's Cross Motion for Summary Judgment should be denied, and judgment should be entered for defendants.

                          Respectfully submitted:

                          Thomas W. Corbett, Jr.
                          Attorney General

By:    /s/ Mary Lynch Friedline
        MARY LYNCH FRIEDLINE
        Senior Deputy Attorney General
        Attorney I.D. No. 47046
        Susan J. Forney
        Chief Deputy Attorney General
        Litigation Section

Office of Attorney General
6th Fl., Manor Complex
564 Forbes Avenue
Pittsburgh, PA  15219
Date:   November 15, 2006

## **CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2006, I electronically filed the foregoing *Brief in Opposition to Plaintiff's Cross Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system.  This document will be mailed via U.S. mail to the following non CM/ECF participants:

Anthony DeFranco, CZ-3518
SCI-Albion
10745 Route 18
Albion, PA 16475-0001

                                          By:     /s/  Mary Lynch Friedline
                                                     MARY LYNCH FRIEDLINE
                                                       Senior Deputy Attorney General

Office of Attorney General
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219