IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANTHONY DeFRANCO, <br> Plaintiff, | : <br> : No. 04-230 -E <br> : Magistrate Judge Baxter |
| V. | : District Judge Cohill <br> : |
| WILLIAM WOLFE, et al., <br> Defendants. | : <br> : |

FILED
'06 DEC -6 AM 10:23
CLERK
U.S. DISTRICT COURT

### PLAINTIFF'S INTERIM REPLY BRIEF TO THE DEFENDANTS' MOTION IN OPPOSITON TO SUMMARY JUDGMENT

AND NOW, comes plaintiff, who brings forth the following Interim Reply Brief to the Defendants' Motion In Opposition to Summary Judgment, pursuant to Local Rule 56.1, and avers as follows:

1. The defendants' have filed a Motion in Opposition to Summary Judgment (Doc. 243) and attached further exhibits, and a Counter Statement of Material Undisputed facts (Doc. 244). Due to possible further medical declarations, based upon the release of needed medical records, this is plaintiff's Timely Iterim Reply:

I. Facts of Case

The defendants' want this Court to believe that the retaliation claim has changed and that it was over a pair of tennis shoes. Plaintiff has argued that the defendants had retaliated against him for 1) allegedly threatening to kill a guard and, 2) the converstaion where defendant Showers speficially threatened plaintiff because of his assertion of suing the Department of Corrections (which Showers' is apart of) and that plaintiff "would see how the DOC deals with inmates who sue". Plaintiff has never abandoned the fact that the defendants' did retaliate due to his allege threat to the guard but they also retaliated because of his statement to Showers of his intent to

1

sue over "missing personal property" which included tennis shoes, legal correspondance and other property. This claim was addressed in plaintiff's Amd.Cplt. ¶ 52-59. Plaintiff was missing personal property that was stolen by the DOC, which included tennis shoes. He had sent out "informal resolutions" in the form of request slips and verbal communications with staff, and parts of his property were eventually found, but not his tennis shoes and some other property. Prior to filing a grievance, inmates are encouraged to try to resolve the dispute by requests to staff. It is all a part of the grievance process (See, Plt.'s MSJ Ex "X"). However, because the DOC, including defendant Showers, did nothing to locate the other missing property, which included tennis shoes, plaintiff approached defendant Showers, showed him the typed out grievance in the hopes it would get him to help locate the missing property, and that is when Showers threatened plaintiff, stating that he (plaintiff) would see how the DOC deals with inmates who sue. (Plt.'s Amd. Cplt. ¶ 52-59).[1] Without question the filing or intent to file a grievance or lawsuit is a constitutional protected activity, see, <u>Allah v. Seiverling</u>, 229 F.3d 220, 224-25 (3dCir.2001). It has long been established that government actions, which standing alone do not violate the constitution, may nonetheless be constitutional torts if motivated in substantial by a desire to punish an individual for the exercise of a constitiutional right, such as filing lawsuits or grievances.

Approximately ten (10) days after defendant Showers threatened plaintiff over his grievance actions, a review was being conducted on removing his z-code, which began on May

---

[1] In footnote 1 of the defendants' Response, they make a passing comment that plaintiff's claim should be barred by the statue of limitations (page 2). Stated throughout plaintiff's complaints, he stated Showers threatened him for his intention to sue the DOC (Amd.Cplt. ¶52-59). Plaintiff did not become aware of the "injury" of Showers stated retaliation until August 15, 2002 when he found out he and others removed the z-code. Under federal law, a §1983 claim accrues when plaintiff knows or has reason to know, of the injury that consitutes the basis of the action, <u>Dreary v. Three Unnamed Police Officers</u>, 746 F.2d 186, 193 (3rCir.1984).

