IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY DEFRANCO,<br>    Plaintiff,<br>         v.<br>WILLIAM WOLFE, et al.,<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>) | C.A. No. 04-230 Erie<br><br>District Judge Cohill<br>Magistrate Judge Baxter |

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

**I.    RECOMMENDATION:**

It is respectfully recommended that:

1. Plaintiff's Motion for Partial Summary Judgment [Document # 191] be denied;

2. Defendants' Cross-Motion for Summary Judgment [Document # 201] be granted in part and denied in part; and

3. Plaintiff's Cross-Motion for Summary Judgment [Document # 229] be denied.

**II.    REPORT:**

On August 10, 2004, Plaintiff Anthony DeFranco, an inmate at the State Correctional Institution at Albion ("SCI-Albion"), filed this civil rights action pursuant to 42 U.S.C. § 1983 against William Wolfe, former Superintendent at SCI Albion ("Wolfe"); Steve Reilly ("Reilly") and Denise Bunner ("Bunner"), Psychologists at SCI-Albion; Rod Showers, Unit Manager at SCI-Albion ("Showers"); Judy Jackson, Counselor at SCI-Albion ("Jackson"); unnamed Defendants identified as Jane Doe and Dr. John Doe; and Jeffrey Beard, Secretary of the Pennsylvania Department of Corrections ("Beard"). Plaintiff subsequently filed an amended and supplemental complaint on March 7, 2005, in which he added Defendants William Barr, Superintendent's Assistant at SCI-Albion ("Barr"), and Marilyn Brooks, current Superintendent at SCI-Albion ("Brooks"). [Document # 76]. Plaintiff later filed a second amended and supplemental complaint on September 7, 2005 ("Second Amended Complaint"), in which he

added an additional claim against Defendant Barr. [Document # 114].

In his multiple pleadings, Plaintiff claims that Defendants violated his rights guaranteed by the first, eighth, and fourteenth amendments to the United States Constitution, as follows: (i) Defendants removed him from "z-code" (single cell) status and placed him in a shared cell with another inmate in retaliation for a misconduct he received for allegedly threatening a prison guard (Document # 3, Complaint, at ¶ 33); (ii) by removing his z-code status, Defendants acted with deliberate indifference to his serious medical needs, which allegedly require his placement in a single cell (Id. at ¶¶ 37-45); and (iii) Defendant Barr transferred him to SCI-Smithfield in retaliation for the filing of this lawsuit (Document # 114, Second Amended Complaint, at ¶ 67). As relief for his claims, Plaintiff seeks declaratory and injunctive relief, in the form of restoration of his z-code status, along with compensatory and punitive damages.

### A.     Relevant Procedural and Factual History

On or about October 20, 1999, Plaintiff was transferred to SCI-Albion from SCI-Pittsburgh, where he had been housed in a "single cell" unit, due to his inability to cope with having a cell-mate.[1] (Document # 3, Complaint, at ¶ 16; Declaration of William Barr attached as Exhibit 1 to Document # 203, at ¶ 4). Upon his arrival at SCI-Albion, Plaintiff was originally housed with several different cell-mates; however, because of his inability to cope with cell-mates, he was assigned "z-code" status in February 2000, and was placed in a single cell.[2] (Document # 3, Complaint, at ¶ 17).

On March 24, 2002, Plaintiff received a misconduct for threatening to kill a corrections officer and was placed in SCI-Albion's Restricted Housing Unit ("RHU"). (See Declaration of William Barr attached as Exhibit 2 to Document # 203, Defendant's Brief, at ¶ 4). Upon his

---

[1] A "single cell" is a cell occupied by a single inmate.

[2] A "z-code" is the designation given to an inmate who is deemed to require placement in a single cell.

release from the RHU in April 2002, Plaintiff was assigned to a different housing unit at SCI-Albion to separate him from the corrections officer he had threatened. ( Id. at ¶ 13; Document # 3, Complaint, at ¶ 21).

