IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ANTHONY DEFRANCO, )
        Plaintiff, )
        v. ) C.A. No. 04-230 Erie
         )
WILLIAM WOLFE, et al., ) **District Judge Cohill**
        Defendants. ) **Magistrate Judge Baxter**

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### I. RECOMMENDATION:

It is respectfully recommended that Defendants' Cross-Motion for Summary Judgment [Document # 201] be granted in part and denied in part.

### II. REPORT:

#### A. Relevant Procedural History

On August 10, 2004, Plaintiff Anthony DeFranco, an inmate at the State Correctional Institution at Albion ("SCI-Albion"), filed this civil rights action pursuant to 42 U.S.C. § 1983 against William Wolfe, former Superintendent at SCI Albion ("Wolfe"); Steve Reilly ("Reilly") and Denise Bunner ("Bunner"), Psychologists at SCI-Albion; Rod Showers, Unit Manager at SCI-Albion ("Showers"); Judy Jackson, Counselor at SCI-Albion ("Jackson"); unnamed Defendants identified as Jane Doe and Dr. John Doe; and Jeffrey Beard, Secretary of the Pennsylvania Department of Corrections ("Beard"). Plaintiff subsequently filed an amended and supplemental complaint on March 7, 2005, in which he added Defendants William Barr, Superintendent's Assistant at SCI-Albion ("Barr"), and Marilyn Brooks, current Superintendent at SCI-Albion ("Brooks"). [Document # 76]. Plaintiff later filed a second amended and supplemental complaint on September 7, 2005 ("Second Amended Complaint"), in which he added an additional claim against Defendant Barr. [Document # 114].

In his multiple pleadings, Plaintiff claims that Defendants violated his rights guaranteed by the first, eighth, and fourteenth amendments to the United States Constitution, as follows:

(I) Defendants removed him from "z-code" (single cell) status and placed him in a shared cell with another inmate in retaliation for a misconduct he received for allegedly threatening a prison guard (Document # 3, Complaint, at ¶ 33); (ii) by removing his z-code status, Defendants acted with deliberate indifference to his serious medical needs, which allegedly require his placement in a single cell (Id. at ¶¶ 37-45); and (iii) Defendant Barr transferred him to SCI-Smithfield in retaliation for the filing of this lawsuit (Document # 114, Second Amended Complaint, at ¶ 67). As relief for his claims, Plaintiff seeks declaratory and injunctive relief, in the form of restoration of his z-code status, along with compensatory and punitive damages.

On June 22, 2006, Plaintiff filed a motion for partial summary judgment [Document # 191], requesting that judgment be entered in his favor on his retaliatory transfer claim against Defendant Barr. In response, Defendants filed a cross-motion for summary judgment [Document # 201], along with a brief in opposition to Plaintiff's motion for partial summary judgment and in support of their cross motion for summary judgment. [Document # 204]. In their brief, Defendants argued that: (I) Plaintiff's retaliatory transfer claim against Defendant Barr should be dismissed because the transfer was based on legitimate penological interests and/or "there are issues of fact in dispute as to the element of causation." (Document # 204 at p. 6); (ii) Plaintiff has failed to exhaust his administrative remedies with regard to his retaliation and Eighth Amendment claims concerning the removal of his z-code status in or around August 2002; (iii) Plaintiff has failed to state a claim upon which relief may be granted with regard to his Eighth Amendment claim of deliberate indifference related to the removal of his z-code; and (iv) Plaintiff's retaliation claim, based upon the removal of his z-code, fails to state a claim upon which relief may be granted, because the z-code was not removed in response to Plaintiff's engagement in constitutionally protected activity.

In response to Defendants' cross-motion for summary judgment, Plaintiff filed his own cross-motion for summary judgment, in which he responded to Defendants' cross-motion and requested judgment in his favor on all of his claims. [Document # 229]. Defendants filed a brief in opposition to Plaintiff's cross-motion [Document # 243], and Plaintiff filed a reply brief. [Document # 254].

