## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ANTHONY DeFRANCO,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civ. No. 04-0230 Erie** |
| | ) **Magistrate Judge Baxter** |
| **WILLIAM WOLFE, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

## OPINION and ORDER

This matter has been referred to United States Magistrate Judge Susan Paradise Baxter in accordance with the Magistrates Act, 28 U.S.C. §§ 636 (b)(1)(A) and (B), and Rules 72.1.3 and 72.1.4 of the Local Rules for Magistrates.

The Magistrate Judge filed a Report and Recommendation (Doc. 288) on November 8, 2007, in which she recommended that Defendants' Cross-Motion for Summary Judgment (Doc. 201) be granted in part and denied in part. The parties were allowed ten days from the date of service to file objections. Service was made on plaintiff by certified mail at SCI Albion, where he is incarcerated, and on Defendants. No objections were filed. This case has also been referred back to the District Court for further proceedings.

On December 11, 2007, Plaintiff filed a Motion for Clarification (Doc. 290), seeking clarification on whether any claims or any defendants have been dismissed from this action. Plaintiff's questions will be answered herein. We note for the record, to address one of

Plaintiff's concerns, that there have been no *ex parte* communications with the Court in this case.

Our de novo review of the entire pleadings and documents in the case show that this action should be dismissed.

In the November 8, 2007 Report and Recommendation (Doc. 288), the Magistrate Judge recommended that Plaintiff's retaliation claim related to the removal of his z-code status in June 2002 allegedly as a result of the misconduct that was filed against Plaintiff for threatening to kill a corrections officer be granted. We agree and thus this claim will be dismissed. The remaining claims and defendants remaining in this action are as follows:

1. Plaintiff's Eighth Amendment deliberate indifference claim related to the removal of, and refusal to reinstate, Plaintiff's z-code status against Defendants Wolfe, Reilly, Brunner, Showers, Jackson, Barr, and Beard.

2. Plaintiff's First Amendment claim that Defendant William Barr transferred Plaintiff in retaliation for engaging in the constitutionally protected activity of filing a lawsuit and for filing internal grievances.

3. Plaintiff's First Amendment retaliation claim related to the removal of his z-code status in June 2002 allegedly as a result of Plaintiff's comment to Defendant Showers that he intended to sue the institution, asserted against Defendants Showers.

We address each of these claims in turn to show that the claims must be dismissed as a matter of law.

2

## I. Eighth Amendment Deliberate Indifference Claim

Plaintiff asserts an Eighth Amendment claim against Defendants alleging that they

were deliberately indifferent to his serious medical need by removing, and refusing to

reinstate, his z-code status.

> Pursuant to the Eighth Amendment's prohibition on cruel and unusual
> punishment, prison officials are required to provide basic medical treatment to
> inmates. See Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir.1999). In order to
> establish a constitutional violation, a prisoner must show that prison officials
> were deliberately indifferent to the prisoner's serious medical needs. See
> Estelle v. Gamble, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).
> The alleged violation must be beyond mere negligence. See Durmer v.
> O'Carroll, 991 F.2d 64, 68 (3d Cir.1993).

Baez v. Stine, 2008 WL 131670, *1 (3d Cir. Jan. 15, 2008).

### A. Whether Recent Documents Create A Genuine Issue of Material Fact

Defendants argued that summary judgment on this claim was appropriate for several

reasons, but ultimately the Magistrate Judge recommended that Defendants' motion be denied

because there were genuine issues of material fact as to whether Plaintiff has a serious

medical need for z-code status. Specifically, the Magistrate Judge cited three instances of

recent record evidence that conflicted with or contradicted earlier record evidence, as follows:

First, Plaintiff introduced a Declaration dated October 2, 2005, signed by Angela

Lindemuth that included three statements:

> (1) She reiterated her professional opinion, as stated in her two earlier reports dated
> September 23, 2002, and August 20, 2004, that Plaintiff not be double celled due to
> his history of violence and impulsivity.
>
> (2) She stated that Plaintiff internalizes and suppresses his anger of dealing with
> cellmates, which causes him to take increased dosages of nitroglycerin, which in turn
> causes irreparable harm to his pre-existing heart condition.

3

(3) She offered her opinion that Plaintiff be housed in a single cell for his safety and the safety of any cellmate.

(Declaration of Angela Lindemuth, October 2, 2005.) These statements could be interpreted as in conflict with Dr. Lindemuth's testimony taken on December 17, 2004.

Second, Plaintiff's "Inmate's Request to Staff Member" dated April 27, 2005, with a "Response" stating that the staff at SCI-Smithfield placed Plaintiff on z-code because of his "continued need for Mental Health treatment and counseling." (Ex. N to Doc. 231.) This appears to conflict with SCI-Albion's determination that Plaintiff did not need z-code status.

Finally, Plaintiff's brother, Richard J. DeFranco, M.D., submitted a "History and Report on Anthony DeFranco," dated August 12, 2006, in which he opined that single cell status is medically necessary for Plaintiff due to his pre-existing heart condition, his psychological inability to cohabitate with another person, and to prevent causing irreparable harm to his heart condition. (History and Report on Anthony DeFranco, August 12, 2006, attached as Ex. E to Doc. 231.) Dr. DeFranco's report apparently conflicts with the medical evidence showing that during the relevant time period z-code status for Plaintiff was not medically necessary.

Our review of these documents in light of the entire record demonstrates that they do not raise a genuine issue of material fact. We will discuss each document in turn.

### 1. Angela Lindemuth's October 2, 2005 Declaration

On November 1, 2004, we adopted the report and recommendation of the Magistrate Judge granting Plaintiff's petitions for a temporary restraining order, and we ordered

4

Defendants to immediately reinstate Plaintiff's z-code status and place him in a single cell at

SCI-Albion. (Doc. 13.)

Our determination was based upon two memos written by Angela Lindemuth to the Z-

Code Committee, one dated September 23, 2002, and the other dated August 20, 2004. (Both

memo's were attached as Exhibits to Plaintiff's Petition for Immediate Temporary Restraining

Order (Doc. 9).) In Dr. Lindemuth's September 23, 2002 Memo she stated as follows:

> I have been treating Anthony Defranco for Panic Disorder and generalized
> anxiety for several years. He has required increasing doses of anxiolytics to
> manage his symptoms. Undoubtedly he also harbors the antisocial personality
> disorder traits, reflected by his prominent history of volatility, impulsivity,
> physical aggression, multiple violent offenses, including murder.

> The inmate relentlessly is plagued by bitterness and resentment, consumed by
> the probability of spending the rest of his life in prison. he asserts that his
> frustration tolerance has reached its limit. Contending with a cell-mate, he
> concedes, will only serve to fuel his brewing anger and agitation. The likely
> result is erupting in an explosive rage.

> My recommendation is therefore that Anthony Defranco be conferred Z-code
> status.

(September 23, 2002 Lindemuth Memo.) Dr. Lindemuth's August 20, 2004 memo, written

two years after the first memo, reproduces the above paragraphs verbatim. The only

substantive difference between the memos is the addition of a one-sentence paragraph before

her recommendation, as follows:

> Internalizing and suppressing anger also exasperates his angina (chest pain
> resulting from decreased blood circulation to the heart), requiring him to take
> more nitroglycerine to dilate the coronary vessels that become constricted by
> the severe episodic hostility.

(August 20, 2004 Lindemuth Memo.)

Subsequent to our Order granting Plaintiff's petitions for a temporary restraining order

Dr. Lindemuth submitted an Affidavit, dated November 8, 2004, in which she explained the

circumstances under which she wrote the earlier memos as follows:

1.  My name is Dr. Angela Palys Lindemuth. I am employed by Mental
    Health Management. I provide service to the State Correctional
    Institution at Albion as a part-time psychiatrist.

2.  I have treated Anthony DeFranco since April 6, 2001.

3.  Each time I met with inmate DeFranco he requested that I support his
    effort to obtain a Z code.

4.  I did, in fact, write a letter to the staffing committee suggesting inmate
    DeFranco be given Z code status. I do stand by the letter of support I
    wrote for inmate DeFranco. However, the letter was a suggestion to the
    committee and was written at the request of inmate DeFranco. I do not
    believe he is special, or warrants any more consideration th[a]n that of
    the majority of the inmates I treat. In this case, it was done only due to
    his request and persistence.

5.  I do not serve on the [z-code] committee, nor have I ever served on a
    prison's custody level staffing committee.

6.  In retrospect, I would not have offered a letter of support for inmate
    DeFranco's Z code due to the fact I feel that he has misused my letter
    and has manipulated his way into single cell status.

(Affidavit of Lindemuth, November 8, 2004, attached to Appendix to Objections to the Report

and Recommendation, at 33 (Doc. 19).) Defendants also pointed out that Dr. Lindemuth's

earlier memos were not diagnoses, nor were they prescription for treatment, but were instead

mere recommendations.

On December 17, 2004, a hearing on Plaintiff's Motion for Preliminary Injunction was

held before Judge Baxter. Following the hearing, the Magistrate Judge issued a Report and

Recommendation, entered January 19, 2005, in which she recommended that all of Plaintiff's

6

outstanding motions related to obtaining injunctive relief be denied. (Doc. 41.) On February

28, 2005, we adopted this Report and Recommendation as the opinion of the Court. (Doc.

62.)

As explained in the Report and Recommendation, "Dr. Lindemuth's testimony at the

December 17th hearing was particularly important since this court based its Temporary

Restraining Order on recommendations, dated September 23, 2002, and August 20, 2004,

urg[ing] that Plaintiff be conferred z-code status." (Doc. 41, at 4.) We summarized Dr.

