IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

**FILED**

MAR 1 2 2008

CLERK ___ DISTRICT COURT
___ ___ OF PENNSYLVA___

ANTHONY DeFRANCO,
                Plaintiff

      V.

WILLIAM WOLFE, et al.,
                Defendants

No. 04-230-E
District Judge Cohill

## MOTION FOR RECONSIDERATION

AND NOW, comes Plaintiff, pursuant to Civil Rules of Procedure, Rule 59, asking this Honorable Court to reconsider its March 3, 2008 Order, granting summary judgment to Defendants, and in support avers as follows:

Plaintiff has set forth his request in order of the Opinion and Order entered by the Court on March 3, 2008 (Doc 291).

I.   Dr. Lindemuth's October 2, 2005 Declaration

Doctor Lindemuth provided a Declaration subsequent to the testimony she gave before Magistrate Judge Baxter on December 17, 2004. While the Magistrate Judge sat through the hearing and has been able to determine credibility issues by virtue of conducting all of the hearings and rulings on pre-trial matters, the Judge agreed that there exists questions of material fact regarding Dr. Lindemuth (Doc 288). While this Court states that Dr. Lindmeuth's 10/2/05 Declaration is congruent with her testimony and other reports, therefore not raising a genuine issue of fact for trial. However, Dr. Lindemuth testified during the 12/17/04 hearing that she would _not_ have signed or have written her Reports for a federal court to read. The Court specifically asked the doctor if she would have written the report if she had known that

a court would order a z-code. Dr. Lindemuth answered "No" (12/17/04 Dr. Lindemuth p. 30). Also, she testified under cross-examination that she would not have written the letter had plaintiff not insisted that she do so (Id. at 51). The doctor was "astounded" that her memo caused the federal court to grant z-code and it was not what she intended (Id. at 15). The memo was met for the D.O.C. not the federal court to see. The memo was sort of a therapeutic maneuver, it wasn't the result she intended, it was the act of writing the memo to appease the inmate (Id. at 10-12). The memo was for the z-code committee and she did not expect it to be applied in any other fashion (Id. at 48). Her testimony was that she wrote the memo as therapy and to appease plaintiff. However, she signed the 10/2/05 Declaration after she resigned from the D.O.C. and was no longer Plaintiff's treating physician.

Regarding the doctor's November 8, 2004 affidavit, the doctor testified she did not write the affidavit, Mr. Barr did (Id. at 8). She "concurred" with Mr. Barr that she did not plan on the memo going to federal court (Id. at 10). This affidavit stated plaintiff had misused and manipulated her reports to gain z-code status and Plaintiff questioned her about that and the doctor's reply was that she did not expect the reports to go outside the "z-code committee" and Plaintiff took it around the policy of the institution (Id. at 48).

Coincidentally, after the October 22, 2004 TRO hearing in which Mr. Barr directly threatened Plaintiff with a transfer, Barr summoned Dr. Lindemuth to a room and admonished her about writing the reports, his concern was a dangerous precedent being set and the prison being told what to do by the court (Id. at 74-76). Mr. Barr directed the

doctor not to write reports again.  First, Mr. Barr had no right to dictate to this doctor on what to do regarding being a physician. Second, his actions were to intimidate this material witness into doing what he wanted.  Which led to the doctor signing the 11/8/04 affidavit claiming Plaintiff misused and manipulated the reports by producing them to the court.  Barr's actions were also the cause for the doctor's long and confusing testimony.  Dr. Lindemuth was scared and intimidated by Mr. Barr.  Given the fact this doctor signed a Declaration subsequent to the testimony given indeed shows conflicting testimony.  Notably, Dr. Lindemuth was no longer Plaintiff's doctor and no longer employed by the D.O.C. when she signed the Declaration.  Without question she knew it would be used in federal court.  This fact, coupled with Defendant Barr's actions just prior to the 12/17/04 hearing, speaks volumes and is inconsistent with her testimony.