20, 2002 (Def.'s MSJ Ex. "15" ¶3). Notable, plaintiff's annual review are in the month of January, not May or June (See attached, Request by Counselor Webb, stating plaintiff's annual review month is January, Ex. "AA"). There was no reason to hold an annual review seven (7) months early unless it was designed to punish plaintiff. It is undisputed that plaintiff's annual review is in the month of January—the defendant's argument that this annual review initiated by defendant Jackson and Showers and those acting in concert with them, was simply an annual review done by DOC policy, is patently untrue given the fact that plaintiff's annual review month is January (Ex. "AA"). This annual review process was circumvented by the defendants to further punish plaintiff for his alleged threat to the guard and for his assertion and filing the grievance over missing (stolen) personal property which included his tennis shoes. Plaintiff's speech to defendant Showers regarding the filing of the lawsuit while in the process of filing a grievance is protected speech. The case cited by the defendants, *McElroy v. Lopac*, 403 F.3d 855, 858 (7thCir.2005) is misplaced. That case dealt with an inmates "inquiries" about his prison pay. That inmate never asserted filing a grievance. The Court in *McElroy* even noted that had he made the grievance filing or assertion of such, that it would had been consitutionally protected, *Id.*, at 859. Ironically, the case cited by defendants actually supports plaintiff.

      Defendant Jackson's involvement in this conspiracy to further punish plaintiff is noted by her very own handwriting, among others, stating that plaintiff had manipulated Albion staff upon his arrival to gain the z-code status (Plt.s MSJ Ex. "C", Vote 2), and her further stating that his medication would handle his psych needs; and stating that high levels of stress do not meet the z-code criteria which is an obvious mistruth designed to remove the z-code (all written by her on the vote sheet, Ex. "C"). These actions are 'unusually suggestive' as stated in, *Krouse v. American Stabilizer*, 126 F.3d 500, 503 (3dCir.1997).

Further, this annual review that was started on May 20, 2002, was not in accordance with DOC policy. Plantiff's annual review month is January, not May or June. (See Ex. "AA", Request Response by Counselor Webb, stating plaintiff's annual review month is January). The question then becomes why did the defendants circumvent the annual review process and initiate one some 6 to 7 months early? It was designed to take away the medically needed z-code to inflict punishment upon him.

There is a factual dispute if the purported Ms. Eichenlaub ever met with plaintiff. Plaintiff has submitted a declaration that no meeting ever transpired between the two of them. (Plt.'s MSJ Ex. "Z"). The defendants have offered no evidence that a meeting ever occurred other then the purported DC-97 form that does not specifically state a meeting was held. Moreover, this psychologist is not a doctor and if she stated that plaintiff's medication should be handling his psych needs, she was deliberately indifferent to his medical needs. Notably, several other staff referred to this Eichenlaub's alleged notation that his medication should be handling his psychiatric needs in voting to remove the z-code. Ms. Eichenlaub is not qualified to make a medication opinion. She is not a doctor, all defendants' knew she was not a doctor and they were deliberately indifference by not seeking medical opinion. She did not confer with plaintiff's treating psychiatrist, which she should have done before making a medication conclusion. Moreover, Dr. Lindemuth, SCI Albion's psychiatrist, put out a Recommendation to these voting z-code committee staff members alerting them to the fact that plaintiff should be converted back to z-code status. However, as this record clearly reflects, absolutely nothing was done as a result of that medical Recommendation by a doctor. Defendant Reilly admitted receiving the September 2002 Recommendation but stated he did not know what, if anything, was done as a result. (Def.'s MSJ Ex. "12" 1, 2). Defendant Reilly states that "The result of a

4

psychiatric recommendation for Z-code status to the psychologist activates discussion of the inmate's case during psychiatric team staffing. The responding defendant does not recall his exact actions after receiving this correspondence." Id. at ¶ 2. However, this Court has all of the z-code vote sheets and it clearly shows that *nothing* was done in regards to the doctor's specific Recommendation. No staffing was initiated as Reilly specifically stated should had been performed. This is clear retaliation and deliberate indifference.