On June 24, 2002, a staff meeting (referred to as a "staffing") was held to review whether Plaintiff's z-code status should be continued and, by unanimous vote, the staff voted to remove Plaintiff's z-code classification. (Document # 203, Exhibit 3 at p. 2).  Plaintiff claims that he learned about the staff's decision to remove his z-code on August 15, 2002, at or around the time he was placed in a double cell, with a cell-mate. (See Document # 14, Transcript of October 22, 2004 hearing, at p. 9).

Subsequently, at Plaintiff's insistence, Angela Lindemuth, D.O. ("Dr. Lindemuth"), SCI-Albion's Correctional Psychiatrist, drafted a memo addressed to the "Z-code Committee," dated September 23, 2002, recommending that Plaintiff "be conferred Z-code status." (See Document # 117, Transcript of December 17, 2004 hearing, at p. 51; Document # 22, Plaintiff's Appendix and Exhibits, App. 3 at p. 1).  In her memo, Dr. Lindemuth indicated that she had been treating Plaintiff for panic disorder and generalized anxiety for several years, for which he required "increasing doses of anxiolytics." (Document # 22, Plaintiff's Appendix and Exhibits, App. 3 at p. 1).  Dr. Lindemuth opined further that Plaintiff harbored "antisocial personality disorder traits" that made it difficult for him to contend with a cell-mate, and that "[t]he likely result is [Plaintiff] erupting in an explosive rage." (Id.).

Despite Dr. Lindemuth's memo, the staff's decision to remove Plaintiff's z-code status remained unchanged.  Following Plaintiff's repeated requests to his counselor and Dr. Lindemuth, Plaintiff received another z-code staffing on March 10, 2004, at which the majority of staff members voted to disapprove Plaintiff's z-code request. (See Document # 116, Transcript of December 17, 2004 hearing, at pp. 13-14, 47-48; Document # 203, Exhibit 3 at p. 3).  As a result, Plaintiff was denied z-code status.

Plaintiff initiated this action by filing a Complaint on August 10, 2004.  On August 26, 2004, Plaintiff filed a motion for preliminary injunction [Document # 4], which he subsequently amended on September 2, 2004. [Document # 6].  Thereafter, on September 22, 2004, Plaintiff

3

filed a petition for a temporary restraining order ("TRO petition") [Document # 7]. A telephonic hearing on Plaintiff's TRO petition was held before this Court on October 22, 2004. During the hearing, Plaintiff claimed that his placement in a double cell with another inmate had exacerbated his pre-existing heart condition, which required him to increase his dosage of heart and anxiety medication. (Document # 14, Transcript of October 22, 2004, hearing, at pp. 11, 13-14). In response, Defendants denied that Plaintiff's medical records reflected a need for z-code status and that Plaintiff was in danger of suffering irreparable harm as a result of his placement in a double cell. (Id. at pp. 6-7, 13). Nevertheless, Defendant Barr represented to the Court that "[w]e can actually shift [Plaintiff] to a Z Code cell if necessary." (Id. at p. 22).

After the telephonic hearing of October 22, 2004, Plaintiff filed a second petition for temporary restraining order [Document # 9] on October 26, 2004, claiming that, immediately after the telephone hearing, he was told by Defendant Barr that "there will probably be a single cell available for you at SCI-Dallas." (See Document # 9 at ¶ 4). Thus, Plaintiff was seeking a restraining order to prevent him from being transferred to another facility in retaliation for his z-code challenge. Since Plaintiff had previously claimed that SCI-Albion staff members threatened to have him transferred if he continued to pursue z-code status, and in light of Defendant Barr's statement to this Court during the telephonic hearing that single cells were available at SCI-Albion, this Court decided to consider Plaintiff's second TRO petition sua sponte, in conjunction with Plaintiff's first petition.