On February 28, 2007, this Court issued a Report and Recommendation recommending that: (I) Plaintiff's Motion for Partial Summary Judgment [Document # 191] and Cross-Motion for Summary Judgment [Document # 229] be denied; and (ii) Defendants' Cross-Motion for Summary Judgment [Document # 229] be denied with regard to Plaintiff's retaliatory transfer claim against Defendant Barr, but be granted with regard to Plaintiff's retaliation and Eighth Amendment deliberate indifference claims related to the removal and/or refusal to reinstate his z-code status. The latter recommendation to dismiss Plaintiff's z-code-related claims was based solely upon this Court's finding that Plaintiff failed to exhaust his administrative remedies with regard to such claims. [Document # 272].

Plaintiff filed objections to this Court's Report and Recommendation on March 9, 2007, challenging, in part, this Court's finding that Plaintiff failed to exhaust his administrative remedies regarding his z-code-related claims. [Document # 274]. On June 12, 2007, District Judge Maurice B. Cohill issued a Memorandum Order adopting this Court's recommendation that Plaintiff's Motion for Partial Summary Judgment [Document # 191] and Cross-Motion for Summary Judgment [Document # 229] be denied, but rejecting this Court's recommendation that Defendants' Cross-Motion for Summary Judgment be granted in part with regard to Plaintiff's z-code-related claims. [Document # 279]. In particular, Judge Cohill determined that genuine issues of material fact exist with regard to Plaintiff's exhaustion of administrative remedies. (Document # 279 at p. 10). As a result, Judge Cohill "den[ied] summary judgment in favor of Defendants based on the failure to exhaust administrative remedies without prejudice," and recommitted this matter to this Court for consideration of Defendants' remaining arguments in favor of summary judgment with regard to Plaintiff's z-code-related claims. (Id. at p. 12).

**B.     Relevant Factual History**

On or about October 20, 1999, Plaintiff was transferred to SCI-Albion from SCI-Pittsburgh, where he had been housed in a "single cell" unit, due to his inability to cope with

3

having a cell-mate.[1] (Document # 3, Complaint, at ¶ 16; Declaration of William Barr attached as Exhibit 1 to Document # 203, at ¶ 4). Upon his arrival at SCI-Albion, Plaintiff was originally housed with several different cell-mates; however, because of his inability to cope with cell-mates, he was assigned "z-code" status in February 2000, and was placed in a single cell.[2] (Document # 3, Complaint, at ¶ 17).

On March 24, 2002, Plaintiff received a misconduct for threatening to kill a corrections officer and was placed in SCI-Albion's Restricted Housing Unit ("RHU"). (See Declaration of William Barr attached as Exhibit 2 to Document # 203, Defendant's Brief, at ¶ 4). Upon his release from the RHU in April 2002, Plaintiff was assigned to a different housing unit at SCI-Albion to separate him from the corrections officer he had threatened. ( Id. at ¶ 13; Document # 3, Complaint, at ¶ 21).

On June 24, 2002, a staff meeting (referred to as a "staffing") was held to review whether Plaintiff's z-code status should be continued and, by unanimous vote, the staff voted to remove Plaintiff's z-code classification. (Document # 203, Exhibit 3 at p. 2). Plaintiff claims that he learned about the staff's decision to remove his z-code on August 15, 2002, at or around the time he was placed in a double cell, with a cell-mate. (See Document # 14, Transcript of October 22, 2004 hearing, at p. 9).

Subsequently, at Plaintiff's insistence, Angela Lindemuth, D.O. ("Dr. Lindemuth"), SCI-Albion's Correctional Psychiatrist, drafted a memo addressed to the "Z-code Committee," dated September 23, 2002, recommending that Plaintiff "be conferred Z-code status." (See Document # 117, Transcript of December 17, 2004 hearing, at p. 51; Document # 22, Plaintiff's Appendix and Exhibits, App. 3 at p. 1). In her memo, Dr. Lindemuth indicated that she had been treating Plaintiff for panic disorder and generalized anxiety for several years, for which he required

---

[1] A "single cell" is a cell occupied by a single inmate.

[2] A "z-code" is the designation given to an inmate who is deemed to require placement in a single cell.

4

"increasing doses of anxiolytics." (Document # 22, Plaintiff's Appendix and Exhibits, App. 3 at p. 1). Dr. Lindemuth opined further that Plaintiff harbored "antisocial personality disorder traits" that made it difficult for him to contend with a cell-mate, and that "[t]he likely result is [Plaintiff] erupting in an explosive rage." (Id.).