Lindemuth's testimony as follows:

> At the preliminary injunction hearing, Dr. Lindemuth testified that her
> letter was not interpreted correctly by the court. She stressed that because she
> was unable to move to any topic other tha[n] Plaintiff's z-code status in their
> therapy sessions, and because Plaintiff constantly requested a recommendation
> letter in this regard, she agreed to write this letter as a "therapeutic" measure to
> solidify Plaintiff's trust in her, while at the same time knowing personally that
> Plaintiff would not be given z-code status at any rate. She testified that
> Plaintiff was unlikely to be granted z-code status because there was limited
> space in the institution and Plaintiff's situation was not more dire than many
> other inmates seeking z-code status.
>     Dr. Lindemuth stressed over and over in her testimony that she would
> not have written this letter as an affidavit for the court to base an order
> requiring that Plaintiff be single-celled. She refused to testify that there was
> likelihood of irreparable harm to Plaintiff or others if Plaintiff continued to be
> double-celled, and in fact, testified oppositely. Although Dr. Lindemuth did
> not retract anything she wrote in her letters, she kept insisting in her testimony
> that there was a distinction between using her words as intended - for a staffing
> decision that she was certain would be against Plaintiff - and to support a court
> opinion of irreparable harm. Dr. Lindemuth was adamant that her
> recommendation could not be interpreted to support the latter. In essence, the
> very evidence relied upon by the court to support the TRO was eliminated as
> support for injunctive relief by Dr. Lindemuth herself.

(Doc. 41, at 5.) The above summary was made without benefit of a transcript, which had not

7

been made yet. A representative portion of Dr. Lindemuth's actual testimony from the

hearing, which is consistent with the above summary, is as follows:

> [Dr. Lindemuth:] . . . [The memo] was really directed, and that's how I addressed it, to the Z code committee that makes – – in fact, I conveyed my skepticism of that to  – – to Mr. DeFranco, that it's likely not going to fly and the Z code committee is really going to accept it necessarily because there are so many other individuals, many inmates, that are really very much the same in their demeanor and conduct and history as Mr. DeFranco, that they're unpredictable, they're volatile, they're aggressive, and so on.
>
> And even though ideally all of these inmates would probably be more – – it would be more suitable for these individuals ideally to be in a single cell, it is not practical. So I did convey that to him. I said, well, I can give – – I can give this memo, but don't count on anything changing.
>
> My – – my primary purpose was really kind of a supportive therapy, and that was a – – that was a modality of supportive therapy, which is to – – as a psychiatrist, to validate a patient's concern and to do not just medication therapy, but to put – – to apply any other input or drug medication that I can even though the outcome is – – isn't the – – lies in the hands of the Z code committee.
>
> But just my act of accepting to write this and my willingness and the fact that there's an alliance there and reassurance, it was just, again, a – – amounted really to a supportive therapy. So it wasn't so much the result that was what I intended, it was the act or the process of doing something that would appease – – would appease the inmate.

(Transcript of Motion Hearing, December 17, 2004, at 11-12, Doc. 117.) Throughout the 80

pages of Dr. Lindemuth's testimony she continually reiterated the above explanation for

writing the memos.

Dr. Lindemuth never repudiated her earlier memos, but instead consistently explained

that a single cell was an "ideal" situation for someone like Mr. DeFranco, as well as nearly all

of her inmate-patients who fit a similar profile, but that the practical reality was that she felt it

was unlikely that Mr. DeFranco would be granted z-code status. When asked several times

whether it was her opinion that Plaintiff should be in a single cell, she consistently explained

8

that "ideally" yes, he should be, but that practically he is in prison which has limited facilities with many other inmates who have violent and impulsive behaviors and that it was simply not possible for all such inmates to be granted a single cell.

Turning to Dr. Lindemuth's October 2, 2005 Declaration, we find no conflict or contradiction with her December 17, 2004 testimony or her prior memos recommending that Plaintiff be placed in a single cell. First, in her October 2, 2005 Declaration she reiterated her professional opinion, as stated in her two earlier reports dated September 23, 2002, and August 20, 2004, that Plaintiff not be double celled due to his history of violence and impulsivity. This is consistent with her testimony at the hearing that this was and is her professional opinion.

Second, she stated that Plaintiff internalizes and suppresses his anger of dealing with cellmates, which causes him to take increased dosages of nitroglycerin, which in turn causes irreparable harm to his pre-existing heart condition. Again, this is consistent with her earlier August 20, 2004 Memo in which Dr. Lindemuth stated that "[i]nternalizing and suppressing anger also exasperates his angina . . . , requiring him to take more nitroglycerine to dilate the coronary vessels that become constricted by the severe episodic hostility." During the hearing she testified consistently that she included this information because it "is true [that] suppressing anger is an effect on the angina and it would be in everybody's case." (Id. at 63.) Dr. Lindemuth did not testify as to the actual dosages of nitroglycerin prescribed and taken by Plaintiff over time, but instead explained that she wrote that he was taking more nitroglycerin because Plaintiff told her that he was taking more. (Id. at 64.)

9

Finally, Dr. Lindemuth offered her opinion that Plaintiff be housed in a single cell for his safety and the safety of any cellmate. Again, we find nothing in this statement that is contradictory or inconsistent to Dr. Lindemuth's prior memos or her December 17, 2004 testimony.

This Declaration offers nothing material to the Court that it did not already know. The Court already knows, from the prior memos and her testimony, that Dr. Lindemuth's opinion is that Plaintiff should be single celled. We also know that Dr. Lindemuth is aware that determining z-code status in a prison setting is not based on her opinion, and that she nonetheless is capable of holding that opinion and expressing it in writing when she feels it will be of therapeutic value to the patient. Thus, it is not surprising that Dr. Lindemuth has written a memo consistent with her earlier memos and testimony. She has already repeatedly explained to the Court under oath that although she might believe it is best for an inmate like Plaintiff to be single celled, it is not always possible in a prison setting, and that her opinion on the matter should not be a basis for a Court to dictate to the prison. Based on the above discussion we find that Dr. Lindemuth's October 2, 2005 Declaration does not create a genuine issue of material fact precluding summary judgment.

## 2. Plaintiff's "Inmate's Request to Staff Member"

Plaintiff completed an "Inmate's Request to Staff Member"dated April 27, 2005, in which he inquired of his SCI-Smithfield Counselor Supervisor, F. Campopiano what the "reason or reasons for the approval" of the recent approval of his z-code status. (Ex. N to Doc. 231.) The response, dated April 28, 2005, was that the "Primary reason was your continued need for Mental Health treatment and counseling." (Id.)

10

The actual "Vote Sheet" in which four staff members voted to "continue "Z" code for

Plaintiff also includes a lengthy explanation in its Staff Recommendations section. ('Vote

Sheet," April 18, 2005, attached as part of Ex. 3 to Doc. 203-2.) Significantly, the

recommendations sections set forth the following history with regard to Plaintiff:

> Prior to his arrival at SCI-Smithfield, SCI-Albion circulated a vote sheet on 3-
> 10-04 for a "Z" code, and the Vote Sheet denied the "Z" code. In response to
> this, DeFranco filed a civil action against several SCI-Albion staff members.
> DeFranco has indicated that the "Z" code was ordered by the court to be
> assigned to him. A copy of a Magistrate Judge's Report and Recommendation
> in association with this action, is in his file, and under the Conclusion section
> of that document it indicates that it was the judge's recommendation that,
> "Defendants should be ordered to return Plaintiff to z-code status in a single
> cell at SCI-Albion immediately." Upon his arrival at SCI-Smithfield, a
> temporary "Z" code was assigned at IRC, and on 4-13-05, a PRT was held to
> determine his progress and whether to keep his "Z" code. The consensus of the
> PRT was that he keeps his "Z" code.

(Id.) In light of this explanation, we see no conflict here with SCI-Albion's prior

determination that Plaintiff did not need z-code status.

Clearly, staff at SCI-Smithfield were under the impression that the a federal court had

ordered that this Plaintiff be placed on z-code status and given a single-cell. Given that belief

by staff, we would be surprised had the vote turned out differently. We also see no conflict

with SCI-Albion's determination regarding Plaintiff's z-code status with Mr. Campopiano's

explanation to Plaintiff that a primary reason for the z-code classification was the need for

mental health treatment and counseling. As explained above, it is clear that Plaintiff has a

need for mental health treatment and counseling and that his psychiatrist, Dr. Lindemuth,

thought that a single cell should be given to him. There is no dispute as to whether, in an

ideal situation, Plaintiff would benefit from single cell placement. A prison is not an "ideal"

11

situation and thus prison officials must make z-code determinations based on many factors. The relevant issues are whether Plaintiff has a "serious medical need" for single cell status, and if so, whether Defendants were deliberately indifferent to that need. The fact that SCI-Albion did not grant z-code status while SCI-Smithfield did in light of a federal court order dictating that Plaintiff be given a single cell does not create a genuine issue of material fact as to whether Plaintiff had a serious medical need for z-code status.

### 3. Dr. DeFranco's History and Report on Anthony DeFranco

Plaintiff's brother, Richard J. DeFranco, M.D., submitted a "History and Report on Anthony DeFranco," dated August 12, 2006, in which he opined that single cell status is medically necessary for Plaintiff due to his pre-existing heart condition, his psychological inability to cohabitate with another person, and to prevent causing irreparable harm to his heart condition. (Richard J. DeFranco, M.D., History and Report on Anthony DeFranco, August 12, 2006, attached as Ex. E to Doc. 231.)

We find that Dr. DeFranco's report is not in conflict with the other medical evidence of record. Plaintiff explained that his brother's Report is "consistent with psychiatrist, Dr. Lindemuth's August 20, 2004 Report and her October 2, 2005 Declaration." (Doc. 229, at 14.) We agree with Plaintiff, and as already explained, we find no conflict in Dr. Lindemuth's memos, testimony, or Declaration. Nor do we find that her opinion that Plaintiff should be in a single cell was sufficient to raise a genuine issue of material fact. Dr. DeFranco's opinion that Plaintiff should be in a single cell, even ignoring the fact that he is Plaintiff's brother, is not surprising. No doubt any doctor, ignoring the limitations of the prison setting, would arrive at the same "ideal" conclusion.