This Court stated (erroneously) that Dr. Lindemuth did not see the nitroglycerin intake reports but relied on what Plaintiff told her (Doc 291 at 9).  Dr. Lindemuth testified that she had Plaintiff's medical file and verified it was true about the nitroglycerin intake (12/17/04 Lindemuth, pp. 70-77).  It is therefore clear Dr. Lindemuth saw and verified the fact of Plaintiff's nitroglycerin intake increasing (contrary to nurse Rebele's testimony).  While nurse Rebele testified Plaintiff's nitroglycerin intake decreased, her testimony was uncertain and mistaken.  In fact, she testified Plaintiff's first refill was in July 2003 (one month after initial prescription.  This testimony is at best speculation notwithstanding the fact the Ms. Rebele had access to Plaintiff's medical file.  She testified from recollection which turned out to be uncertain.  While Ms. Rebele and Dr. Lindemuth

3

testified, Plaintiff attempted to gain access to his medical file so he could question the veracity of their testimony. The Defendants represented to the court Plaintiff was <u>not</u> permitted to see his medical file per D.O.C. policy (this was a patent misrepresentation to the truth as inmates are allowed to inspect their medical files). The untruth by the defendants stopped Plaintiff from accessing his medical file during this critical stage in the proceedings (12/17/04 Dr. Lindemuth p. 21-23). Ms. Rebele's testimony is unreliable at best. Her uncertainty and counsel's questions which stated alleged facts are all reasons her testimony is unreliable.

II. Plaintiff's Inmate's Request to Staff Member

As the Court noted in the Opinion, Plaintiff was given a new staffing at SCI Smithfield in 2005. While the Court focused on the vote sheets writing, it over-looked a critical part: the date the vote sheet was made and the counselor's comments regarding the previous federal court order is April 18, 2005. Contained in the same comment section, the counselor noted that a "PRT" (Psychiatric Review Team) was convened earlier on April 13, 2005 and the consensus was that Plaintiff keep his z code. The PRT held its meeting <u>prior</u> to the vote sheet preparation referencing the court's action. The PRT is a group of doctors and psychologists that hold a meeting to determine if an inmate requires z code status. The PRT determined, independently, that Plaintiff required the z code. Moreover, the Court over-looked Plaintiff's request to his counselor where Plaintiff referenced a prior meeting where the counselor informed him that he would speak with the Unit Manager and By-pass a formal vote on permanent z code status.

4

Mr. Zimmerman-I am writing regarding our meeting on whether Mr. Compopiono agreed with you to by-pass the vote sheet and leave me on permanent z-code status. Thank you for taking the time to talk with me and your help.

Answer:   He met with psychology, and the agreement is to have it remain for now, with a review of it in a month.  Apparently, there were some medication adjustments made that Psychology wants to see how you adjust to before any review is made to determine if the Z code is still needed.  Signed K. Zimmerman 3-18-05.

(Doc 229, Plaintiff's Motion For Summary Judgment, attached as Ex. "M").  All of this evidence shows that Plaintiff was not just given a Z code at SCI Smithfield due to prior court action.  Rather, it demonstrates that SCI Smithfield made medication adjustments and thereafter felt Plaintiff required Z code status, only after doctors convened a "PRT" prior to the vote and medically determined Plaintiff required the Z code.

Moreover, the Court is over-looking the fact that SCI Albion also felt Plaintiff required the Z code--in 2000 the Chief Psychologist "highly recommended" it (Magistrate's R & R, p. 8 n.4).  Plaintiff maintained Z code at SCI Albion from 2000-2002.  It was only after Plaintiff received misconducts and engaged in grievance filing was the Z code removed.  So, SCI Albion also knew Plaintiff required Z code status.  They prescribed it to him in 2000.  Also, contained in Defendants summary judgment motion they attached Defendant Chief Psychologist Reilly's answer to interrogatories where Defendant Reilly admits that treating Plaintiff's psychiatric needs by Z code is in his best interests:

3. Progress note of December 20, 2002: Inmate was concerned with the threat of moving to single cell status. Currently inmate DeFranco is being treated for general anxiety disorder through psychiatry and he is a member of the mental health roster. Inmate DeFranco stressed that he genuinely needed to maintain his Z code. The subject appears in need of single cell status at this time. Certainly treating his psychiatric needs is in the subject's best interest. It appears that inmate DeFranco is requesting reassurance that his single cell would not be abruptly removed. Maintain Z code status for inmate. Staff for Z code status. S. Reilly, Chief Psychologist.

(Doc 204, Ex. "11" ¶3). Without question SCI Albion staff knew and believed Plaintiff required Z code status in December 2002. Completely congruent with SCI Smithfield staff.