      The defendant's object to the use of plaintiff's Ex. "B" in his Cross Motion for Summary Judgment. This is a Request Response by Unit Manager John Skendall who has been employed by SCI Albion since 1994. They claim the request was some sort of "trick" and that it circimvented the discovery process. This request was submitted to staff and was submitted the proper way. While plaintiff did ask defendants Jackson and Showers if it was the normal procedure utilized at Albion that when an inmate is moved off of his Long Term Unit, and has a staffing shortly thereafter, would the New Unit defer the staffing back to that inmates Long Term Unit where staff would be familiar with the inmate. The defendants answered "No", that it was not the normal procedure at Albion. (Plt.'s MSJ Ex. "A", ¶1,2). Plaintiff, knowing that the defendants gave untruthful answers had a request submitted to Unit Manager Skendall, who knows the system at Albion and asked him this very same question. Unit Manager Skendall stated that *it was the normal procedure at Albion*. Unit Manager Skendall gave a truthful answer and it shows that 1) Showers and Jackson were untruthful, and 2) that plaintiff's 2002 staffing/annual review should had been deferred back to his Long Term Unit. Of course the defendants want this stricken because it is truthful and contradicts the defendants who have an obvious interest in misrepresenting the truth. The fact of the matter is that plaintiff was released from the RHU on April 25, 2002 and the staffing to remove his z-code began on May 20, 2002

when defendant Jackson submitted the DC-97. Plaintiff was on Showers and Jackson's Unit for three (3) weeks when they began the staffing (annual review). (Def.'s MSJ Ex. "15" ¶2). The z-code was removed (according to the defendants) on June 24, 2002. All of these facts show overwhelming evidence that these defendants acted with retaliation and deliberate indifference; they began an annual review in May or June of 2002 when plaintiff's annual review month is January (See, Ex. "AA"); Ms. Eichenlaub made a conclusion that medication *should be* handling plaintiff's psych needs without consulting with any doctor; defendants Showers and Jackson failed to defer plaintiff's annual review staffing back to his Long Term Unit consistent with normal procedure at Albion (Plt.'s MSJ Ex. "B"); Showers and Jackson's handwritten remarks stating plaintiff was manipulative, that he manipulated staff upon his arrival to get the z-code (these remarks clearly not needed to determine a z-code need), and stating that his medication should be handling his psychiatric needs without consulting with any doctor, and stating that **high levels of stress do not meet the z-code criteria**, while it does meet the criteria as stated Chief Psychologist Reilly (Plt.s MSJ Ex. "C", 2)[2]; and the defendants total disregard to the psychiatrists Recommendation that they admitted to receiving, where even Chief Psychologist Reilly admitted that a new staffing should have been initiated but nothing was done---this all shows retaliation and deliberate indifference. It shows causation and the prongs stated in <u>Rauser v. Horn</u>, 241 F.3d 330, 333-34 (3dCir.2001). The proximity to the events establishes retaliation. <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 280 (3dCir.2000); suggestive timing is relevant to caustion in retaliation claims. Also, <u>Pate v. Peel</u>, 256 F.Supp.2d 1326, 1338 (N.D.Fla.2003)(a

---

[2] Defendant Jackson's state of mind on helping the other defendants retaliate to remove the z-code is particularly telling by her very own handwritten comments, stating, *inter alia*, that high levels of stress do not meet the z-code criteria; while the Chief Psychologist stated that it does and that is why plaintiff was allegedly given the z-code. If Jackson was not a part of this conspiracy one would have to ask why she wrote those comments on the z-code vote sheets (Plt.'s MSJ Ex. "C", Vote 2).

prisoner can establish retaliatory motive by alleging a chronology of events from which a retalitory aminus on the part of the defendants could reasonably be inferred).

**II. The Record Supports Z-Code Need**

Plaintiff has argued his claim under the Eighth Amendment and states that the z-code given to him was a medical need. The undisputed medical facts establish, without question, that plaintiff requires the medical z-code due to his medical and psychiatric condition:

a). Medical Condition: plaintiff was born with a heart murmur, diagnosed as a mitra-valve prolapse. During his years of incarceration at SCI Pitsburgh, he has required some care for his angina (cardiac chest pain). His cardiac condition was made worse by the defendants deliberate indifference in removing his z-code. It is undisputed that prior to the defendants removal of his z-code plaintiff did not require Nitroglycerin, Aspirin, or Lopressor for his cardiac state. It was only in June/July of 2003 (some nine months <u>after</u> the z-code was taken away) that these medications were prescribed. The defendants doctor Baker admits as much in his declaration (Def's MSJ Ex. "7"). Defendant Reilly states that he simply recommended the z-code in February 2000 due to high levels of stress, claiming the z-code was not medical necessity (Def."s MSJ Ex. "17"). However, this is clearly a self-serving declaration designed to defeat plaintiff's claims. As this Cout is obviously aware, high levels of stress is a medical condition in and of itself. Moreover, Reilly in his recent declaration states that the z-code given to plaintiff was only on a **temporary basis**, giving him time to adjust (*Id.* ¶4). This record is clear that plaintiff was given the z-code in February 2000 and removed June 2002. The z-code that was initiated by Reilly for a "temporary" basis lasted some **2 and a half years**. Two and a half years is not temporary. Also of note is that while Reilly claims in this new declaration that the z-code given