On October 29, 2004, this Court issued a Report and Recommendation recommending that: (i) Plaintiff's first TRO petition [Document # 7] be granted, based largely upon Dr. Lindemuth's letters addressed to the "Z-Code Committee," dated September 23, 2002, and August 20, 2004;[3] and (ii) Plaintiff's second TRO petition [Document # 9] be granted, finding

---

[3] Dr. Lindemuth's letter dated August 20, 2004, was attached to Plaintiff's second TRO petition and reiterated her previous recommendation that Plaintiff "be conferred Z-code status," based upon her finding that, since Plaintiff's removal from z-code status and placement in a double cell, he had required increasing dosages of anxiolytics and nitroglycerine to control his anxiety and heart conditions, and his angina had been exasperated. (See Document # 9, attachment 5).

4

that "the only apparent reason for transferring Plaintiff to SCI-Dallas, or threatening to do so, would be in retaliation for Plaintiff's continued exercise of his First Amendment right to file grievances and to petition this Court for the reinstatement of his z-code status." (Document # 11, Report and Recommendation, at pp. 5-6). By Memorandum Order dated November 2, 2004, District Judge Maurice B. Cohill adopted this Court's Report and Recommendation and ordered that Plaintiff's z-code status be reinstated immediately and that he be placed in a single cell at SCI-Albion. [Document # 13].

On December 17, 2004, an evidentiary hearing on Plaintiff's motion for preliminary injunction [Document # 4], regarding Plaintiff's z-code status, was held before this Court, during which testimony was taken from Dr. Lindemuth; Carla J. Webb, Plaintiff's Unit Counselor at SCI-Albion; and Sue Ann Rebele, first shift Nursing Supervisor at SCI-Albion ("Nurse Rebele"). At the hearing, the testimony elicited from Dr. Lindemuth and Nurse Rebele essentially eliminated this Court's previous concern regarding the likelihood of irreparable harm that would be caused to Plaintiff if he was placed in a double-cell. (See Document # 41, Report and Recommendation, at pp. 5-6). As a result, on January 19, 2005, this Court issued a Report and Recommendation recommending, *inter alia*, that Plaintiff's request for preliminary injunction be denied. [Document # 41]. This Report and Recommendation was subsequently adopted by District Judge Cohill by Order dated February 28, 2005. [Document # 62].

On or about February 15, 2005, Defendant Barr requested an Administrative/Separation transfer for Plaintiff, which set forth the following rationale for the transfer request:

> An Administrative/Separation transfer is being requested due to litigation against William Barr, SCI-Albion's Superintendent's Assistant. Mr. Barr is the Institutional Grievance Coordinator and doesn't want any potential problems between the inmate and future potential grievances.

(Document # 192, Exhibit D). The transfer request was approved on February 23, 2005, and Plaintiff was ultimately transferred to SCI-Smithfield on March 8, 2005. (Id.). On the date of his transfer, Plaintiff filed a Grievance, addressed to Defendant Barr, challenging the transfer as "retaliatory." (Document # 192, Exhibit A). In an Initial Review Response, dated March 28, 2005, SCI-Albion's Grievance Officer responded to Plaintiff's Grievance by stating, in pertinent

5

part:

> Mr. DeFranco has a formal separation in place from Mr. Barr. It is felt that based on pending litigation it is in the best interest of all parties that he not be housed at SCI-Albion....

(Document # 192, Exhibit B).

Nevertheless, on May 10, 2005, despite "not find[ing] an appeal on file for [Plaintiff's Grievance]," Defendant Brooks wrote Plaintiff an appeal response stating "I will allow you to be returned to SCI-Albion in resolution of the grievance." (Document # 192, Exhibit C). As a result, Plaintiff was ultimately transferred back to SCI-Albion on August 2, 2005. (Document # 191 at p. 3).