Despite Dr. Lindemuth's memo, the staff's decision to remove Plaintiff's z-code status remained unchanged. Following Plaintiff's repeated requests to his counselor and Dr. Lindemuth, Plaintiff received another z-code staffing on March 10, 2004, at which the majority of staff members voted to disapprove Plaintiff's z-code request. (See Document # 116, Transcript of December 17, 2004 hearing, at pp. 13-14, 47-48; Document # 203, Exhibit 3 at p. 3). As a result, Plaintiff was denied z-code status.

Construed broadly, Plaintiff's z-code-related claims consist of the following:

1. An Eighth Amendment claim for deliberate indifference to a serious medical need against all defendants for not granting him z-code status; and

2. A First Amendment retaliation claim against Defendants Showers and Jackson in connection with the June 2002 vote denying him a z-code.

### C.  Standards of Review

#### 1.  Summary Judgment

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(e) further provides that when a motion for summary judgment is made and supported, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Id.

A district court may grant summary judgment for the defendant when the plaintiff has

failed to present any genuine issues of material fact. See Fed.R.Civ.P. 56(c); Krouse v. American Sterilizer Co., 126 F.3d 494, 500 n.2 (3d Cir. 1997). The moving party has the initial burden of proving to the district court the absence of evidence supporting the non-moving party's claims. Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Country Floors, Inc. v. Partnership Composed of Gepner and Ford, 930 F.2d 1056, 1061 (3d Cir. 1990). Further, "[R]ule 56 enables a party contending that there is no genuine dispute as to a specific, essential fact 'to demand at least one sworn averment of that fact before the lengthy process of litigation continues.'" Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) quoting Lujan v. National Wildlife Federation, 497 U.S. 871 (1990).

The burden then shifts to the non-movant to come forward with specific facts showing a genuine issue for trial. Matsushita Elec. Indus. Co. v Zenith Radio Corp., 475 U.S. 574 (1986); Williams v. Borough of West Chester, Pa., 891 F.2d 458, 460-461 (3d Cir. 1989)(the non-movant must present affirmative evidence - more than a scintilla but less than a preponderance - which supports each element of his claim to defeat a properly presented motion for summary judgment). The non-moving party must go beyond the pleadings and show specific facts by affidavit or by information contained in the filed documents (i.e., depositions, answers to interrogatories and admissions) to meet his burden of proving elements essential to his claim. Celotex, 477 U.S. at 322; Country Floors, 930 F.2d at 1061.

A material fact is a fact whose resolution will effect the outcome of the case under applicable law. Anderson v. Liberty Lobby, Inc. 477 U.S. 242, 248 (1986). Although the court must resolve any doubts as to the existence of genuine issues of fact against the party moving for summary judgment, Rule 56 "does not allow a party resisting the motion to rely merely upon bare assertions, conclusory allegation or suspicions." Firemen's Ins. Co. of Newark, N.J. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982). Summary judgment is only precluded if the dispute about a material fact is "genuine," i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 247-249.

6

### 2. *Pro Se* Pleadings

*Pro se* pleadings, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim if it appears "'beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Haines v. Kerner, 404 U.S. 519, 520-521(1972), quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957). If the court can reasonably read pleadings to state a valid claim on which the litigant could prevail, it should be done so despite failure to cite proper legal authority, confusion of legal theories, poor syntax and sentence construction, or litigant's unfamiliarity with pleading requirements. Boag v. MacDougall, 454 U.S. 364 (1982); United States ex rel. Montgomery v. Bierley, 141 F.2d 552, 555 (3d Cir. 1969)(petition prepared by a prisoner may be inartfully drawn and should be read "with a measure of tolerance"); Smith v. U.S. District Court, 956 F.2d 295 (D.C.Cir. 1992); Freeman v. Department of Corrections, 949 F.2d 360 (10th Cir. 1991). Under our liberal pleading rules, a district court should construe all allegations in a complaint in favor of the complainant. Gibbs v. Roman, 116 F.3d 83 (3d Cir.1997). See, e.g., Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996)(discussing Fed.R.Civ.P. 12(b)(6) standard); Markowitz v. Northeast Land Company, 906 F.2d 100, 103 (3d Cir. 1990)(same).