12

Dr. DeFranco presented no evidence to show that he actually has treated Plaintiff while he was in prison during the relevant time period at issue. In addition, his opinion is given in a vacuum; that is, he offers no opinion as to why Plaintiff should receive a single cell, but that other inmate-patients in similar situations should not. In contrast, Dr. Lindemuth is Plaintiff's treating doctor. Her memos and testimony show someone who is clearly struggling to balance her treatment and care of Plaintiff with the reality that he is in fact incarcerated. Dr. DeFranco and Dr. Lindemuth offer the same medical opinion, but Dr. Lindemuth's opinion is supported by her long-term treatment of Plaintiff in the prison setting where z-code staffing determinations are made. Dr. DeFranco's opinion differs from Dr. Lindemuth's in that he is Plaintiff's brother and is thus able to provide historical information that comes from such an intimate life-time relationship. Nonetheless, there is no significant information included in Dr. DeFranco's report that has not been presented to the Court through other record evidence. Assuming that Dr. DeFranco's report would be introduced into evidence, we see nothing in it that conflicts or contradicts other record evidence. We thus find that Dr. DeFranco's report does not raise a genuine issue of material fact as to whether Plaintiff had a serious medical need.

Finally, we note that Dr. DeFranco's report is not entirely accurate. He bases his opinion in part on Plaintiff's intake of nitroglycerin over time, stating as follows:

> In or around June of 2003 (about 9 months after being double celled) Anthony DeFranco was prescribed Nitroglycercin (sp), Aspirin and Lopressor for his cardiac condition." He had never needed a blood thinner or Nitroglycercin (sp) for his angina. A review of his records indicate that he was taking more Nitroglycercin (sp) tablets from the time of prescription (June 2003) until he was in a single cell (November/December 2004).
>
> . . .

13

> The prison's forced double celling and removal of his medically needed z-code
> caused him to go on and consume Nitroglycercin (sp) at a rapidly increasing
> rate (based upon a reasonable degree of medical certainty). . . . Notably in
> early 2006, . . . . his Nitroglycercin (sp) intake decreased dramatically. He
> required less than 15 tablets in more than one year.

(Id. at 1-2.)

Sueane Rebele, a nursing supervisor at SCI-Albion, testified regarding Plaintiff's

nitroglycerin intake at the December 17, 2004 hearing, and she verified that Plaintiff was

prescribed the medication for the first time on or about June 19, 2003, nine months after first

being placed in a double cell. (Transcript of Motion Hearing, Dec. 17, 2007, at 57, Doc. 113;

see also copy of prescription labels attached to Ex. BB to Plaintiff's Interim Reply Brief (Doc.

254).) Ms. Rebele also testified that Plaintiff " takes [nitroglycerin] as he needs it." (Id. at

55.) She testified that he is to take one tablet, and if that does not relief his chest pain, he is to

take up to two more tablets at five minute intervals, for a total of three tablets in a fifteen

minute period. (Id. at 55-56.) If his chest pain is not relieved by three tablets within 15

minutes then medical attention is required. (Id. at 56.) She testified that Plaintiff would

receive a prescription for nitroglycerin containing 25 tablets. (Id. at 56.)

After his initial prescription in June 2003, Ms. Rebele testified that Plaintiff received

another prescription of 25 tablets in July 2003, but she was not sure. (Id. at 57.) A copy of

prescription labels attached to Exhibit BB to Plaintiff's Interim Reply Brief suggests that the

first refill may have been in November 2003. (Ex. BB to Doc. 254.) Ms. Rebele also testified

that Plaintiff received a nitroglycerin refill in November 2003. (Transcript of Motion Hearing,

Dec. 17, 2007, at 57.) That 25 tablet prescription lasted Plaintiff for approximately seven

months when he received another 25 tablet refill in June 2004. (Ex. BB to Doc. 254.) The

14

next refill occurred in December 2004 (Id.; Transcript of Motion Hearing, Dec. 17, 2007, at 57.) We have not been given any information to show when Plaintiff refilled his prescription again. According to Dr. DeFranco, by early 2006 Plaintiff had only needed 15 tablets in the prior year. (Dr. DeFranco's Report, at 1-2, Ex. E to Doc. 231.)

If Ms. Rebele was correct that Plaintiff's first refill occurred in July 2003, then Plaintiff needed all 25 tablets in his prescription in one month, indicating that he was experiencing consistent chest pain over a short period of time. However, the record evidence suggests that Plaintiff's first refill was not until November 2003, which means he would have consumed the first 25 tablets in a five month period. His nitroglycerin intake then decreased during the next seven month period as his 25-tablet prescription lasted from November 2003 until June 2004. Plaintiff's next refill, occurred six months later, in December 2004. Thus, contrary to Dr. DeFranco's report, the record evidence does not show that Plaintiff was consuming nitroglycerin "at a rapidly increasing rate", but that he was consuming it a consistent rate, and even at a decreasing rate at one point. While Dr. DeFranco is correct that Plaintiff began nitroglycerin in June 2003 nine months after he was double celled, he is otherwise in error as to the consumption rate of the nitroglycerin.

Dr. DeFranco also identifies Plaintiff has having been diagnosed with mitral valve prolapse, and that he has had numerous Electrocardiograms, Echocardiograms, and Stress Tests. However, Dr. DeFranco never mentions the results of any of these tests. In contrast, Mark Baker D.O., the Medical Director of SCI-Albion, provided the following information about Plaintiff's tests

15

• a May 1996 Echocardiogram showed only clinically insignificant trace bicuspid regurgitation.

• a 1997 stress test had negative results.

• a May 2003 EKG was clinically insignificant.

• a January 2004 Echocardiogram that reflected only trace mitral insufficiency but no definitive evidence of mitral valve prolapse, mitral stenosis or obstructive cardiomyopathy.

(Declaration of Mark Baker, D.O., August 1, 2006, at ¶¶ 4-5, attached as Ex. 7 to Defendants' Brief in Support.)  Dr. DeFranco makes no effort to address these tests results.

These discrepancies between the record evidence and Dr. DeFranco's summarization of the evidence raise a serious question as to the reliability of his report.  In addition, Dr. DeFranco is not Plaintiff's treating physician, and is not privy to all relevant medical record evidence regarding Plaintiff.  We disagree with Dr. DeFranco that his knowledge of Plaintiff's medical history and records prior to Plaintiff's arrival at SCI-Albion, combined with his telephone conversations with Dr. Reilly and Dr. Lindemuth and his attendance at the December 17, 2004 hearing, render him "more than qualified to render a true, correct and accurate medical opinion in this case." (Declaration of Richard DeFranco, M.D., November 26, 2006, Ex. BB.)  In light of the other medical evidence of record, we find that no reasonable fact-finder could conclude that Plaintiff has a serious medical need for z-code status based on Dr. DeFranco's reports.

We have concluded that the above three pertinent documents do not create a genuine issue of material fact.  Thus, the question remains whether Plaintiff has a serious medical need

16

to be housed in a single cell, and if so, whether prison officials were deliberately indifferent to Plaintiff's serious medical need.

## B. Whether Plaintiff Has a "Serious Medical Need" for Z-code Status

The record reveals that in 1986, Plaintiff was given a diagnosis of Mixed Personality disorder with features of the borderline paranoid. (December 17, 2004 Lindemuth Testimony, at 37.) In 1990 he was diagnosed with Adjustment Disorder with Depression. (Ex. 9 to Defendants' Cross Motion, at Answers at ¶ 6.) Shortly after that diagnosis the same doctor gave Plaintiff a diagnosis of Adjustment Disorder with Anxiety and Anorexia. (Id.) He was diagnosed by Dr. Lindemuth with Panic Disorder without Agoraphobia in 2001, which continued as his diagnosis through 2005. (Id.) In 2005, he was diagnosed by a Dr. Longstreet with Panic Disorder with Agoraphobia, and in 2006 Dr. Longstreet changed Plaintiff's diagnosis to Delusional Disorder. (Id.) According to SCI-Albion psychologist Denese Bunner, "there was never any significant mental illness and/or mental health diagnosis of inmate DeFranco generated by the Psychology Department." (Ex. 8, at Answers at ¶ 9.)

A physical exam from September 2003 revealed that Plaintiff had no complaints and he was stable. (December 17, 2004 Rebele Testimony, at 59.) A May 2004 physical showed that Plaintiff had voiced no complaints. (Id.) In October 2004, he complained of a knee problem from falling out of his bunk, but no other problems were mentioned. (Id. at 59-60.)

Dr. Baker prescribed nitroglycerin for Plaintiff in June 2003, for "atypical chest pain." (Baker Declaration, at ¶ 5.) Ms. Rebele explained as follows:

> Nitroglycerin is taken for chest pain. It's typically prescribed for angina, which is a non-specific chest pain. However, while reviewing his chart, Dr. Baker did make note that he has nontypical angina pectoris, okay, which he correlates

17

with anxiety and not actual chest pain.

(December 17, 2004 Rebele Testimony, at 54.) She further testified that Plaintiff does not take nitroglycerin for his high blood pressure or his mitral valve prolapse, but that he takes it for anxiety. (Id.)

Dr. Baker states that he disagrees with Plaintiff's opinion "that his heart condition is aggravated by the anxiety he experiences when double celled." (Baker Declaration, at ¶ 6.) Dr. Baker also opined that Plaintiff "does not have such a [serious medical] condition warranting single cell status," but if Plaintiff did have such a condition Dr. Baker "would inform staff involved in the Z-code review." (Id., at ¶ 7.) Finally, Dr. Baker felt that it was better for Plaintiff to have a cellmate, who would be able to call for help should Plaintiff have a problem. (Id. at ¶ 6, and Testimony of Sue Ann Rebele, October 22, 2004, at 6.)

To show that he does have a serious medical need for z-code status, Plaintiff relies primarily on Dr. Lindemuth's memos, his brother's Report, and the nitroglycerin that was only prescribed after his z-code status was removed. We have addressed these issues above.