   3. Dr. DeFranco's History & Report on Anthony DeFranco

   The Court states that no doubt any doctor, ignoring the limitations on the prison setting, would arrive at the same "ideal" conclusion about Plaintiff's single cell. It would be unrealistic to ask Dr. DeFranco to render an opinion on other inmates who are similar should not be single celled. His medical expert opinion was that Plaintiff required it, and by the prison's removal of it caused  irreparable harm. Dr. DeFranco was privy to medical information through prison doctors, the hearing on 12/17/04 and receiving information from Plaintiff. As stated, while Dr. Lindemuth testified other inmates (a dozen or so)(12/17/04 Lindemuth p. 33-34) fit Plaintiff's situation but none are given single cell. First, no one knows if these 12 other inmates even wanted a single cell. Second, as noted through the doctor's testimony, she testified under extreme duress and there is no evidence of 12 other similar situated inmates. The major point is that regardless, a prison cannot refuse "treatment" to save money. Monmouth County Corr.Inst.Inmates v. Lanzaro, 834 F.2d 326, 347 (3rd1987). Dr. DeFranco and Lindemuth's statement say specifically

6

that Defendants action cause[d] **irreparable injury** and that Plaintiff requires Z code status. Dr. DeFranco did not say "idealy", he stated directly Plaintiff requires Z code. Plaintiff medically requires Z code status and would under any setting, prison or otherwise. Furthermore, Dr. DeFranco's Report is completely accurate. Plaintiff was consuming nitroglycerin at an increasing rate (June 2003-November 2004) in that Plaintiff did not require the drug until <u>after</u> being forced to double cell. Since November 2004 Plaintiff's nitroglycerin intake decreased dramatically. Ms. Rebele's testimony was not accurate and her recollection on many matters were incorrect. Dr. DeFranco had been in contact with Plaintiff's doctors at SCI Pittsburgh, Albion and Smithfield. To discredit Dr. DeFranco's Report based on the testimony of Ms. Rebele would not only be unfair, it would be contrary to established law. During Ms. Rebele's testimony she looked to Plaintiff for help when she had supposedly just read his file (12/17/04 Rebele, p. 59). Even the Magistrate Judge cautioned her not to look for Plaintiff for help in testifying. Therefore her testimony regarding Plaintiff's nitroglycerin is unreliable. The Defendants even stopped Plaintiff from access his medical file at the 12/17/04 hearing as already stated. Additionally, during discovery, Plaintiff attempted to have copies of his medical file at his own expense (.10 cents per page). The Defendants were attempting to charge Plaintiff some $54.00 for 24 pages which he could not afford. Plaintiff requested the Court to order Defendants to give him his copied pages (Doc 239) at the normal .10 per page rate. This Court ultimately denied the request suggesting Plaintiff ask his family to help pay the $54.00 dollars (Doc 239). The Defendants strategically stopped Plaintiff

from having those pages by inflating the cost.

It appears this Court has weighed the credibility of witnesses and evidence(e.g. Defendants Dr. Baker vs. Dr. DeFranco)(Doc 291 at 16). Plaintiff suggests this is legal error. See, Anderson v. Liberty Lobby, 477 U.S. 242, 255 (1986), evaluating credibility, the court will not do--weighing evidence and drawing inferences are all functions for the jury. In Hunt v. Cromarite, 526 U.S. 541, 550-55 (1999), the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, all reasonable inferences will be drawn in the non-moving party's favor. It appears this Court has weighed evidence and witness credibility in granting summary judgment to Defendants. Plaintiff would ask the Court to reconsider.

C. Deliberate Indifference

This Court stated under this subject matter that the prison did not ignore Dr. Lindemuth's memos (Doc 291 at 21). This is simply untrue as proven by Defendant Reilly's answer to interrogatories. Specifically, it was asked if the Defendants received Dr. Lindemuth's reports dated September 2002 and August 2004. Defendant Reilly answered "yes" that they received the September 2002 memo but does not what was done as a result. Although according to Defendant Reilly, it should have generated a Z code staffing (Doc 204, Ex. "12"). This Court has all of the Z code vote sheets and none were done as a result of Dr. Lindemuth's Reports. The prison did in fact ignore the doctors recommendations.

II. Retaliatory Transfer Claim

First, this Court ruled less then 1 year ago that this claim should go to trial (Doc 279 at 3). Specifically, the Court stated:

> In light of this evidence it is certainly possible that a jury could find that Mr. Barr transferred Mr. DeFranco in retaliation for engaging in constitutionally protected activity. However, it is also possible that a jury could find that Mr. Barr's reasons for transferring Mr. DeFranco were not retaliatory. The burden will be on Mr. Barr to convince the jury that he transferred Mr. DeFranco for the reasons stated in his affidavit. Mr. Barr will also have to explain to why he did not offer a full explanation for the transfer earlier. Questions of the credibility of witnesses and determinations of contested facts are for the fact-finder, not a court sitting in summary judgment, There exists genuine issues of material fact that make summary judgment on this claim inappropriate.