to plaintiff was not a medical necessity (Id. at 4), in his answers to interrogatories he made contradictory statements. Specifically;

> "Progress note of December 20, 2002: inmate was concerned with the threat of moving to (sic) single cell status. Currently, inmate DeFranco is being treated for general anxiety disorder through psychiatry and he is member of the mental health roster. Inmate DeFranco stressed that he genuinely needed to maintain his Z Code  The subject appears in need of single cell status at this time. **Certainly treating his psychiatric needs is in the subject's best interest.** It appears that inmate DeFranco is requesting reassurance that his single cell would not be abruptly removed. Maintain Z Code status for inmate. Staff for Z Code status. S. Reilly, Chief Psychologist."

(Def.s MSJ Ex. "11", ¶3). Defendant Reilly cites to the fact that treating plaintiff's psychiatric needs is in his best interests in maintaining z-code status. By his very own statements admits that this z-code was of medical necessity. This new declaration and statements given in his Answers are self-contradictory. Conclusory and self-serving affidavits are not sufficient to create genuie issue of material fact on motion for summary judgment, *Murphy v. Facet*, 329 F.Supp.2d 1260 (D.Utah2004). Also, Dr. DeFranco gives an in-depth review of how bad stress is on a person and that stress is a medical condition (Plt.'s MSJ Ex. "BB").

Doctor Lindemuth also testified about plaintiff's health and heart condition. The doctor had reviewed plaintiff's cardiac status in connection with single cell, the doctor stated:

> The Witness: Yes. Now that could be coincidentally because as individuals age, and, you know, the progression of heart disease is usually for the worse as time goes on. But again, all cardiac patients are advised to reduce stress, **and being in a double cell constitutes a stress obviously that would be adverse to his cardiac state.**

(Trans. 12/17/04 page 12-13). Even while Dr. Lindemuth was under intimidation by the defendants to testify a certain way, she admitted that being double celled is harmful to plaintiff. At the time of this testimony she was employed by the defendants. In addition to Dr. Lindemuth's testimony and expert medical opinion, Dr. DeFranco's declarations are completely consistent with Dr. Lindemuth. In composing her Recommendations to the prison that plaintiff

be converted back to z-code status, she testified that she took her notes and those of the medical department to make an accurate Report; "—basically, I've taken the main points of my notes, of my impressions, and the impressions of the medical department, and put it in a memo form." (Id., at 67). Therefore it is established that the medical department are aware of the harm done by double celling.

Moreover, contained in the vote sheet comment section of the 2000 z-code granting, plaintiff's counselor wrote, **"per psych recommendations-inmate complains of anxiety and previous use of med.s (M.H.)"**---the counselor cited to plaintiff's established previous use of medications and mental health history in voting to approve the z-code. Again, the Unit manager at the time stated, "appears to be suffering from anxiety, cellmate claims he does not sleep." (See, Plt.'s MSJ Ex. "C", Vote 1). Clearly, the z-code prescribed to plaintiff was of medical necessity---Reilly admits as much in his Answers to Interrogatories; the staff voting during that time cite to anxiety problems; plaintiff's prior taking of medications and mental health.

While Reilly's new declaration states that the reason plaintiff's z-code was removed in 2002, *inter alia*, was no serious maladjustment. That flies in the face of all logic considering the fact the plaintiff had just went to the RHU for threatening to kill a guard only months before they revoked the z-code. If threatening to kill a guard does not constitute maladjustment, it is difficult to fathom what the defendants would consider maladjustment. Also plaintiff's Valium prescription at that time was sky-rocketing to 55 mg.s per day. Certainly his anxiety/stress was extremely high at that time.