On June 22, 2006, Plaintiff filed a motion for partial summary judgment [Document # 191], requesting that judgment be entered in his favor on his retaliatory transfer claim against Defendant Barr. In response, Defendants filed a cross-motion for summary judgment [Document # 201], along with a brief in opposition to Plaintiff's motion for partial summary judgment and in support of their cross motion for summary judgment. [Document # 204]. In their brief, Defendants argue that: (i) Plaintiff's retaliatory transfer claim against Defendant Barr should be dismissed because the transfer was based on legitimate penological interests and/or "there are issues of fact in dispute as to the element of causation." (Document # 204 at p. 6); (ii) Plaintiff has failed to exhaust his administrative remedies with regard to his retaliation and Eighth Amendment claims concerning the removal of his z-code status in or around August 2002; (iii) Plaintiff has failed to state a claim upon which relief may be granted with regard to his Eighth Amendment claim of deliberate indifference related to the removal of his z-code; and (iv) Plaintiff's retaliation claim, based upon the removal of his z-code, fails to state a claim upon which relief may be granted, because the z-code was not removed in response to Plaintiff's engagement in constitutionally protected activity.

In response to Defendants' cross-motion for summary judgment, Plaintiff filed his own cross-motion for summary judgment, in which he responds to Defendants' cross-motion and requests judgment in his favor on all of his claims. [Document # 229]. Defendants have since filed a brief in opposition to Plaintiff's cross-motion [Document # 243], and Plaintiff has filed a

6

reply brief. [Document # 254].  This matter is now ripe for consideration.

### B.     Standards of Review
#### 1.     Summary Judgment

Federal Rule of Civil Procedure 56(c)  provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."  Id.

A district court may grant summary judgment for the defendant when the plaintiff has failed to present any genuine issues of material fact.  See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997).  The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims.  Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990).  Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial.  Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary

7

judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

### 2.     *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "'beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Haines v. Kerner, 404 U.S. 519, 520-521(1972), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should be done so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P.

12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same).

### C.     The Exhaustion Requirement and Procedural Default

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), provides:

> no action shall be brought with respect to prison conditions under section 1983 of this title ... by a prisoner confined in any jail, prisons, or other correctional facility until such administrative remedies as are available are exhausted.

Id.

The requirements that an inmate exhaust administrative remedies applies to all inmate suits regarding prison life, including those that involve general circumstances as well as particular episodes. Porter v. Nussle, 534 U.S. 516 (2002). See also Concepcion v. Morton, 306 F.3d 1347 (3d Cir. 2002) (for history of exhaustion requirement). Administrative exhaustion must be completed prior to the filing of an action. McCarthy v. Madigan, 503 U.S. 140, 144 (1992). Thus, federal courts are barred from hearing a claim if a plaintiff has failed to exhaust all the available remedies. Grimsley v. Rodriquez, 113 F.3d 1246 (Table), 1997 WL 2356136 (Unpublished Opinion) (10th Cir. May 8, 1997). However, a plaintiff's failure to exhaust his administrative remedies does not deprive the district court of subject matter jurisdiction. Nyhuis v. Reno, 204 F.3d 65, 69 n.4 (3d Cir. 2000) ("...[W]e agree with the clear majority of courts that § 1997e(a) is *not* a jurisdictional requirement, such that failure to comply with the section would deprive federal courts of subject matter jurisdiction.").

The exhaustion requirement is not a technicality, rather it is federal law which federal district courts are required to follow. Nyhuis, 204 F.3d at 73 (by using language "no action shall be brought," Congress has "clearly required exhaustion"). There is no "futility" exception to the administrative exhaustion requirement. Ahmed v. Dragovich, 297 F.3d 201, 206 (3d Cir. 2002) citing Nyhuis, 204 F.3d at 78.