### D. Discussion
#### 1. Eighth Amendment Claim

In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. Estelle v. Gamble, 429 U.S. 97 (1976). "In order to establish a violation of [the] constitutional right to adequate medical care, evidence must show (I) a serious medical need, and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need." Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need[3] involves the "unnecessary and wanton infliction of pain." Estelle, 429 U.S. at 104. Such indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury" White v. Napoleon, 897 F.2d 103, 109 (3d Cir. 1990).

Mere misdiagnosis or negligent treatment is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. Estelle, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." Durmer, 991 F.2d at 67 (citations omitted).

In this case, Plaintiff argues that he has a serious medical need to be housed in a single cell. In support of this claim, Plaintiff argues that, in February 2000, Defendant Reilly, SCI-Albion's Chief Psychologist, "determined ... that plaintiff required a medical z-code."[4] (See Document # 229, Plaintiff's Cross-Motion for Summary Judgment, at p. 12). Plaintiff notes that he "has had a heart murmur since child birth," and that "[h]e has received continued cardiac care, prior to his incarceration and afterwards." (Document # 229 at p. 12). Plaintiff argues that "anxiety/stress are dangerous for angina sufferers," and that "anyone with cardiac trouble needs to avoid stress and double celling constitutes an obvious stress." (Id. at pp. 12-13). As further support for his claim, Plaintiff alleges that he "was never prescribed nor needed Nitroglycerin or Aspirin due to his cardiac trouble" until June 2003, approximately nine (9) months after his z-code was removed, thus contending that being housed in a double cell exacerbates his heart

---

[3] A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention." Monmouth County Correction Institute Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987).

[4] According to the z-code committee's vote sheet, dated February 7, 2000, Defendant Reilly "highly recommended" that Plaintiff be granted z-code status "due to stress levels." (Document # 203, Exhibit 3 at p. 1).

8

condition. (Id. at p. 13).

Shortly after the filing of this case, Plaintiff filed two separate motions for temporary restraining order ("TRO motions"), seeking immediate restoration of his z-code status. [Document ## 7 and 9]. After a telephone hearing was held on these motions, this Court issued a Report and Recommendation on October 29, 2004, recommending that Plaintiff's TRO motions be granted and that Plaintiff's z-code be reinstated. [Document # 11]. This recommendation was based largely upon Dr. Lindemuth's memos addressed to the "Z-Code Committee," dated September 23, 2002, and August 20, 2004.[5] The Court reasoned at the time that, not only did Dr. Lindemuth's memos warn that Plaintiff's disorder may result in an explosive rage directed at a cellmate, but they also spoke to immediate harm to Plaintiffs own health.

However, at the evidentiary hearing held before this Court on December 17, 2004, with regard to Plaintiff's motion for preliminary injunction [Document # 4], Dr. Lindemuth testified that the "primary purpose" for writing her memos recommending z-code status was "really kind of a supportive therapy" to "appease the inmate." (See Document # 117, Hearing Transcript, at pp. 11-12). In this regard, Dr. Lindemuth explained that "[e]very time [Plaintiff] met with [her], primarily the focus of the interaction was how - - how this cohabitation with another inmate [was] distressing [him]," which became a "stumbling block to ongoing treatment" that she felt could be overcome by writing the recommendation. (Document # 117, Hearing Transcript, at pp. 44, 52). In doing so, Dr. Lindemuth testified that she did not expect her recommendation to be followed by the z-code committee "because [she] knew that mental health criteria weren't going to be considered" and that Plaintiff's "profile ... is very similar to the vast majority of the inmates that are housed in [SCI-Albion]." (Id. at p. 53).

In addition, the Court's concern that Plaintiff's angina condition was linked to his need

---

[5]

Dr. Lindemuth's letter dated August 20, 2004, was attached to Plaintiff's second TRO petition and reiterated her previous recommendation that Plaintiff "be conferred Z-code status," based upon her finding that, since Plaintiff's removal from z-code status and placement in a double cell, he had required increasing dosages of anxiolytics and nitroglycerine to control his anxiety and heart conditions, and his angina had been exasperated. (See Document # 9, attachment 5).

9

for a single cell was essentially refuted at the preliminary injunction hearing. Through the testimony of Sue Anne Rebele, Health Care Manager at SCI-Albion, Defendants demonstrated that Plaintiff's angina did not require increased medication over the period that he was double-celled, but, in fact, Plaintiff's refill orders for nitroglycerin actually decreased during an eighteen month period in 2003 and 2004 when he had a cellmate. (Document # 113, Transcript of December 17, 2004 Hearing, at pp. 57-58).