Dr. Lindemuth's memos cannot be viewed in a vacuum. Her testimony clearly explains the reasons why she authored the memos, that she stands by her recommendations that Plaintiff should be given z-code status, that many other inmates present with similar conditions who would benefit from z-code status, and that she is well-aware that only a small percentage of inmates can be given z-code status. Significantly, Dr. Lindemuth has never stated that Plaintiff has a "serious medical need" for z-code status. In response to Plaintiff's question "Do you believe that I should be in a single cell or a double cell?" Dr. Lindemuth stated:

18

> Well, that's a difficult - - ideally, optimally - -
> . . .
>
> Ideally, anyone of your profile would be better off - - see, my problem is that, yeah, we can talk in ideal and optimal terms, but how is that possible? . . .
>
> . . . what I am saying is that anyone that represents this profile would be better off in a single cell. I mean, that is a no-brainer.

(Lindemuth Testimony, at 43-44.) The following exchange then occurred:

> THE COURT: And my question is: Would he be more appropriate for a single cell than your other patients?
>
> A. No. I have individuals that are of - - have the same history, the same presentation, except that they don't - - even though they do begrudge the fact that [they] are in - - that they are cohabiting, they just never have made that the sole, prominent [issue] in their sessions that we have and never requested that I intervene.

(Id. at 44.) Dr. Lindemuth also explained that she wrote the memo recommending z-code status because it would allow Plaintiff to move beyond his singular focus on z-code status during his meetings with Dr. Lindemuth. (Id. at 44-45.) Dr. Lindemuth consistently repeated these explanations throughout her testimony.

Dr. DeFranco's report is not inconsistent with Dr. Lindemuth's opinion, but fails to account for the physical limitations of a prison institution in light of the number of inmates who might be appropriate for z-code status. As already discussed, there are serious deficiencies in Dr. DeFranco's report that make it unreliable as evidence sufficient to raise a genuine issue of material fact. We repeat that we find that no reasonable fact finder could conclude that Plaintiff has a serious medical need for z-code status based on Dr. DeFranco's report, in light of the other, more complete, medical evidence of record.

Finally, the record evidence in regard to the nitroglycerin intake is clear and does not raise a genuine issue of material fact. Plaintiff's interpretation of his intake of nitroglycerin, like Dr. DeFranco's report, mistakenly cites an increasing rate of consumption when the record evidence shows a consistent rate of consumption. At best, Plaintiff points out that he was never prescribed nitroglycerin until nine months after he was double celled. Dr. Baker explained that he prescribed the nitroglycerin for Plaintiff, and had he felt that it was medically necessary that Plaintiff be in a single cell he would have informed the z-code committee. The only evidence produced by Defendant to refute Dr. Baker's opinion is the unsupported and insufficient report of Dr. DeFranco.

Plaintiff does criticize Dr. Baker's assertion that he prescribed nitroglycerin for Plaintiff's anxiety, since nitroglycerin is only prescribed for chest pains. (Plaintiff's Cross Motion for Summary Judgment, at 13.) However, Dr. Baker did state that he prescribed nitroglycerin to Plaintiff for his chest pain. (Baker Declaration, at ¶ 5.) Dr. Baker also relied on medical records and test results to show that Plaintiff's chest pains are related to anxiety, not actual cardiac chest pain. (Id. at ¶¶ 3, 4, & 5.) Thus, Dr. Baker's opinion was that Plaintiff's anxiety was not aggravating his heart condition, and Dr. Baker relied on medical records for his opinion. (Id. at ¶ 6.)

The medical evidence shows that Plaintiff does not have a serious need for z-code status. Plaintiff's strong desire to be in a single cell amounts to a difference of opinion over the preferred course of treatment. We thus find that the record evidence demonstrates that there is no genuine issue of material fact that Plaintiff does not have a serious medical need for z-code status.

## C. Deliberate Indifference

Assuming that Plaintiff was able to demonstrate a serious medical need for z-code status, we also find that he cannot establish that prison officials were deliberately indifferent to his serious medical need. The record evidence shows that the medical staff took Plaintiff's physical and mental health into consideration throughout the relevant time period. Dr. Lindemuth has sufficiently explained her memos recommending that Plaintiff be placed on z-code status, and that they were not to be taken as directives. In any event, her memos were not ignored by prison officials. Plaintiff cannot show that Defendants were deliberately indifferent to a serious medical need.

## II. Retaliatory Transfer Claim Asserted Against Defendant Barr

Plaintiff asserts a claim against Defendant William Barr alleging that Defendant Barr transferred him from SCI-Albion to SCI-Smithfield in retaliation for filing a lawsuit and for continuing to pursue z-code status in violation of his constitutionally protected rights. We have previously reviewed this issue when we denied both Plaintiff's and Defendants' motions seeking summary judgment on this claim. Because we are convinced that summary judgment is appropriate on this issue, we will vacate our prior Order dated June 12, 2007 (Doc. 279), insofar as we denied Defendants' Cross-Motion for Summary Judgment on Plaintiff's retaliatory transfer claim.

In Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001), the Third Circuit "set forth with specificity the elements of a prisoner's cause of action for retaliation and the burden of proof he must carry to succeed." Rauser, 241 F.3d at 333. "As a threshold matter, a prisoner-plaintiff in a retaliation case must prove that the conduct which led to the alleged

21

retaliation was constitutionally protected." Id. "Next, a prisoner litigating a retaliation claim must show that he suffered some 'adverse action' at the hands of the prison officials." Id. Once the first two elements are satisfied, a plaintiff must prove "a causal link between the exercise of his constitutional rights and the adverse action taken against him" Id.

Because Defendants concede that Plaintiff has met the first two elements, we focus on the causation element, which itself consists of a burden shifting framework. The framework first requires Plaintiff to prove that his conduct was a substantial or motivating factor in Defendant Barr's decision to transfer him. Id. (see also Carter v. McGrady, 292 F.3d 152, 158 (3d Cir. 2002).) The burden then shifts to Defendant to "prove by a preponderance of the evidence that it would have taken the same disciplinary action even in the absence of the protected activity." Rauser, 241 F.3d at 333. In the prison context, "courts should afford deference to decisions made by prison officials, who possess the necessary expertise." Id. at 334. Thus, a "prison regulation that impinges on the constitutional rights of an inmate is valid if it is 'reasonably related to legitimate penological interests.'" Id. (quoting Turner v. Safley, 482 U.S. 78, 89 (1987)).

The Third Circuit explained this final aspect of the burden shifting framework as meaning that "once a prisoner demonstrates that his exercise of a constitutional right was a substantial or motivating factor in the challenged decision, the prison officials may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 334. "The Third Circuit has recently instructed district courts to 'be diligent in enforcing these causation requirements' in recognition of the fact that public actors 'must make a large

22

number of decisions in charged atmospheres thereby inviting litigation against themselves in

which plaintiffs ask the courts to second guess the actor's decisions.'" Lauren W. v.

DeFlaminis, 480 F.3d 259, 267-68 (3d Cir.2007). Ebersole v. Pennsylvania, 2007 WL

2815730, \*5 (M.D.Pa. Sept. 25, 2007).

## A. Whether Plaintiff's Exercise of a Constitutional Right Was a Substantial or Motivating Factor in Defendant Barr's Decision to Transfer Plaintiff

Plaintiff must first establish that the filing of his lawsuit was a substantial or

motivating factor in Defendant Barr's request for a transfer.

Plaintiff filed the instant lawsuit on August 10, 2004. On October 22, 2004, a

telephonic hearing was held to consider Plaintiff's motions for a temporary restraining order,

and the matter was taken under advisement. During the hearing, the Court and Mr. Barr had

the following exchange:

THE COURT: What I meant is, would it be something that is considered for someone like Mr. DeFranco because of his psychiatric diagnosis rather than the secondary heart ailment that apparently stems from the psychiatric illness?

MR. BARR: Your Honor, what happens in staffings is, it's like a puzzle and everybody weights in on it in order to complete the entire picture. Certainly the psychological staff here - - they're seeing Mr. DeFranco. They're getting a small snapshot of his actual behavior and time on the housing unit. The people that actually live there with him, the unit manager, the counselor, the officers that are there on the block watching his interaction and stuff, those are the opinions that we certainly take a look at when formulating whether or not a Z Code is warranted. Do we take into consideration what the psychiatrist said, absolutely. But do we defer our responsibility to the psychiatrist, no, we do not.

THE COURT: What I was getting at is simply this: Is it something like you have 12 Z Code single cells and you sit there and you think, well, perhaps DeFranco needs to go into one, but you know, Y, B, and F prisoners are worse. So because we don't have any more Z Code cells, we'll hold him off until there's a space?

23

MR. BARR: No. We can actually shift Mr. DeFranco to a Z Code cell if necessary.

(Transcript of hearing, October 22, 2004, at 21-22. (Doc. 14).)

On October 23, 2004, before the Court issued a ruling on the temporary restraining order, Plaintiff filed a Petition for Immediate Temporary Restraining Order to enjoin Defendants from transferring him out of SCI-Albion. Plaintiff based his request for a restraining order on a conversation he had with Defendant Barr after the October 22, 2004 hearing, in which Plaintiff alleges that Defendant Barr "made a specific threat to plaintiff, stating 'there will probably be a single cell available for you at SCI-Dallas.'" (Petition for Immediate Temporary Restraining Order, at ¶ 4. (Doc. 9).) According to Plaintiff, Mr. Barr's statement implied that Plaintiff "will be transferred from this prison, where he is near his family, to a prison far away as a means of retaliation for the filing of this lawsuit." (Id.)

On October 29, 2004, the Magistrate Judge issued a Report and Recommendation, in which she recommended that Plaintiff's two motions for a temporary restraining order be granted and that Defendants be (I) ordered to return Plaintiff to z-code status and place him in a single cell at SCI-Albion, and (ii) ordered to refrain from transferring Plaintiff in response to his request for placement in a single cell. (Doc. 11, at 6.) On November 1, 2004, the Court adopted the Report and Recommendation as the opinion of the Court. (Doc. 13.) We note that we adopted the Report and Recommendation prior to the date when objections to the report were due because the matter concerned granting temporary restraining orders. Unfortunately, this meant the Court did not consider Defendants' timely filed objections before adopting the Report and Recommendation.