This Court had all of the record evidence during the time it made this ruling on June 11, 2007. There has been absolutely no further evidence submitted since that time. Further, even the Magistrate Judge stated there were questions raising genuine issues of material fact in her R & R (Doc 272 at 16-17). The Magistrate Judge saw and heard Defendant Barr and is the best person to make credibility determinations.

The Court has echoed the Defendants statements that a z-code cell was only "free up" by displacing another inmate is untrue. The Unit Manager approached another inmate once Plaintiff was granted the TRO and asked that inmate to move to another single cell on a higher custody level Unit. This was the Unit Manager's decision. He could have as simply moved Plaintiff to the higher custody Unit instead. They were both single cells. In other words, the Defendants could have simply instructed Plaintiff to move to that Unit and it would not have involved any other inmate.

The Court went on at length regarding the relationship between Mr. Barr and Plaintiff. Plaintiff has stated that in early 2002 Mr.

Barr treated him fairly. However, in the summer of 2002 Mr. Barr wanted Plaintiff transferred. Attached to Plaintiff's amended complaint he submitted exhibits where it conclusively shows Mr. Barr's antagonism. Plaintiff advised Mr. Barr of how terrible it was being on that Unit and asked if he could be moved. Plaintiff explained how staff treated him and set him up. Barr replied "NO" (Doc 75, Ex. "D"). Also, while in the RHU Plaintiff wrote Barr wanting to be sure he did not end the wrong grievance. Mr. Barr stated he would not tamper with it claiming he believed Plaintiff knew which grievance he wanted to end. Within days of sending Barr the first request slip Plaintiff was receiving retaliatory misconducts and sent to the RHU. It was during this specific time period that Plaintiff was on the transfer list (not in March 2002 as Mr. Barr stated in his affidavits). Barr misrepresented the truth in his affidavits as there were no planned transfer in March 2002. When Michele Flavell telephoned Barr in the summer of 2002 he told her he would have Plaintiff transferred "right now" if it were up to him (Doc. 26). In further support of the Flavell Declaration is the answer to interrogatories of Defendant Reilly who stated in response to questions that the transfer was scheduled in August 2002 and that he told the "PRC" (Program Review Committee) Plaintiff should stay at SCI Albion due to his good behavior (Doc 204, Ex. "11" ¶12). This corroborates Ms. Flavell that the transfer was scheduled for the summer of 2002 and not March 2002 as Mr. Barr stated. It further corroborates her in that the "PRC" stopped the transfer and not Mr. Barr. Defendant Barr's self-serving affidavit should not be able to over-come summary judgment, Ennis v. Nation Assin of Business, 53 F.3d 55, 62 (4th1995). Or, as here, grant summary judgment in Defendant's

favor based upon his self-serving affidavit.  Plaintiff filed a verified amended complaint where he specifically stated Mr. Barr <u>threatened</u> him after the 10/22/04 TRO hearing.  It was not an "explanation" of bed space as Barr contends, it was a <u>direct</u> threat.  While Ms. Rebele gave an affidavit, her testimony establishes that she was not in the room the entire time and she was not sure about much.  Nevertheless, Mr. Barr directly threatened Plaintiff that day.

Defendant Barr did convey to the Magistrate Judge that he had no plans to transfer Plaintiff during the hearing, whether recorded verbatim or not.  The Judge heard him as well as Plaintiff.  During Ms. Rebele's testimony, it was established by Judge Baxter Mr. Barr stated there were single cells available at SCI Albion at that time (12/17/04 Rebele, p. 79-80).

The Court also made a patent error in claiming Plaintiff stated the Defendants did not transfer him due to their need of him to run a peer group.  Plaintiff has never made such an argument as this Court stated (Doc 291 at 37).

All of the assertions by Plaintiff about him intimidating and tampering with witnesses were true.  Dr. Lindemuth testified that Barr summoned her to a room where he admonished her and directed her not to write reports for inmates again.  His concern was not for Plaintiff but setting a dangerous precedent and opening flood gates (12/17/04 Lindemuth p. 74-76).  Even Judge Baxter was amazed that Barr did that saying, "did he say all of those things to you."  So these actions by Mr. Barr were not delusions, they were true actions by Barr. Plaintiff was not obsessive, he was referencing what transpired and proven by Dr. Lindemuth's testimony.