Doctor Richard J. DeFranco has provided a further Declaration that adds clarity to this entire matter. Dr. DeFranco has spoken with plaintiff's treating physicians throughout his incarceration. He has been made well aware of the treatment and prescriptions prescribed to

9

plaintiff. In addition to actually speaking with the different treating doctors, he was actually present during the December 17, 2004 preliminary injunction hearing held in this matter, and heard all of the medical testimony. (See, Plt.'s MSJ Ex. "BB"). Also attached to his Declaration is a copy of a page of plaintiff's medications. This clearly shows a *decrease* in plaintiff's Lopressor since his return to single cell status. It also indicates that plaintiff had been prescribed four bottles of Nitroglyercin during the time of double celling. This record is clear that plaintiff was forced to double cell in August 2002. Only in June of 2003 was the drug Nitroglycercin prescribed---<u>after</u> the forced double celling. There was no decrease in the Nitroglycerin while double celled as plaintiff was only prescribed the drug while he was double celled. The argument in defendants Response (Doc. 243, page 9) where they argue that plaintiff's Nitroglycerin intake had decrease while double celled, is contradicted by this record. The record indicates that plaintiff was prescribed Nitroglycerin in June 2003, and required three (3) refills up until December 2004 (plaintiff's return to z-code status). (Plt.'s MSJ Ex. "BB", attachment of prescriptions). That equals four (4) twenty-five pill bottles in an 18 month period.

  Doctor DeFranco further states that he had spoke with defendant Reilly and that it was his understanding that Reilly stated plaintiff required a *medical* z-code in 2000. Dr. DeFranco goes on to explain how serious stress can be and that it is a medical condition. Stress, to name just a few, can affect a persons heart, immune system and worsen a persons mental health state (Plt.'s MSJ Ex. "BB"). Dr. DeFranco is a medical doctor and qualified to give a meaningful opinion regarding this case. He has sufficient information by plaintiff's physicians and hearing the medical testimony. He spoke with the Medical Director at SCI Pittsburgh; plaintiff's treating Psychiatrist at SCI Albion; plaintiff's Psychiatrist at SCI Smithfield, all of whom had plaintiff's medical file at those times (Id. Ex. "BB").

Ms. Eichenlaub, the psychologist who allegedly wrote that plaintiff's medication should be handling his psychiatric needs (Def.'s MSJ Ex. "15", attachment), should have sought opinion from his treating doctor as a psychologist cannot prescribe medication and should not render an independent conclusion on whether a patients medication is "handling" a psychiatric disorder without conferring with a medical doctor (Ex. "BB").

Dr. DeFranco opines that based upon a reasonable degree of medical certainty, that the defendants' caused irreparable harm to plaintiff's pre-existing heart condition. (Id.) He also states that being double celled constitutes a condition that physically and mentally harms him. (Id). Dr. DeFranco's expert medical opinion is consitent with the defendants Dr. Lindemuth who testified that double celling is adverse to plaintiff's medical state and is harmful to his cardiac condition (Trans. 12/17/04 at 12-13).

While the defendants did produce a declaration from Dr. Baker, SCI Albion's doctor, that declaration is particularly telling in a couple of different ways. For example, in Dr. Baker's declaration (Def.'s MSJ Ex. "7") he states that he prescribed Nitroglycercin for **Anxiety**. Plaintiff provided this Court with a copy from the PDR that specifically states that Nitroglycercin is prescribed only for cardiac related chest pain (Plt.'s MSJ Ex. "D"). Nitroglycerin is not prescribed for anxiety. Second, in Dr. Baker's declaration, he went as far as to actually state that he would recommend plaintiff for a double cell due to his "minor heart condition" when he recommended a single cell for another inmate (Mr. April) due to his heart condition in order to reduce stress that is caused by double celling (Plt.'s MSJ Ex. "U"). The defendants admit as much in their Counterstatement of Undisputed Facts (Doc. 244 ¶66). Inmate April was recommended by Dr. Baker to have a single cell to reduce stress due to his cardiac state; but Dr. Baker takes a complete opposite stand in his declaration for the defendants here. Dr. Baker

11

cannot have it both ways. Either stress is adverse to a cardiac patients heart or it is not. It is obvious that Dr. Baker signed this declaration to help the defendants (his employers).