In addition, the United States Court of Appeals for the Third Circuit has explicitly held that the exhaustion requirement of the PLRA includes a procedural default component, by analogizing it to the exhaustion doctrine (with its corollary procedural default component) in the

9

habeas context. Spruill v. Gillis, 372 F.3d 218, 228-229 (3d Cir. June 18, 2004). The Circuit explained:

> We believe that Congress's policy objectives will be served by interpreting § 1997e(a)'s exhaustion requirement to include a procedural default component. Based on our earlier discussion of the PLRA's legislative history, [...] Congress seems to have had three interrelated objectives relevant to our inquiry here: (1) to return control of the inmate grievance process to prison administrators; (2) to encourage development of an administrative record, and perhaps settlements, within the inmate grievance process; and (3) to reduce the burden on the federal courts by erecting barriers to frivolous prisoner lawsuits. Each of these goals is better served by interpreting § 1997e(a)'s exhaustion language to include a procedural default component than by interpreting it merely to require termination of all administrative grievance proceedings.

Id. Having concluded that the PLRA includes a procedural default component, the Court then indicated that "prison grievance procedures supply the yardstick for measuring procedural default." Id. at 231.

### D. Exhaustion and Procedural Default applied

In order to exhaust all of the administrative remedies within the Pennsylvania Department of Correction's ("DOC") grievance system, a grievance must be appealed through all administrative levels of appeal at the inmate's institution and the DOC inmate-initiated grievances must follow the procedures set forth in Administrative Directive 804 ("DC-ADM 804"), which is included as part of the inmate handbook distributed to each inmate. The first step in the grievance process is for the inmate to file a claim with the institution's grievance officer. The grievance officer will investigate a grievance and provide the inmate with an Initial Review Response, which includes "a brief rationale, summarizing the conclusions and any action taken or recommended to resolve the issues raised in the grievance." DC-ADM 804 VI(B)(4). If the inmate is not satisfied with the Initial Review Response, there are two levels of appeal he must pursue to exhaust his claim: (1) an appeal within five days of his receipt of the Initial Review Response to the prison superintendent and, if the appeal is denied, (2) an appeal to the DOC Secretary's Office of Inmate Grievances and Appeals ("DOC Secretary"). DC-ADM 804 VI(C)(1).

In this case, Plaintiff claims that he "filed grievances regarding the removal of [his] z-code and staff dealings," but they "went unresponded to by the Department of Corrections." (See Declaration of Anthony DeFranco attached as Exhibit C to Document # 208, at ¶ 1). Copies of two of these grievances were attached to his original Complaint in this matter. (See Document # 3, Complaint, Exhibits 1 and 2). Plaintiff later submitted a copy of a third grievance he purportedly filed with regard to his z-code status as an attachment to his response to Defendants' objections to this Court's Report and Recommendation, dated October 29, 2004. (See Document # 22, Plaintiff's Appendix and Exhibits, Exhibits C). According to the copies submitted by Plaintiff, these grievances were dated August 25, 2002, December 16, 2002, and March 23, 2004. (Id.).

However, Defendants contend that "[t]he Department of Corrections has no record of any grievances by [Plaintiff] relating to the Z-code issue, and the records reveal that [Plaintiff] never pursued any grievance through final review." (Document # 203, Brief, at p. 34). In support of this contention, Defendants have submitted the Affidavit of Tracy Pollock, Grievance Review Officer at the DOC, who attests to the following, in pertinent part:

> a) [Plaintiff] has not appealed any grievance through the final review stage;
>
> b) there is no record of a grievance relating to Z-code staffing at any time, including on or about August 25, 2002, December 16, 2002, or March 23, 2004. ...

(Document # 203, Exhibit 13 at ¶ 7(a), (b))

DC-ADM 804 outlines the following procedures regarding an inmate's submission of a grievance, and acceptance of the grievance by the Facility Grievance Coordinator:

> A grievance must be submitted to the Facility Grievance Coordinator using the **DC-804, Part 1 - Grievance Form.** All grievances must be signed and dated by the inmate.... All copies, with the exception of the inmate's copy **(GOLDEN ROD)**, shall be forwarded to the Facility Grievance Coordinator. The **PINK** copy will be returned to the inmate, acknowledging acceptance of the grievance.
>
>       *      *      *
>
> The Facility Grievance Coordinator shall assign a grievance tracking number to all grievances (even rejected grievances) upon receipt and enter all grievances into the Automated Inmate Grievance Tracking

11

System....