Because the testimony elicited from Dr. Lindemuth and Nurse Rebele essentially eliminated this Court's previous concern regarding the likelihood of irreparable harm that would be caused to Plaintiff if he was placed in a double-cell, this Court issued a Report and Recommendation on January 19, 2005, recommending, *inter alia*, that Plaintiff's request for preliminary injunction be denied. [Document # 41]. This Report and Recommendation was subsequently adopted by District Judge Cohill by Order dated February 28, 2005. [Document # 62].

Thereafter, in an effort to resurrect Dr. Lindemuth's opinions expressed in her previous memos to the "Z-code Committee," Plaintiff obtained and submitted a Declaration from Dr. Lindemuth, dated October 2, 2005, in which the doctor, once again, expressed her opinion that "[Plaintiff] be housed in a single cell for his safety," because "[h]e internalizes and suppresses his anger of dealing with cellmates which causes him to take increased doses of nitroglycerin" and "causes irreparable harm to his pre-existing heart condition." (Document # 128, Attachment 1; Document # 231, Exhibit G). Plaintiff argues that "[t]his Declaration was signed subsequent to the doctor's testimony and should therefore be considered the doctor's most recent testimony regarding this matter." However, Dr. Lindemuth's hearing testimony cannot be so easily discounted or overlooked. Instead, Dr. Lindemuth's most recent Declaration does more to raise questions regarding her own credibility than it does to clarify the issue of whether Plaintiff does, in fact, have a serious medical need for Z-code status.

Further clouding the issue is the fact that, after Plaintiff was transferred to SCI-Smithfield in 2005, he was granted z-code status based on his "continued need for Mental health treatment and counseling." (Document # 231, Exhibit N). Thus, there is an indication in the record that

Plaintiff was found to have a medical need for z-code status after the entry of Judge Cohill's Order on February 28, 2005.

Plaintiff has also produced a medical report from his brother, Richard J. DeFranco, M.D., dated August 12, 2006, in which Dr. DeFranco opines that Plaintiff needs to be housed in a single cell "due to his physical health, mental health and the probability of his going into an explosive rage on a potential cell-mate." (Document # 231, Exhibit E at p. 2). In addition, Dr. DeFranco declares that "[b]eing double celled also exacerbates [Plaintiff's] heart problems, which causes irreparable harm." (Id.). However biased this opinion may appear based upon Dr. DeFranco's relationship to the Plaintiff, bias only goes to the weight the opinion is given by the factfinder; it does not nullify the opinion altogether.

After considering all of the foregoing conflicting and, at times, contradictory evidence of record, this Court finds that there exists a genuine issue of material fact as to whether Plaintiff has a serious medical need for z-code status, which precludes the entry of summary judgment. The determination of whether Plaintiff has a serious medical need for z-code status, and the ultimate decision as to whether Defendants were deliberately indifferent to such a medical need, if one is found, must be left for the factfinder at trial.

### 2. Retaliation Claim

Plaintiff claims that Defendants removed his z-code status in June 2002, and placed him in a shared cell with another inmate, in retaliation for the misconduct he received on March 24, 2002, for allegedly threatening to kill a prison guard. (Document # 3, Complaint, at ¶ 33). In addition, Plaintiff claims that Defendant Showers' actions were also in response to Plaintiff's threat to sue the DOC for losing some of Plaintiff's property.

"Retaliation for the exercise of constitutionally protected rights is itself a violation of rights secured by the Constitution actionable under section 1983." See White v. Napoleon, 897 F.2d 103, 111-12 (3d Cir.1990). "Government actions, which standing alone, do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right." Mitchell v. Horn, 318 F.3d 523,

11

530 (3d Cir. 2003), quoting Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000).

In order to state a prima facie case of retaliation, a prisoner must demonstrate:

>  1) the conduct in which he was engaged was constitutionally protected;
>
>  2) he suffered "adverse action" at the hands of prison officials[6]; and
>
>  3) his constitutionally protected conduct was a substantial or motivating factor in the decisions to discipline him.[7]

Carter v. McGrady, 292 F.3d 152, 157-58 (3d Cir. 2002), quoting Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Following the satisfaction of a prima facie case of retaliation, the burden then shifts to the defendants to demonstrate, by a preponderance of the evidence, that their actions would have been the same, even if Plaintiff were not engaging in the constitutionally protected activities. Carter, 292 F.3d at 158. "Once a prisoner has demonstrated that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. In evaluating a prison official's opinion, "[p]rison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Bell v. Wolfish, 441 U.S. 520, 547 (1979).