24

Defendant Barr submitted a Declaration, dated November 8, 2004, attached as an

exhibit to Defendants' Appendix to Objections to the Report and Recommendation, and also

attached as Exhibit 1 to Defendants' Brief in Support of Cross Motion for Summary

Judgment. In his Declaration, Mr. Barr explained that he did in fact have a conversation with

Plaintiff after the October 22, 2004 hearing. (November 8, 2004 Barr Declaration, at ¶ 12.)

The conversation occurred in the presence of Sueane Rebele, who also testified at the October

22, 2004 hearing. (Id.) Mr. Barr recounted the conversation as follows:

> Specifically, the following was said, I explained to inmate DeFranco that we
> look at the Department as a whole when looking for bed space, rather than an
> individual facility. I went on to explain that if he was given a Z code we could
> not guarantee that the cell would be at SCI-Albion. I explained that the single
> cell could be, for instance, at SCI-Dallas. To the extent that I made reference
> to SCI-Dallas, that was not said in any way to communicate a threat. It was
> nothing more than an observation of the reality of the situation at that time. To
> the extent that inmate DeFranco asserts that I specifically testified that there
> existed an opening within the Z-Code cells that he could move into without
> displacing any other inmate, that is simply not true. I do not recall testifying in
> that regard at all, and can only assume that what was said by me may have been
> misinterpreted by inmate DeFranco. On the date of the telephone conference,
> there was no opening in a Z-Code cell at SCI-Albion, nor is there one today.

(Id.; see also Declaration of William Barr, July 19, 2006, at ¶ 8, attached as Ex. 2 to

Defendants' Brief In Support of Cross Motion.) Defendants argue that Mr. Barr did not

threaten Plaintiff with a transfer to another institution *even if* there was a Z-Code cell available

at SCI-Albion, but rather he merely explained to him the practical reality of the space

limitations in the institution with regard to available single cells.

To support their position, Defendants include an Affidavit from Sueane Rebele, the

Health Care Administrator at SCI-Albion, who witnessed the conversation between Mr. Barr

and Plaintiff, and stated,

[Mr. Barr] told inmate DeFranco that if his Z Code is granted there is no guarantee that the single cell would be at SCI-Albion. He said the first cell open could be at an institution like SCI-Dallas. he explained to inmate DeFranco that to his knowledge, all of the single, general population cells, are currently full at SCI-Albion. The tenor of Mr. Barr's demeanor was one of explanation as to how housing and cell assignment is facilitated in the Department of Corrections. Inmate DeFranco thanked Mr. Barr for his time and returned to the housing unit.

(Affidavit of Sueane Rebele, November 8, 2004, attached as an exhibit to Defendants'

Appendix to Objections to the Report and Recommendation, and also attached to Defendants'

Brief in Support of Cross Motion for Summary Judgment.)

Defendants also explain that Mr. Barr's testimony on October 22, 2004, in which he

stated that the prison, that is, SCI-Albion, could shift Plaintiff to a single cell if necessary,

means nothing more than what it says in the context of the hearing: if the Court orders that

Plaintiff be placed in a single cell, then SCI-Albion could accommodate such an Order. Mr.

Barr explained his testimony as follows:

In making that response, my intent was to explain what could be done at Albion on a temporary basis, if so ordered by the Court. If the Court understood my response to suggest anything else, *i.e.*, that Albion had a permanent Z-code cell opening, I regret not being clearer.

(Declaration of William Barr, July 19, 2006, at ¶ 6, attached as Ex. 2 to Defendants' Brief In

Support of Cross Motion.) Significantly, the above-referenced testimony did not concern

whether Plaintiff would be transferred.

When Mr. Barr was made aware that the Court had granted the temporary restraining

order and had ordered Defendants to place Plaintiff in a single cell, the prison did in fact

classify Plaintiff with a Z code. (July 19, 2006 Barr Declaration, at ¶ 7.) As expected,

however, there were no Z Code cells available, so an inmate in one of the single cells was

26

asked to move to a higher custody level unit. (Id.) When the inmate refused, he was sent to

the Restricted Housing Unit for disobeying a direct order, which freed up a single cell into

which Plaintiff was placed. (Id.)

Following the December 17, 2004 hearing, the Court issued a Report and

Recommendation denying Plaintiff's various motions for injunctive relief and his motion to

vacate, the Court stated in a footnote as follows:

> Plaintiff also seeks a preliminary injunction to stop any retaliatory transfer to
> another institution, and specifically to SCI Dallas, where Plaintiff claims
> Defendant Barr threatened to send him following his successful TRO motion.
> *The Court accepts Defendant Barr's testimony that no such transfer is
> planned*: "I explained to inmate DeFranco that we look at the Department as a
> whole when looking for bed space, rather than an individual facility. I went on
> to explain that if he was given a Z code we could not guarantee that the cell
> would be at SCI-Albion. I explained that the single cell could be, for instance,
> at SCI-Dallas. . . . On the date of the telephone conference, there was no
> opening in a Z-Code cell at SCI-Albion, nor is there one today." Affidavit of
> William Barr, November 8, 2004 at ¶ 12.

(Doc. 41. at n.2 (emphasis added.) We agree with Defendants that we misinterpreted

Mr. Barr's testimony in part. (Defendants' Brief in Support of Cross Motion, at 13.) Mr. Barr

did not testify that "no such transfer is planned," but rather his testimony quite clearly states

that he explained to Plaintiff that he could not guarantee that a single cell would be available

at SCI-Albion. Viewed in context, it makes sense that at the time of the conversation Mr.

Barr was not planning on transferring Plaintiff, but it is also clear that his testimony concerned

the practical institutional realities regarding the availability of single cells. Consistent with

his testimony, when the Court did order that Plaintiff be given a single cell, he was shifted

into a single cell at SCI-Albion only after another inmate was displaced.

27

The January 19, 2005 Report and Recommendation was adopted by the Court on February 28, 2005. (Doc. 62.) We note that the rulings contained in the Report and Recommendation were all against Plaintiff and in favor of Defendants. That is, we did not grant Plaintiff's requests for injunctive relief regarding his z-code status.

In early March 2005, Plaintiff was transferred from SCI-Albion to SCI-Smithfield, which is the subject of Plaintiff's retaliatory transfer claim. Shortly after the March 2005 transfer Plaintiff filed a motion for a temporary restraining order in which he requested that the Court order his transfer back to SCI-Albion. (Motion for Temporary Restraining Order, Doc. 68). In this motion, Plaintiff cited footnote 2 from our January 19, 2005 Report and Recommendation and stated it as meaning that the "Court accepted Mr. Barr's testimonial via his declaration that Plaintiff would not be transferred." (Doc. 68, at ¶ 3.) As noted, our misstatement of his testimony was actually that we accepted Defendant Barr's testimony that "no such transfer is *planned*." We never said that Mr. Barr testified that Plaintiff "would *not* be transferred." That is a mischaracterization of our (erroneous) statement in footnote 2. Mr. Barr's testimony was offered solely to explain the October 22, 2004 conversation, it was not offered as a promise for the future. Simply put, there is no testimony from Mr. Barr that Plaintiff would not be transferred.

During the April 21, 2005 hearing to address Plaintiff's requests for injunctive relief regarding his transfer, Plaintiff again repeated this mischaracterization as follows:

. . . you took the declaration from Mr. Barr and in your recommendation to deny the temporary restraining order and leave me at Albion you accepted the declaration as true, that there was no planned transfer for me.

(Transcript of April 22, 2005 Hearing, at 23.) Unfortunately, we continued our

28

misunderstanding of Mr. Barr's testimony when we stated, "When he told me he had no plans to transfer you, I believed him." (Id. at 23-24.)

As previously stated, the correct interpretation of Mr. Barr's Declaration is as testimony given to explain a single conversation with Plaintiff that occurred in the presence of Sueane Rebele following the October 22, 2004 hearing. This conversation prompted Plaintiff to file an additional motion for injunctive relief as he viewed Mr. Barr's words as a threat to transfer him. Mr. Barr offered declaratory testimony to explain that he did not threaten Plaintiff with a transfer, but rather explained to him that single cell space is limited and thus there was no guarantee that a single cell would be available at SCI-Albion. Ms. Rebele backed up this explanation in her own affidavit. When we issued our initial opinion and order granting the temporary restraining order we did so without the benefit of Mr. Barr's and Ms. Rebele's explanatory testimony. It was our mistake to extend Mr. Barr's limited testimony regarding a brief conversation he had before the Court had made any substantive ruling, to mean a promise of no transfer in subsequent unrelated hearings.

Plaintiff notes that he was transferred approximately one week after his Objections to the January 19, 2005 Report and Recommendation were denied and the Report and Recommendation were adopted by the Court, thereby setting up a causal connection between the Court's Order and his transfer. (April 21, 2005 Hearing, at 6.) Plaintiff's presentation of his retaliatory transfer claim is as follows:

(1) Mr. Barr threatens that Plaintiff will be transferred, perhaps to SCI-Dallas right after the October 22, 2004 hearing;

(2) Plaintiff files a motion for injunctive relief to stop any transfer out of SCI-Albion because of this comment;

29

(3) the Court issues a Report and Recommendation dated October 29, 2004 recommending, in part, that "Defendants should be ordered to refrain from transferring Plaintiff to another correctional institution in response to his request for placement in a single cell" (Doc. 11, at 6);

(4) the Court adopts the Report and Recommendation on November 1, 2004;

(5) the Court's January 19, 2005 Report and Recommendation and February 28, 2005 Order ultimately deny Plaintiff's requests for injunctive relief, which means that the prior order not to transfer Plaintiff is no longer in effect;

(6) with no Court order restraining Mr. Barr from making a transfer, Plaintiff is transferred to SCI-Smithfield in early March 2005.