Finally, Defendant Barr told this Court Plaintiff was on a transfer list on March 24, 2002 after receiving misconduct (#A0294324), and that he was somehow reasonable for the transfer not going through (Doc. 204 Barr Affidavit, Ex. "2" ¶4). This Affidavit by Mr. Barr is a fabrication. Plaintiff was not on a transfer list in March 2002. As stated in the Flavell Declaration (Doc 26) and Defendant Reilly's Answers to Interrogatories (Doc 204, Reilly Ex. "11") Plaintiff was scheduled for transfer in August 2002 after being sent back to the RHU in July 2002. As further support establishing Mr. Barr has fabricated the truth, attached hereto and marked Ex. "A" is a copy of the August 2002 transfer hold on Plaintiff. Defendant Reilly, as above stated, even admitted the transfer was August 2002 and that him and the "PRC" discontinued it. And, Mr. Barr's very own counselor admitted as much through his question to Dr. Lindemuth, stating the transfer request was the summer of 2002 (12/17/04, Lindemuth p. 61).

Based upon this compelling evidence, Plaintiff asks this Court to reconsider its Order (Doc 291) and allow this case to proceed to trial.

March 9, 2008

Respectfully submitted,

Anthony DeFranco CZ-3518
10745 Route 18
Albion, Pa. 16475-0002

cc: Attorney General
counsel for defendants'

DC-141    PART I       COMMONWEALTH OF PENNSYLVANIA

MISCONDUCT REPORT OR OTHER    DEPARTMENT OF CORRECTIONS       **A** 296525

| Number | Name | Institution | Incident Time 24 Hr. Base | Incident Date | Date of Report |
|---|---|---|---|---|---|
| 5518 | DEFRANCO | SCIA | 1930 | 8-9-02 | 8-9-02 |

Place of Incident: H/D-22    RHU

### OTHER INMATES OR STAFF INVOLVED OR WITNESSES (CHECK I OR W)

| DC Number | Name | I | W | DC Number | Name | I | W |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

**MISCONDUCT CHARGE OR OTHER ACTION**    DC-ADM 802 VI 'A' 1.h

**STAFF MEMBER'S VERSION**

YOU ARE BEING TRANSFERRED TO ADMINISTRATIVE CUSTODY IN ACCORDANCE WITH DC-ADM 802 VI A. 1. h. THE INMATE IS BEING HELD TEMPORARILY FOR ANOTHER AUTHORITY AND IS NOT CLASSIFIED FOR THE GENERAL POPULATION OF THE HOLDING INSTITUTION. INMATE IS PENDING TRANSFER TO ANOTHER INSTITUTION.

**IMMEDIATE ACTION TAKEN AND REASON**

**PRE-HEARING CONFINEMENT**

IF YES

☐ YES
☒ NO

TIME          DATE

☐ REQUEST FOR WITNESSES AND REPRESENTATION

FORMS GIVEN TO INMATE
☐ INMATE'S VERSION

| REPORTING STAFF MEMBER SIGNATURE AND TITLE | ACTION REVIEWED AND APPROVED BY RANKING C.O. ON DUTY     SIGNATURE AND TITLE | DATE AND TIME INMATE GIVEN COPY |
|---|---|---|
| LT. D. JONES | M. Cord CO IV | DATE 8-9-02   TIME 24 HOUR BASE 1930 |

YOUR HEARING MAY BE SCHEDULED ANY TIME AFTER
DATE          TIME

Misconduct Category
☐ CLASS 1   ☐ CLASS 2

Signature of Person Serving Notice
MC INTOSH CO

### NOTICE TO INMATE

You are scheduled for a hearing on this allegation on the date and the time indicated or as soon thereafter as possible. You may remain silent, if you wish. Anything you say will be used against you both at the misconduct hearing and in a court of law if this matter is referred for criminal prosecution. If you choose to remain silent, the hearing committee/examiner may use your silence as evidence against you. If you indicate that you wish to remain silent, you will be asked no further questions. If you are found guilty of a Class I misconduct, any pre-release status you have will be revoked.

WHITE —DC-15      YELLOW—Inmate Cited      PINK—Staff Member Reporting Misconduct      GOLDENROD—Deputy Superintendent