It is true that plaintiff had a pre-existing heart condition prior to the z-code removal; however, these defendants made the heart condition worse by the removal of the z-code. This is stated in Dr. DeFranco's declarations in this case, and Dr. Lindemuth's testimony. Noteworthy is the fact that Dr. Lindemuth gave a declaration on October 2, 2005 stating that double celling of plaintiff causes irreparable harm to his heart condition and she opined that he should be single celled (Plt.s MSJ Ex. "G"). This declaration was signed subsequent to Dr. Lindemuth's testimony during the preliminary injunction hearing and should be considered by the Court as the doctor's *recent* testimony in this case. Doctor Lindemuth's Declaration reads:

### DECLARATION

I, <u>Dr. Angela Linemuth</u>, make the following declaration in regards to Anthony DeFranco

1. As stated in my Report's dated September 23, 2002 and august 20, 2004, it is my professional opinion that Anthony DeFranco not be double celled due to history of violence and imulsivity, which represents a serious risk to any potential cellmate.
2. He internalizes and supresses his anger of dealing with cellmates which causes him to take increased doses of nitroglycerin; this causes irreparable harm to his pre-existing heart condition.
3. It is my opinion that Anthony DeFranco be housed in a single cell for his safety and the safety of any cellmate.

Signed pusuant to 28 U.S.C. §1746.

Date: 10/2/05                                    (Signed) Angela Lindemuth, R.Ph., D.O.

(Plt.'s MSJ Ex. "G"). This declaration was just signed by Dr. Lindemuth on October 2, 2005, which post-dates her testimony of the December 17, 2004 preliminary injunction hearing.

b). Psychiatric need: the defendants claim that plaintiff does not require a z-code due to his psychiatric disabilities. That is simply not borne out of the record in this case. For example, Dr.

Lindemuth testified that in regards to whether going to the RHU for threatening a guard constitutes significant progress. The doctor answer:

> A. Exactly, that's not deemed in your case as either—it's just part—it's part of your inherent character style. And, you know even in the most ideal conditions, you still, if you were provoked, even with a minor trigger, you would tend to use these defense mechanisms of wanting to threaten or strike somebody. That's why you're in prison, right, for violence.

(Trans. 12/17/04 page 19). Again, while the Court asked the doctor whether she agreed that plaintiff should be in a single cell (due to his psychiatric needs), the doctor replied: "Yes, that would be optimal, yes." (Id. at 50). And again during questioning regarding plaintiff's psychiatric disabilities and having a cellmate, the doctor stated, "Okay. But what I'm saying is that anyone that represents this profile would be better off in a single cell. I mean, that is a no-brainer." (Id. at 44).

While the defendants cite to doctor Polmueller's declaration, (Def.s' MSJ Ex. "14") where they had him add in a "comment section" (that plaintiff objects to) the defendants attempt to use this declaration as a medical opinion that plaintiff does not require a z-code due to mental health. However, again that argument fails as this doctor, saying all that he could to help the defendants, stated that labeling plaintiff's mental disorder as serious would be "questionable". That is their best argument. And the doctor would not state plaintiff's mental disorders were not serious. Of interest concerning this doctor, is the testimony of Dr. Lindemuth regarding what Dr. Polmueller noted, and whether his notes were consistent with hers:

> A. Impulsivity, a violatility, unpredictability. Again, consistent with the psychologist here and within what the anti-social personality disorder is about. These are just criteria, you know, for that character disorder, which Dr. Pazad (sic) concluded what was trouling you and I think—and also Dr. Pul Mueler (sic). We all agreed that primarily your behavior is manifestation or is a function of your anti-social character disorder.