(See DC-ADM 804 attached to Document # 19, at Sections VI.A.1.f and VI.B.1.a)(emphasis in original). In her affidavit, Tracy Pollock, further reiterates that "[w]hen a grievance is submitted by the inmate, it is immediately assigned a grievance number" and "then proceeds to Initial Review." (Document # 203, Exhibit 13 at ¶ 3).

Notwithstanding the foregoing policy, Plaintiff argues that he "was never issued a grievance number so [he] could not appeal anyone of them." (See Declaration of Anthony DeFranco attached as Exhibit C to Document # 208, at ¶ 1). Thus, Plaintiff would have this Court believe that he properly submitted three different grievances regarding his z-code status, but that, in each case, the Grievance Coordinator refused to assign a grievance number, thus preventing Plaintiff from exhausting his administrative remedies. The only evidence Plaintiff offers to substantiate his claim that he, in fact, filed these grievances is his declaration that each one was accompanied by an affidavit signed by a Notary Public. (See Declaration of Anthony DeFranco attached as Exhibit C to Document # 208, at ¶ 1). However, this fact merely proves that Plaintiff signed each grievance on the date indicated; it does nothing to prove the grievances were actually submitted to the Grievance Coordinator.

DOC's policy dictates that Plaintiff should have received a pink copy of each grievance he submitted for filing. (See DC-ADM 804 attached to Document # 19, Section VI.A.1.f). If a pink copy of each grievance was returned to Plaintiff without a number assigned to it, it is presumed that Plaintiff would have brought this fact to the attention of the Grievance Coordinator; however, there is no evidence of record indicating that Plaintiff ever attempted to do so. On the other hand, Plaintiff may be arguing that he never received a pink acknowledgment copy of any of his z-code grievances, each of which would have borne a grievance number. If this was the case, Plaintiff's apparent working knowledge of the DOC's grievance procedure would certainly have made him aware that the absence of a pink acknowledgment copy meant that the grievance was not accepted for filing. Yet, there is no evidence of record indicating that Plaintiff made any effort to track the progress of these grievances if, in fact, he had submitted them for filing.

Furthermore, this Court takes note that the second grievance purportedly filed by Plaintiff regarding his z-code status, dated December 16, 2002, made no mention of a prior grievance having been filed on August 25, 2002.  Specifically, in response to section B of the December 16, 2002, grievance, which instructed Plaintiff to "[l]ist actions taken and staff you have contacted, before submitting this grievance," Plaintiff merely listed the following:  "Have spoken to psychology (Ms. Bunner & Mr. Reilly) numerous times; Have spoken with the Superintendent and my psychiatrist and unit counselor." (See Document # 3, Complaint, Exhibit 2).  Similarly, the third grievance Plaintiff purportedly filed with regard to his z-code status, dated March 23, 2004, contained no reference to any grievance having been filed previously with regard to the same subject matter. (See Document # 22, Exhibit D).

In short, the record is devoid of any documentary evidence to support Plaintiff's assertion that he ever filed a grievance with regard to the removal of his z-code status, let alone appealed any such grievance through the final review stage.  In any event, Plaintiff has certainly not presented any evidence sufficient to overcome Tracy Pollock's affidavit that Plaintiff failed to file any grievance relating to his z-code status.  As Plaintiff is procedurally barred from doing so now, he has failed to exhaust his administrative remedies with regard to his claims related to the removal and/or failure to reinstate his z-code status.  For this reason, this Court recommends that Plaintiff's retaliation and Eighth Amendment deliberate indifference claims arising from the removal and/or failure to reinstate his z-code status be dismissed.

### E.     Retaliatory Transfer

The only remaining claim to be considered is Plaintiff's retaliatory transfer claim against Defendant Barr.  "Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." See White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990).  "Government actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir.