Defendants argue that Plaintiff has failed to meet the threshold requirement of proving

---

[6] To show an "adverse action," the plaintiff must demonstrate that defendants' action were "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Allah v. Al-Hafeez, 208 F.Supp.2d 520,535 (E.D. Pa. June 24, 2002), quoting Allah v. Seiverling, 229 F.3d at 225. See also Dixon v. Brown, 38 F.3d 379, 379 (8th Cir. 1994) (a plaintiff "need not show a separate, independent injury as an element of the case ... because the retaliatory disciplinary charge strikes at the heart of an inmate's constitutional right to seek redress of grievances, [and] the injury to his right inheres in the retaliatory conduct itself.").

[7] In analyzing the third element of the retaliation test, the court must determine whether there is a causal connection between the exercise of the constitutional rights and the adverse actions. "A suggestive temporal proximity between the protected activity and an alleged retaliatory act may be sufficient to meet the causal link requirement of the prima facia case." Allah v. Al-Hafeez, 208 F.Supp.2d at 535, citing Rauser, 241 F.3d at 330 and Johnson v. Rendell, 56 F.Supp.2d 547, 552 (E.D. Pa. 1999).

12

that he was engaged in constitutionally protected activity when he threatened to kill a corrections officer. The Court agrees. While a principal function of free speech under our system of government is to invite dispute and even stir people to anger, Terminiello v. City of Chicago, 337 U.S. 1, 4 (1949), the First Amendment has never protected:

> face-to-face words plainly likely to cause a breach of the peace by the addressee, words whose speaking constitute a breach of the peace by the speaker - including 'classical fighting words,' words in current use less 'classical' but equally likely to cause violence, and other disorderly words, including profanity, obscenity and threats.

Chaplinsky v. State of New Hampshire, 315 U.S. 568, 573 (1942). In particular, "a 'true' threat, where a reasonable person would foresee that the listener will believe he will be subjected to physical violence upon his person, is unprotected by the first amendment." U.S. v. Orozco-Santillian, 903 F.2d 1262, 1265-66 (9th Cir. 1990)(citation omitted)(finding repeated threats to INS agents from deportable alien were unprotected). See also In re Parmalee, 63 P.3d 800, 807-08 (Wash.Ct.App. 2003)(finding inmate's language, referring to correctional officer as a "piss ant" and "shithead" who should be fired "before his attitude gets him fucked up," was a true threat and, thus, not protected speech).

In this case, Plaintiff was found guilty of misconduct for threatening to kill a corrections officer. Although Plaintiff attempted to characterize his threatening comment as a "joke," certainly a reasonable person would foresee that the corrections officer receiving the threat would believe Plaintiff intended to commit "physical violence upon his person," especially considering Plaintiff is a convicted murderer. Accordingly, Plaintiff's threatening comment was a "true" threat unprotected by the First Amendment. Because Plaintiff was not engaged in constitutionally protected activity when he made the threat for which he received a misconduct in March 2002, he cannot claim that any actions allegedly taken by Defendants as a result of the misconduct amounted to retaliation in violation of his constitutional rights. Thus, Plaintiff's retaliation claim related to the June 2002 vote to remove his z-code should be dismissed as it relates to the misconduct that was filed against Plaintiff for threatening to kill a corrections officer.

This is not the case, however, with regard to Plaintiff's claim that Defendant Showers

participated in this alleged retaliation because Plaintiff threatened to sue the DOC:

> Defendant Showers and Jackson began this so-called z-code annual review with the sole purpose to further punish plaintiff for threatening the prison guard **and plaintiff's statement to Showers of his intent to sue the DOC and Showers threat of how he would see how the DOC 'deals with inmates who sue.'**

(Document # 229 at p.3)(emphasis added).