Therefore, according to Plaintiff, Mr. Barr transferred him in retaliation for pursing his z-

code status.

In light of our clarification, Plaintiff's retaliatory transfer claim is more properly

framed as follows:

(1) Mr. Barr and Plaintiff have a conversation in the presence of Ms. Rebele after the October 22, 2004 hearing in which Mr. Barr explained that single cell beds at SCI-Albion were limited and that there is no guarantee that one would be available;

(2) Plaintiff believes this is a threat to transfer him so he files a motion for injunctive relief to stop any transfer out of SCI-Albion;

(3) without benefit of Mr. Barr or Ms. Rebele's testimony the Court issues a Report and Recommendation dated October 29, 2004 recommending, in part, that "Defendants should be ordered to refrain from transferring Plaintiff to another correctional institution in response to his request for placement in a single cell" (Doc. 11, at 6);

(4) the Court, without benefit of Mr. Barr or Ms. Rebele's testimony, and without permitting Defendants to file objections, adopts the Report and Recommendation on November 1, 2004;

(5) Plaintiff is placed in a single cell at SCI-Albion that was freed up when the inmate occupying the cell was sent to the RHU for refusing to leave the cell;

30

(6) the November 1, 2004 Temporary Restraining Order expired after ten days, however Plaintiff remained in a single cell at Albion;

(7) following the December 17, 2004 preliminary injunction hearing the Magistrate Judge issues a January 19, 2005 Report and Recommendation recommending denial of Plaintiff's request for injunctive relief in favor of Defendants;

(8) in the course of denying injunctive relief the Court erroneously mischaracterizes Mr. Barr's testimony as a promise that no transfer of Plaintiff is planned;

(9) on February 15, 2005, Mr. Barr requests that Plaintiff be transferred, the transfer request is approved on February 23, 2005, before the Court adopts the January 19, 2005 Report and Recommendation;

(10) on February 28, 2005, the Court adopts the January 19, 2005 Report and Recommendation and Plaintiff's requests for injunctive relief are denied;

(11) Plaintiff is transferred to SCI-Smithfield on or about March 8, 2005.

In light of Mr. Barr's reasons for requesting that Plaintiff be transferred we conclude that Plaintiff's engaging in the protected activity of filing a lawsuit and pursuing z-code status were not a "substantial or motivating factor" in his decision. The question we must address is whether Mr. Barr requested the transfer with the intent to punish Plaintiff for filing a lawsuit and/or in retaliation for pursuing z-code status. Floyd v. Dugal, 2003 WL 23101802 (E.D.Pa. Dec 16, 2003), *affirmed*, 112 Fed.Appx. 865 (3rd Cir. 2004).

One of Plaintiff's key arguments that the transfer was retaliatory is his assertion that Mr. Barr directly threatened Plaintiff with a transfer after the October 22, 2004 hearing. As explained above, Plaintiff has been able to maintain the apparent viability of this argument in part because the Court mischaracterized Mr. Barr's testimony. We now find that Mr. Barr did not threaten to transfer Plaintiff during the conversation following the October 22, 2004

31

hearing. We accept that Mr. Barr was merely explaining the reality of the limited single cell

beds within the institution. Ms. Rebele was a witness to this conversation and confirms Mr.

Barr's version of the conversation. In response, Plaintiff has only offered an allegation that

Ms. Rebele may not have been present during all of the conversation between Mr. Barr and

Plaintiff, and even then he has not presented any evidence to show that Ms. Rebele's

testimony is inaccurate.

Moreover, Mr. Barr's interaction with Plaintiff over time does not reveal any history of

antagonism towards Plaintiff. Plaintiff does not dispute that Mr. Barr has in fact been helpful

to him. In Mr. Barr's July 19, 2006 Declaration, he explained as follows:

> 3. As Assistant to the Superintendent and as Grievance Coordinator [at SCI-
> Albion from 2001 to mid-2006], I had substantial direct contact with inmates,
> including inmate DeFranco. In addition to coordinating the grievance process.
> I personally handled information requests, assisted inmates with their problems
> and concerns, and dealt with family questions and issues.

(Barr's July 19, 2006 Declaration, at ¶ 3.) Mr. Barr made the following relevant and

undisputed statements directly related to Plaintiff:

> 4. Over the years, I had many positive dealings with inmate DeFranco and
> assisted him with numerous grievances, property issues, disputes with staff,
> and even transfers. For example, DeFranco received a misconduct
> (#A0294324) for threatening to kill a corrections officer and was placed in the
> Restricted Housing Unit pending transfer on March 24, 2002. Several
> members of his family called and pleaded with me to keep him at Albion. I
> spoke with the corrections officer in question about keeping DeFranco here at
> SCI-Albion, and after further discussion with the administrative staff, it was
> determined that he would continue to be housed at SCI-Albion and be
> separated from the officer by housing assignment.

(Id. at 4.) Based on Plaintiff's misconduct he was actually *scheduled* to be transferred out of

32

SCI-Albion on March 24, 2002, and it was only because of Mr. Barr that he was not

transferred.

Mr. Barr also assisted Plaintiff in regard to communicating with his lawyers and

family on other legal matters. On July 3, 2002, Plaintiff inquired of Mr. Barr regarding losing

his telephone privileges, in which he first stated "thank-you for your generous offer of making

sure I have ample time to work with my lawyers, I may need that." (Inmate's Request to Staff

Member, July 3, 2002, attached with Ex. 6 to Defendants' Brief in Support of Cross Motion.)

In response to Plaintiff, Mr. Barr stated "We will work on a[n] issue by issue basis with phone

calls. Just send me a request when you are working on a case that warrants extra phone time."

(Id.)

Plaintiff also sent a request to Mr. Barr when he was in the Restricted Housing Unit, in

which Plaintiff's main concern appears to be making sure that Mr. Barr does not have a

negative view of him based on other people's comments:

> Mr. Barr, as you probably know, I am now in the R.H.U. In this past March
> you told my family and I that I had one of the best files you had seen and that
> all the staff had good things to say about me. I am bringing this up because of
> how I believe people have you looking at me. Mr. Barr, honestly, I'm not a
> bad person and haven't done half the things people have told you. How could I
> be a good person for 10 years straight and then just like that turn into trouble. I
> am asking you to please look deeper into what anyone says about me. I'm not
> a troublemaker and just wanted to ask you to not accept every negative
> comment about me. Thanks for listening and caring.

(Inmate's Request to Staff Member, July 11, 2002, attached with Ex. 6 to Defendants' Brief in

Support of Cross Motion.) In response, Mr. Barr stated as follows:

> Please use the time in R.H.U. to evaluate what you can do to maintain yourself
> at SCI-Albion. I believe you do become too familiar with staff. You should
> not even think of staff on a first name basis . . . . I would personally like to see

33

you stay at SCI-Albion to keep from creating a hardship on your family. They call and show concern for you most inmates are not that lucky.

(Id.) We note that Mr. Barr's response in July 2002, came after he had already intervened to keep Plaintiff at SCI-Albion, and he was again encouraging him to behave in a manner that would allow him to stay at SCI-Albion.

On November 4, 2002, Plaintiff requested Mr. Barr's assistance with regard to shoes that had gone missing when he was in the R.H.U. (Inmate's Request to Staff Member, November 4, 2002, attached with Ex. 6 to Defendants' Brief in Support of Cross Motion.) Mr. Barr's response was that he had thought the issue was dealt with long ago and that it was decided that the value of the missing shoes was $53.99. (Id.) Mr. Barr informed Plaintiff that he "directed Inmate accounts to credit" him the $53.99. (Id.)

Plaintiff also points out that he has repeatedly warned, for years, that he would be transferred for seeking z-code status, and that Mr. Barr finally made it happen. However, the record evidence is clear that Plaintiff has always sought z-code status, and he has continually sought it during the time he was double celled, from August 2002 until November 2004, and he was never transferred during that time. The only time he was scheduled to be transferred was as a result of his misconduct, and it was Mr. Barr who intervened so that Plaintiff could remain at SCI-Albion.

Finally, we examine the evidence regarding Mr. Barr's motivation in requesting the transfer. First, the transfer petition shows that the purpose of the transfer was an administrative separation requested on February 15, 2005. (Pennsylvania Department of Corrections, Transfer Petition System - Permanent Petition for Anthony DeFranco, attached as

34

Ex. D to Plaintiff's Sworn Affidavit Authenticating His Exhibits.) The "Rationale for the

Transfer" states, in part, as follows:

> An administrative/Separation transfer is being requested due to litigation
> against William Barr, SCI-Albion's Superintendent's Assistant. Mr. Barr is the
> Institutional Grievance Coordinator and doesn't want any potential problems
> between this inmate and future potential grievances.

(Id.) Plaintiff filed a grievance on March 8, 2005, and the Initial Review Response was as

follows:

> Mr. DeFranco has a formal separation in place from Mr. Barr. It is felt that
> based on pending litigation it is in the best interest of all parties that he not be
> housed at SCI-Albion. No inmate has the right to determine where he or she
> will be housed.

(Official Inmate Grievance Initial Review Response, March 15, 2005, attached as Ex. B to

Plaintiff's Sworn Affidavit Authenticating His Exhibits.) On May 10, 2005, Superintendent

Marilyn Brooks allowed Plaintiff to be returned to SCI-Albion in resolution of his grievance.

(Appeal to Superintendent, May 10, 2005, attached as Ex. C to Plaintiff's Sworn Affidavit

Authenticating His Exhibits.)

Mr. Barr explained the events that occurred after the October 22, 2004 hearing that

motivated him to request the transfer as follows:

> 9. Mr. DeFranco misinterpreted my comments [of October 22, 2004] and filed
> another TRO Motion, claiming that I had threatened to transfer him "as a
> means of punishment for filing the lawsuit." (Doc. #9.) He also indicated that
> he was presently drafting an Amended Complaint naming me as a defendant as
> a result of what he believed was a "direct threat." He filed pleadings
> throughout the fall of 2004 and early 2005 in which he claimed that I had
> tampered with witnesses, made statements in a threatening and upset tone,
> misrepresented and manipulated the truth, and was part of a conspiracy to alter
> the truth. (Doc. #'s 21, 21.)