(Trans. 12/17/04 at 41). Testimony of Dr. Lindemuth of Dr. Polmueller's notes regarding plaintiff. As stated, while Dr. Polmueller attempts to down-play his notes and observations on

13

plaintiff, Dr. Lindemuth's testimony indeed sheds light on what his notes indicate, i.e., Impulsivity, a volatility, unpredictability. The medical evidence in this case, without question, demonstrates that plaintiff has a serious mental health condition which represents a danger to any cellmate (Dr. Lindemuth's testimony; recent Declaration of 10/2/05; Dr. Polmueller's Notes). Further, Dr. DeFranco has the same conclusion. Moreover, as this Court is aware, during the 12/17/04 preliminary injunction hearing, Dr. Lindemuth testified to this Court's question, stating she would <u>not</u> have written her prior Reports for this Court to issue an Order directing the defendants to reinstate plaintiff's z-code: The doctor testified "No" that she would not have (Trans. 12/17/04 at 30). This is evidence that she was under duress and intimidation in light of the fact that she did provide a subquent Declaration stating plaintiff's need for z-code and irreparable harm (Plt.s MSJ Ex."G"). Knowing this Declaration was being used for this Federal Court's consideration.

    Again, while plaintiff's was transferred to SCI Smithfield, a new staffing was conducted regarding whether plaintiff medically required a z-code. That staffing was conducted by doctors, psychiatrist, psychologists, among other specialists, who actually held a meeting (called a "PRT"-- Psychiatric Review Team) and it was medically determined that plaintiff requires the z-code. The Smithfield vote sheet relfects that (Plt's MSJ Ex. "C", 4). It was an absolute unanimous "yes" vote by <u>all</u> doctors and staff in April 2005 (Id.) In addition plaintiff submitted request slips to staff regarding this z-code vote and they replied that it was given to plaintiff as a medical (mental health) necessity (Plt.'s MSJ Ex. "M & N"). It is ironic that the defendants counter-part (SCI Smithfield) have proven that plaintiff requires the z-code. This done by qualified, medical staff ("The PRT"). While the vote sheet indicates this Court's prior TRO Ruling, stating it was in plaintiff's file, it was the defendants who placed that Ruling there, and they also placed this Court's subsequent Ruling there, including the preliminary injunction denial. It was all in plaintiff's file

and put there by the defendants. So, SCI Smithfield officials were aware of all ruling held in this case. Nevertheless, the vote sheet and request answers by staff, without question, prove plaintiff was given a new staffing and that it was *unanimously* concluded by professional, medical staff, that plaintiff requires a medical z-code. Noteworthy, defendant Beard answered interrogatories stating that the same z-code criteria is used throughout all Pa. prisons (attached, Ex. "CC" 2).

**Staff Requests**

The defendants object to plaintiff's Ex. "L" attached to his Cross Motion for Summary Judgment. These are request slips submitted to staff. There was no trick or misuse of the request slip policy. Plaintiff, after receiving answers to interrogatories by defendants Showers, Jackson and Beard (Plt.'s MSJ Ex. "CC" 4), where each state that correctional officers are **very qualified** to make a vote on whether an inmate requires a z-code (as they see and observe inmates everyday), plaintiff submitted a half dozen request slips to staff who have knowledge of plaintiff, and have observed him frequently, and each of these staff stated unquestionably that plaintiff requires the z-code. There was nothing improper about how plaintiff submitted these requests and they should be considered by this Court.

Plaintiff is currently awaiting this Court's Ruling on granting him his psychological files so that his family can have other medical professionals give their opinion on plaintiff's mental health. Plaintiff therefore reserves the right to supplement this Reply Brief with further Declarations by his medical professionals.

---

Plaintiff was in a single cell for the majority of his incarceration at SCI Pittsburgh. Whether he was given a "formal" z-code is unknown to him. His Counterstatement of Undisputed Facts only claimed he was placed in a *single cell* for most of his time, not that he was z-coded. Also, z-code inmates are held in "general population". There are over 100 inmates now at SCI Albion alone, with z-codes, in "general population".

WHEREFORE, plaintiff prays this Honorable Court will grant summary judgment in his favor. Alternatively, there are material factual disputes of record.

Date: November 29, 2006

Respectfully submitted,

Anthony DeFranco CZ-3518
10745 Route 18
Albion, Pa. 16475-0002

**Certificate of Service**
Plaintiff certifies that he has
served the defendants at 564
Forbes Ave. Pgh., Pa. 15219.

16