13

2000).

In order to state a prima facie case of retaliation, a prisoner must demonstrate:

1) the conduct in which he was engaged was constitutionally protected;

2) he suffered "adverse action" at the hands of prison officials[4]; and

3) his constitutionally protected conduct was a substantial or motivating factor in the decisions to discipline him.[5]

Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002), quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Following the satisfaction of a prima facie case of retaliation, the burden then shifts to the defendants to demonstrate, by a preponderance of the evidence, that their actions would have been the same, even if Plaintiff were not engaging in the constitutionally protected activities. Carter, 292 F.3d at 158. "Once a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. In evaluating a prison official's opinion, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

---

[4] To show an "adverse action," the plaintiff must demonstrate that defendants' action were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Allah v. Al-Hafeez, 208 F.Supp.2d 520,535 (E.D. Pa. June 24, 2002), quoting Allah v. Seiverling, 229 F.3d at 225. See also Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) (a plaintiff "need not show a separate, independent injury as an element of the case ... because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, [and] the injury to his right inheres in the retaliatory conduct itself.").

[5] In analyzing the third element of the retaliation test, the court must determine whether there is a causal connection between the exercise of the constitutional rights and the adverse actions. "A suggestive temporal proximity between the protected activity and an alleged retaliatory act may be sufficient to meet the causal link requirement of the prima facia case." Allah v. Al-Hafeez, 208 F.Supp.2d at 535, citing Rauser, 241 F.3d at 330 and Johnson v. Rendell, 56 F.Supp.2d 547, 552 (E.D. Pa. 1999).

Defendants do not dispute that Plaintiff has met the first and second prongs of his retaliatory transfer claim, conceding that "Plaintiff engaged in protected activity when he filed [the present] [law]suit and the March 2005 transfer to SCI-Smithfield would qualify as 'adverse action' in connection with a retaliation claim." (Document # 203, Defendants' Brief, at p. 7).

Defendants argue, however, that Plaintiff "cannot establish that his protected conduct was a 'substantial or motivating factor' in [Defendant] Barr's decision to request an Administrative Separation in February 2005," and, thus, cannot satisfy the third prong of his retaliation claim. In addition, Defendants argue that even if the Court finds that a *prima facie* case has been made, judgment should be entered in their favor in any event when the burden shifts to them to demonstrate that the same transfer would have been made despite the protected conduct. Both of these arguments are based upon Defendants' reasons for the transfer.

Defendants claim that Plaintiff was transferred because he became obsessed with what he perceived as unfair treatment by Defendants. They argue that Plaintiff exhibited obsessive and angry behavior toward any directive issuing from the institution, and especially from Defendant Barr, resulting in an impasse of sorts between Plaintiff and the Grievance Coordinator. In this regard, Defendants have submitted the affidavit of Defendant Barr, dated July 19, 2006, in which Defendant Barr explains that, since this Court's hearing on October 22, 2004:

> 10. [Plaintiff] seemed to become more and more obsessive in his allegations and focus upon my statements and actions. I grew concerned that [Plaintiff] would not be able to accept any decision or recommendation by me or other staff, particularly in the grievance context. I believed that my effectiveness could be compromised, particularly as grievance coordinator, as [Plaintiff] would inevitably view my actions (and the grievance process itself) as tainted or the product of a conflict of interest. Thus, I requested an Administrative/Separation Transfer in mid-February 2005.
>
> 11. This transfer request was not intended to punish or retaliate against [Plaintiff] for filing this lawsuit or pursuing his claim for Z-Code status. Rather, because of [Plaintiff's] irrational mindset and obsessions with my role and decisions (which [Plaintiff] had developed in preceding months), I believed that [Plaintiff] would never believe that he was getting a fair shake at SCI-Albion. In my view, the transfer request would allow him to start fresh and pursue his concerns in a setting free of what he perceived to be conflict of interest and conspiracy.