Defendants argue that Plaintiff's comment that he was going to sue the institution for losing his tennis shoes cannot be deemed to be protected activity, and even if it were, that Plaintiff cannot establish that this comment was the substantial motivating factor in voting to remove his z-code status. (Document # 243 at pp. 3-4). In response, Plaintiff claims that the filing or intent to file a grievance or a lawsuit is a constitutionally protected activity and that the timing of the z-code "annual" review, being close to seven months early, is evidence of the motivation. (Document # 254 at pp. 2-3). This Court agrees with Plaintiff.

Initially, the Court finds that Plaintiff's alleged comment to Defendant Showers that he intended to sue the institution for losing his tennis shoes is constitutionally protected speech under the First Amendment. See, e.g., Lindell v. O'Donnell, 2005 WL 2740999 at *30 (W.D.Wis. Oct. 21, 2005)(finding threat to sue corrections officer for abuse was protected speech because it involved a matter of public concern). "It stands to reason that an inmate is more likely to be dissuaded from filing an inmate complaint or lawsuit when his verbalized intention to do so is met with retaliation than when an act of retaliation follows the filing of the grievance or lawsuit." Id.

Second, it is beyond dispute that the removal of Plaintiff's z-code status constituted adverse action, as such action was "sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." Allah v. Al-Hafeez, 208 F.Supp.2d 520,535 (E.D. Pa. June 24, 2002), quoting Allah v. Seiverling, 229 F.3d at 225.

Finally, Plaintiff alleges that a review of his z-code status was begun, at the instance of Defendants Showers and Jackson, only ten days after Plaintiff's alleged comment to Defendant Showers. This temporal proximity between Plaintiff's protected activity and the alleged retaliatory act of removing his z-code, coupled with Plaintiff's allegation that the z-code review

14

began approximately seven months earlier than expected, is sufficient to raise a genuine issue of material fact as to whether the ultimate removal of Plaintiff's z-code status was motivated by Plaintiff's threatening comment to Defendant Showers. See Allah v. Al-Hafeez, 208 F.Supp.2d at 535, citing Rauser, 241 F.3d at 330 and Johnson v. Rendell, 56 F.Supp.2d 547, 552 (E.D. Pa. 1999)("A suggestive temporal proximity between the protected activity and an alleged retaliatory act may be sufficient to meet the causal link requirement of the prima facia case").

Based on the foregoing, therefore, Plaintiff's retaliation claim related to the June 2002 vote to remove his z-code should be allowed to proceed to the extent plaintiff alleges that such retaliation arose from Plaintiff's comment to Defendant Showers that he intended to sue the institution for losing his tennis shoes.

### III.   CONCLUSION

For the foregoing reasons, it is respectfully recommended that Defendants' Cross-Motion for Summary Judgment [Document # 201] be granted in part and denied in part, as follows:

(1) Summary Judgment should be granted in favor of Defendants with regard to Plaintiff's retaliation claim related to the removal of his z-code status in June 2002 allegedly as a result of the misconduct that was filed against Plaintiff for threatening to kill a corrections officer, and such claim should be dismissed;

(2) Summary Judgment should be denied with regard to Plaintiff's retaliation claim related to the removal of his z-code status in June 2002 allegedly as a result of Plaintiff's comment to Defendant Showers that he intended to sue the institution for losing his tennis shoes, and such claim should be allowed to proceed to trial; and

(3) Summary Judgment should be denied with regard to Plaintiff's Eighth Amendment deliberate indifference claim related to the removal of, and refusal to reinstate, Plaintiff's z-code status, and such claim should be allowed to proceed to trial.

Furthermore, in accordance with District Judge Cohill's previous Order dated June 12, 2007 [Document # 279], Plaintiff's retaliatory transfer claim against Defendant Barr should be allowed to proceed to trial.

In accordance with the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B) and (c), and

Local Rule 72.1.4B, the parties are allowed ten (10) days from the date of service to file written objections to this report. Any party opposing the objections shall have seven (7) days from the date of service of objections to respond thereto. Failure to timely file objections may constitute a waiver of any appellate rights. See e.g., Nara v. Frank, ___ F.3d ___, 2007 WL 1321929 (3d Cir. May 8, 2007).

S/Susan Paradise Baxter  
SUSAN PARADISE BAXTER  
Chief United States Magistrate Judge

Date: November 8, 2007

cc: The Honorable Maurice B. Cohill  
United States District Judge