35

10. Inmate DeFranco seemed to become more and more obsessive in his allegations and focus upon my statements and actions. I grew concerned that Mr. DeFranco would not be able to accept any decision or recommendation by me or other staff, particularly as grievance coordinator, as DeFranco would inevitably view my actions (and the grievance process itself) as tainted or the product of a conflict of interest. Thus, I requested an Administrative/Separation transfer in mid-February 2005.

11. This transfer request was not intended to punish or retaliate against DeFranco for filing his lawsuit or pursuing his claim for Z-Code status. Rather, because of DeFranco's irrational mindset and obsessions with my role and decisions (which DeFranco had developed in preceding months), I believed that DeFranco would never believe that he was getting a fair shake at SCI-Albion. In my view, the transfer request would allow him to start fresh and pursue his concerns in a setting free of what he perceived to be conflict of interest and conspiracy.

(Barr's July 19, 2006 Declaration, at ¶¶ 9-11.) With regard to Superintendent Brooks'

decision to return Plaintiff to SCI-Albion, Mr. Barr stated as follows:

12. Ultimately, a decision was made to allow DeFranco to return to SCI-Albion as a reasonable means of resolving DeFranco's grievance concerning the transfer and his related motions in this federal court proceeding. I had no objection to that course of action. However, I believe then and now that my concerns about DeFranco's well-being, and about the integrity and effectiveness of the grievance process at SCI-Albion, were legitimate and warranted the transfer request.

(Id. at ¶ 12.)

Clearly, the critical time-frame on this issue begins on October 22, 2004. Plaintiff

offers no evidence that Mr. Barr had ever threatened to transfer him before that date, and he

offers no credible evidence that any other prison official had actually threatened him with a

transfer. Plaintiff is correct that he continually claimed that he had been threatened with a

transfer, and "warned" that he would eventually be transferred, but these amount to bare

allegations that we need not credit. Plaintiff attempts to add documentary support to these

36

allegations in the form of affidavits or testimony, however, it is clear that this evidence is merely proof that Plaintiff had told others of his belief that he had been threatened with a transfer, but not record evidence showing an actual threat. In addition, at various times during the multiple hearings in this matter when Plaintiff has complained of statements made by prisons officials the Court has advised Plaintiff that prison officials often say things to inmates to "keep them on their toes" and that prison officials are not obligated to be nice to inmates. Finally, Plaintiff's only allegation that Mr. Barr had threatened him is based on the October 22, 2004 conversation.

Plaintiff also does not dispute that prior to October 22, 2004, Mr. Barr was consistently supportive and helpful to him. He does not dispute that upon the urging of Plaintiff's friends and family members that Mr. Barr had intervened to make sure that Plaintiff stayed at SCI-Albion when he was actually awaiting transfer. Plaintiff's argument that the only reason he was not transferred from SCI-Albion was because prison officials wanted him to lead a peer group is not only unsupported, but also not credible on its face. He was facing a transfer because he had pled guilty to threatening to kill an officer. No reasonable factfinder could accept that this transfer was stopped because this particular inmate was needed for a prison program.

Plaintiff also submits an "Unsworn Declaration" dated November 26, 2004, from Michele Flavell, apparently a friend or family member of Plaintiff. (Unsworn Declaration Of Michele Flavell, November 26, 2004, attached as Ex. A to Plaintiff's Reply to Defendants' Submissions to Partial Summary Judgment (Doc. 208), and Doc. 26, which includes a letter from Michele Flavell). Ms. Flavell states that in the summer of 2002 she engaged in

37

numerous telephone conversations with Mr. Barr while Plaintiff was in the R.H.U to "make sure Tony wasn't transferred to another facility in central PA." (Doc. 26 & Ex. A to Doc. 208.) Ms. Flavell further states that it was not Mr. Barr who intervened to stop Plaintiff's transfer, but that the transfer was stopped "due to some program committee at Albion." (Id.) Ms. Flavell admits that at one time Mr. Barr did say that "he would help to keep [Plaintiff] at Albion due to his mother's heart troubles and family being so close," but that in the summer of 2002 he was "in no way on [Plaintiff's] side in trying to keep him at Albion.: (Id.) Ms. Flavell supports her statements with her assertion that Mr. Barr had told her that **"if it were up to [Mr. Barr] that [Plaintiff] would be transferred to the central of the State (Rockview) right now**.'" (Id. (bold in original))

Initially we note that Ms. Flavell's statement that the transfer was stopped due to some program committee is completely unsupported, and as noted above, not credible on its face. In addition, we find nothing in Ms. Flavell's declaration that undermines Mr. Barr's stated reasons for requesting that Plaintiff be transferred in February 2005. Nor is there any evidence in the statement to dispute that it was because of Mr. Barr that Plaintiff's transfer in 2002 did not occur. At best, Plaintiff argues that Ms. Flavell's declaration shows that Mr. Barr desired to have Plaintiff transferred in the summer of 2002, and that he finally was able to succeed on getting Plaintiff transferred in 2005.

We decline to accept this argument for two reasons. First, there is nothing inconsistent with Mr. Barr desiring that an inmate like Plaintiff not be his responsibility, and yet in his actual conduct perform acts that benefit the inmate, including assisting in making sure that he stay housed at SCI-Albion. In fact, the record evidence supports that Mr. Barr's conduct was

38

one of helping Plaintiff. Finally, had Mr. Barr truly wanted to have Plaintiff transferred in 2002 it is clear that his most opportune time to accomplish this goal was in 2002 when Plaintiff was actually going to be transferred based on Plaintiff's own misconduct. All Mr. Barr had to do was sit back and watch the transfer happen, but he did not. We therefore find that Ms. Flavell's declaration does not undermine or otherwise call into question Mr. Barr's motivations for requesting Plaintiff's transfer.

Plaintiff also attempts to negate the impact of the February 15, 2005 transfer petition by purporting to reveal the document as fraudulent in that it was either back-dated, or manufactured after the fact. (Plaintiff's Motion for Partial Summary Judgment, at 6, 8; Plaintiff's Reply to Defendants' Submissions to Partial Summary Judgment, at 5.) As proof that the transfer petition is fraudulent, Plaintiff notes that the petition is dated February 15, 2005, and states that an "administrative/Separation transfer is being requested due to litigation against William Barr, . . . ." (Plaintiff's Transfer Petition, Ex. D.) However, Plaintiff notes that there was no litigation against Mr. Barr until March 7, 2005. (Doc. 63.) Therefore, Plaintiff argues that Exhibit D was either fabricated after the fact, or the date on Exhibit D was forged to show that it occurred before the Court's February 28, 2005 Order. (Plaintiff's Motion for Partial Summary Judgment, at 8; Plaintiff's Reply to Defendants' Submissions to Partial Summary Judgment, at 5.)

Plaintiff's argument is unavailing as it depends entirely on an overly narrow focus on a literal interpretation of the term "litigation." According to Plaintiff, the only possible meaning of the term "litigation" in the transfer petition is that an actual document has been filed on the docket. The prison transfer petition is not a statute. Mr. Barr clearly explained in his affidavit

39

that Plaintiff had indicated "that he was presently drafting an Amended Complaint" to include Mr. Barr as a Defendant, and that "throughout the fall of 2004 and early 2005" Plaintiff had filed pleadings in the instant action claiming that Mr. Barr "had tampered with witnesses, made statements in a threatening and upset tone, misrepresented and manipulated the truth, and was part of a conspiracy to alter the truth." (Barr's July 19, 2006 Declaration, at ¶ 9.) Plaintiff does not address the fact that the above statements are consistent with the February 15, 2005 transfer petition explanation, even though Mr. Barr was not formally named as a defendant until March 7, 2005.  Plaintiff also fails to dispute that he did file pleadings claiming that Mr. Barr "had tampered with witnesses, made statements in a threatening and upset tone, misrepresented and manipulated the truth, and was part of a conspiracy to alter the truth." We find no significance in the fact that the transfer petition uses the term "litigation" at a time before Plaintiff named Mr. Barr as a Defendant.  We therefore conclude that no reasonable fact finder could reject the transfer petition as being fraudulent or forged.

Next, Plaintiff argues that Mr. Barr's stated reasons for requesting the transfer should not be accepted. Plaintiff's argument, in part, depends on the Court rejecting the transfer petition as fraudulent. The plain language of the transfer petition explains the reason for the transfer as "due to litigation," Mr. Barr the "Institutional Grievance Coordinator [] doesn't want any potential problems between this inmate and future potential grievances." (Ex. D.) Plaintiff must reject this reason, given at the time of the transfer, because it is consistent with Mr. Barr's Declaration explaining his reasons for the transfer. We of course do not reject the transfer petition, but instead find it compelling evidence in support of Mr. Barr's consistent testimony given in his Declaration.

40

Plaintiff's remaining arguments to reject Mr. Barr's stated reasons for the transfer are as follows. First, he points to the "Response" to his grievance about the transfer, which stated that the reason for the transfer was "a formal separation in place from Mr. Barr . . . . based on pending litigation." (Official Inmate Grievance Initial Review Response, March 15, 2005, attached as Ex. B to Plaintiff's Sworn Affidavit Authenticating His Exhibits.) However, for the reasons stated above, we find nothing in this Response that is inconsistent with Mr. Barr's stated reasons, although it is less complete than the reason stated in the February 15, 2005 transfer petition.

Next, Plaintiff argues that to accept Mr. Barr's reasons for requesting the transfer would allow prison officials to retaliate against any inmate who *might* file a grievance. (Plaintiff's Reply to Defendants' Submissions to Partial Summary Judgment, at 4.) This is a "slippery slope" argument that is simply not true. We examine retaliatory claims on a case by case basis. Our finding that Mr. Barr's reasons for requesting a transfer are legitimate does not mean that any prison official may legally transfer an inmate who files a grievance. We make such a ruling by considering all the relevant conduct, not just the prison official's stated reason.