(Document # 203, Exhibit 2 at ¶¶ 10, 11).

15

Defendants maintain that the motivation for the transfer was not the lawsuit itself, but, rather, the hostility with which Plaintiff interacted with the prison staff, and especially, Defendant Barr, in the aftermath of the z-code decision and the hearings about that decision in this Court. This type of reasoning was upheld as a basis for a prisoner transfer in Burks v. Romine, 85 Fed.Appx. 274, 276 2003 WL 23173709 at *2 (3d Cir. Dec. 2, 2003). In that case, the Third Circuit Court of Appeals upheld a District Court's finding that, where a plaintiff's "own pleadings demonstrate hostility and animosity towards [a prison staff member] ... such a bad relationship between an inmate and a staff member [can] certainly establish[] a legitimate penological interest supporting [a] transfer." Id.

Plaintiff counters that this explanation is simply a *post hoc* attempt to justify the transfer. He cites the language on the Transfer Petition itself, which was initiated by Defendant Barr on or about February 15, 2005. The Transfer Petition provides that "[a]n Administrative/Separation transfer is being requested **due to litigation against William Barr**, SCI-Albion's Superintendent's Assistant." (Document # 192, Exhibit D)(emphasis added). Furthermore, after Plaintiff filed a grievance regarding the transfer, an Initial Review Response was prepared by Ronald J. Bryant and initialed by Defendant Barr, which reiterated that "[i]t is felt that **based on pending litigation** it is in the best interest of all parties that [Plaintiff] not be housed at SCI-Albion." (Document # 192, Exhibit D)(emphasis added). Moreover, Plaintiff points to Defendant Brooks' subsequent acquiescence to Plaintiff's request to be returned to SCI-Albion, only two months after his transfer to SCI-Smithfield, as in conflict with Defendant Barr's explanation of the language used on Plaintiff's transfer request.

In this case, the reasons for Plaintiff's transfer set forth in Defendant Barr's affidavit must be weighed against the simply-stated reason in the Transfer Petition. One conclusion is that the decision to transfer Plaintiff would not have been made but for the filing of this litigation. The Defendants provide conflicting evidence to argue that such a conclusion is too simplistic and does not account for the change in Plaintiff's behavior toward Defendant Barr and others at the institution following the filing of the lawsuit. Weighing the conflicting evidence presented to determine whether Plaintiff has made his case or Defendants have met their burden is precisely

the type of determination that is inappropriate for a court sitting in summary judgment. These questions raising genuine issues of material fact must be left for a jury to decide, as the ultimate factfinder. As a result, this Court recommends the denial of Plaintiff's motion for partial summary judgment [Document # 191], as well as Defendants' cross- motion for summary judgment [Document # 201], as it pertains to Plaintiff's retaliatory transfer claim, and that Plaintiff's retaliatory transfer claim against Defendant Barr be allowed to proceed to trial.

### III.   CONCLUSION

For the foregoing reasons, it is respectfully recommended that:

1. Plaintiff's Motion for Partial Summary Judgment [Document # 191] be denied;

2. Defendants' Cross-Motion for Summary Judgment [Document # 201] be granted in part and denied in part, as follows:

    (a) Summary Judgment should be granted in favor of Defendants with regard to Plaintiff's retaliation and Eighth Amendment deliberate indifferent claims related to the removal and/or refusal to reinstate his z-code status, and such claims should be dismissed, as a result of Plaintiff's failure to exhaust his administrative remedies; and

    (b) Summary Judgment should be denied with regard to Plaintiff's retaliatory transfer claim against Defendant Barr, and such claim should be allowed to proceed to trial against Defendant Barr only;

3. Plaintiff's Cross-Motion for Summary Judgment [Document # 229] be denied.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (c), and Local Rule 72.1.4B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights.

    /s/Susan Paradise Baxter
SUSAN PARADISE BAXTER
Chief United States Magistrate Judge

cc:   The Honorable Maurice B. Cohill
      United States District Judge