Notably, Plaintiff fails to address that Mr. Barr outlined Plaintiff's specific conduct to explain and support his decision to request the transfer. Mr. Barr noted,

• that Plaintiff indicated he was drafting an amended complaint naming Mr. Barr as a defendant;

• that Plaintiff filed several pleadings alleging that Mr. Barr had tampered with witnesses, made statements in a threatening and upset tone, misrepresented and manipulated the truth, and was part of a conspiracy to alter the truth; and

41

• Plaintiff was increasingly obsessive in his allegations and focus upon Mr. Barr's statements and actions;

(Barr's July 19, 2006 Declaration, at ¶¶ 9, 10.) Plaintiff's conduct reasonably resulted in Mr. Barr "growing concerned that [Plaintiff] would not be able to accept any decision or recommendation by him or other staff, particularly as grievance coordinator [since Plaintiff] would inevitably view my actions (and the grievance process itself) as tainted or the product of a conflict of interest" and that he "would never believe that he was getting a fair shake at SCI-Albion." (Id. at ¶¶ 10, 11.)

Finally, Plaintiff also argues that Superintendent Brooks' decision to transfer Plaintiff back to SCI-Albion shows that Mr. Barr's reasons for requesting the transfer do not further a legitimate penological interest. (Plaintiff's Motion for Partial Summary Judgment, at 9.) The simple response to this argument is that Superintendent Brooks' "reasonable means of resolving the grievance" does not imply that she agrees that the initial transfer was an unlawful retaliation. In addition, her decision may, or may not, mean that she ultimately disagreed with Mr. Barr's reasons for requesting the transfer. We are not reviewing or second-guessing whether prison officials made the correct decision, we are reviewing whether Mr. Barr's reasons for the transfer were intended to punish Plaintiff or retaliate against him. Plaintiff may be right that Superintendent Brooks ultimately disagreed with Mr. Barr's reasons, but that does not mean that the reasons were not legitimate.

In fact, it is possible that Superintendent Brooks agreed with Mr. Barr's reasons, but ultimately decided that Mr. Barr and the prison would have to deal with the possibility that Plaintiff would have difficulty in the grievance process. Mr. Barr recognized this when he

42

stated that even though he had no objection to the Superintendent's decision to let Plaintiff come back to SCI-Albion, he still believed that his "concerns about DeFranco's well-being, and about the integrity and effectiveness of the grievance process at SCI-Albion, were legitimate and warranted the transfer request ." (Id. at ¶ 12.) While we consider the fact that Plaintiff was returned to SCI-Albion, we find no evidence from that action that would negate or undermine Mr. Barr's reasons for initially requesting the transfer. To do so would require the Court to second-guess prison officials about decision that they are in the best position to make.

Mr. Barr's stated reasons for requesting the transfer are consistent with the stated reason on the February 15, 2005 transfer petition. Mr. Barr's reasons are also consistent as an explanation as to why Mr. Barr's previous harmonious relationship with Plaintiff changed after the October 22, 2004 conversation. Moreover, it is clear that Mr. Barr did not threaten to transfer Plaintiff on October 22, 2004, nor did he promise that no transfer would occur. Plaintiff has offered no credible evidence to raise a genuine issue of material fact that Mr. Barr did not intend to punish Plaintiff or retaliate against him for filing the lawsuit or pursuing z-code status. We find that there is no genuine issue of material fact that Plaintiff's filing of a lawsuit and his pursuit of z-code status were not a substantial or motivating factor in Defendant Barr's request for a transfer. Accordingly, we will grant summary judgment in favor of Defendant Barr on Plaintiff's retaliatory transfer claim.

43

## B. Whether Barr Would Have Transferred Plaintiff Absent the Protected Conduct for Reasons Reasonably Related to a Legitimate Penological Interest

Assuming that Plaintiff can meet his burden of establishing causation, we agree with Defendant Barr that the record evidence also shows that he would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest. As set forth above, Plaintiff is unable to discredit Mr. Barr's reasons for requesting the transfer. As already discussed, we find that Mr. Barr's stated reasons for requesting the transfer are consistent with the stated reason set forth on the contemporaneous February 15, 2005 transfer petition and include specific undisputed conduct by the Plaintiff that explain the change in the relationship between Mr. Barr and Plaintiff after the October 22, 2004 hearing. We find that Mr. Barr's desire to protect the integrity of the grievance process, to eliminate the appearance of a conflict of interest, and to ensure that Plaintiff did not feel that he was not getting a "fair shake" at SCI-Albion, are legitimate penological reasons in light of Plaintiff's conduct set forth by Mr. Barr. Thus, there is no genuine issue of material fact that Mr. Barr's reasons for requesting the transfer are reasonably related to legitimate penological interests. Accordingly, we will also grant summary judgment in favor of Defendant Barr on Plaintiff's retaliatory transfer claim on this ground.

## III. Retaliation Claim against Showers

Finally, Plaintiff asserts a retaliation claim against Defendant Showers alleging that his z-code was removed on May 20, 2002, in retaliation for having stated to Showers in March 2002, that he intended to file a lawsuit because he was missing property. Plaintiff must show that he was engaged in a constitutionally protected activity, that he was subjected to adverse

44

action and that the protected activity was a substantial or motivating factor in the state actor's

decision to take the adverse action. Rauser, 241 F. 3d at 333-334.

Plaintiff's explains his protected activity as follows:

plaintiff approached defendant Showers, showed him the typed out grievance
in the hopes it would get him to help locate the missing property, and that is
when Showers threatened plaintiff, stating that he (plaintiff) would see how the
DOC deals with inmates who sue.

(Plaintiff's Interim Reply Brief, at 2.) Plaintiff does not claim that Showers' above-statement

was retaliation for intending to file a grievance, rather he alleges that the retaliatory conduct

occurred when Defendant Showers and Jackson began the z-code review process on May 20,

2002, ultimately culminating in the removal of Plaintiff's z-code as a result of the June 24,

2002 staffing. (Plaintiff's Cross Motion for Summary Judgment, at 3; Plaintiff's Interim

Reply Brief, at 2-3.)

Assuming that Plaintiff's threat to file a lawsuit over his missing personal property is

protected activity, Plaintiff is unable to establish that his threat to file a lawsuit was a

substantial or motivating factor in the removal of his z-code on June 24, 2002. The Vote

Sheet for the staffing for z-code status dated June 24, 2002, shows that all staff members

voting, not just Defendant Showers, voted against granting Plaintiff z-code status. (Vote

Sheet, June 24, 2002, attached as part of Ex. 3 to Plaintiff's Brief in Support of Cross

Motion.) We agree with Defendants that there is "nothing in the record except plaintiff's

unsupported beliefs and assumptions to suggest that Jackson or Showers' votes were

motivated by a desire to impose further punishment or that they dictated the votes of the other

staff members." (Defendants' Brief in Opposition to Plaintiff's Cross Motion, at 3-4.)

45

Plaintiff attempts to portray the z-code staffing, begun on May 20, 2002, as nefarious, but the record evidence demonstrates that the staffing was standard procedure since Plaintiff had just arrived on the new unit in April 2002. (Ex. 15 to Defendants' Brief in Opposition to Plaintiff's Cross Motion.) Moreover, a psychologist interviewed Plaintiff before completing a form in which she recommended that "his medications should be addressing his needs for his panic disorder. Circulate vote sheet to determine continued need for Z-code." (Form DC-97 attached to Ex. 15.) We understand that Plaintiff disagrees with the psychologist's recommendations, and he faults the prison for not consulting a psychiatrist or other medical professional about his medications, however, he does not offer credible evidence to show that the psychologist was somehow involved in a conspiracy with Defendants Showers and Jackson.

Moreover, he offers no credible evidence to show how it was that Defendants Showers and Jackson influenced, manipulated or dictated the votes of the others who voted against Plaintiff receiving a z-code. All Plaintiff can offer is his unfounded assertions of a conspiracy and irregular procedures, all apparently commanded by Defendant Showers because Plaintiff had threatened to sue over his missing personal property. Under these circumstances we find there is no genuine issue of material fact that Plaintiff's threat to institute legal action was not a substantial or motivating factor in the denial of Plaintiff's z-code on June 24, 2002. Because Plaintiff cannot establish the causation element we will grant summary judgment in favor of Defendant Showers on this claim.

46

## IV. Conclusion

Rule 72 of the Federal Rules of Civil Procedure provides in pertinent part: "the district court may accept, reject, or modify the recommended decision, receive further evidence, or recommit the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b). We accept the Report and Recommendation, filed on November 8, 2007, insofar as it recommended granting Defendants' Cross-Motion for Summary Judgment (Doc. 201) with regard to Plaintiff's retaliation claim related to the removal of his z-code status in retaliation for Plaintiff threatening to kill a corrections officer. We will adopt the relevant parts of the Report and Recommendation as to this issue as the Opinion of this Court.

We reject the Report and Recommendation insofar as it recommended that Defendants' Cross-Motion for Summary Judgment (Doc. 201) be denied. We will grant summary judgment in favor of Defendants with regard to Plaintiff's retaliation claim related to the removal of his z-code status in June 2002 allegedly as a result of Plaintiff's comment to Defendant Showers that he intended to sue the institution. We will also grant summary judgment in favor of Defendants with regard to Plaintiff's Eighth Amendment deliberate indifference claim related to the removal of, and refusal to reinstate, Plaintiff's z-code status. Finally, we will grant summary judgment in favor of Defendants with regard to Plaintiff's retaliatory transfer claim asserted against Defendant Barr.

An appropriate Order will be entered.

_March 3, 2008_
Date

_Maurice B. Cohill, Jr._
Maurice B. Cohill, Jr.,
Senior District Judge

47